# EXHIBIT 2

# United States District Court
# Eastern District of Pennsylvania (Philadelphia)
# CIVIL DOCKET FOR CASE #: 2:18-cv-00753-CDJ

CLANCY v. PENNSYLVANIA HIGHER EDUCATION
ASSISTANCE AGENCY
Assigned to: HONORABLE C. DARNELL JONES, II
all others Case: 2:18-cv-00031-CDJ
Cause: 28:1332 Diversity-Other Contract

Date Filed: 02/21/2018
Jury Demand: Plaintiff
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

## Plaintiff

**CAROL CLANCY**
*ON BEHALF OF HERSELF AND ALL*
*OTHERS SIMILARLY SITUATED*

represented by **MARC H. EDELSON**
EDELSON & ASSOCIATES, LLC
3 TERRY DR SUITE 205
NEWTOWN, PA 18940
215-867-2399
Fax: 267-685-0676
Email: medelson@edelson-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**PENNSYLVANIA HIGHER**
**EDUCATION ASSISTANCE AGENCY**
*doing business as*
FEDLOAN SERVICING
*doing business as*
AMERICAN EDUCATION SERVICES

| Date Filed | # | Docket Text |
|---|---|---|
| 02/21/2018 | 1 | COMPLAINT against PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY ( Filing fee $ 400 receipt number PPE173852 filed by CAROL CLANCY. (Attachments: # 1 Civil Cover Sheet)(jaa, ) (Entered: 02/22/2018) |
| 02/21/2018 | | 1 Summons Issued as to PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY. Forwarded To: COUNSEL on 2/22/18 (jaa, ) (Entered: 02/22/2018) |
| 02/21/2018 | | DEMAND for Trial by Jury by CAROL CLANCY. (jaa, ) (Entered: 02/22/2018) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/22/2018 14:56:20 | | |
| **PACER** | achristina:5288197:0 | **Client Code:** | 2825 |

| Login: | | | |
|---|---|---|---|
| **Description:** | Docket Report | **Search Criteria:** | 2:18-cv-00753-CDJ |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CAROL CLANCY, on behalf of herself and all others similarly situated, | )<br>)<br>)<br>) Civil Action No. |
| Plaintiff, | ) |
| v. | )  18   753 |
| PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY d/b/a FEDLOAN SERVICING d/b/a AMERICAN EDUCATION SERVICES, | )<br>)<br>)<br>) JURY TRIAL DEMANDED |
| Defendants. | ) |

**FILED**

FEB 2 1 2018

KATE BARKMAN, Clerk
By_____Dep. Clerk

## CLASS ACTION COMPLAINT

Plaintiff Carol Clancy ("Plaintiff"), on behalf of herself and all others similarly situated, brings this class action against Defendant Pennsylvania Higher Education Assistance Agency ("PHEAA" or "Defendant") for various common law causes of action and, upon knowledge or information and belief, alleges as follows:

## NATURE OF THE ACTION

1.      As of December 2017, the total amount of outstanding student loan debt in the United States is $1.41 trillion and represents the second largest category of consumer debt behind housing-related debt. The vast majority of these student loans are owned by the United States Department of Education ("DOE").

2.      PHEAA is one of four (4) primary servicers of federal student loan debt. It has served in this role since June 2009, operating under the trade name FedLoan Servicing

("FedLoan"). Currently, PHEAA manages a loan portfolio valued at approximately $330 billion.

3.    DOE pays PHEAA approximately $2.09 per month to act as an intermediary between itself and each of the nearly 7.5 million federal loan borrowers PHEAA services. In addition, PHEAA earns interest on the loans in its portfolio and receives various subsidies and special allowance payments from DOE.

4.    As one of the primary federal loan servicers, PHEAA is responsible for, among other things, collecting payments and administering federal programs designed to ease the burden of crushing student loan debt.

5.    For example, in February 2012, PHEAA became solely responsible for administering two (2) of these federal programs: the Public Service Loan Forgiveness ("PSLF") program and the Teacher Education Assistance for College and Higher Education ("TEACH") grant program. Congress designed each of these programs to incentivize public service by those pursuing higher education. Specifically, both programs provide complete forgiveness of outstanding federal student debt for borrowers who make a total of one hundred twenty (120) payments while engaged in qualifying public employment.

6.    To take advantage of the PSLF and TEACH programs, borrowers must apply to PHEAA. PHEAA then processes the applications and approves eligible applicants. Importantly, a borrower's loan payments do not begin to count towards forgiveness until PHEAA approves the borrower's application.

7.    Undoubtedly, the PSLF and TEACH programs have benefited borrowers who serve the public with their education, as well as those members of the public who are served.

2

But helping these borrowers get out of debt sooner directly conflicts with PHEAA's financial interest in collecting interest and servicing fees on active loans.

8.  Starting in June 2009 and through the present ("the Class Period"), PHEAA orchestrated a scheme to undermine the PSLF and TEACH programs and boost its own revenue. This scheme was comprised of at least the following three (3) unlawful acts:

   a.  First, PHEAA delayed, or unjustifiably failed to process altogether, applications under the PSLF and TEACH programs. By doing so, PHEAA was able to extend the date by which eligible borrowers could have their loans forgiven. This allowed PHEAA to lengthen the duration of the loans and collect more in monthly servicing fees. This deceptive conduct by PHEAA directly harmed eligible borrowers who, as a because of the unjustified delay, were forced to make extra payments on loans that should have (and could have) been forgiven sooner.

   b.  Second, PHEAA delayed, or unjustifiably failed to process altogether, applications under federal Income Driven Repayment ("IDR") plans, including 2015's Revised Pay As You Earn ("REPAYE") program. Using certain guidelines, IDR programs limit an eligible borrower's monthly payment to a fixed percentage of their income. They also provide the borrower with complete loan forgiveness after twenty years of repayment. Like the harm caused by PHEAA's delayed processing of PSLF and TEACH program applications, the harm caused by its delayed IDR processing directly harmed eligible borrowers who, as a because of

3

the unjustified delay, were forced to make extra payments on loans that should have (and could have) been forgiven sooner.

c.      Third, PHEAA improperly placed borrowers who were current on their payments into "deferment" or "forbearance" status. "Deferment" and "forbearance" are usually granted to those borrowers who cannot make their monthly payments due to financial hardship. Borrowers who are in "deferment" or "forbearance" status cannot make payments that count towards loan forgiveness under the PLSF, TEACH, or IDR programs. But PHEAA still collects monthly fees for servicing their loans. PHEAA's improper "deferment" or "forbearance" designations, therefore, artificially increased its revenue by extending the duration of loans under the PLSF, TEACH, or IDR programs.

9.      The Consumer Financial Protection Bureau ("CFPB") has confirmed complaints by borrowers nationwide of similar misconduct by PHEAA in its administration of the PSLF, TEACH, and IDR programs. PHEAA's unlawful conduct caused borrowers to suffer major inconvenience and ascertainable financial harm insofar as it resulted in: (1) the unnecessary extension of loan duration, (b) accrued interest on the principal balance of loans during improperly designated periods of deferment or forbearance, (c) monthly payments under IDR programs billed at inaccurate levels, and (d) additional fees caused by the PSLF, TEACH, and IDR processing delays.

10.     Regrettably, PHEAA's unlawful scheme was highly successful. Its own financial statements reveal that during the Class Period, its revenue from servicing federal

4

loans increased annually. This revenue increase is directly related to the illegal acts complained of herein and derives from unjustified expenses imposed on borrowers, like Plaintiff and the Class, who were subjected to one or more of PHEAA's unlawful tactics during the Class Period.

## JURISDICTION AND VENUE

11. This Court has minimal-diversity jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2) because: (1) the aggregate amount in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs, (2) PHEAA is a citizen of the Commonwealth of Pennsylvania, and (3) there are Class Members (including Plaintiff) who are citizens of a different State.

12. This Court has general personal jurisdiction over PHEAA because: (1) PHEAA is incorporated under the laws of the Commonwealth of Pennsylvania, and (2) PHEAA maintains its principal place of business within the Commonwealth of Pennsylvania.

13. Venue is proper in this District under 28 U.S.C. § 1391(b), (c), and (d) because, during the Class Period, PHEAA resided and transacted business in this District from an office is Chester, Pennsylvania.

## PARTIES

14. Plaintiff Carol Clancy is a natural person who resides in Florissant, St. Louis County, Missouri. Plaintiff borrowed federal student loans to pay for her undergraduate education. Since at least September 2013, FedLoan has been Plaintiff's loan servicer.

15. FedLoan informed Plaintiff Clancy that her loan would be placed in good standing if timely payments were made in 9 out of 10 months. Plaintiff Clancy has made timely

payments since her loans were transferred to Defendant PHEAA each and every month as she has been on a direct deposit program, yet despite these timely payments, her loan has not been placed in good standing. As such, Plaintiff Clancy's credit report reflects a much lower value than it should.

16.     Defendant PHEAA's failure to correctly process Plaintiff Clancy's loan payments has resulted in a loss of credit for what otherwise would have been years of qualified payments under the PSLF program, thereby significantly extending the duration of her student loans.

17.     Defendant PHEAA is a for-profit corporation incorporated and existing under the laws of the Commonwealth of Pennsylvania. PHEAA maintains its headquarters at 1200 N. 7th Street, Harrisburg, Pennsylvania 17102. In 1963, PHEAA was created by the Pennsylvania General Assembly as a public corporation tasked with improving higher education opportunities for Pennsylvanians by funding student loans and grants. Over time, PHEAA has dramatically shifted its business model from a Pennsylvania-focused business to a primary servicer of federal student loans.

18.     In 2009, DOE awarded PHEAA one of four Federal Loan Servicing Contracts. Despite its name and traditional mandate, PHEAA's business now has a national scope and its business is no longer confined to servicing student loans. Today, it also guarantees loans and acts as a lender itself.

19.     All PHEAA's student loan business is conducted under one of two trade names: (1) FedLoan, which exclusively handles federal student loans, and (2) American Educations

6

Services ("AES"). In 2014, PHEAA's aggregate revenues exceeded $600 million and it recorded more than $220 million in profits, a nearly 58% profit margin.

20.     PHEAA's revenues and profits are so substantial that, since 1988, it has received no public appropriations and has operated as a private business that is financially independent of the Commonwealth of Pennsylvania. PHEAA has the power to sue and be sued, to enter into contracts, and to own, encumber, and dispose of property. Moreover, under Pennsylvania law, PHEAA bears sole responsibility for its debts and is authorized to engage in collection activity independently. In light of these facts, courts have generally concluded that PHEAA is "a very wealthy corporation engaging in nationwide commercial student-loan financial-services activities" and not a state actor.[1]

## FACTUAL ALLEGATIONS

**Student Loan Debt**

21.     For several decades, the average annual cost of higher education in the United States has greatly outpaced the rate of inflation. A recent study by the College Board, for example, revealed that, since 1970, there has been a more than 200% increase in the inflation-adjusted cost of attending a two or four-year institution.[2]

22.     Because of this spike in the price of a college education, students have become increasingly reliant on federal student loans to help finance their educations. Indeed, as of

---

[1] *U.S. ex rel Oberg v. Pa. Higher Ed. Assistance Agency*, 804 F.3d 646, 676-77 (4th Cir. 2015), *cert. denied*, 137 S. Ct. 617, 196 L. Ed. 2d 513 (2017); *see also Pa. Higher Ed. Assistance Agency v. NC Owners, LLC*, No. 1:16-cv-1826, 2017 WL 2506397 at *2 (M.D. Pa. June 9, 2017); *Lang v. Pa. Higher Ed. Assistance Agency*, 610 F. App'x 158, 160-63 (3d Cir. 2015); *Lang v. Pa. Higher Ed. Assistance Agency*, 201 F. Supp. 3d 613 (M.D. Pa. 2016).

[2] *Tuition and Fees and Room and Board Over Time*, Table 2, (Released 2017), The College Board https://trends.collegeboard.org/college-pricing/figures-tables/tuition-fees-room-and-board-over-time

December 2017, the total amount of outstanding student loan debt in the United States is $1.41 trillion and represents the second largest category of consumer debt behind housing-related debt. The federal government owns approximately 94% of all student loans. To service these loans, it relies on four companies, PHEAA being the largest among them as of September 2016.

23.     DOE assigns loans to one of the four servicers when the loans are disbursed (*i.e.* paid out directly to the institution or to the borrower). Upon being assigned the loan, the servicer becomes solely responsible for collection and repayment and serves as the borrowers' exclusive contact with respect to questions or issues regarding their federal loans. Borrowers are assigned their loan servicer by DOE and have no option to change servicers.

24.     The servicer receives a per-unit fee from DOE for each loan assigned to it for servicing. The fee generally depends on two criteria: (1) the status of the loan, and (2) the total volume of loans from the category being serviced. PHEAA's 2009 fee schedule in its agreement with DOE is represented in a table set forth in Figure 1, below. This table includes a "unit price," or monthly servicing fee due to PHEAA,[3] for loans in 7 different categories based on the number of loans being serviced in that category:

**FIGURE 1**

| Status | Volume Low | Volume High | Unit Price |
|---|---|---|---|
| Borrowers in "in-school" status | N/A | N/A | $ 1.050 |
| Borrowers in "grace" or "current repayment status | 1 | 3,000,000 | $ 2.110 |
| | 3,000,001 | UP | $ 1.900 |

---

[3] PHEAA's annual financial statement, released in August 2016, discloses that PHEAA received $188.5 million dollars for servicing approximately 7.5 borrowers. This corresponds to an average of $2.09 per month for each borrower.

| Borrowers in "deferment" or "forbearance" | 1 | 1,600,000 | $ 2.070 |
| --- | --- | --- | --- |
| | 1,600,001 | UP | $ 1.730 |
| Borrowers 31-90 days delinquent | N/A | N/A | $ 1.620 |
| Borrowers 91-150 days delinquent | N/A | N/A | $ 1.500 |
| Borrowers 151-270 days delinquent | N/A | N/A | $ 1.370 |
| Borrowers 270+ days delinquent | N/A | N/A | $ 0.500 |

25.     As Figure 1 illustrates, PHEAA is compensated on a "per unit" basis, which simply means that the more borrowers there are with an active loan balance, the more DOE pays PHEAA. This fee structure gives PHEAA a financial incentive to maintain or increase the number of borrowers with active loans, which it accomplishes, in part, by delaying the ability of borrowers to obtain loan forgiveness through the PSLP, TEACH, and IDR programs.

**Alternative Loan Repayment Programs**

26.     Loan servicers are exclusively responsible to provide borrowers information about, and enroll them in, the federal government's various student loan repayment plans.

27.     The most common repayment plan is the Level Repayment plan, which splits the borrower's outstanding principal and interest in equal monthly installments. But the federal government has also created several Alternative Loan Repayment Programs ("ALRPs") which aim to reduce the burden of student debt on borrowers.

28.     Each ALRP requires borrowers to meet certain requirements while in repayment in order to earn loan forgiveness. One such requirement is that borrowers make "qualifying monthly payments." Under the PSLF program, for example, a "qualifying monthly payment" is a payment made: (a) after October 1, 2007; (b) under a "qualifying repayment plan,"

9

including all IDR plans; (c) for the full amount due as shown on the bill; (d) no later than 15 days after the due date; and (e) while employed by a "qualifying employer."

29.     Importantly, only a *required* payment counts as "qualifying monthly payment." Thus, no "qualifying monthly payment" can be made while the loan is in "in-school," "deferment," or "forbearance" status or during the "grace period" before official repayment begins.

30.     The ultimate objective of each ALRP, and the servicer's role in administering the programs, is to provide borrowers with an opportunity to make reasonably affordable monthly payments based on their income and occupation.

IDR Programs

31.     One of more popular groups of ALRPs authorized by DOE is known as Income Driven Repayment or "IDR" plans. As of June 2016, nearly 5.3 million borrowers were enrolled in IDR plans. These plans are available to all eligible borrowers regardless of occupation. IDR plans set the borrowers' monthly payment to 10% or 15% of their monthly discretionary income. The percentage is based on which plan the borrower is enrolled in and when the loan was first disbursed. If the borrower makes "qualifying monthly payments" for twenty years, the principal balances of their loans are forgiven. Under IDR plans, payments made during "forbearance" or "deferment" status, or during processing of the application, do not count towards the borrower's loan forgiveness.

32.     Borrowers must apply to their servicer to enroll in an IDR plan. As part of the application process, a borrower must disclose income, location, and family information, which the servicer uses to determine eligibility and to process the application. Applications may be

10

submitted online or by mail and servicers are required to process the application within 15 days of receipt.[4]

33.    The Revised Pay As You Earn ("REPAYE") plan is the newest IDR program made available by DOE. This program caps a borrower's monthly payment to 10% of their monthly discretionary income, which is the difference between the borrower's Adjusted Gross Income ("AGI") and 150% of the state poverty guideline for the borrower's family size. All Direct Loan, Stafford, and Graduate PLUS borrowers are eligible for the REPAYE plan.

34.    Under REPAYE, undergraduate loans are forgiven after a borrower makes "qualifying monthly payments" for 20 years. Graduate loans, or Direct Loans that consolidate graduate and undergraduate loans, are eligible for forgiveness after 25 years of "qualifying monthly payments."

35.    Under REPAYE, if the borrower's monthly payment does not cover all the interest owed each month, the REPAYE plan covers half of the unpaid interest. For those borrowers with subsidized loans, the REPAYE plan covers all unpaid interest for the first three years of enrollment in the plan and half the unpaid interest for each year thereafter. If the borrower leaves the REPAYE plan, the unpaid interest is added to the borrower's principal.

36.    Borrowers can simultaneously be enrolled in both the REPAYE plan and the PSLF program. Payments made under REPAYE count toward the 120 "qualifying monthly payments" required to obtain forgiveness under the PSLF program.

### PSLF Program

---

[4] *See U.S. Dept. of Ed., Memorandum from U.S. Dept. of Ed. Under Secretary Ted Mitchell on Policy Direction on Fed. Student Loan Servicing* (July 20, 2016), available at http://www2.ed.gov/documents/press-releases/loan-servicing-policy-memo.pdf

37.     The PSLF program is an ALRP designed specifically to incentivize students to enter public service following graduation. Borrowers who enroll in the PSLF program are entitled to loan forgiveness in as little as ten years by making a total of 120 monthly payments under an IDR or other repayment plan while engaged in eligible public employment. By offering an opportunity to obtain debt forgiveness more quickly, the PSLF program encourages graduates to take public service jobs that generally pay less than those in the private sector.

38.     To take advantage of the PSLF, borrowers must be employed full-time in "qualifying employment," which is employment in governmental organizations at any level (federal, state, local, or tribal), 501(c)(3) non-profit organizations, and other non-profit organizations that deliver qualifying public services (*e.g.* military service, law enforcement, public safety, public health, education, and legal services).

39.     Many students who aspire to public service burden themselves with student debt because they have been promised the opportunity to obtain early loan forgiveness under the PSLF program.

### TEACH Grant Program

40.     The TEACH program is another ALRP that provides grants to students who are completing, or plan to complete, coursework needed to begin a teaching career. In return for the grant, the student agrees to commit four years to teaching in a "high-need" field (*e.g.* mathematics, science, or foreign languages) at a school or educational service agency that serves students from low-income families.

41.     Certain recipients of TEACH grants are also eligible for loan forgiveness under the PSLF plan as teaching is often considered "qualifying employment" under that plan.

12

42.     All TEACH grant funds received by borrowers who do not meet the service obligations are converted to a Direct Unsubsidized Loan, with interest charged form the original date the TEACH grant was disbursed.[5]

**PHEAA is Incentivized to Extend the Duration of Borrowers' Loans**

43.     In 2009, PHEAA, along with three other "Title IV" servicers, was awarded a Federal Loan Servicing Contract ("the 2009 Contract") by DOE to service federal student loans nationwide. The 2009 Contract between DOE and PHEAA provides: "[i]t is the intent of the Department to procure a performance-based contract(s) that promotes competition and provides best of business services. To achieve this goal, the Department expects each servicer to provide commercially available services that will yield high performing portfolios and high levels of consumer satisfaction."

44.     Because PHEAA receives a monthly servicing fee under the Contract for its role in collecting and processing loan payments and administering ALRPs, the Contract creates a conflict of interest between PHEAA and the borrowers whose loans it services. While borrowers are incentivized to enroll in ALRPs in order to obtain lower monthly payments and eventual loan forgiveness, PHEAA's monthly service fees incentivize it to delay or deny borrower enrollment in ALRPs and to keep loans active for as long as possible.

45.     Under the pay schedule set forth in Figure 1, above, every borrower who obtains loan forgiveness results in one less loan for which PHEAA can collect a monthly service fee from DOE.

---

[5] *Teach Grant Program*, Department of Education (Feb. 2017)
https://studentaid.ed.gov/sa/sites/default/files/teach-grant.pdf

46.     Figure 1 also demonstrates that the 2009 Contract incentivizes PHEAA to place borrowers into "deferment" or "forbearance" status. Under the 2009 Contract, once the total number of loans in "active repayment" status exceeds 3,000,000, PHEAA receives a *lower* per unit price than it does for loans in "deferment" or "forbearance." Thus, PHEAA has a financial interest under the 2009 Contract in improperly classifying loans in "active repayment" status as in "deferment" or "forbearance" status, especially once the number of loans in "active repayment" status approaches or exceeds 3 million.

47.     In 2014, DOE revised the 2009 Contract to remove this financial incentive by lowering the amount it paid for loans in "deferment" or "forbearance" status to less than what it paid for loans in "active repayment" status.[6] The contract, however, maintained the same overall structure of compensating PHEAA based on the number of loans it serviced, thus continuing to encourage PHEAA to keep borrowers in debt longer.

48.     Each calendar quarter, the federal government evaluates the performance of each of the ten major loan servicers using criteria such as: (1) the "percentage of borrowers in current repayment status," (2) the percentage of loans that are delinquent, and (3) borrower satisfaction with customer service.

49.     According to the evaluation for the quarter ending December 31, 2016, PHEAA ranked ninth among the ten servicers evaluated. It was revealed that PHEAA had the lowest percentage of loans in "active repayment" status, which is consistent with PHEAA's scheme of preventing borrowers from obtaining loan forgiveness.

---

[6] *See* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/ED-FSA-09-D-0014_MOD_0072_PHEAA.pdf

50. The CFPB's April 2017 Monthly Complaint Report further evidences PHEAA's

unlawful scheme. According to that report, federal student loan borrowers complained of the

following:

> a. difficulty enrolling in IDR plans, reporting lost documentation, extended
> application processing times, and unclear guidance when seeking to switch
> between IDR plans;
>
> b. difficulty completing annual recertification for their IDR plans, including
> lengthy processing times and insufficient information from their servicers to
> meet recertification deadlines;
>
> c. overpayments being misapplied such that, instead of reducing the principal
> balance of the loan, the payment was applied to future balances and placed
> the loan in "paid ahead status"; and
>
> d. failures in administering the PSLF and TEACH programs, including delays
> in processing IDR plan enrollment and recertification that prevented them
> from making qualifying monthly payments under the PSLF program,
> improper denial of loan forgiveness following 120 qualifying monthly
> payments based on inaccurate employment data, and failure to be enrolled
> in the PSLF program (despite submitting applications online) after years of
> repayment because some of their loans had been previously consolidated.[7]

51. According to the CFPB, PHEAA received the second most number of

complaints in April 2017 and experienced a 269% increase from one year earlier. At all times

covered by the CFPB's April 2017 report, PHEAA was the exclusive loan servicer for

borrowers applying under the PSLF and TEACH programs. Thus, all complaints regarding

administration of those programs were directed at PHEAA and FedLoan.

**PHEAA Has a Policy of Denying Borrowers the Benefits of ALRPs in Violation of its
Loan Servicing Contract**

---

[7] http://files.consumerfinance.gov/f/documents/201704_cfpb_Monthly-Complaint-Report.pdf

15

52.     PHEAA orchestrated a scheme during the Class Period to deny borrowers the benefit of loan forgiveness that Congress and DOE intended for them when they created the ALRPs. This scheme was implemented through, among other means, the following common practices: (1) creating obstacles to repayment; (2) providing incorrect information to borrowers; (3) incorrectly processing payments; (4) ignoring or disregarding borrowers' complaints; and (5) cheating many borrowers out of their ability to make lower monthly payments.

53.     PHEAA's failure to timely and properly process ALRP applications deprived borrowers of the opportunity to make "qualifying monthly payments" that count toward loan forgiveness. To accommodate its processing delays, PHEAA places loans into "deferment" or "forbearance" status, which prevents borrowers from making "qualifying monthly payments." In some instances, these improper designations earned PHEAA increased monthly service fees.

54.     Borrowers who face application processing delays—most of them public service employees and low-income borrowers—have lost months of payments that would have otherwise been credited toward loan forgiveness. One student loan borrower in the PSLF program, for example, complained to the CFPB that her IDR application remained pending for months with PHEAA. She explained how the processing delay created a financial hardship for her:

> This delay…is creating a hardship on me, as it is lengthening the amount of time I remain in debt and delays my final repayment date back as many months as [my servicer is] unable to get me into the new repayment plan. I am also enrolled in the Public

16

> Service Loan Forgiveness program, so the "clock" on my
> maximum 10-year repayment time span has essentially stopped.[8]

55. PHEAA's delays also cost borrowers in other ways. It has been observed, for example, that income grows for college graduates the longer they remain in the workforce, peaking at roughly 25 years into their careers.[9] Because borrowers in forbearance forgo making qualifying monthly payments at their present income and family size, they assume an obligation to make future monthly payments at the back-end of their loan forgiveness terms, often when their income and family size is higher. This increases the total lifetime cost of their loans.

56. Moreover, when PHEAA finally does process a borrower's application for an ALRP, it often calculates an incorrect monthly payment, causing borrowers to lose "qualifying monthly payments" and erroneously prolonging the term of the borrower's loan.

57. In other instances, PHEAA improperly delays, or fails to process altogether, the annual recertifications of TEACH program borrowers. As a result, many borrowers under the TEACH program have their grants improperly converted into Direct Unsubsidized Loans, costing them thousands of dollars in new principal and future interest.

## PHEAA's Unlawful Policy Injured Plaintiff

58. Plaintiff is a student loan borrower whose loans are currently serviced by FedLoan.

---

[8] *See* https://www.consumerfinance.gov/about-us/blog/trying-enroll-income-driven-repayment-plan-avoid-applicationabyss-our-student-loan-tips-and-resources

[9] *See Economic Analysis – Major Decisions: What Graduates Earn Over Their Lifetimes*, Brad Hershbein and Melissa S. Kearney, The Hamilton Project (Sep. 29, 2014), available at http://www.hamiltonproject.org/papers/major_decisions_what_graduates_earn_over_their_lifeti mes

17

59.     Plaintiff's loan was transferred to Defendant PHEAA and she began making payments via direct deposit in September 2013.

60.     As alleged herein, PHEAA exploited these programs to increase the duration of Plaintiff's and Class Members' loans and generate additional servicing fees by, among other things: (1) misprocessing ALRP annual recertification forms; (2) unnecessarily and improperly placing loans into "deferment" or "forbearance" status; and (3) charging additional processing and administration fees to remove loans from "deferment" or "forbearance" status after they were improperly designated as such.

61.     Further, by increasing the duration of Plaintiff's and Class Members' loans, PHEAA caused additional harm by inflating the total amount owed by these borrowers. For example, loans placed into "deferment" or "forbearance" status continue to accrue interest even through borrowers are unable to make "qualifying monthly payments" during that period. This additional interest is added to the principal balance and increases the borrower's overall debt obligation.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and as representative of the following Class:

> All persons whose student loans were serviced by FedLoan and who enrolled in an ALRP during the period of at least January 1, 2009 through the present ("the Class Period")

63.     Excluded from the Class are PHEAA, its officers, directors, management, employees, subsidiaries, or affiliates. Also excluded from the Class is the Judge presiding over this action, his or her law clerks, spouse, any other person within the third-degree of

18

relationship living in the Judge's household, the spouse of such person, and the United States government.

64.     The Class is so numerous and geographically dispersed that joinder is impracticable. Further, the Class is readily identifiable from information and records in the PHEAA's possession.

65.     Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and the Class Members sustained damages arising out of PHEAA's common course of conduct in violation of law as set forth in this Complaint. The injuries and damages of each Class Member were directly caused by PHEAA's wrongful conduct as alleged herein.

66.     Plaintiff will fairly and adequately protect the interest of the Class Members. Plaintiff is an adequate representative of the Class and has no interest adverse to the interests of the Class Members. Plaintiff has retained counsel competent and experienced in consumer class action litigation.

67.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual Class Members. These common questions of law and fact include, but are not limited to:

> a.  Whether PHEAA has a common and pervasive practice of misprocessing and delaying ALRP applications;
>
> b.  Whether PHEAA's misconduct caused injuries to Plaintiff and the Class Members by causing them to pay unnecessary interest, fees, and other charges;
>
> c.  Whether PHEAA's misconduct violates the Pennsylvania Unfair Trade Practices and Consumer Protection Law; and
>
> d.  Whether PHEAA's misconduct violates Pennsylvania common law

68.     A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of each individual case would be substantial. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying outcomes, establishing incompatible standards of conduct for PHEAA.

69.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### (Breach of Contract)

70.     Plaintiff incorporates by reference each preceding allegation as if same were set forth more fully at length herein.

71.     PHEAA entered into a contract with DOE on June 17, 2009 ("the 2009 Contract").

72.     Under the terms of the 2009 Contract, PHEAA is responsible for servicing Plaintiff's and the Class Members' federal student loans in return for payments from DOE.

20

73.     Plaintiff and the Class Members, as borrowers whose loans are serviced by

PHEAA, are the intended beneficiaries of the 2009 Contract between PHEAA and DOE.

74.     The 2009 Contract provides, in relevant part:

> The servicer shall respond to written and email questions and
> requests timely and accurately. The servicer shall respond and
> resolve customer complaints; and create and execute a plan to
> escalate complaints to FSA and the Ombudsman.
>
> ***
>
> Review and Reconciliation: Records are examined and reconciled
> to determine that transactions were properly processed and
> approved.

75.     PHEAA materially breached the terms of the 2009 Contract when it engaged in

a course of conduct designed to delay or otherwise interfere with the processing of ALRP

applications as described more fully in this Complaint.

76.     PHEAA's breach of the 2009 Contract damaged Plaintiff and the Class

Members, as more fully described in this Complaint.

## COUNT II
## (Unjust Enrichment)

77.     Plaintiff incorporates by reference each preceding allegation as if same were set

forth more fully at length herein.

78.     PHEAA accepted millions of dollars in payments under the terms of the 2009

Contract with DOE to compensate it for servicing federal student loans and administering

ALRPs to Plaintiff and the Class Members.

79.     Plaintiff and the Class Members have unjustifiably conferred a benefit on

PHEAA in the form of extra, unnecessary payments of fees, interest, and other monies.

21

80.     Plaintiff and the Class Members have conferred a benefit on PHEAA through their status as borrowers whose loans are serviced by PHEAA, which allowed it to collect a monthly amount from DOE for servicing these loans.

81.     Plaintiff and the Class Members have conferred, and continue to confer, a benefit on PHEAA by acting as an instrumentality that allows PHEAA to collecting payments for servicing federal student loans.

82.     PHEAA has been able to retain the benefits conferred by Plaintiff and the Class Members by maintaining its current unlawful practices, as set forth herein, and by retaining payments, fees, and other monies it is not entitled to.

83.     PHEAA failed to perform the services for which it was paid and has thus been unjustly enriched at the expense of Plaintiff and the Class Members.

84.     Because PHEAA wrongfully obtained these benefits at the expense of Plaintiff and the Class Members through unlawful and inequitable conduct, PHEAA is obligated reimburse Plaintiff and the Class Members all amounts by which it has been unjustly enriched.

## COUNT III
### (Fraud)

85.     Plaintiff incorporates by reference each preceding allegation as if same were set forth more fully at length herein.

86.     As alleged herein, PHEAA made material factual misrepresentations concerning its administration of ALRPs in accordance with DOE guidelines.

87.     Plaintiff and the Class Members relied on PHEAA's false statements when they enrolled in ALRP programs serviced by PHEAA and made qualified monthly payments in reliance on PHEAA's misrepresentations.

22

88.     PHEAA also made false representations to DOE when it agreed to service ALRP loans in accordance with federal law, despite having no intention of changing its policies to comply with the law. PHEAA knew and intended that these misrepresentations would cause Plaintiff and the Class Members to rely on them in enrolling in ALRPs and submitting payments to PHEAA, enabling PHEAA to continue receiving payments from DOE for servicing their loans.

89.     PHEAA represented that it would properly administer ALRP programs knowing or believing that those representations were false. Plaintiff and the Class Members were justified in relying on PHEAA's false representations as the loan servicer assigned to them by DOE and the only servicer authorized to administer the PSLF and TEACH programs.

90.     Plaintiff and the Class Members were injured as a result of PHEAA's fraudulent conduct.

## COUNT IV
## (Breach of Fiduciary Duty)

91.     Plaintiff incorporates by reference each preceding allegation as if same were set forth more fully at length herein.

92.     PHEAA, as a federal student loan servicer, has a confidential and/or fiduciary relationship with Plaintiff and the Class Members. For example, in order to apply for an ALRP, Plaintiff and the Class Members are required to provide PHEAA private, confidential information regarding their income and family.

93.     In accordance with the 2009 Contract, PHEAA represents to Plaintiff, the Class Members, the public, and Congress that it acts in the best interest of borrowers, including

23

providing them advice, information, and other tools to assist them in choosing the "right" or "best" repayment plan based on their circumstances.

94.     As such, PHEAA acts in a position of advisor or counselor and represents that it will act in good faith and in the interests of Plaintiff and the Class Members.

95.     Furthermore, the relative positions of PHEAA and borrowers, including Plaintiff and the Class Members, is such that PHEAA has the power and means to take advantage of, or exercise undue influence over, borrowers, including Plaintiff and the Class Members.

96.     For example, Plaintiff and the Class Members were assigned PHEAA to service and process their ALRPs, putting PHEAA in a position where it could exploit Plaintiff and the Class Members without recourse.

97.     To increase its profits, PHEAA exploited its relationship with Plaintiff and the Class Members by making representations and engaging in misconduct that violated this confidential or fiduciary relationship. As such, PHEAA is operating in a manner most beneficial to itself rather than the borrowers it services, including Plaintiff and the Class Members.

98.     PHEAA's breach of its confidential or fiduciary relationship was the direct and proximate cause of the injuries suffered by Plaintiff and the Class Members, as detailed more fully herein.

## COUNT V
### (Negligent Misrepresentation)

99.     Plaintiff incorporates by reference each preceding allegation as if same were set forth more fully at length herein.

24

100.    As the student loan servicer assigned to Plaintiff and the Class Members, PHEAA had a duty to accurately represent how it would administer the ALRPs for which it was responsible.

101.    Rather than provide Plaintiff and the Class Members with accurate information, PHEAA, in the course of its business, supplied false information to Plaintiff and the Class Members, including through monthly statements, emails, and its website, representing that it administers ALRPs in accordance with DOE guidelines.

102.    PHEAA knew, or should have known, that it was not in compliance with DOE guidelines and that its pervasive and systematic failure to correctly process ALRP applications and borrower payment created obstacles to full repayment or loan forgiveness.

103.    PHEAA intended for Plaintiff and the Class Members to rely upon the information it provided to them.

104.    Plaintiff and the Class Members justifiably relied upon the false information provided by PHEAA and, as a result, incurred extra fees, interest, and payments, or otherwise had the duration of their loans unjustifiably extended. This unlawfully increased PHEAA's revenue and profits by resulting in additional monthly servicing payments, interest, subsidies, and special allowance payments that it otherwise would not have been entitled to had it properly administered ALRPs to Plaintiff and the Class Members.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

a.      Certification of this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designation of Plaintiff as Class Representative, and

appointment of Plaintiff's counsel, Marc H. Edelson & Associates, LLC, as Class counsel;

b.      A judgment awarding Plaintiff and the Class Members monetary damages, including punitive damages and restitution, for PHEAA's violations of the common law as alleged in Counts I through V, above;

c.      Prejudgment interest at the maximum rate allowed by law; and

d.      Any other relief this Court deems proper and just.

## **JURY TRIAL DEMANDED**

**PLEASE TAKE NOTICE** that, pursuant to Fed. R. Civ. P. 38(b), Plaintiff respectfully demands a trial by jury as to all issues so triable.

*Respectfully Submitted*,

/s/ Marc H. Edelson                (51834)
Marc H. Edelson, Esq.
Liberato Verderame, Esq.
**EDELSON & ASSOCIATES, LLC**
3 Terry Drive, Suite 205
Newtown, PA 18940
P: (215) 867-2399
Email: medelson@edelson-law.com
           lverderame @edelson-law.com


Joshua H. Grabar, Esq.
Grabar Law Office
1735 Market Street, Suite 3750
Philadelphia, PA 19103
P: (267) 507-6085
Email: jgrabar@grabarlaw.com

Paul Scarlato, Esq.

26

Brian Penny, Esq.
Goldman Scarlato Penny, P.C.
8 Tower Bridge
Suite 1025
161 Washington Street
Conshohocken, PA 19428
P: (484) 342-0700
Email: scarlato@lawgsp.com
Email: penny@lawgsp.com

*Attorney for Plaintiff Carol Clancy and the Proposed Class*

Dated: