# EXHIBIT 4

# United States District Court
## Middle District of Pennsylvania (Harrisburg)
### CIVIL DOCKET FOR CASE #: 1:17-cv-00385-YK

Salvatore v. Pennsylvania Higher Education Assistance Agency
Assigned to: Honorable Yvette Kane
Referred to: Magistrate Judge Martin C. Carlson (Settlement)
Cause: 28:1332 Diversity-Fraud

Date Filed: 03/01/2017
Jury Demand: Plaintiff
Nature of Suit: 370 Other Fraud
Jurisdiction: Diversity

**Plaintiff**

| | | |
|---|---|---|
| **Danielle Salvatore**<br>*individually and on behalf of all others similarly situated* | represented by | **Brandon M Wise**<br>Peiffer Rosca Wolf Abdullah Carr & Kane, APLC<br>818 Lafayette Ave., Floor 2<br>St. Louis, MO 63104<br>314-833-4825<br>Email: bwise@prwlegal.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Marion K. Munley**<br>Munley, Munley & Cartwright<br>The Forum Plaza<br>227 Penn Avenue<br>Scranton, PA 18503<br>570-346-7401<br>Email: mmunley@munley.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **Pennsylvania Higher Education Assistance Agency**<br>*also known as*<br>PHEAA<br>*also known as*<br>FedLoan Servicing | represented by | **James J. Jarecki**<br>PA Higher Education Assistance Agency<br>1200 North Seventh Street<br>Harrisburg, PA 17102-1444<br>717-720-1568<br>Fax: 717-720-3911<br>Email: jjarecki@pheaa.org<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 03/01/2017 | 1 | COMPLAINT against Pennsylvania Higher Education Assistance Agency ( Filing fee $400, Receipt Number 0314-4018908) filed by Danielle Salvatore. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit(s) A)(ve) (Entered: 03/01/2017) |

| 03/01/2017 | 2 | Summons Issued as to Pennsylvania Higher Education Assistance Agency and provided TO ATTORNEY ELECTRONICALLY VIA ECF for service on Defendant(s)in the manner prescribed by Rule 4 of the Federal Rules of Civil Procedure. (NOTICE TO ATTORNEYS RECEIVING THE SUMMONS ELECTRONICALLY: You must print the summons and the attachment when you receive it in your e-mail and serve them with the complaint on all defendants in the manner prescribed by Rule 4 of the Federal Rules of Civil Procedure). (Attachments: # 1 Summons Packet) (ve) (Entered: 03/01/2017) |
| 03/02/2017 | | SPECIAL ADMISSION FORM AND ECF REGISTRATION FORM mailed to Attorney Brandon Wise (lg) (Entered: 03/02/2017) |
| 03/29/2017 | 3 | MOTION to Appear Pro Hac Vice - Attorney Brandon Wise is seeking special admission. Filing fee $ 50, receipt number 0314-4044111. by Danielle Salvatore.(Wise, Brandon) (Entered: 03/29/2017) |
| 03/29/2017 | | DOCKET ANNOTATION: Petitioner Brandon Wise and Associate Counsel Marion Munley - bar status verified. (dmn) (Entered: 03/29/2017) |
| 03/31/2017 | 4 | Letter addressed to counsel Re: Case Assignment and Procedures. Signed by Honorable Yvette Kane on 3/31/17. (rw) (Entered: 03/31/2017) |
| 04/03/2017 | 5 | SPECIAL ADMISSIONS FORM APPROVED as to Brandon M. Wise, Esquire. Signed by Honorable Yvette Kane on 4/3/17. (rw) (Entered: 04/04/2017) |
| 04/04/2017 | 6 | WAIVER OF SERVICE Returned by Danielle Salvatore. Pennsylvania Higher Education Assistance Agency waiver sent on 3/7/2017, answer due 5/8/2017. (Wise, Brandon) (Entered: 04/04/2017) |
| 04/10/2017 | 7 | LETTER addressed to counsel Re: Case Assignment and Procedures. Signed by Honorable Yvette Kane on 4/10/17. (rw) (Entered: 04/10/2017) |
| 04/28/2017 | 8 | MOTION to Exceed Page Limitation by Pennsylvania Higher Education Assistance Agency. (Attachments: # 1 Proposed Order, # 2 Certificate of Service)(Jarecki, James) (Entered: 04/28/2017) |
| 05/01/2017 | 9 | ORDER - upon consideration of Defendants unopposed motion 8 for leave to file a brief in support of its forthcoming motion to dismiss that exceeds fifteen (15) pages, IT IS ORDERED THAT the motion is GRANTED. Signed by Honorable Yvette Kane on 5/1/17. (rw) (Entered: 05/01/2017) |
| 05/05/2017 | 10 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Pennsylvania Higher Education Assistance Agency. (Attachments: # 1 Exhibit(s), # 2 Exhibit(s), # 3 Exhibit(s), # 4 Exhibit(s), # 5 Proposed Order, # 6 Certificate of Nonconcurrence, # 7 Certificate of Service)(Jarecki, James) (Entered: 05/05/2017) |
| 05/08/2017 | 11 | BRIEF IN SUPPORT re 10 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Pennsylvania Higher Education Assistance Agency. (Attachments: # 1 Unpublished Opinion(s), # 2 Certificate of Service)(Jarecki, James) (Entered: 05/08/2017) |
| 05/26/2017 | 12 | AMENDED COMPLAINT against Pennsylvania Higher Education Assistance Agency, filed by Danielle Salvatore. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Exhibit(s) E)(Wise, Brandon) (Entered: 05/26/2017) |
| 06/06/2017 | 13 | Unopposed MOTION to Exceed Page Limitation by Pennsylvania Higher Education Assistance Agency. (Attachments: # 1 Proposed Order, # 2 Certificate of Service)(Jarecki, James) (Entered: 06/06/2017) |
| 06/08/2017 | 14 | ORDER - upon consideration of Defendants unopposed motion 13 for leave to file a brief in support of its forthcoming motion to dismiss that exceeds fifteen (15) pages, IT IS |

| | | |
|---|---|---|
| | | ORDERED THAT the motion is GRANTED. Signed by Honorable Yvette Kane on 6/8/17 (rw) (Entered: 06/08/2017) |
| 06/09/2017 | 15 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Pennsylvania Higher Education Assistance Agency. (Attachments: # 1 Exhibit(s), # 2 Certificate of Nonconcurrence, # 3 Proposed Order, # 4 Certificate of Service)(Jarecki, James) (Entered: 06/09/2017) |
| 06/14/2017 | 16 | ORDER - IT IS ORDERED THAT Defendants motion 10 to dismiss Plaintiffs original complaint is DENIED AS MOOT. Signed by Honorable Yvette Kane on 6/14/17. (rw) (Entered: 06/14/2017) |
| 06/23/2017 | 17 | BRIEF IN SUPPORT re 15 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Pennsylvania Higher Education Assistance Agency. (Attachments: # 1 Unpublished Opinion(s), # 2 Certificate of Service)(Jarecki, James) (Entered: 06/23/2017) |
| 07/05/2017 | 18 | Unopposed MOTION for Extension of Time to File Brief in Opposition to Defendant's Motion to Dismiss *and Motion for Leave to File Excess Pages* by Danielle Salvatore. (Attachments: # 1 Proposed Order)(Wise, Brandon) (Entered: 07/05/2017) |
| 07/10/2017 | 19 | ORDER - upon consideration of Plaintiffs unopposed motion 18 for an extension of time and to exceed page limitations, IT IS ORDERED THAT Plaintiffs motion, is GRANTED. Plaintiff may file a brief in opposition to Defendants motion to dismiss that exceeds 15 pages, or 5,000 words, on or before July 21, 2017. Signed by Honorable Yvette Kane on 7/10/17. (rw) (Entered: 07/10/2017) |
| 07/17/2017 | 20 | Unopposed MOTION for Extension of Time to File Brief filed by Pennsylvania Higher Education Assistance Agency. (Attachments: # 1 Proposed Order, # 2 certificate of service)(Jarecki, James) (Entered: 07/17/2017) |
| 07/18/2017 | 21 | ORDER - upon consideration of Defendants unopposed motion 20 for an extension of time to file a reply brief to Plaintiffs brief in opposition to Defendants motion to dismiss, IT IS ORDERED THAT Defendants motion is GRANTED. Defendant may file its reply brief on or before August 11, 2017. Signed by Honorable Yvette Kane on 7/18/17. (rw) (Entered: 07/18/2017) |
| 07/21/2017 | 22 | BRIEF IN OPPOSITION re 15 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Danielle Salvatore. (Attachments: # 1 Exhibit(s) A)(Wise, Brandon) (Entered: 07/21/2017) |
| 08/11/2017 | 23 | REPLY BRIEF re 15 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Pennsylvania Higher Education Assistance Agency.(Jarecki, James) (Entered: 08/11/2017) |
| 09/27/2017 | 24 | ORDER - IT IS HEREBY ORDERED THAT a Case Management Conference is set for 11/17/2017 at 10:30 AM before Honorable Yvette Kane. The court prefers to hold this conference by telephone. Plaintiffs counsel shall initiate this telephone conference. Counsel should be prepared to address any pending motions at the conference. Counsel are advised to comply with Rule 16.3(a) of the Rules of Court for the Middle District of Pennsylvania. Local Rule 16.3 requires lead counsel for each party to meet prior to the case management conference and complete a Joint Case Management Plan form. The completed form, which is set forth in Appendix A of the local rules, must be filed jointly by the parties on or before November 13, 2017. Signed by Honorable Yvette Kane on 9/27/17. (rw) (Entered: 09/27/2017) |
| 10/17/2017 | 25 | Consent MOTION to Continue *and/or Reschedule* by Danielle Salvatore. (Attachments: # 1 Proposed Order)(Wise, Brandon) (Entered: 10/17/2017) |
| 10/19/2017 | 26 | ORDER - IT IS ORDERED that the Consent Motion 25 to Continue Rule 16 Conference |

| | | is GRANTED. The case management conference scheduled for November 17, 2017, at 10:30 a.m., is CONTINUED to December 1, 2017, at 10:30 a.m. IT IS FURTHER ORDERED THAT the parties shall submit their joint case management plan on or before November 27, 2017. Signed by Honorable Yvette Kane on 10/19/17. (rw) (Entered: 10/19/2017) |
|---|---|---|
| 11/27/2017 | 27 | CASE MANAGEMENT PLAN by Danielle Salvatore. (Attachments: # 1 Proposed Stipulated Order Proposed Stipulated Protective Order)(Wise, Brandon) (Entered: 11/27/2017) |
| 12/08/2017 | 29 | ORDER REFERRING CASE - IT IS ORDERED THAT the above-captioned action is REFERRED to Magistrate Judge Carlson for mediation. Consideration of Defendants motion 15 to dismiss, Plaintiffs first amended complaint 12 , is deferred pending the outcome of mediation proceedings. IT IS FURTHER ORDERED THAT a telephone conference is scheduled for February 2, 2018, at 10:30 a.m. Plaintiffs counsel shall initiate the call. Signed by Honorable Yvette Kane on 12/8/17. (rw) (Entered: 12/08/2017) |
| 12/13/2017 | 30 | SCHEDULING ORDER: A Settlement Conference is set for 1/18/2018 at 1:00 PM in Harrisburg before Magistrate Judge Martin C. Carlson. SEE ORDER FOR COMPLETE DETAILS. Signed by Magistrate Judge Martin C. Carlson on December 13, 2017. (kjn) (Entered: 12/13/2017) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/22/2018 14:57:18 | | | |
| **PACER Login:** | achristina:5288197:0 | **Client Code:** | 2825 |
| **Description:** | Docket Report | **Search Criteria:** | 1:17-cv-00385-YK |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DANIELLE SALVATORE, | ) | |
| individually and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-00385-YK |
| | ) | |
| PENNSYLVANIA HIGHER | ) | Judge: Yvette Kane |
| EDUCATION ASSISTANCE | ) | |
| AGENCY, | ) | |
| a/k/a PHEAA, | ) | |
| a/k/a FEDLOAN SERVICING, | ) | *JURY TRIAL DEMANDED* |
| | ) | *EQUITABLE RELIEF SOUGHT* |
| *Defendant.* | ) | |

### FIRST AMENDED COMPLAINT--CLASS ACTION

Plaintiff, Danielle Salvatore ("Plaintiff"), pursuant to FED. R. CIV. P. 15(a)(1)(B),

by her undersigned attorney, on her own behalf and on behalf of all others similarly

situated, upon personal knowledge as to herself and her own acts, and upon information

and belief as to all other matters, brings this action against Defendant Pennsylvania

Higher Education Assistance Agency ("PHEAA") also known as PHEAA and also

known as FedLoan Servicing ("FedLoan") (collectively, "Defendant") and alleges as

follows:

## THE PARTIES

1.      Plaintiff Danielle Salvatore is an individual citizen of the State of Texas. Ms. Salvatore resides in San Antonio, Texas. Ms. Salvatore has been on active military duty since October 2012.

2.      Defendant Pennsylvania Higher Education Assistance Agency, also known as PHEAA, also known as FedLoan Servicing, is one of the nation's largest student loan servicers. Defendant is organized under the laws of Pennsylvania, 24 P.S. § 5101 and is headquartered and located in Harrisburg, Pennsylvania.

3.      Defendant is a citizen of the Commonwealth of Pennsylvania.

4.      Defendant may be served at 1200 North 7th Street, Harrisburg, Pennsylvania 17102.

## JURISDICTION AND VENUE

5.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331.

6.      Further, this Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. 1332(d)(2) based on minimal diversity of citizenship between Plaintiff and Defendant and an amount in controversy exceeding $5,000,000.

7.      This Court has supplemental jurisdiction over pendent state law claims pursuant to 28 U.S.C. §1367(a).

8.      This Court has personal jurisdiction over the Defendant because Defendant regularly and systematically conducts business in this District.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant has and continues to operate its student loan servicing enterprise in this District.

## FACTUAL ALLEGATIONS

### *An Overview of Student Loan Payment Plans*

10.     As of February 21, 2017, student loan borrowers in the United States owed over $1.4 *trillion* dollars in student loan debt (principal plus capitalized interest) – and this amount increases at a rate of $2,853.88 per second.[1]

11.     Upon entering repayment and at any time during the repayment process, federal student loan borrowers have multiple repayment options.

12.     Many student loan borrowers, rather than choosing the "standard" 10-year repayment option, which can range from hundreds to thousands of dollars per month, turn to "income-driven" student loan repayment plans.

13.     Income-driven repayment plans allow a student loan borrower to pay only a percentage of his or her "discretionary income" towards student loan debt each month, which is the only monthly payment many student loan borrowers can afford.

---

[1] Finaid.org debt calculator.
(http://www.finaid.org/loans/studentloandebtclock.phtml)

14.     For borrowers already struggling to pay ever-increasing childcare costs or save enough to purchase a first home, attempting to pay crushing student loan debt can seem impossible.

15.     This is especially true when the "standard" repayment option, which spreads the total principal amount of the loan plus daily interest over ten (10) years, can range from hundreds to *thousands* of dollars per month.

16.     As such, many student loan borrowers turn to "income-driven" repayment plans, which allow the borrower to pay only a percentage of his or her "discretionary income" as payments, rather than paying the full amount due under the "standard" repayment plan.

17.     However, these "income-driven" repayment plans are generally scheduled for payoff or forgiveness after twenty (20) or twenty-five (25) years.

18.     "Discretionary income" is the difference between the student loan borrower's adjusted gross income ("AGI") and 150 percent of the poverty guideline for the student loan borrower's family size.

19.     Before December of 2015, there were four income-driven repayment plans established under the Higher Education Act of 1965 that allowed financially-burdened student loan borrowers to repay his or her federal student loans at a reduced amount, but over a longer duration.

20.     These plans include:

(1)   <u>Income-Contingent Repayment ("ICR")</u> – 20% of discretionary income for 25 years, remaining balance is forgiven after 25 years of qualifying payments;

(2)   <u>Income-Based Repayment ("IRB")</u> – 15% of discretionary income for 25 years, remaining balance is forgiven after 25 years of qualifying payments;

(3)   <u>IBR for New Borrowers</u> – 10% of discretionary income for "new borrowers" for 20 years, remaining balance is forgiven after 20 years of qualifying payments;

(4)   <u>Pay-As-You-Earn ("PAYE")</u> – 10% of discretionary income, but only applies to a "new borrower" as of October 1, 2007, who also received a disbursement of a Direct Loan on or after October 1, 2011.

21.   Each of these plans allows student loan borrowers to only consider his or her income when calculating the applicable payment amount for each repayment plan.

22.   This is accomplished by the borrower filing his or her taxes as either "single" or "married filing separately."

23.   As such, under ICR, IBR, IBR for New Borrowers, and PAYE, there is a clear course of action that a student loan borrower can follow to ensure that the student loan borrower's income – and, importantly, *only* the student loan borrower's income – is considered in determining the income-driven payment amount.

24.   Stated differently, ICR, IBR, IBR for New Borrowers, and PAYE repayment plans allow a student loan borrower to exclude his or her spouse's income in the payment amount calculation by simply filing his or her federal taxes as "single" or "married filing separately."

25.   Additionally, each of these plans has a "cap," or maximum total payment amount that the student loan borrower would have to pay.

26.     For IBR and PAYE, no matter the borrower's income, he or she would never pay more than the standard repayment plan amount.

27.     For ICR, the borrower would never pay more than he or she would pay on a repayment plan with a fixed payment over the course of 12 years, adjusted according to his or her income.

28.     Beginning in December of 2015, the Higher Education Act authorized a fifth income-driven student loan repayment option for federal loans: Revised Pay-As-You-Earn or "REPAYE."

29.     REPAYE allows any borrower to pay only 10% of his or her "discretionary income," for 20 or 25 years, depending on whether there were Direct Loans taken out for graduate or professional study, and the remaining balance is forgiven.

30.     So, at first blush, REPAYE seems to offer student loan borrowers significant cost savings over ICR and IBR.

31.     However, REPAYE has several significant differences when compared to ICR, IBR, new IBR, and PAYE.

32.     First, and perhaps most importantly, REPAYE does not allow student loan borrowers to consider only his or her income in the income-driven repayment plan's payment amount calculation (unless the borrower is separated from his or her spouse or unable to determine his or her spouse's income).

33.     Rather, once a student loan borrower is married, his or her "discretionary income" *must include* his or her spouse's income – no matter how the borrower files his or her income taxes.

34.     This could, and often does, result in a significantly higher monthly payment amount, and, therefore, more money paid to the student loan holder under REPAYE as opposed to ICR, IBR, new IBR, and PAYE, which all allow a borrower to consider only his or her income in calculating his or her repayment amount.

35.     Secondly, and perhaps equally as important, there is no "cap" or maximum amount that the borrower could have to pay under REPAYE.

36.     This could result in significantly more paid to the student loan holder under REPAYE as opposed to ICR, IBR, new IBR, and PAYE, which all have a cap on the maximum amount the borrower could possibly pay.

37.     As such, borrowers under the REPAYE plan could, and upon information and belief, already have, found themselves paying significantly more per month than they would have paid under the standard repayment plan, ICR, IBR, new IBR or PAYE.

38.     Additionally, the Higher Education Act has two other important provisions that provide additional amounts to student loan holders when a borrower switches his or her repayment plan to REPAYE.

39.     First, when a borrower switches from IBR to REPAYE, he or she must first enter the standard 10-year repayment plan for one month – and, therefore, pay the

full standard payment for that month, which, in many cases will be an exorbitant amount.

40.     The only alternative to paying the full standard payment is to seek forbearance for that one-month transitional period, instead.

41.     However, the borrower will have to pay the student loan holder a fee for that forbearance and the student loan borrower's repayment schedule is placed on hold and pushed back until his or her first REPAYE payment.

42.     Additionally, if the student loan servicer does not appropriately process the student loan borrower's switch to REPAYE, the student loan borrower must continue to make full payments or continue in forbearance for more than one month: *i.e.*, as long as it takes the student loan servicer to finalize the switch.

43.     Further, when a borrower switches from IBR to REPAYE, any outstanding interest owed will be capitalized (i.e., added to the loan's principal balance).

### *Student Loan Servicer's Motivation to Improperly Switch Borrowers to REPAYE and Cause Other Delay Issues for Borrowers in Repayment*

44.     Student loan servicers, like Defendant, also have huge incentives to switch student loan borrowers to REPAYE or cause other delays or issues for a borrower in repayment.

45.     First, while it may seem logical that student loan servicers would not want their borrowers to be in forbearance, but rather be making monthly payments, that is not always the case.

46.    Instead, under their contract with the federal government, student loan servicers have a financial incentive to have some of their borrowers in repayment, but others in forbearance.

47.    This is evident after viewing Defendant's contract with the federal government. Exh A.

48.    Currently, Defendant's payment schedule is:

| CLIN | Status | Unit | Unit Measure | Unit Rate |
|------|--------|------|--------------|-----------|
| 0001 | In School | 1+ | EA | $ 1.05 |
| 0002 | In Grace | 1+ | EA | $ 1.68 |
| 0003 | In Repayment | 1+ | EA | $ 2.85 |
| 0004 | Service Member | 1+ | EA | $ 2.85 |
| 0005 | Deferment | 1+ | EA | $ 1.68 |
| 0006 | Forbearance | 1+ | EA | $ 1.05 |
| 0007 | Delinquent 6-30 Days | 1+ | EA | $ 2.11 |
| 0008 | Delinquent 31-90 Days | 1+ | EA | $ 1.46 |
| 0009 | Delinquent 91-150 Days | 1+ | EA | $ 1.35 |
| 0010 | Delinquent 151-270 Days | 1+ | EA | $ 1.23 |
| 0011 | Delinquent 271-360 Days | 1+ | EA | $ 0.45 |
| 0012 | Delinquent 361 or more Days | 1+ | EA | $0.45 |
| 0013 | Delinquency Reduction Compensation Program[1] | N/A | N/A | Not-to-Exceed $2,000,000 |
| | Cohort Default Rate (CDR) Challenge Support | | | |
| 0013 | Institution[2] | 1+ | EA | $213.00 |
| 0014 | Borrower[3] | 1+ | EA | $23.00 |
| | Loan Consolidation | | | |
| 0015 | One-Time Development Cost[4] | N/A | N/A | Not-to-Exceed $1,200,000.00 |
| 0016 | Consolidations Completed | 1+ | EA | $27.35 |
| 0017 | CDR Assistance Pilot (rate per school assisted)[5] | 1+ | EA | $18,000.00 |
| | Public Service Loan Forgiveness (PSLF)[6] | | | |
| 0018 | Approved Employment Certification Form | 1+ | EA | $5.00 |
| 0019 | Denied Employment Certification Form | 1+ | EA | $2.50 |
| 0020 | Borrowers in TEACH Grant Status | 1+ | EA | $1.05 |

Exh. A.

49.    Under Defendant's contract, Defendant makes $2.85 per month for each student loan borrower who is in repayment.

50.     Under Defendant's contract, Defendant makes $1.68 per month for each student loan borrower who is in deferment.

51.     Under Defendant's contract, Defendant makes $1.05 per month for each student loan borrower who is in forbearance.

52.     Under Defendant's contract, Defendant makes $2.85 per month for each student loan borrower who is a service member receiving benefits under the Servicemembers Civil Relief Act, or other qualifying criteria.

53.     Defendant is the main student loan servicer for student loan borrowers who file a Public Student Loan Forgiveness ("PSLF") certification.

54.     That program provides that after 120 months of qualifying payments, a student loan borrower's outstanding student loan debt would be discharged.

55.     Thus, for Defendant, each student loan borrower who is transferred to Defendant because of his or her filing of a PSLF certification, Defendant knows or should know that the borrower is worth at least $342.00 (120 months x $2.85 / month = $342.00).

56.     However, Defendant can, and has attempted to here, make extra money per borrower by making sure that the borrower must take a forbearance or deferment.

57.     For example, if a student loan borrower has to take 4 months of forbearance due to Defendant's falsifying his or her income certification form, then Defendants get 4 months of the "forbearance" rate - $1.05 per month.

58.     This is turn makes a student loan borrower that was initially worth $342.00 worth $346.20 ($342.00 + ($1.05 / month x 4 months) = $346.20).

59.     Causing issues for Plaintiff is even more lucrative for Defendant. Because Plaintiff is a servicemember, Defendant would not see a reduction in the monthly payment rate, as the servicemember rate is $2.85 per month.

60.     Applying the formula above, an extra 4 months of forbearance for a servicemember actually increases the worth of a borrower from $342.00 to $353.40 ($342.00 + ($2.85 / month x 4 months) = $353.40).

61.     The same formulas apply for student's not on PSLF, but who are on plans for some other type of forgiveness after a period of 20 or 25 years.

62.     As such, Defendant has a financial incentive to switch student loan borrowers to REPAYE or take other actions to cause delays or issues for borrowers in repayment in order to place – and *keep* – them in forbearance while Defendant processes the change.

63.     Further, Defendant has an incentive to falsify student loan borrower's documents, like Defendant did to Plaintiff, or to otherwise derail student loan borrower's payments, so that Defendant can employ its system of taking months to attempt to remedy issues, all the while collecting extra monthly payments for servicing the loans, thereby increasing a student loan borrower's worth to Defendant.

64.     Moreover, Defendant delays processing requests and other documents, so that student loan borrowers have to remain in forbearance or deferment for longer periods, resulting in more money, over time, for Defendant.

65.     Consequently, if the student loan servicer does not appropriately and timely process the student loan borrowers switch to between repayment plans, the student loan borrower must continue to make full payments or continue in forbearance until the student loan servicer finalizes the switch which results in more money per borrower, over time, to Defendant

*When Deception Fails, Defendant Chooses to Enroll Student Loan Borrowers in REPAYE without Authorization and Attempt to Otherwise Delay Student Loan Borrowers Repayment Attempts*

66.     Upon information and belief, when Defendant is unable to coerce student loan borrowers into switching to REPAYE by failing to clearly describe and misrepresenting REPAYE and its consequences, Defendant still switches borrowers to REPAYE against their will.

67.     Defendant accomplishes this by checking or representing to borrowers that they had checked Item #2 on the borrower's Income-Driven Repayment Plan Request, which states, "(Recommended) I want my loan holder to place me on the plan with the lowest monthly payment."

68.     Once Defendant has checked Item #2 on the Income-Driven Repayment Plan Request, Defendant proceeds as though it has non-revocable power to place

student loan borrowers in REPAYE – even if student loan borrowers contact Defendant and alert Defendant that the student loan borrower did not check Item #2.

69.     Therefore, once Defendant has checked Item #2 on the Income-Driven Repayment Plan Request, Defendant can place that borrower in REPAYE, despite the numerous detrimental side-effects REPAYE can and will have on the student loan borrower.

70.     Defendant, upon information and belief, takes similar actions with other repayment plans to cause issues for student loan borrowers, which almost always requires the student loan borrower to be placed on forbearance or deferment.

*Plaintiff Was Forced Into REPAYE Against Her Will*

71.     On February 26, 2015, Plaintiff submitted a Federal Direct Consolidation Loan Application and Promissory Note, consolidating her only three non-Direct loans,[2] and an Income-Driven Repayment Plan Request, checking the "IBR" box under "Direct Loan Program Loans."

72.     On April 9, 2015, Defendant sent Plaintiff a letter, stating that she had been approved for IBR and her payments, for her newly consolidated Direct loan, was $0.00.

---

[2] Plaintiff had seven loans that were already Direct student loans.

73.     Plaintiff received a letter from Defendant, showing her recently consolidated Direct loan and providing a payment amount of $0.00 on April 10, 2015, April 26, 2015, and May 27, 2015.

74.     On June 5, 2015, Defendant sent Plaintiff a letter, stating that, as she had submitted a PSLF Employment Certification, all of her loans were being transferred to Defendant.

75.     Plaintiff received a letter from Defendant, showing her recently consolidated Direct loan and providing a payment amount of $0.00 on June 26, 2015, August 27, 2015, October 27, 2015, November 26, 2015, and December 27, 2015.

76.     On December 24, 2015, Defendant sent Plaintiff a letter, stating that Plaintiff's loans were currently under IBR and, therefore, she needed to submit her annual recertification of income and family size by February 26, 2016.

77.     On January 7, 2016, Plaintiff sent Defendant her Income-Driven Repayment Plan Request. A true and accurate copy is provided as Exhibit B.

78.     Plaintiff's income had increased, so she was unable to recertify using her federal income tax information.

79.     Therefore, Plaintiff *typed* out her Income-Driven Repayment Plan Request, but *signed* it and mailed it in.

80.     For Item #1, "Select the reason you are submitting this form (Check one only)," Plaintiff *typed* and "X" for Box #2: "I am already in an income-driven

repayment plan and am submitting documentation for the annual recalculation of my payment. Skip to Item 5."

81.      Plaintiff then skipped and left blank Items #3 and #4, continuing to *type* her responses for Item #5, #6, #7, #8, #9, and #10.

82.      Plaintiff then *signed* and dated the form in a light pen marking.

83.      On January 27, 2016, Plaintiff received a letter from Defendant, showing her recently consolidated Direct loan and providing a payment amount of $0.00.

84.      On February 13, 2016, Defendant sent Plaintiff a letter, showing Plaintiff's seven prior Direct loans and providing a payment amount of $290.20.

85.      Prior to that, Plaintiff was paying less than $100 per month for her loans under her IBR plan; therefore, having heard nothing to the contrary, Plaintiff believed her income-driven request had been processed and this was her new IBR payment amount.

86.      As such, Plaintiff paid this $290.20.

87.      On February 25, 2016, Defendant sent Plaintiff a letter, showing her recently consolidated Direct loan and providing a payment amount of $0.00.

88.      On March 5, 2016, Defendant sent Plaintiff a letter, again showing Plaintiff's seven prior Direct loans and providing a payment amount of $290.20.

89.      Plaintiff paid this $290.20.

90.      On March 27, 2016, Defendant sent Plaintiff a letter, again showing her recently consolidated Direct loan and providing a payment amount of $0.00.

91.     On April 5, 2016, Defendant sent Plaintiff a letter, again showing Plaintiff's seven prior Direct loans and providing a payment amount of $290.20.

92.     Plaintiff paid this $290.20.

93.     On April 13, 2016, Defendant sent Plaintiff a letter, stating:

> We received your request to remove your loans from an Income-Based Repayment (IBR) plan and to repay under another plan. We removed your loans from IBR and placed them on a Standard Repayment plan. In order to complete your repayment plan change, you are required to make a payment under the Standard Repayment plan. If the Standard payment amount is too high, a reduced payment forbearance option may be available. If you qualify, this option allows you to remit a lower payment amount to complete your repayment plan change.
>
> **What's Next**
> You will receive a bill for the Standard payment amount and you must remit payment no later than 15 days after the due date. If you can't afford the payment and need to request a reduced payment forbearance, please contact us. If you do not pay or contact us, you will remain on the Standard Repayment plan.
>
> **Good to Know**
> After you make the requested payment, we will put your account on the repayment plan that you originally selected. We will send you a confirmation letter when that process is complete.

94.     On April 14, 2016, Defendant sent Plaintiff a letter, stating, "The repayment schedule for some of all or your student loans changed. Please review the new Repayment Schedule information on the back of this letter. These new terms take effect on the due date listed. We will send a bill approximately 20 days prior to your due date." There is no information on the back of that letter.

95.     On April 14, 2016, Defendant capitalized $1,135.59, 4,775.63, $114.88, $2,620.17, $4,010.85, $114.88, $2,487.78, and $4,774.90 in accrued interest. <u>In total, $20,034.68 was capitalized</u> – or added to Plaintiff's interest-accruing principal balance.

96.     After receipt of these letters, having no idea what was going on, Plaintiff contacted Defendant by telephone.

97.     Plaintiff informed Defendant that she had been paying her IBR payments since February and wanted an explanation for the April letters and bills.

98.     Defendant told Plaintiff that her Income-Driven Request was just being processed and that Plaintiff had selected to be switched to the plan with the lowest monthly payment.

99.     Plaintiff responded that this was not true and that she had selected to continue on IBR, and Plaintiff requested to continue on her IBR plan, which she had been on before Defendant was assigned to service her student loans, and had been on IBR with Defendant since February of 2016.

100.    Defendant informed Plaintiff that she had no choice and would be routed to the plan with the lowest payment amount, which also required that she either make the standard payment she had already been billed for or she could request a forbearance.

101.    Plaintiff again insisted that she had not selected to switch plans, but rather had selected to remain on her current plan – IBR.

102.    Defendant responded that she had checked the box to allow them to switch Plaintiff, so that is what they did.

103.    Plaintiff asked Defendant what her $290.20 payments, which she had been making since February, had been for; Defendant was unable to provide a response.

104.    Plaintiff insisted that she had not checked a box to allow Defendant to switch her plan and requested a copy of this alleged document.

105.    Thereafter, Defendant provided Plaintiff a copy of an Income-Driven Repayment Plan Request that Defendant claimed Plaintiff had submitted. This form was the same that Plaintiff had filled out, <u>except that it now had a heavily marked "X" *written* into Item #2, choosing "(Recommended) I want my loan holder to place me on the plan with the lowest monthly payment."</u> Exh. C.

106.    Plaintiff is as adamant today as she was when she spoke with Defendant in April 2016, that she did not mark Item #2.

107.    Item #2 also states, "Choose a plan and then continue to Item #3" – but there is nothing *typed* or *written* into Item #3 or Item #4, which is how Plaintiff filled it out, because she *typed* in Item #1, which then told her to skip to Item #5.

108.    Other selections support that Defendant, not Plaintiff, marked Item #2, including the fact that the mark for Item #2 is clearly different than the selections made by Plaintiff, and if Plaintiff was going to switch payment plans (which she did not do) this which would require a full months payment, so Plaintiff would have selected the options " I want a one-month reduced-payment forbearance in the amount of $ _____ (must be at least $5)." as she could not afford a payment on the full standard repayment plan.

109.    The Income-Driven Repayment Plan Request provided as Exhibit B bears the identification number 6314198 on and is the only such available document in Plaintiff's studentloans.gov account.

110.    Plaintiff accessed the document on studentloans.gov, and the electronic document, as of May 24, 2017, still reflects how Plaintiff filled out the form – with no marking in Item #2.

111.    Any document that is presented to this Court with Item #2 marked was marked by Defendant, or someone other than Plaintiff.

112.    On April 26, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan and providing a payment amount of $210.88.

113.    On May 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans and providing a payment amount of $1,947.06.

114.    On May 25, 2016, Defendant sent Plaintiff a letter, stating that she had been approved for a forbearance from June 16, 2016 through July 15, 2016 for her newly consolidated Direct loan and from June 25, 2016 through July 24, 2016 for her prior seven Direct loans.

115.    On June 1, 2016, Defendant capitalized $150.78, $165.26, $52.40, $97.90, $138.80, $52.40, $92.95, and $165.26 in accrued interest. In total, $915.75 was capitalized.

116.    On June 10, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *in forbearance* and providing for a payment amount of $5.00.

117.    On June 25, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan *in forbearance* and providing for a payment amount of $1.30.

118.    On June 26, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan *not in forbearance* and providing for a payment amount of $210.88.

119.    On July 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *in forbearance* and providing for a payment amount of $4.35.

120.    On July 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *not in forbearance* and providing for a payment amount of $2,073.07.

121.    On July 7, 2016, Defendant sent Plaintiff a letter, stating:

> We reviewed your Income-Driven Repayment (IDR) plan form and denied your request for the following reasons.
>
> CONFLICTING INFORMATION: You requested to have your monthly plan recalculated, but also selected a new repayment plan in question 2. Please send a new application, either requesting only the recalculation and leaving question 2 blank, or requesting that you want to change plans.

122.    On July 13, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *in forbearance* from July 25, 2016 through August 15, 2016.

123.    On July 13, 2016, Defendant sent Plaintiff a letter, stating:

> We approved your request for an Income-Driven Repayment (IDR) plan. Your new repayment plan is Revised Pay As You Earn (REPAYE) for the loans listed. We used your income documentation and family size to determine your new monthly payment of $379.24 which is first due on 8/16/2016.

Your new monthly payment amount is effective for all payments due between 08/16/2016 and 08/01/2017. You are still responsible for any payments due before 08/16/2016. About 3 months prior to 08/01/2017, we will send you notification letting you know that you are due to recertify (complete application and provide updated income documentation). If you do not recertify, any outstanding interest will likely be capitalized and your payment amount may increase.

124.    As of July 18, 2016, Defendant placed Plaintiff's newly consolidated Direct loan into "*delinquent*" status and placed her other seven prior Direct loans into "*forbearance*" status.

125.    On July 19, 2016, Defendant sent Plaintiff a letter, stating that she had been approved for a *forbearance* from July 16, 2016 through August 15, 2016 for her newly consolidated Direct loan and from July 25, 2016 through August 15, 2016 for her prior seven Direct loans.

126.    On July 26, 2016, Defendant sent Plaintiff a letter, stating that she had accrued $2,213.35 in interest, which would capitalize on August 16, 2016 if she did not pay the amount.

127.    On July 27, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $220.72 and was first due on August 16, 2016.

128.    On August 4, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $379.27 and was first due on September 16, 2016.

129.    On August 6, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $220.72 and was first due on September 16, 2016.

130.    On August 16, 2016, capitalized $210.86, $298.02, $94.53, $176.67, $250.31, $94.53, $167.72, and $298.02 in accrued interest. In total, $1,588.05 was capitalized.

## Defendant is Refusing to Return Borrowers to their Prior Plan without Ramifications

131.    In addition to improperly switching borrowers out of their chosen income-driven plan, once notified, Defendant fails to place student loan borrowers in the correct plan, without any ramifications to the student loan borrower.

132.    When Plaintiff discovered that Defendant had changed her repayment plan from IBR to REPAYE, she contacted Defendant and told Defendant that she had been on IBR, she had requested to remain on IBR when she recertified, and she wanted to continue on IBR, rather than being switched into a new repayment plan.

133.    Defendant told Plaintiff that she could not remain on IBR (which is false), that she had no choice except to be routed by Defendant to the plan with the lowest payment amount (which is false), which also required that she either make a standard payment or she could request a forbearance.

134.   After Defendant told Plaintiff she had no other choice, and because Plaintiff feared adverse financial consequences, she agreed to a one-month forbearance with a reduced payment amount.

135.   However, Defendant told Plaintiff it was too late for that payment, but she would rather have to undergo a deferment, instead.

136.   As such, Defendant placed Plaintiff on a deferment for April 2016 and processed a forbearance request for May 2016.

137.   This is how Defendant's plan works. By fabricating issues and delaying processing requests, Defendant subtly increases the amount of money it makes off of student loan borrowers.

### *Defendant Utilizing an Income-Driven Repayment Request Process that Takes More than One Month, as "Time is Money" for Defendant*

138.   Defendant is utilizing an income-driven repayment plan request processing procedure that takes many, many months – to the detriment of the student loan borrower, but the benefit of the student loan holder and servicer.

139.   For instance, while the Higher Education Act contemplates a one-month period to switch a borrower to REPAYE, Defendant's document and information processing procedure actually takes many, many months.

140.   The reason is simple – for Defendant, "time is money."

141.   Defendant's scheme to increase forbearances and deferments – and therefore the worth of student loan borrowers to Defendant – is addressed above.

142.    As student loan borrowers accrued interest continues to capitalize while they are in forbearance and waiting for their switch to REPAYE, the longer they are in forbearance, the more their principal and accrued interest increases.

143.    In fact, on information and belief, Defendant *automatically* processes two months of forbearance every time they tell borrowers they are processing an administrative forbearance, without alerting the borrower of this or seeking their permission to do so.

144.    Finally, Defendant saves costs by having a lengthy processing time, as Defendant does not have to hire as many employees as would be required to timely process all of its income-driven requests.

### It Took Many, Many Months for Defendant to Process Plaintiff's Income-Driven Plan Request

145.    On December 24, 2015, Defendant sent Plaintiff a letter, stating that Plaintiff's loans were currently under IBR and, therefore, she needed to submit her annual recertification of income and family size by February 26, 2016.

146.    On January 7, 2016, Plaintiff sent Defendant her Income-Driven Repayment Plan Request.

147.    It was not until April 13, 2016, more than 3 months later, that Defendant sent Plaintiff a letter, stating:

> We received your request to remove your loans from an Income-Based Repayment (IBR) plan and to repay under another plan. We removed your loans from IBR and placed them on a Standard Repayment plan. In order to complete your repayment plan change,

you are required to make a payment under the Standard Repayment plan. If the Standard payment amount is too high, a reduced payment forbearance option may be available. If you qualify, this option allows you to remit a lower payment amount to complete your repayment plan change.

**What's Next**
You will receive a bill for the Standard payment amount and you must remit payment no later than 15 days after the due date. If you can't afford the payment and need to request a reduced payment forbearance, please contact us. If you do not pay or contact us, you will remain on the Standard Repayment plan.

**Good to Know**
After you make the requested payment, we will put your account on the repayment plan that you originally selected. We will send you a confirmation letter when that process is complete.

148.    Defendant should be able to process this in a timely manner, within one month.

149.    On April 14, 2016, Defendant sent Plaintiff a letter, stating, "The repayment schedule for some of all or your student loans changed. Please review the new Repayment Schedule information on the back of this letter. These new terms take effect on the due date listed. We will send a bill approximately 20 days prior to your due date." There is no information on the back of that letter.

150.    Then, on April 14, 2016, Defendant capitalized $1,135.59, 4,775.63, $114.88, $2,620.17, $4,010.85, $114.88, $2,487.78, and $4,774.90 in accrued interest. In total, $20,034.68 was capitalized.

151.   On April 26, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan and providing a payment amount of $210.88.

152.   On May 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans and providing a payment amount of $1,947.06.

153.   On May 25, 2016, Defendant sent Plaintiff a letter, stating that she had been approved for a *forbearance* from June 16, 2016 through July 15, 2016 for her newly consolidated Direct loan and from June 25, 2016 through July 24, 2016 for her prior seven Direct loans.

154.   On June 1, 2016, capitalized $150.78, $165.26, $52.40, $97.90, $138.80, $52.40, $92.95, and $165.26 in accrued interest. In total, $915.75 was capitalized.

155.   On June 10, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *in forbearance* and providing for a payment amount of $5.00.

156.   On June 25, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan *in forbearance* and providing for a payment amount of $1.30.

157.   On June 26, 2016, Defendant sent Plaintiff a letter, showing her newly consolidated Direct loan *not in forbearance* and providing for a payment amount of $210.88.

158.   On July 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *in forbearance* and providing for a payment amount of $4.35.

159.   On July 5, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *not in forbearance* and providing for a payment amount of $2,073.07.

160.    On July 7, 2016, Defendant sent Plaintiff a letter, stating:

We reviewed your Income-Driven Repayment (IDR) plan form and denied your request for the following reasons.

CONFLICTING INFORMATION: You requested to have your monthly plan recalculated, but also selected a new repayment plan in question 2. Please send a new application, either requesting only the recalculation and leaving question 2 blank, or requesting that you want to change plans.

161.    On July 13, 2016, Defendant sent Plaintiff a letter, showing her seven prior Direct loans *in forbearance* from July 25, 2016 through August 15, 2016.

162.    On July 13, 2016, Defendant sent Plaintiff a letter, stating:

We approved your request for an Income-Driven Repayment (IDR) plan. Your new repayment plan is Revised Pay As You Earn (REPAYE) for the loans listed. We used your income documentation and family size to determine your new monthly payment of $379.24 which is first due on 8/16/2016.

Your new monthly payment amount is effective for all payments due between 08/16/2016 and 08/01/2017. You are still responsible for any payments due before 08/16/2016. About 3 months prior to 08/01/2017, we will send you notification letting you know that you are due to recertify (complete application and provide updated income documentation). If you do not recertify, any outstanding interest will likely be capitalized and your payment amount may increase.

163.    As of July 18, 2016, Defendant placed Plaintiff's newly consolidated Direct loan into "*delinquent*" status and placed her other seven prior Direct loans into "*forbearance*" status.

164.    On July 19, 2016, Defendant sent Plaintiff a letter, stating that she had been approved for a *forbearance* from July 16, 2016 through August 15, 2016 for her

newly consolidated Direct loan and from July 25, 2016 through August 15, 2016 for her prior seven Direct loans.

165.    On July 26, 2016, Defendant sent Plaintiff a letter, stating that <u>she had accrued $2,213.35 in interest</u>, which would capitalize on August 16, 2016 if she did not pay the amount.

166.    On July 27, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $220.72 and was first due on August 16, 2016.

167.    On August 4, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $379.27 and was first due on September 16, 2016.

168.    On August 6, 2016, Defendant sent Plaintiff a letter, stating that they had recalculated her monthly payment under REPAYE; as such, her payment was $220.72 and was first due on September 16, 2016.

169.    On August 16, 2016, capitalized $210.86, $298.02, $94.53, $176.67, $250.31, $94.53, $167.72, and $298.02 in accrued interest. <u>In total, $1,588.05 was capitalized</u>.

170.    On or about September 15, 2016, Plaintiff began paying $220.72 monthly, as stated by Defendant's August 6, 2016 letter.

171.    As such, while Plaintiff sent in her income-driven annual recertification in January of 2016, due to Defendant's unlawful acts, she was not able to start making income-driven payments until September of 2016, more than 8 months later.

*The CFPB's Warnings to Student Loan Servicers*

172.    Prior to Defendant's unfair, deceptive, and illegal acts, the Consumer Financial Protection Bureau ("CFPB") issued its September of 2015 report, titled "Student Loan Servicing: Analysis of Public Input and Recommendations for Reform."[3]

173.    The CFPB's report provides important context here, and shows that Defendant was, or should have been aware of the issues alleged by Plaintiff.

174.    The CFPB's report details many actions, processes, and procedures undertaken by student loan servicers, which are often the exact unfair, deceptive and illegal practices Defendant is often engaging in.

175.    Obviously, Defendant did not follow the CFPB's recommendations or reform its actions, as Defendant continued to engaged in these actions, processes, and procedures even after the release of the September 2015 report, which stated, in relevant part:

> For borrowers experiencing financial hardship, flexible repayment options can be a powerful tool to keep borrowers on track to satisfy their

---

[3] Available at http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf (last accessed May 26, 2016)(provided as Exhibit D).

obligations, particularly income-driven plans available to the vast majority of borrowers with federal loans experiencing financial distress. (Page 17-18)

**Periods of nonpayment, such as forbearance, can significantly increase the amount of unpaid interest, cause borrowers' total debt to grow, and ultimately prevent borrowers from making progress toward satisfying their obligation to repay the debt owed.** (Page 25)(emphasis added)

**Federal student loan borrowers may be enrolled in a repayment plan that does not reflect their choice due to paperwork processing errors.** Borrowers with federal student loans can request that their student loan servicer select the income-driven repayment plan with the lowest monthly payment, an option designed to assist borrowers when selecting between multiple, seemingly-similar options. **Comments from individual student loan borrowers and borrower assistance organizations state that servicers may enroll borrowers in a repayment plan that does not reflect the borrower's choice and borrowers must contact their servicer a second time to re-enroll in the plan with the lowest monthly payment amount.** (Page 27-28)(emphasis added)

**Borrowers report encountering delays and processing errors when attempting to certify income while enrolling in an income-driven repayment plan.** ... Other borrower comments note that processing delays may lead to missed payments, late fees, or unnecessary use of forbearance. (Page 29)

Federal rules for these repayment plans include significant negative consequences for borrowers who continue to be eligible for PFH payments and wish to remain enrolled, but for whom recertification is not timely, such as: **Payment shock**. **When borrowers' recertification is not timely, borrowers receive billing statements reflecting a monthly payment calculation based on the amount they would have owed under the standard 10-year repayment plan prior to entering an income-driven repayment plan (known as the permanent standard payment amount)**. (Page 33)(emphasis added)

Borrowers who have high debt or low income over a long period of time can still satisfy their financial obligations by continuing to make on-time

PFH payments, even if these payments are not high enough to pay down principal. For these borrowers enrolled in income-driven repayment plans, every month that they make a qualifying payment satisfies a prerequisite to obtain loan forgiveness. **However, if a servicer fails to promptly process an application for either of these repayment plans, a borrower may experience two kinds of negative consequences. First, a borrower may be forced to pay the higher monthly payment, thus decreasing the amount entitled to be forgiven. Second, delayed processing could force a borrower to use forbearance, thus extending the eligibility date for forgiveness by each month that it takes to approve the recertification application. Both of these could result in hundreds or thousands of dollars in additional extra payments paid by the borrower.** Commenters identify specific problems related to recertification, including issues involving notices, paperwork processing delays, and incorrect information from customer service personnel. **As outlined above, the costs to borrowers who do not have a timely recertification processed by their student loan servicers can be substantial.** (Page 34-35)(emphasis added)

Moreover, if a borrower submits income documentation and a recertification application within 10 days of the annual recertification deadline, the servicer is required to maintain the current payment amount until the income documentation is processed and the new payment amount can be calculated. Although this regulation protects these borrowers against the payment shock that results from a failure to recertify on time, **some borrowers could face interest capitalization, forfeited interest subsidy, or delayed loan forgiveness, depending on servicers' policies.** Comments from student loan borrowers suggest that servicers may not consistently apply the protection against payment shock, despite federal regulatory requirements. **Commenters note that borrowers may submit the required paperwork but servicers may take up to two months to process an application, during which the borrowers' annual recertification deadlines may pass.** Comments from borrowers also state that processing delays may cause borrowers' payments to revert to their standard 10-year monthly payments, even if paperwork is received by the deadline. (Page 36-37)(emphasis added)

176.    Then, in August of 2016, the CFPB issued its "Midyear Update on Student Loan Complaints: Income-driven Repayment Plan Application Issues" (available at: http://files.consumerfinance.gov/f/documents/201608_cfpb_StudentLoanO mbudsmanMidYearReport.pdf) (also provided as Exhibit E). This publication describes the exact unfair, deceptive and illegal practices Defendant is engaging in:

> **The Bureau handled complaints from borrowers describing IDR application processing delays that last weeks or months, during which these borrowers lose out on protections that can lower their monthly payment, save them money on interest charges, and start them on the path to loan forgiveness.** Many student loan borrowers are able to complete the application process for an IDR plan online at www.studentloans.gov, supplemented by tax information provided electronically by the Internal Revenue Service. For these borrowers, a student loan servicer need only validate the information provided, and approve or deny the application. However, consumers seeking to apply online in this manner report encountering costly and cumbersome delays. (Page 3)(emphasis added)

> Borrowers report that servicers reject borrowers' applications without providing borrowers the opportunity to fix mistakes or update documentation. **Instead of facilitating these borrowers' enrollment in their requested IDR plan, clumsy or flawed IDR enrollment practices mean borrowers are unlikely to obtain an affordable repayment option.** ... These borrowers rely on their student loan servicer to evaluate whether borrowers' supporting documentation is sufficient to approve or deny an enrollment application, and to work with them to address any deficiencies in their application. However, consumers report surprise rejections that can lead to payment shocks, delayed benefits, and increased interest charges. (Page 3)(emphasis added)

**When borrowers seek to investigate potential repayment options and contact their lender or servicer to obtain information, complaints reveal that some of these borrowers may receive responses that servicers do not or were unable to offer an alternative repayment plan.** (Page 12)(emphasis added)

The Bureau has repeatedly discussed widespread problems reported by consumers related to student loan servicing practices, and in particular, practices related to IDR plans. To date, we have focused on two key areas where there is a mismatch between borrower expectations and actual service delivered. **First, we described problems identified by consumers related to the information provided by student loan servicers regarding available repayment options.** These include concerns raised by borrowers related to practices by some servicing personnel that drive borrowers into short-term alternatives such as forbearance, instead of longer-term options that may be better suited to meet many borrowers' needs. **Second, we highlighted problems borrowers described when seeking to maintain an income-driven monthly payment amount, including issues related to servicer communications regarding borrowers' obligation to recertify income and family size under these plans.** This report focuses on a **third key area in the lifecycle of a student loan borrower enrolled in an IDR plan—the processing of application paperwork and other obstacles related to IDR enrollment.** (Page 14)(emphasis added)

**In particular, consumer complaints continue to cite IDR enrollment issues that result in lost interest subsidy benefits, potentially delay eligibility for loan forgiveness benefits, and trigger unnecessary capitalization of interest.** (Page 16)(emphasis added)

To enroll in an IDR plan, borrowers are required to submit an application, along with proof of income and family size, to their servicer for review and processing. This application may be submitted online through www.studentloans.gov—an information system managed by the Department of Education—or via paper application, submitted directly to a student loan servicer. **In both cases, servicers target processing IDR applications within 15 days.** (Page 16-17)(emphasis added)

**Servicers' failure to timely process these applications can be detrimental to borrowers. Borrower complaints note that IDR applications may take weeks or months to process, delaying borrowers' access to the consumer protections described above.**

**Furthermore, when borrowers' enrollment in IDR is delayed, they may be subject to otherwise avoidable harms, such as increased loan balances and loss of benefits.** (Page 18)(emphasis added)

Borrowers complain that their loan balances grow due to the accrual and capitalization of interest during extended application processing periods. Generally, servicers will place a borrower's loans into administrative forbearance for up to 60 days while processing an initial IDR application. During periods of forbearance, interest continues to accrue. However, unlike other types of forbearance, interest accrued during a period of administrative forbearance will not capitalize (i.e., will not be added on to a borrower's principal balance) if an application is processed and the borrower is successfully enrolled in IDR during this period. **However, borrowers report that servicers may take longer than 60 days to process their applications, even when these applications are complete and submitted timely. Borrowers complain that their administrative forbearance period expires before their application is processed, and only learn of the expiration of forbearance when they receive an unexpected bill indicating that they owe a payment set at their prior, standard 10-year amount. For some borrowers, this can also result in the capitalization of unpaid interest charges, potentially increasing loan balances by hundreds or even thousands of dollars.** (Page 19)(emphasis added)

Delayed IDR enrollment also delays and decreases borrowers' potential loan forgiveness. Borrowers enrolled in an IDR plan are entitled to forgiveness of any remaining loan balance after 20 or 25 years of qualified payments. If these borrowers are employed in public service, they can receive loan forgiveness after 10 years of qualified payments. **Borrowers complain that their servicer's delayed processing of their IDR applications is obstructing their road to repayment, and effectively reducing any loan forgiveness benefit they may ultimately receive.** One borrower notes: [My servicer] still [has] not completed the processing of my application. . . . This delay . . . is creating a hardship on me, as it is lengthening the amount of time I remain in debt and delays my final repayment date back as many months as [my servicer is] unable to get me into the new repayment plan. I am also enrolled in the Public Service Loan Forgiveness program, so the "clock" on my maximum 10-year repayment time span has essentially stopped. ... (Page 20)(emphasis added)

In effect, borrowers using forbearance forgo qualifying months at their present income and family size and assume an obligation to make future monthly payments—in some circumstances, borrowers may experience future wage growth that makes these monthly payments substantially higher than payments based on their current income and family size. For these borrowers, processing delays can result in higher future payments that may further increase the total lifetime cost of their loan. (Footnote 19) (emphasis added)

It is also important to note that in both cases described above, the borrowers would miss out on progress toward loan forgiveness during any month in which the borrowers needed to use forbearance to postpone an unaffordable monthly payment. In effect, because each borrower must still make 240 months of qualifying payments in total, not including any months spent in forbearance, each borrower forgoes qualifying months toward loan forgiveness in the near term, but remains obligated to make additional monthly payments in the future. This may prove particularly costly if either borrower experiences wage growth, causing future qualifying payments to be calculated based on a higher income. As these examples demonstrate, there are multiple touch points during the IDR application process where processing delays can lead to substantial increases in costs for consumers. (Page 28)(emphasis added)

Borrowers on an IDR plan can expect to recertify income and family size as many as 24 times during the life of their loan. If a single application processing delay can increase a borrower's loan balance by over $1000, delays during each annual recertification process could cause a borrower's loan balance to increase by tens of thousands of dollars. (Page 28)(emphasis added)

*A Review of Defendant's Unlawful Scheme to Increase The Worth of Each Student Loan Borrower's Account*

177.   Defendant's unfair, deceptive, and illegal practices allow Defendant, as the

student loan servicer, to gain extra monthly payments from the government that it

would not be entitled to but for if the borrower was not switched to REPAYE, another

repayment plan, or otherwise had his or her account and regular payment of his or her student loans sabotaged by Defendant.

178.    Defendant accomplishes this goal by using deception to convince borrowers to switch to REPAYE, falsifying documents creating issues with student loan borrowers' accounts, and by employing a processing procedure that takes more than one month.

179.    Through this First Amended Complaint, Plaintiff seeks declaratory and injunctive relief, as well as compensation, on her own behalf and on behalf of a class of those similarly situated, for the violation of various laws, including but not limited to, the unfair, deceptive, and illegal acts and practices of Defendant.

180.    Some of Defendant's acts include, but are not limited to:

a)  forcing student loan borrowers to switch to REPAYE or another student loan payment plan,

b)  creating issues with student loan borrowers' accounts resulting in the student loan borrower having to be placed on forbearance or deferment;

c)  refusing to return improperly switched student loan borrowers to their previously chosen plan without any ramifications to the student loan borrower,

d)  employing a paperwork or information processing procedure that lasts more than one month;

e)  charging extra fees the student loan borrower would not have to pay if the borrower was not switched to between plans,

f)  charging extra standard, full payments the student loan borrower would not have to pay if the student loan borrower was not switched between plans,

g) charging extra interest on that capitalized interest/capital that student loan borrowers would not have to pay if the student loan borrowers were was not switched between plans, and

h) charging extra higher payments when the student loan borrower has to pay his or her final months of repayment at a higher, time-adjusted wage because his or her required months were extended only because Defendant's scheme required the use of forbearance or deferment by student loan borrowers.

181.   In short, Defendant has created a system that allows Defendant to extract a few extra monthly payments from the government by creating issues with student loan borrowers accounts. As such, Defendant are operating in a way most beneficial to themselves and, often, in a manner directly opposite of that requested and expected by the student loan borrower.

182.   Therefore, Plaintiff and all others similarly situated have been damaged as a direct and proximate result of Defendant's willful and intentionally unlawful, unfair, and deceptive conduct, warranting punitive damages for Defendant's irreprehensible behavior and injunctive relief to prevent Defendant from continuing to switch student loan borrowers between payment plans or otherwise creating issues with student loan borrowers' accounts so that student loan borrowers have to be placed on forbearance or deferment, and preventing Defendant from having a paperwork or information processing system that that takes more than one month to process simple documents and information.

**CLASS ACTION ALLEGATIONS**

183.   Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3)

of the Federal Rules of Civil Procedure on behalf of herself and classes of persons

similarly situated for declaratory, injunctive, and monetary relief, and defined as:

**Unfair and Deceptive Practices Class**
All individuals who currently have or since March 1, 2014 have had Defendant as
his or her student loan servicer, and have been subject to Defendant's unfair and
deceptive business practices, as outlined below in Count I, and who have suffered
damages due to Defendant's unfair and deceptive practices.

**Constructive Fraud Class**
All individuals who since March 1, 2012 were subjected to Defendants' unfair,
misleading, and/or deceptive conduct, as further described below in Count III, and
who have suffered damages do to Defendant's unlawful acts.

**Unjust Enrichment Class**
All individuals who since March 1, 2013 were placed in forbearance or deferment
by Defendant for more than one month after applying for an income-driven
repayment plan who suffered damages as a result of Defendant's acts.

184.   Specifically excluded from the Unfair and Deceptive Practices Class (the

"Class") and the Constructive Fraud Class, and the Unjust Enrichment Class

(collectively, the "Classes") are: (a) any officers, directors, or employees of Defendant,

or any of their subsidiaries; (b) any judge assigned to hear this case (or spouse or family

member of any assigned judge); (c) any employee of the Court; and (d) any juror selected

to hear this case.

185.   Plaintiff asserts claims against Defendant, individually and on behalf of all

members of the Classes for violations of the law as indicated and set forth below.

186.   The members of the Classes are ascertainable from objective criteria.

187.   If necessary to preserve the case as a class action, the Court itself can redefine the Classes, create additional classes or sub-classes, or both.

188.   Additionally, Plaintiff reserves the right to move for certification of the Classes as defined herein, or a class or subclass with a different definition, as to be determined by Plaintiff after the completion of discovery. As discovery unfolds, additional classes or modified classes might be possible or necessary. However, as it appears, on information and belief, that Defendant's illegal affected similarly situated individuals throughout the United States, a single nationwide class brought pursuant to Pennsylvania law, to which Defendant is clearly subject, is best-suited for this action and places Defendant on notice of the broadest possible class that Plaintiff could move for, as implied by the Federal Rules' notice-pleading standard.

189.   The requirements of Rule 23(a) are satisfied for the proposed Class and Subclass because the members of the proposed Class and Subclass are so numerous and geographically dispersed that joinder of all its members is impracticable. Although the exact number and identity of each Class and Subclass member is unknown at this time, there are believed to be at least thousands of potential Class and Subclass members. Therefore, the "numerosity" requirement of Rule 23(a)(1) is met.

190.   The commonality requirement of Rule 23(a)(2) is satisfied because there are questions of law or fact common to Plaintiff and the other members of the proposed Class and Subclass. Among those common questions of law or fact are:

a.    whether Defendant, through its acts or omissions, engaged in fraudulent and deceptive conduct which creates a likelihood of confusion or misunderstanding by altering student loan borrower's applications and switching student loan borrowers to between payment plans against their will;

b.    whether Defendant, through its acts or omissions, engaged in fraudulent and deceptive conduct which created a likelihood of confusion or misunderstanding by refusing to return improperly switched student loan borrowers to their chosen, prior plan without any ramifications to the student loan borrower;

c.    whether Defendant, through its acts or omissions, engaged in a scheme of falsifying documents or taking other actions that effectively required student loan borrowers to enroll in forbearance or deferment so that Defendant could increase each student loan borrower's overall value to Defendant, at the expense of the student loan borrower;

d.    whether Defendant, through its acts or omissions, engaged in fraudulent and deceptive conduct which creates a likelihood of confusion or misunderstanding by employing a document and information processing procedure that results in simple requests or certifications taking more than one month to complete or process;

e.    whether Defendant's actions were willful, intentional, and taken in bad faith;

f.    whether Plaintiff and the members of the proposed Classes have sustained or continue to sustain damages as a result of Defendant's wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining damages for the injuries sustained;

g.    whether Plaintiff and the members of the proposed Classes are entitled to compensatory, consequential, exemplary, and punitive damages; and

h.    whether Plaintiff and the members of the proposed Classes are entitled to declaratory, injunctive, or other equitable relief.

191.    Plaintiff's claims are typical of the claims of the proposed Classes that she seeks to represent, as described above, because they arise from the same course of conduct by Defendant and are based on the same legal theories. Further, Plaintiff seeks the same form of relief for herself and the proposed Classes. Therefore, the "typicality" requirement of Rule 23(a)(3) is satisfied.

192.    Because her claims are typical of the proposed Classes that Plaintiff seeks to represent, Plaintiff has every incentive to pursue those claims vigorously. Plaintiff has no conflicts with, or interests antagonistic to the proposed Classes. Plaintiff, a victim of unscrupulous student loan collection and general business practices, is committed to the vigorous prosecution of this action, which is reflected in her retention of competent counsel experienced in complex and challenging litigation.

193.    Plaintiff's counsel satisfies the requirements of Rule 23(g) to serve as counsel for the proposed Classes. Plaintiff's counsel (a) has identified and thoroughly investigated the claims set forth herein; (b) has previously been counsel in student loan servicer litigation; (c) has been involved in complex class litigation; (d) has extensive knowledge of the applicable law; and (d) has the resources to commit to the vigorous prosecution of this action on behalf of the proposed Classes. Accordingly, Plaintiff satisfies the adequacy of representation requirements of Rule 23(a)(4).

194.    In addition, this action meets the requirements of Rule 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to Plaintiff and

others similarly situated, making final injunctive or corresponding declaratory relief with respect to the proposed Classes appropriate.

195.    This action also meets the requirements of Rule 23(b)(3). Common questions of law or fact, including those set forth above, exist as to the claims of all members of the proposed Classes and predominate over questions affecting only individual Class members, and a class action is superior – if not the only method – for the fair and efficient adjudication of this controversy.

196.    Class treatment will permit large numbers of similarly situated student loan borrowers to prosecute their respective claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

197.    This action is manageable as a class action. Notice may be provided to members of the proposed Classes by first-class mail and through the alternative means, including electronic mail (email), internet postings including banner ads, distribution through social media, including sponsored postings on Facebook and Twitter, and by publication. Thus, the superiority and manageability requirements of Rule 23(b)(3) are satisfied.

## COUNT I – VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

198.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

199.   Pursuant to Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(3):

> "Trade" and "commerce" mean "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth."

200.   Defendant's student loan servicing business qualifies as "trade" and "commerce" as defined by 73 P.S. § 201-2(3).

201.   Pursuant to Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4):

> "Unfair methods of competition" and "unfair or deceptive acts or practices" mean any one or more of the following:
>
> (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

202.   To increase its profits, Defendant represented and, upon information and belief, still represents that its services have benefits that they do not have and routinely engage in fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding that allows student loan holders to gain extra fees, interest, and payments from student loan borrowers and allows themselves, as student loan servicers, to gain extra monthly payments, interest subsidies and special allowance payments that they would not be entitled to if a student loan borrower was not switched to REPAYE.

203.   Defendant accomplishes this by fraudulently misrepresenting REPAYE's material facts, coercing borrowers to switch to REPAYE or switching borrowers to

REPAYE against their will, representing that they are unable to return those student

loan borrowers to their prior, chosen plan without any cost or delay to the borrower,

and by intentionally employing a REPAYE processing procedure that lasts more than

one month.

204.    Pursuant to Pennsylvania's Unfair Trade Practices and Consumer

Protection Law, 73 P.S. § 201-9.2. Private Actions:

> (a) Any person who purchases or leases goods or services primarily
> for personal, family or household purposes and thereby suffers any
> ascertainable loss of money or property, real or personal, as a result
> of the use or employment by any person of a method, act or
> practice declared unlawful by 9 73 P.S. § 201-3. 10 73 P.S. §§ 201-
> 4, 201-4.1. 11 73 P.S. §§ 201-2, 201-4.1. 12 73 P.S. § 201-4. 11
> section 313 of this act, may bring a private action to recover actual
> damages or one hundred dollars ($100), whichever is greater. The
> court may, in its discretion, award up to three times the actual
> damages sustained, but not less than one hundred dollars ($100),
> and may provide such additional relief as it deems necessary or
> proper. The court may award to the plaintiff, in addition to other
> relief provided in this section, costs and reasonable attorney fees.

> (b) Any permanent injunction, judgment or order of the court made
> under section 414 of this act shall be prima facie evidence in an
> action brought under section 9.215 of this act that the defendant
> used or employed acts or practices declared unlawful by section 3
> of this act.

205.    Through this Complaint, Plaintiff seeks declaratory and injunctive relief,

as well as compensation, on her own behalf and on behalf of those similarly situated,

for Defendant's violations of Pennsylvania's Unfair Trade Practices and Consumer

Protection Laws, including but not limited to, the unfair or deceptive acts or practices

of Defendant as described in detail herein.

206.    Some of Defendant's unfair or deceptive acts or practices include, but are not limited to:

a)      falsifying borrower's income-driven repayment applications;

b)      causing and/or creating issues with student loan borrowers' repayment, resulting in student loan borrowers having to be placed on forbearance or deferment;

c)      enrolling student loan borrower's in a different repayment plan than he or she is currently in, against his or her will and without permission,

d)      refusing to return improperly switched borrowers to their previous plan without any cost or delay to the student loan borrower,

e)      intentionally causing student loan borrower's information processing to last more than one month;

f)      intentionally delaying student loan borrower's payments on income-driven repayment plans

g)      charging extra fees the student loan borrower would not have to pay if the student loan borrower did not switch to payment plans,

h)      charging extra standard, full payments the student loan borrower would not have to pay if the student loan borrower was not switched payment plans,

i)      charging extra capitalized interest Defendant would not be entitled to if the student loan borrower was not switched to a different payment plan,

j)      collecting monthly servicing fees/payments as student loan borrowers would have more months prior to his or her loan being forgiven or paid off.

207.    As such, Defendant is operating in a way most beneficial to itself and, often, in a manner directly opposite of that requested by the student loan borrower,

despite Defendant holding itself out as acting in the best interest of the student loan borrower.

208.    As such, Plaintiff and all others similarly situated have been damaged as a direct and proximate result of Defendant's willful and intentionally deceptive conduct, warranting punitive damages for Defendant's irreprehensible behavior and injunctive relief to prevent Defendant from inaccurately describing REPAYE, coercing or forcing struggling student loan borrowers to switch to REPAYE, refusing to return improperly switched REPAYE student loan borrowers to their previously chose repayment plan with no ramifications to the student loan borrowers, and having a REPAYE process that takes more than one month.

209.    Defendant's practices, as set forth above, were unfair, fraudulent or deceptive in that:

> a.  The practices were immoral, oppressive and unscrupulous in that they imposed upon student loan borrowers with no meaningful choice, imposed an unreasonable burden on student loan borrowers and was so oppressive as to leave student loan borrowers with little alternative but to submit to the practices. Student loan borrowers had no control over the Defendant's acts, and student loan borrowers attempts to ensure that were on the correct and most beneficial plan for themselves were futile, and
>
> b.  Student loan borrowers cannot reasonably avoid the injury caused by Defendant, as Defendant is in ultimate control of their website, their processing of income-driven student loan applications, their processing of income-driven student loan

plans, and Defendant routinely mislead and coerced student loan borrowers, routinely alter student loan borrowers' documents, and/or refuse to follow student loan borrowers' instructions.

210.   Defendant's unfair and deceptive acts and practices and conduct were directed toward Plaintiff and other Class members.

211.   Defendant intended for student loan borrowers, including Plaintiff and Class members, to rely on their acts and practices in determining which income-driven student loan repayment plan was best for the student loan borrowers, in being placed in the correct income-driven student loan repayment plan for the student loan borrowers, and in having their income-driven student loan repayment plans processed and carried out in an effective and efficient manner.

212.   Defendant also intended for student loan borrowers, including Plaintiff and Class members, to rely on Defendant's documents, correspondence, loan billing statements, emails and website as correct, even though the website contained vague, inaccurate, and misleading information and many other documents were often incorrect and sent in a manner meant to confuse and mislead student loan borrowers.

213.   As such, Defendant intended for student loan borrowers to rely on their fraudulent or deceptive conduct and, therefore, create or cause a likelihood of confusion or of misunderstanding about the best income-driven student loan repayment plans for the student loan borrowers, how he or she could be treated after

requesting to return to his or her previous plan, and how his or her income-driven student loan repayment plan was to be processed and carried out.

214.   Defendant's unfair or deceptive acts or practices occurred during the course of conduct involving trade or commerce, specifically the presentation of information involving services to collect income-driven student loan repayment plans, the processing of services to collect income-driven student loan repayment plans, and the carrying out of services to collect income-driven student loan repayment plans. The information provided created a likelihood of confusion or misunderstanding by student loan borrowers.

215.   Plaintiff and Class members justifiably relied on Defendant's unfair or deceptive acts or practices and incurred damages due to (1) the misleading, vague, and inaccurate information displayed by Defendant about the different income-driven student loan repayment plans, (2) being coerced or forced into an income-driven student loan repayment plan that was not the best for them, (3) being unable to return to their previously chosen income-driven student loan repayment plan without ramifications, including spending months on forbearance and/or deferment to the benefit of Defendant, and (4) Defendant's processing that lasts more than one month.

216.   Plaintiff's and Class members' damages were directly and proximately caused by Defendant's unfair acts or deceptive acts or practices.

217.    Defendants acts cost Plaintiff money in the form of increased payment amounts, use of forbearance, payment of forbearance fees, and extending the time until Plaintiff qualifies for loan forgiveness, resulting in additional payments being required at the end of Plaintiff's loan term.

218.    Defendant's conduct was addressed to the market generally and otherwise implicates consumer protection concerns and, therefore, a consumer nexus exists in that:

    a.  Defendant's acts and practices in collecting student loans payments, supplying vague, incorrect, and misleading information, altering student loan borrower's paperwork, impermissibly enrolling student loan borrowers in repayment plans which they did not consent to, failing to return student loan borrowers to the correct plan, and utilizing a paperwork and information processing system that is intentionally not effective and efficient; and

    b.  Defendant's acts and practices otherwise implicate consumer protection concerns including, but not limited to, promoting fair and upright business practices.

219.    Plaintiff  is authorized to bring a private action under the Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-9.2.

220.    Defendant's conduct was outrageous and done with a bad motive or with reckless indifference to the interests of others. Punitive damages are thus warranted, in order to deter Defendant and others from engaging in similar conduct in the future, as

well as to provide additional compensation, retribution and an incentive to prevent injustices that might otherwise go unredressed.

221.    Reasonable attorneys' fees and costs should be awarded pursuant to 73 P.S. § 201-9.2.

## COUNT II – NEGLIGENT MISREPRESENTATION

222.    Plaintiffs incorporates by reference all preceding paragraphs as if fully set forth herein.

223.    To increase its profits, Defendant, in the course of its business, profession or employment, or any other transaction in which they have a pecuniary interest, supplied false information for the guidance of others that allow student loan holders to gain extra fees, interest, and payments from borrowers and student loan servicers, such as themselves, to gain extra monthly payments, interest subsidies and special allowance payments that they would not be entitled to if a borrower did not switch to REPAYE.

224.    Defendant accomplishes this by providing false information and misrepresenting material facts about REPAYE, coercing borrowers to switch to REPAYE through the misrepresentation of fact, or by fraudulently representing that it is unable to return borrowers to his or her prior chosen repayment plan without any cost or delay to him or her, and by employing a REPAYE process that lasts more than one month.

225.    Some of Defendant's false representations include, but are not limited to:

a)   falsifying borrower's income-driven repayment applications; and

b)   falsely claiming that it cannot return improperly switched REPAYE borrowers to their previous plan (IBR, ICR or PAYE) without any cost or delay to the borrower;

226.   Defendant's misrepresentations were directed toward Plaintiff.

227.   Defendant failed to exercise reasonable care or competence in obtaining or communicating the information.

228.   Defendant failed to exercise reasonable care or competence in ascertaining the truth or falsity of its statements.

229.   Defendant intended for student loan borrowers, including Plaintiff, to rely on their information provided by Defendant in determining which income-driven student loan repayment plan was best for the student loan borrowers, in being placed in the correct and best income-driven student loan repayment plan for the student loan borrowers, and in having their income-driven student loan repayment plans processed and carried out in an effective and efficient manner.

230.   Defendant also intended for student loan borrowers, including Plaintiff, to rely on its documents, correspondence, loan billing statements, emails and website as correct, even though the website contained vague, inaccurate, and misleading information and other documents were often incorrect.

231.   As such, Defendant intended for student loan borrowers to rely on Defendant's incorrect information and, therefore, create, or cause a likelihood of,

confusion or of misunderstanding about the best income-driven student loan repayment plans for the student loan borrowers, how they could be treated after requesting to return to their previous plan, and how their income-driven student loan repayment plans were to be processed and carried out.

232.   Defendant's misrepresentations occurred during the presentation of information involving services to collect income-driven student loan repayment plans, the processing of services to collect income-driven student loan repayment plans, and the carrying out of services to collect income-driven student loan repayment plans.

233.   Plaintiff justifiably relied on Defendant's misrepresentations and incurred damages due to (1) the misleading, vague, and inaccurate information displayed by Defendant about the different income-driven student loan repayment plans, (2) being coerced or forced into an income-driven student loan repayment plan that was not the best for them, (3) being unable to return to their previously chosen income-driven student loan repayment plan without ramifications, and (4) Defendant's REPAYE processing procedures that last more than one month.

234.   Defendant, as Plaintiff's assigned student loan servicer, had a duty to accurately describe student loan repayment options, including providing students with correct information.

235.   Plaintiff's damages were directly and proximately caused by Defendant's unlawful conduct.

236.    Defendant's conduct was outrageous and done with a reckless indifference to the interests of others. Punitive damages are thus warranted, in order to deter Defendant and others from engaging in similar conduct in the future, as well as to provide additional compensation, retribution and an incentive to prevent injustices that might otherwise go unredressed.

## COUNT III – CONSTRUCTIVE FRAUD

237.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

238.    Defendant, as a student loan servicer, has a confidential and/or fiduciary relationship with Plaintiff and Constructive Fraud Class Members, as Defendant is privy to Plaintiff's and Class members' private, confidential information, including family size and arrangements, income information, and tax information, and Defendant represents to student loan borrowers, including Plaintiff and Class members, that Defendant is acting in the best interest of student loan borrowers, including providing student loan borrowers information and other tools to "help" or assist student loan borrowers in choosing the "right" or "best" repayment plan for themselves.

239.    Additionally, Defendant promotes that student loan borrowers chose an option that allows Defendant to place student loan borrowers in income-driven repayment plans.

240.   As such, Defendant acts in a position of advisor or counselor as reasonably to inspire confidence in student loan borrowers that they will act in good faith for the student loan borrower's interest.

241.   Further, the relative position of the Defendant and student loan borrowers, including Plaintiff, is such that Defendant has the power and means to take advantage of or exercise undue influence over the student loan borrowers.

242.   Moreover, Defendant's enabling statute states the "Purpose" of Defendant:

> shall be to improve the higher educational opportunities of persons who are residents of this State and who are attending approved institutions of higher education, in this State or elsewhere, by assisting them in meeting their expenses of higher education in accordance with the provisions of this act and by enabling the agency, lenders and postsecondary institutions to make loans available to students and parents for postsecondary education purposes.

24 P.S. § 5102.

243.   Defendant, in its latest Annual Financial Report states in part, "We are a public corporation and government instrumentality created by the Pennsylvania

General Assembly. We serve students and schools nationally through our state grant, guaranty, servicing, and financial aid processing systems."[4]

244.    To increase its profits, rather than acting with scrupulous fairness and good faith in their dealings with student loan borrowers, and refraining from using their position to student loan borrower's detriment and their own advantage, Defendant made representations, performed certain conduct, and breached their confidential or fiduciary relationship that has allowed student loan holders to gain extra fees and monthly payments.

245.    Defendant accomplishes this breach of a confidential or fiduciary relationship by falsifying student loan borrower's documents, creating issues for student loan borrowers which require months of forbearance or deferment, fraudulently representing that Defendant is unable to return those borrowers to their prior, chosen plan without any cost or delay to him or her, and by intentionally employing a document and information processing procedure that intentionally lasts more than one month.

246.    Due to the special and unique nature of the student loan borrower and student loan servicer, Defendant is able to exercise extraordinary influence over Plaintiff regarding student loan matters.

247.    Plaintiff experienced this special, extraordinary influence.

---

[4] Available at http://www.pheaa.org/about/pdf/financial-reports/annual/2016AuditedFinancialStatements.pdf (last visited May 24, 2017)

248.    Some of Defendant's fraudulent conduct, misrepresentations and/or omissions include, but are not limited to:

a)    falsifying borrower's income-driven repayment applications;

b)    causing and/or creating issues with student loan borrowers' repayment, resulting in student loan borrowers having to be placed on forbearance or deferment;

c)    enrolling student loan borrower's in a different repayment plan than he or she is currently in, against his or her will and without permission,

d)    refusing to return improperly switched borrowers to their previous plan without any cost or delay to the student loan borrower,

e)    intentionally causing student loan borrower's information processing to last more than one month;

f)    intentionally delaying student loan borrower's payments on income-driven repayment plans

g)    charging extra fees the student loan borrower would not have to pay if the student loan borrower did not switch to payment plans,

h)    charging extra standard, full payments the student loan borrower would not have to pay if the student loan borrower was not switched payment plans,

i)    charging extra capitalized interest Defendant would not be entitled to if the student loan borrower was not switched to a different payment plan,

j)    collecting monthly servicing fees/payments as student loan borrowers would have more months prior to his or her loan being forgiven or paid off.

249.    As such, Defendant is operating in a way most beneficial to themselves and, often, in a manner directly opposite of that requested by the student loan borrower,

such as Plaintiff and Class members, despite holding themselves out as acting in the best interest of the student loan borrower.

250.   Defendant's fraudulent actions and fraudulent misrepresentations were directed toward Plaintiff.

251.   Defendant intended for student loan borrowers, including Plaintiff, to rely on its actions and fraudulent misrepresentations in determining which income-driven student loan repayment plan was best for the student loan borrowers, in being placed in the correct and best income-driven student loan repayment plan for the student loan borrowers, and in having their income-driven student loan repayment plans processed and carried out in an effective and efficient manner.

252.   Defendant also intended for student loan borrowers, including Plaintiff and Class members, to rely on their documents, correspondence, loan billing statements, emails and website as correct, even though the website contained vague, inaccurate, and misleading information and other documents were often incorrect.

253.   As such, Defendant intended for student loan borrowers to rely on its actions and fraudulent misrepresentations and, therefore, create, or cause a likelihood of, confusion or of misunderstanding about the best income-driven student loan repayment plans for the student loan borrowers, how they could be treated after requesting to return to their previous plan, and how their income-driven student loan repayment plans were to be processed and carried out.

254.   Defendant's actions and misrepresentations occurred during the presentation of information involving services to collect income-driven student loan repayment plans, the processing of services to collect income-driven student loan repayment plans, and the carrying out of services to collect income-driven student loan repayment plans.

255.   Plaintiff, and upon information and belief, Class members relied on Defendant's confidential or fiduciary relationship and incurred damages due to (1) the misleading, vague, and inaccurate information displayed by Defendant about the different income-driven student loan repayment plans, (2) being coerced or forced into forbearance or deferment due to Defendant's acts, (3) being unable to return to their previously chosen income-driven student loan repayment plan without ramifications, and (4) Defendant's document and information processing procedures that last more than one month.

256.   Plaintiff's and Class members' damages were directly and proximately caused by Defendant's breach of a confidential or fiduciary relationship.

257.   As such, Plaintiff and all others similarly situated have been damaged as a direct and proximate result of Defendant's willful, intentional, and outrageous conduct, warranting punitive damages for Defendant's irreprehensible behavior and injunctive.

258.   Defendant's conduct was outrageous and done with a bad motive or with reckless indifference to the interests of others. Punitive damages are thus

warranted, in order to deter Defendant and others from engaging in similar conduct in the future, as well as to provide additional compensation, retribution and an incentive to prevent injustices that might otherwise go unredressed.

## COUNT IV – UNJUST ENRICHMENT

259.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

260.    Plaintiff and Unjust Enrichment Class members have conferred a benefit on Defendant in the form of extra, unnecessary payments of fees, interest, or other monies unearned and undeserved by Defendant.

261.    Plaintiff and Unjust Enrichment Class members have conferred a benefit on Defendant through their status which allows Defendant to collect a monthly amount for servicing those student loan borrowers' loans.

262.    Plaintiff and Unjust Enrichment Class members have conferred and continue to  confer a benefit by acting as an instrumentality that allows Defendant to collect payments for servicing of student loans.

263.    Defendant has been unjustly enriched at the expense of Plaintiff and all Unjust Enrichment Class and members, as described above.

264.    Defendant has been able to retain the benefits conferred by Plaintiff and Class members by maintaining its current unlawful practices, as set forth above, and be retaining payments, fees, or other monies that Defendant did not lawfully or justly earn and does not deserve.

265.    Under the circumstances set forth above, Defendant retaining the benefit conferred on it by Plaintiff and Class members is unjust and inequitable.

266.    Because Defendant wrongfully obtained the benefit at the expense of Plaintiff and the Unjust Enrichment Class members through unlawful and inequitable conduct, Defendant is obligated to disgorge back to Plaintiffs and the members of the Unjust Enrichment Class all amounts by which Defendant has been unjustly enriched at the expense of Plaintiff and the Class Members.

## PRAYER FOR RELIEF

Plaintiff, on behalf of herself and all others similarly situated, request:

A.  Entry of preliminary and permanent injunctions providing that Defendant shall be enjoined from:

    i.  Falsifying student loan borrowers' documents;

    ii.  Refusing to return student loan borrowers to their chosen repayment plan without any ramifications after being notified that the student loan borrower had been placed in the incorrect plan; and

    iii.  Utilizing a lengthy, inefficient, and ineffective income-driven student loan request processing system which takes more than one month for processing; and

B.  Entry of judgment ordering Defendant to take affirmative steps to:

    i.  Return student loan borrowers to their chosen plan without any ramifications after being notified that the student loan borrower had been placed in an incorrect plan; and

    ii.  Create a one-month, effective, and efficient income-driven student loan request processing system; and

C.  Entry of judgment finding:

      i.     Defendant violated the Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201;

     ii.     Defendant is guilty of common law constructive fraud;

    iii.     Defendant is guilty of negligent misrepresentation; and

    iv.     Defendant is guilty of unjust enrichment; and

D.  Monetary damages including compensatory, exemplary, and punitive damages to which Plaintiff and Class members are entitled and will be entitled at the time of trial, in an amount exceeding $5,000,000;

E.  Pre- and post-judgment interest;

F.  The costs of this action;

G.  Reasonable attorneys' fees; and

H.  Such other and further relief as the Court deems proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all issues so triable.

Respectfully submitted,

Dated: May 26, 2017

By: */s/ Brandon M. Wise*
Brandon M. Wise (*admitted pro hac vice*)
PEIFFER ROSCA WOLF
ABDULLAH CARR & KANE, APLC
818 Lafayette Ave., Floor 2
St. Louis, MO 63104
Ph: 314-833-4825
Email: bwise@prwlegal.com

Marion Munley – Bar ID No. 46957
Munley Law PC
227 Penn Avenue
Scranton, PA 18503
Ph: 570-346-7401
Email: mmunley@munley.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 26, 2017 the foregoing document was filed with the Clerk of the Court using the CM/ECF e-filing system. This system will send notice and allow access to the foregoing document to all parties of record.

/s/ Brandon M. Wise

EXHIBIT A

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. Contract ID Code | | Page of Pages | |
|---|---|---|---|---|---|
| | | | | 1 | 21 |

| 2. AMENDMENT MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 0072 | SEP 01, 2014 | | |

| 6. ISSUED BY | CODE | FSA-FS2 | 7. ADMINISTERED BY (If other than item 6) | CODE |
|---|---|---|---|---|

6. ISSUED BY     CODE  FSA-FS2
United States Department of Education
Federal Student Aid/Mission Support Group
830 First St NE - Suite 91F3
Washington DC 20202
Katharine Hill 202-377-4215 katharine.hill@ed.gov

7. ADMINISTERED BY (If other than item 6)     CODE
See Block 6

| 8. NAME AND ADDRESS OF CONTRACTOR (NO., Street, Country, State and ZIP Code) | (x) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| HIGHER EDUCATION ASSISTANCE AGENCY, PENNSYLVANIA DUNS: 007358103<br>1200 NORTH 7TH STREET                        Cage Code: 41UK7<br>FINANCIAL MANAGEMENT 5TH FLOOR<br>HARRISBURG PA 171021444 | | |
| | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>ED-FSA-09-D-0014 |
| | | 10B. DATED (SEE ITEM 13)<br>JUN 17, 2009 |

| CODE 00030774 | FACILITY CODE |
|---|---|

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in item 14. The hour and date specified for receipt of offers ☐ is extended, ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
(a) By completing items 8 and 15, and returning _____ copies of amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OR OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment your desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (If required) | Modification Amount: $0.00 |
|---|---|
| See Schedule | Modification Obligated Amount: $0.00 |

**13. THIS ITEM ONLY APPLIES TO MODIFICATION OF CONTRACTS/ORDERS. IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.**

| Check One | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:<br>Mutual Agreement Between the Parties |
| | D. OTHER (Specify type of modification and authority) |

E.  IMPORTANT:  Contractor ☐ is not, ☒ is required to sign this document and return ___1___ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible)

Please see the attachment for modification description.

Except as provided herein, all terms and conditions of the document referenced in item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)<br>Soo Kang<br>202-377-3798   soo.kang@ed.gov |
|---|---|
| *Fedloan Servicing* | |

| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
|---|---|---|---|
| | 8/27/14 | | AUG 27, 2014 |
| (Signature of person authorized to sign) | | (Signature of Contracting Officer) | |

NSN 7540-01-152-8070
Previous Edition unusable

STANDARD FORM 30. (Rev. 10-83)
Prescribed by GSA FAR (48 CFR) 53.243

The purpose of this modification is to:

1. Replace Section B.13.H: Delinquency Reduction Compensation Program

2. Modify Section B.13.N: Additional Terms

   - Replace Item 3: Common Pricing, previously revised in Modification 0068
   - Modify Item 5: Common Pricing
   - Add Item 11
   - Add Item 12: Service Member Requirements
   - Add Item 13: Servicing Requirements Submission

3. Update C.2 Attachments/Supplemental Documents

4. Replace Attachment A-4, Servicer Allocation Metrics

5. Replace Attachment A-5, Allocation Calculation Example

6. Replace Attachment A-6, Servicing Pricing Definitions

7. Add Attachment A-7, Borrower Status Reporting

8. Add Attachment A-8, Quarterly Delinquency Reduction Compensation Report

All other terms and conditions remain unchanged.

## B.13   ADDITIONAL TERMS AND CONDITIONS

### H. **Delinquency Reduction Compensation Program**

A Delinquency Reduction Compensation Program is established as follows:

$$\text{Delinquency Percentage} = \frac{(\text{Borrowers} > 30 \text{ Days Delinquent})}{(\text{Borrowers In Current Status} + \text{Borrowers} < 361 \text{ Days Delinquent})}$$

Each of the Servicers may earn up to $500,000 per quarter, depending upon performance, as follows:

Level 1 Award is valued at $200,000 if the Servicer achieves a Delinquency Percentage for Quarter End of less than 23.0%.

Level 2 Award is valued at $300,000 if the Servicer achieves a Delinquency Percentage for Quarter End of less than 23.0% (earns $200,000) **AND** Servicer improves upon prior Quarter End Delinquency Percentage (earns $100,000).

Level 3 Award is valued at $500,000 if the Servicer achieves a Delinquency Percentage for Quarter End of less than 21.0% **AND** Servicer improves upon prior Quarter End Delinquency Percentage.

Delinquency Reduction Compensation will be available based on the results of the quarter ending 12/31/2014. Servicers shall submit the Quarterly Delinquency Reduction Compensation Report (Attachment A-8) at the end of each quarter. Quarters are defined as Q1 = Oct 1 to Dec 31; Q2 = Jan 1 to Mar 31; Q3 = Apr 1 to Jun 30, and Q4 = Jul 1 to Sep 30 of each year.

This contract includes performance compensation terms that address delinquency reduction. The compensation will become due to the vendor upon successful achievement of delinquency reduction objectives. The Government intends to promote the reduction of loan delinquency across the entire period of vendor performance. Any vendor that appears to be performing in a manner inconsistent with this intent (e.g. attempting to earn compensation every other quarter, etc.) may, at the sole discretion of the Government, forfeit the delinquency reduction compensation they would have otherwise earned; and may, at the sole discretion of the Government, be required to return previously earned compensation that was achieved through this delinquency reduction program.

The Government may, at its sole discretion, reset the structure of the compensation on an annual basis, effective on September 1 of the performance year; maintain the current structure; or, remove the delinquency reduction compensation entirely by unilateral modification of the contract.

N. **Additional Terms:**

    3.  The Government will set and manage the common pricing, including tier structure, below:

| CLIN | Status | Unit | Unit Measure | Unit Rate |
|------|--------|------|--------------|-----------|
| 0001 | In School | 1+ | EA | $ 1.05 |
| 0002 | In Grace | 1+ | EA | $ 1.68 |
| 0003 | In Repayment | 1+ | EA | $ 2.85 |
| 0004 | Service Member | 1+ | EA | $ 2.85 |
| 0005 | Deferment | 1+ | EA | $ 1.68 |
| 0006 | Forbearance | 1+ | EA | $ 1.05 |
| 0007 | Delinquent 6-30 Days | 1+ | EA | $ 2.11 |
| 0008 | Delinquent 31-90 Days | 1+ | EA | $ 1.46 |
| 0009 | Delinquent 91-150 Days | 1+ | EA | $ 1.35 |
| 0010 | Delinquent 151-270 Days | 1+ | EA | $ 1.23 |
| 0011 | Delinquent 271-360 Days | 1+ | EA | $ 0.45 |
| 0012 | Delinquent 361 or more Days | 1+ | EA | $0.45 |
| 0013 | Delinquency Reduction Compensation Program[1] | N/A | N/A | Not-to-Exceed $2,000,000 |
|  | Cohort Default Rate (CDR) Challenge Support |  |  |  |
| 0013 | Institution[2] | 1+ | EA | $213.00 |
| 0014 | Borrower[3] | 1+ | EA | $23.00 |
|  | Loan Consolidation |  |  |  |
| 0015 | One-Time Development Cost[4] | N/A | N/A | Not-to-Exceed $1,200,000.00 |
| 0016 | Consolidations Completed | 1+ | EA | $27.35 |
| 0017 | CDR Assistance Pilot (rate per school assisted)[5] | 1+ | EA | $18,000.00 |
|  | Public Service Loan Forgiveness (PSLF)[6] |  |  |  |
| 0018 | Approved Employment Certification Form | 1+ | EA | $5.00 |
| 0019 | Denied Employment Certification Form | 1+ | EA | $2.50 |
| 0020 | Borrowers in TEACH Grant Status | 1+ | EA | $1.05 |

1. *Delinquency Reduction Compensation Program shall not exceed $2,000,000 annually per servicer. The maximum amount available each quarter shall not exceed $500,000 per servicer.*
2. *An institution is defined as a school or branch having a unique school code/ID as established by the U.S. Department of Education.*
3. *A borrower is defined as an individual with a unique SSN.*
4. *Development costs for Loan Consolidation will be reimbursed for the actual costs incurred, but not-to-exceed $1,200,000, for the first year only.*
5. *The CDR Assistance Pilot ends on May 16, 2014.*
6. *PSLF Servicer may only bill the Government once per unit (Approved or Denied), per SSN. See the following examples:*
   a. *A borrower submits an approved Employment Certification Form (ECF). The PSLF Servicer may bill the Government once for the approved ECF, regardless of any re-certifications required during borrower tracking within the program and payoff at completion.*
   b. *A borrower submits a denied ECF, then submits an approved ECF. The PSLF Servicer may bill once for the denied ECF, then again for the approved ECF.*

    c. *A borrower submits three consecutively denied ECFs, then on the fourth attempt, the ECF is approved. The PSLF Servicer may only bill for the first denied ECF, then once for the approved ECF.*

5. Common pricing includes all supplies, services and other costs to deliver Title IV Servicing under this contract, including:
   - Costs for bringing contractor systems into compliance for handling federally held debt.
   - Costs for legislative, regulatory or policy changes that affect the FFEL community as a whole, as is commercially accepted practice in the FFEL community.
   - Costs to successfully shutdown the federal servicing system and operations, including:
     a. Continued borrower support for a minimum of 90 days from the last transfer off. Including, but not limited to, responses to inquiries, credit bureau resolutions, payment and correspondence forwarding, tax reporting, etc.
     b. Creation and execution of a decommissioning plan for systems and operational activities.
     c. Continued system support (including interfaces and reject resolution) until system successfully decommissioned -- minimum of 90 days from last transfer off.
     d. Continued reporting and reconciliations until system successfully decommissioned -- including full resolution of all variances, suspense balances and fund balance with Treasury.
   - For all other costs, the Department and the contractor(s) may come to an agreement via the change management process or negotiation, as necessary.

11. The contractor shall provide a complete copy of any complaint served on the contractor in a lawsuit by an individual for conduct alleged to have occurred in the course of servicing activity under the contract. Within 10 days of the date of service of the complaint on the contractor, the contractor shall deliver the copy by email attachment sent to OGC.Servicer@ed.gov, or by hard copy addressed, postage prepaid, to Education Department, Office of General Counsel, DPE: Servicer, 400 Maryland Ave. SW, Washington DC 20202. The contractor need not provide such a complaint if the contractor determines that the conduct alleged did not occur in the course of the contractor's servicing activities under the contract or the plaintiff does not assert a claim with respect to an obligation owed or believed to be owed by the plaintiff to repay a student loan. The contractor shall provide the complaint at no additional cost to the government.

12. Service Member Requirements
    12.1 Service Member is defined in accordance with the Servicemember Civil Relief Act.
    12.2 The servicer shall provide a unique email address and phone number (or an IVR option within existing phone number) that allows the borrowers in the service member category to go directly to a group of agents who have been specially trained to respond to inquiries on all aspects of the military entitlements, forms, regulations, and military payments, as they relate to federal financial aid. The email and phone options shall be

made available to these borrowers on servicer websites and hard copy/electronic correspondences.

    12.2.1 Validation - Servicer shall provide a document to FSA explaining how the service member borrowers can uniquely contact the servicer and where/when that information is made available to the borrower. Servicer shall provide a high level overview of the specialized training the CSRs/agents will go through to be trained to respond to these inquiries and when that training takes place. The training materials should also be made available to FSA on demand. (Send validation items to EDServicerP@ed.gov and COR within 60 days of the Effective Date of this executed modification (0072).)

12.3 The servicer shall review all borrowers in their portfolio against the Department of Defense database MONTHLY and apply the borrower entitlements based on that matching.

    12.3.1 Validation - Servicer shall provide a document outlining the timing of when the monthly matching will occur as well as how/when the benefits will be applied to borrower accounts as a result of the matching. (Send validation items to EDServicerP@ed.gov and COR within 60 days of the Effective Date of this executed modification (0072).)

12.4 The servicer shall provide a listing (SSN, Name, days delinquent) by the 10th calendar day of each month to FSA that identifies EVERY borrower in the service member category that has reached 300 or more days delinquent. The listing shall also outline all activity (calls/emails/correspondence) the servicer has taken to try to resolve the delinquency and how the servicer has contacted the borrower (or if they have been unable to, how they have tried to contact the borrower). FSA will review the listing and may request administrative forbearances on some/all of these borrowers to reduce the delinquency level (which would prevent the borrower from going to Debt Collection). FSA will respond in writing/email to each listing provided by the 25th calendar day of each month to identify any borrower that the servicer should apply a forbearance on. If no response is received from FSA, then no action is needed. All files should be submitted within encrypted zip files with password provided in separate emails. All files should be submitted within encrypted zip files with password provided in separate emails.

    12.4.1 Validation - No pre-implementation validation is needed, FSA will review the listing once implemented to ensure the required data is provided.

12.5 The servicer shall provide a monthly report to FSA identifying all borrowers within the Service Member Category by the 10th calendar day of each month. The report shall be provided via email, in Excel format, and follow the below data elements/format. The report shall be provided to EDServicerP@ed.gov and other email addresses as periodically added by FSA. All files should be submitted within encrypted zip files with password provided in separate emails.

| Borrower SSN | Borrower Name | Benefit borrower qualifies for to meet Service Member category | Eligibility start date | Eligibility end date |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

12.5.1 Validation - No pre-implementation validation is needed, FSA will review the report once implemented to ensure the required data is provided.

13. Servicing Requirements Submission

The servicer shall submit a complete list of servicing requirements as they exist at the time of submission to the Government every two years. This shall include all requirements, including those unique to the servicer (including but not limited to: PSLF, TEACH, TPD, Image Repository). No proprietary information shall be contained in the requirements. The first requirements submission shall be submitted by November 1, 2014.

**C.2    Attachments/Supplemental Documents**

| Number | Title |
|---|---|
| A-1 | Additional Servicer—Initial Requirements Document (Version 21.0) |
| A-2 | Additional Servicer—Intermediate Requirements Document (Version 6.0) |
| A-3 | Additional Servicer—Full Requirements Document (Version 6.0) |
| A-4 | Ongoing Allocation Methodology **(Version 2.0)** |
| A-5 | Sample—Ongoing Allocation Metric Calculation **(Version 2.0)** |
| A-6 | Servicing Pricing Definitions **(Version 10.0)** |
| A-7 | Borrower Status Reporting (Retention) |
| A-8 | Quarterly Delinquency Reduction Compensation Report |
| A-9 | Monthly Invoice Report |

Attachment A-4

## Servicer Allocation Metrics

The allocation of ongoing volume will be determined twice each year based on the performance of each servicer in relation to the other servicers awarded. Quarterly results will be compiled for each servicer based on the performance measures listed below. During July (using March and June quarter end results) and January (using September and December quarter end results) of each year an average of the quarterly performance results will be used to determine the ranking of each servicer in each of the five high-level metric categories. By combining each servicer's ranking in all categories, each servicer may be given a percentage of the designated new borrower pool available to be distributed for the upcoming two quarters. Note: A servicer may be given 0% (zero percent) of the designated new borrower pool, at the Government's sole discretion.

Servicers will be informed of their allocation percentage of new volume by August 15, for the allocation effective September 1 to February month end, and February 15, for the allocation effective March 1 to August 31, of each year.

The allocation of ongoing volume will be determined based on the following factors:

For metrics 1, 2, and 3 borrowers in school, in grace, in deferment, in forbearance, in Service Member, and over 360 days delinquent are excluded from both the numerator and denominator in the calculations. Calculations will be rounded to the hundredth of a percent. Borrowers with loans in multiple statuses shall be counted once, in the lowest performing deliverable status. The lowest performing deliverable status is defined as the lowest unit priced deliverable. Note: Metrics will NOT be calculated separately by school type in any metric.

### Allocation Metrics

1 – **Percentage of Borrowers in Current Repayment Status** – **30% of the overall performance metric** – This calculation is measured by dividing the number of borrowers in current repayment status who are not delinquent at the end of the quarter by the number of all borrowers in both current and delinquent repayment status at the end of the quarter.

2 – **Percentage of Borrowers more than 90 but less than 271 days delinquent** – **15% of the overall performance metric** – This calculation is measured by dividing the number of borrowers who are greater than 90 days delinquent and less than 271 days delinquent at the end of the quarter by the number of borrowers in both current and delinquent repayment status at the end of the quarter.

3 – **Percentage of Defaulted borrowers (over 270 days and less than 361 days delinquent)** – **15% of the overall performance metric** – This calculation is measured by dividing the number of borrowers who are greater than 270 days delinquent and less than 361 days delinquent at the end of the quarter by the number of borrowers in both current and delinquent repayment status at the end of the quarter.

**4 – Borrower Survey results – 35% of the overall performance metric** – Surveys will be conducted quarterly of borrowers in each category (In School, In Grace, and In Repayment). The survey will measure borrower satisfaction with the servicer and results will be based on a scale of $0 - 100$, with 100 representing a perfect score. FSA or an agent of FSA will conduct surveys. All quarterly scores in each category (In School, In Grace, and In Repayment) will be averaged together to provide the quarterly borrower survey result.

**5 – FSA Employee Survey results – 5% of the overall performance metric** – Surveys will be conducted quarterly of FSA employees. The survey will measure satisfaction with the servicer and results will be based on a scale of $0 - 100$, with 100 representing a perfect score. FSA, or an agent of FSA, will conduct surveys.

### Performance Periods
Quarterly scores will be compiled for each servicer, quarters are defined as Q1 = Oct 1 to Dec 31; Q2 = Jan 1 to Mar 31; Q3 = Apr 1 to Jun 30, and Q4 = Jul 1 to Sep 30 of each year.

All available quarterly scores in each metric will be averaged together during July and January of each year to calculate the final result for each metric.

### Allocation Metric Score Comparison Among Servicers
The above calculation will result in a set of 5 scores for each servicer, one score in each metric category (1-Percentage of borrowers in current repayment, 2-Percentage of Borrowers more than 90 but less than 271 days delinquent, 3-Percentage of Defaulted borrowers, 4-Borrower Survey, and 5-FSA Employee Survey).

FSA will compare all servicers' scores (per servicer pool - TIVAS and NFPs) in each allocation metric category and provide a ranking for each servicer in that category, with the best score in each category receiving the highest possible value and the worst score receiving the lowest possible value (highest / lowest values will be determined by the number of servicers included in the allocation pool --- Highest score possible will be the total number of servicers selected, lowest score will be 1).

Once a ranking value has been assigned to each servicer in each allocation category, each score will be adjusted based on the 'weight' the metric will hold. All scores for a servicer will then be added together to provide the "Total Score" for that servicer for the 6-month period. Each servicer will have one Total Score for each 6-month period.

### Allocation of New Volume of Federally Held Debt
Each servicer may be assigned an allocation of new volume by dividing that servicer's total score by the combined total scores of all servicers. The resulting percentage will determine each servicer's percentage of new volume of Federally Held Debt.

The servicer's percentage of new volume will determine the percentage of new borrowers that may be sent to the servicer for servicing (loans for existing borrowers may, to the maximum extent practicable, be sent to the servicer already holding that borrower's other loans).

**Record Retention**
Each servicer shall maintain a listing of all borrowers within their federal portfolio identifying which borrowers exist in each status at the time of invoicing and/or metric submissions to FSA. This information shall be provided to FSA on demand and shall be maintained throughout the performance period and provided to FSA at the end of the contract period. (See Attachment A-7, Borrower Status Reporting)

*NOTE: If a servicer is out of compliance (for example, but not limited to, financial management or reporting, security, OMB Circular A-123, Legislative Mandates, Program Compliance, etc.), that servicer's new volume may be re-allocated to one or more other servicers. In addition, that servicer's current account volume may be transferred to another servicer, at the non-compliant servicer's expense.*

## Attachment A-5

### ONGOING ALLOCATION METRIC CALCULATION - *Assumes 4 servicers*

FINAL SCORE BY ALLOCATION METRIC (based on combined quarterly average score)

|  | METRIC | Servicers | | | |
|---|---|---|---|---|---|
|  |  | Svcr 1 | Svcr 2 | Svcr 3 | Svcr 4 |
| 1 | % of borrowers in current repayment | 88.50% | 81.75% | 83.14% | 91.10% |
| 2 | % of borrowers 91-270 delinquent | 6.10% | 5.00% | 4.15% | 3.76% |
| 3 | % of borrowers 271-360 delinquent | 1.20% | 0.78% | 1.35% | 1.51% |
| 4 | Borrower Survey | 75.78 | 74.78 | 74.67 | 70.15 |
| 5 | FSA Survey | 72.35 | 73.45 | 74.76 | 75.15 |

### SERVICER RANKING BY ALLOCATION METRIC

|  | METRIC | Servicers | | | |
|---|---|---|---|---|---|
|  |  | Svcr 1 | Svcr 2 | Svcr 3 | Svcr 4 |
| 1 | % of borrowers in current repayment | 2nd | 4th | 3rd | 1st |
| 2 | % of borrowers 91-270 delinquent | 4th | 3rd | 2nd | 1st |
| 3 | % of borrowers 271-360 delinquent | 2nd | 1st | 3rd | 4th |
| 4 | Borrower Survey | 1st | 2nd | 3rd | 4th |
| 5 | FSA Survey | 4th | 3rd | 2nd | 1st |

### SERVICER SCORES BASED ON RANKING (PRIOR to weighting)

|  | METRIC | Servicers | | | |
|---|---|---|---|---|---|
|  |  | Svcr 1 | Svcr 2 | Svcr 3 | Svcr 4 |
| 1 | % of borrowers in current repayment | 3.0 | 1.0 | 2.0 | 4.0 |
| 2 | % of borrowers 91-270 delinquent | 1.0 | 2.0 | 3.0 | 4.0 |
| 3 | % of borrowers 271-360 delinquent | 3.0 | 4.0 | 2.0 | 1.0 |
| 4 | Borrower Survey | 4.0 | 3.0 | 2.0 | 1.0 |
| 5 | FSA Survey | 1.0 | 2.0 | 3.0 | 4.0 |

### SERVICER SCORES BASED ON RANKING (WITH weighting)

|  | METRIC | Weight | Servicers | | | |
|---|---|---|---|---|---|---|
|  |  |  | Svcr 1 | Svcr 2 | Svcr 3 | Svcr 4 |
| 1 | % of borrowers in current repayment | 30% | 9.0 | 3.0 | 6.0 | 12.0 |
| 2 | % of borrowers 91-270 delinquent | 15% | 1.5 | 3.0 | 4.5 | 6.0 |
| 3 | % of borrowers 271-360 delinquent | 15% | 4.5 | 6.0 | 3.0 | 1.5 |
| 4 | Borrower Survey | 35% | 14 | 10.5 | 7.0 | 3.5 |
| 5 | FSA Survey | 5% | 0.5 | 1 | 1.5 | 2.0 |

### TOTAL SCORE BY SERVICER

|  | Servicers | | | |
|---|---|---|---|---|
|  | Svcr 1 | Svcr 2 | Svcr 3 | Svcr 4 |
| TOTAL SCORE | 29.5 | 23.5 | 22.0 | 25.0 |

### ALLOCATION EACH SERVICER WILL RECEIVE

|  | Total Score | % of new volume Servicer will receive (Total Score/Comb Totals) | New Borr (assumes 4M borr) |
|---|---|---|---|
| Svcr 1 | 29.5 | 29.50% | 1,180,000 |
| Svcr 2 | 23.5 | 23.50% | 940,000 |
| Svcr 3 | 22.0 | 22.00% | 880,000 |
| Svcr 4 | 25.0 | 25.00% | 1,000,000 |
| Comb Totals | 100 | 100.00% | 4,000,000 |

**Attachment A-6-- Servicing Pricing Definitions**

| Deliverable | Definition |
|---|---|
| Borrowers in IN-SCHOOL status | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have not separated from school as of the last day of the billing period. |
| Borrowers in IN GRACE status | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school but are not yet due for a payment this month. |
| Borrowers in Deferment | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school and would have had a payment due this month, but the payment was replaced with a deferment. |
| Borrowers in Forbearance | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school and would have had a payment due this month, but the payment was replaced with a forbearance. |
| Service Members | Number of unique borrowers (SSNs) with balance not equal to $0.00 who are currently:<br>    Using the SCRA 6% interest limit (borrower has one or more loans with rate reduced to 6% or SCRA eligible loans already at or under 6%)<br>    In a Military Service Deferment<br>    In a Post Active Duty Deferment OR<br>    Using for 0% interest while serving in hostile area (borrower has one or more loans with rate reduced to 0%)<br><br>**NOTE - Any borrower with one/more loans meeting eligibility for this category is included in this category (and payment rate) regardless of the delinquency level, or status, of the loan. |
| Borrowers in IN-REPAYMENT status | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school, borrower had a payment due this month, and payment due was not satisfied by a deferment or forbearance.  The full payment was satisfied by the borrower making a payment (or the borrower is due $0.00 on an income related pay plan) and the borrower is not more than 5 days delinquent on any amount as of the last day of the billing period.<br>    If a newly originated consolidation is added to servicing system with no payment due in the current month (first payment is prior month) the borrower is included in the current category. |
| Borrowers 6 - 30 days delinquent | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school and had a payment due this month.  The full payment was NOT satisfied by the borrower making a payment and the borrower is delinquent 6 to 30 days as of last day of the billing period. |

| | |
|---|---|
| Borrowers 31-90 days delinquent | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school and had a payment due this month. The full payment was NOT satisfied by the borrower making a payment and the borrower is delinquent 31 to 90 days as of last day of the billing period. |
| Borrowers 91-150 days delinquent | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school and had a payment due this month. The full payment was NOT satisfied by the borrower making a payment and the borrower is delinquent 91 to 150 days as of last day of the billing period. |
| Borrowers 151-270 days delinquent | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school and had a payment due this month. The full payment was NOT satisfied by the borrower making a payment and the borrower is delinquent 151 to 270 days as of last day of the billing period. |
| Borrowers 271-360 days delinquent | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school and had a payment due this month. The full payment was NOT satisfied by the borrower making a payment and the borrower is delinquent 271 to 360 days as of last day of the billing period. |
| Borrowers 360+ days delinquent | Number of unique borrowers (SSNs) with balance not equal to $0.00 who have separated from school and had a payment due this month. The full payment was NOT satisfied by the borrower making a payment and the borrower is delinquent 361 or more days as of last day of the billing period. |

\* Last day of the billing period = last day of each month

| Forbearance Examples | Deferment Examples |
|---|---|
| 1) Borrower due 14th monthly - on 1/1 a forbearance is applied to cover Jan 14 - March 14. Borrower will be due for the April payment.<br>  Jan, Feb, Mar - billed as Forbearance<br>  April - billed as current if borrower makes payment or 6-30 if payment is not made. | 1) Borrower due 21th monthly - on 1/10 a deferment is applied covering Jan 15 - July 25. Borrower will be due for the Aug payment.<br>  Jan, Feb, Mar, Apr, May, Jun, Jul - billed as Deferment<br>  Aug - billed as current if borrower makes payment or 6-30 if payment is not made. |
| 2) Borrower due 14th monthly - Borrower does not make Jan 14 payment, but request a one-month forbearance on Jan 28 to cover the Jan 14 payment. Borrower will be due for Feb payment.<br>  Jan - billed as Forbearance | 2) Borrower due 14th monthly - Borrower does not make Jan, Feb, or March payments (goes 75 days delinquent as of March 30), but on April 1st requests an unemployment deferment that covers January 10 to April 30. Borrower will be due for May payment.<br>  Jan - billed as 6-30 delinquent (borrower was delinquent as of end of Jan)<br>  Feb & Mar- billed as 31-90 delinquent( borrower was delinquent as of end of Feb/Mar)<br>  Apr - billed as Deferment<br>  May - billed as current if borrower makes payment or 6-30 if payment is not made. |

| Current/Delinquent Examples | |
|---|---|
| 1) Borrower due 14th monthly for $225.00/month - borrower pays $225 for Jan payment on 1/13. Borrower pays $225.00 on 2/20 for February payment. Jan & Feb - billed as current. Borrower satisfied due amount for monthly payment prior to last day of the month. | 2) Borrower due 14th monthly for $225.00/month - Borrower pays $200.00 on 1/13. Borrower pays $250.00 on 2/14. Jan - billed as 6-30 delinquent (payment was not fully satisfied as of end of month, still owed $25) Feb - billed as current. Total due from borrower ($250.00) has been satisfied by borrower payment. |
| 3) Borrower due 21st monthly for $0.00/month - Borrower's on income plan with payment calculated to be $0. Borrower makes no payment in Jan or Feb and makes a $5.00 payment in March.<br>  Jan, Feb, & Mar - billed as current. Borrower is not in forbearance or deferment and is due a payment calculated as $0 so the borrower has satisfied payment even if no payment is made. | 4) Borrower due 28th monthly for $175.00/month - Borrower pays nothing in January but borrower pays $170.00 on 2/3, then nothing for rest of Feb.<br>  Jan - billed as current (payment was not made in Jan, but borrower was not more than 5 days delinquent)<br>  Feb - billed as current. (payment was not made to cover 2/28 due payment, but borrower was not more than 5 days delinquent) |

| Service Member Examples | |
|---|---|
| 1) Borrower meets eligibility for maximum 6% interest rate - but loan is | 2) Borrower has multiple loans and is eligible for SCRA |

NOTES:

1. Common pricing shall apply regardless of program (i.e. Direct Loan, Federal Family Education Loan) or volume serviced, unless otherwise noted in the contract.
2. Borrowers in multiple statuses shall be billed once, in the lowest performing deliverable status. The lowest performing deliverable status is defined as the lowest unit priced deliverable.
3. Borrowers pending discharge, which include, but are not limited to: conditional disability, death, or bankruptcy, shall be, for billing purposes, counted in the deliverable status at the time of the discharge request.
4. "The last day of the billing period" is defined as the last day of the month.
5. The **revised** annual pricing period shall begin on the effective date of modification 0072.

**Attachment A-7—Borrower Status Reporting (Retention)**

**Report Format**

50 character length

| Field # | Length | Start | End | Description |
|---|---|---|---|---|

**Attachment Page**

Servicer shall store reports in text format (to allow for uploading by FSA into other software if desired).

Servicer shall provide the reports to FSA on demand.

Servicer shall ensure the volume of borrowers in each category MUST match servicer invoicing (if corrections to invoicing made, report should also be corrected).

Servicer shall retain all reports for the duration of the contracts and provide to FSA at end of contract.

Servicer shall provide FSA with a contact (name/email/phone) that can be contacted to request report delivery.

Servicer shall create report with a sort by SSN (ascending).

## Attachment A-8 — Quarterly Delinquency Reduction Compensation Report

| | [Servicer Name] - Quarterly Delinquency Resolution Compensation Report<br>Quarter Ending – (Month, Year) | | | |
|---|---|---|---|---|

| Award Fee | Description | Percentage | NUMERATOR: | DENOMINATOR: |
|---|---|---|---|---|
| 1 | Delinquency Percentage - Current Quarter | % | | |

| | Description | Percentage | NUMERATOR: | DENOMINATOR: |
|---|---|---|---|---|
| | Delinquency Percentage - Prior Quarter | % | | |

Results should be rounded to the 100th of a percent (i.e. .1534677 = 15.35%, .02465123 = 2.47%)

**Qualification for Delinquency Resolution Compensation (As submitted by Servicer)**

| | Description | Qualifies (y/n) |
|---|---|---|
| Level 1 | Delinquency Percentage for Quarter End of less than 23.0%. | |
| Level 2 | Delinquency Percentage for Quarter End of less than 23.0% (earns $200,000) AND Servicer improves upon prior Quarter End Delinquency Percentage | |
| Level 3 | Delinquency Percentage for Quarter End of less than 21.0% AND Servicer improves upon prior Quarter End Delinquency Percentage | |

This report shall be submitted by each servicer for each quarter ending September, December, March and June of each year.

This report shall be submitted to EDServicerP@ed.gov and other email addresses as updated periodically by FSA by the 15th calendar day of the month following quarter end (other addresses may be added by FSA).

The report shall be submitted with a subject line of "Quarterly Delinquency Reduction Report - 700XXX - MMCCYY" - where 700XXX = servicer ID and MMCCYY = quarter end Month & Year

(i.e. Great Lakes for quarter end December 2014 subject would be *Quarterly Delinquency Reduction Report - 700581 – 122014*)
This report shall also be submitted to the COR/CO along with the request for evaluation of Quarterly Delinquency Reduction Compensation qualification.

**Notes about Delinquency Reduction Compensation Calculations**
Volumes used in the above calculation should be the same volumes, by category, that have been submitted with the monthly invoice.

**Delinquency Resolution Calculation (higher % results = better metric result)**
   **Borrower Delinquency Percentage**
   Total count of borrowers in the 31-360 days delinquent statuses
   *Divided by*
   Total count of borrowers in In Repayment status and borrowers in the 31-360 days delinquent statuses

In school, in grace, service members, deferment, forbearance, and >360 delinquent borrowers excluded from numerator & denominator of calculation

**Attachment A-9 — Monthly Invoice Report**

Servicers shall submit the following report with their monthly invoices in Microsoft Excel.

| | |
|---|---|
| Contract Number | _____ |
| Vendor Name | _____ |
| Invoice Start Date | MM/DD/YYYY |
| Invoice End Date | MM/DD/YYYY |

| Status | Volume |
|---|---|
| In School | |
| In Grace | |
| In Repayment | |
| Service Member | |
| Deferment | |
| Forbearance | |
| Delinquent 6-30 Days | |
| Delinquent 31-90 Days | |
| Delinquent 91-150 Days | |
| Delinquent 151-270 Days | |
| Delinquent 271-360 Days | |
| Delinquent > 360 Days | |
| Total | |

| | SCHEDULE Continued | | | | |
|---|---|---|---|---|---|
| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE $ | AMOUNT $ |
| | Contracting Officer: Soo Kang, 202-377-3798, soo.kang@ed.gov<br><br>Primary Contracting Officer Representative: Tammy Connelly, 202.377.3298, tammy.connelly@ed.gov<br><br>Alternate Contracting Officer Representative(s): Lynn Smith, 202-377-3577, lynn.smith@ed.gov Patrice Washington, (202) 377-3845, Patrice.Washington@ed.gov<br><br>Primary Technical Point of Contact: None<br><br>Alternate Technical Point of Contact(s): None | | | | |

# EXHIBIT B

6314198

# INCOME-DRIVEN REPAYMENT PLAN REQUEST:

**For the Revised Pay As You Earn (REPAYE), Pay As You Earn (PAYE), Income-Based (IBR), and Income-Contingent (ICR) repayment plans under the William D. Ford Federal Direct Loan (Direct Loan) and Federal Family Education Loan (FFEL) Programs**

OMB No. 1845-0102
Form Approved
Exp. Date 10/31/2018

**IDR**

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form or on any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

## SECTION 1: BORROWER IDENTIFICATION

Please enter or correct the following information.

☐ **Check this box if any of your information has changed.**

| | |
|---|---|
| SSN | ■■■■■■■■■■ |
| Name | danielle r salvatore |
| Address | ■■■■■■■■■■ |
| City, State, Zip | SELMA, TX, 78154 |
| Telephone – Primary | ■■■■■■■■■■ |
| Telephone – Alternate | ■■■■■■■■■■ |
| E-mail (Optional) | ■■■■■■■■■■ |

## SECTION 2: REPAYMENT PLAN OR RECERTIFICATION REQUEST

**READ BEFORE COMPLETING THIS FORM:**

- You can apply online at **StudentLoans.gov**. It is faster and easier to complete this form online.
- Income-driven repayment plans offer many benefits, but may not be right for everyone.
- You can learn more about these plans at **StudentAid.gov/IDR** and by reading Sections 9 and 10.
- It's simple to explore all of your repayment options at **StudentAid.gov/repayment-estimator**.
- You can find out which types of loans you have and who your loan holder or servicer is at **nslds.ed.gov**.
- If you need help completing this request, contact your loan holder or servicer for free assistance.
- You may have to pay income tax on any loan amount forgiven under an income-driven plan.

**1. Select the reason you are submitting this form (Check only one):**

☐ I am not in an income-driven repayment plan, but want to enter one – <u>Continue to Item 2.</u>

☒ I am already in an income-driven repayment plan and am submitting documentation for the annual recalculation of my payment - <u>Skip to Item 5.</u>

☐ I am already in an income-driven repayment plan and am submitting documentation early because I want my loan holder to recalculate my payment immediately - <u>Skip to Item 5.</u>

☐ I am already in an income-driven repayment plan, but want to change to a different income-driven repayment plan - <u>Continue to Item 2.</u>

**2. Choose a plan and then <u>continue to Item 3</u>.**

☐ (Recommended) I want my loan holder to place me on the plan with the lowest monthly payment.

☐ REPAYE      ☐ IBR

☐ PAYE        ☐ ICR

**3. Do you have multiple loan holders or servicers?**

☐ Yes - Submit a separate request to each loan holder or servicer. <u>Continue to Item 4.</u>

☐ No - <u>Continue to Item 4.</u>

**4. Are you currently in a deferment or forbearance?**

☐ No - <u>Continue to Item 5.</u>

☐ Yes, but I want to start making payments under my plan immediately - <u>Continue to Item 5.</u>

☐ Yes, but I do not want to start repaying my loans until the deferment or forbearance ends - <u>Continue to Item 5.</u>

**If you have FFEL Program loans,** they may only be repaid under IBR. If you request a different plan, your loan holder will consider you for IBR on your FFEL Program loans. You may be able to consolidate your FFEL Program loans into a Direct Consolidation Loan to take advantage of other income-driven plans by visiting **StudentLoans.gov**.

## SECTION 3: FAMILY SIZE INFORMATION

**5. How many children, including unborn children, are in your family and receive more than half of their support from you?**

0 . Continue to Item 6.

A definition of "family size" is available in Section 9. Do not enter a value for you or your spouse. Those values are automatically included, if appropriate.

**6. How many people, excluding your spouse and children, live with you, and receive more than half of their support from you?**

0 . Continue to Item 7.

**7. What is your marital status?**

[X] Single - Continue to Item 8.

[ ] Married - Skip to Item 11.

## SECTION 4A: INCOME INFORMATION FOR SINGLE BORROWERS

**8. Did you file a federal income tax return for either of the past two tax years?**

[X] Yes - Continue to Item 9.

[ ] No - Skip to Item 10.

**9. Has your income significantly changed since you filed your last federal income tax return?** For example, have you lost your job, gotten divorced, or experienced a drop in income?

[X] Yes - Continue to Item 10.

[ ] No - Provide your most recent federal income tax return or transcript. Skip to Section 6.

**10. Do you currently have taxable income?** Check "No" if you do not have any income or receive only untaxed income.

[X] Yes - Skip to Section 5.

[ ] No - Skip to Section 6.

Remember, any person who makes a knowingly false statement or misrepresentation on this form may be subject to fines, imprisonment, or both.

## SECTION 4B: LOAN AND INCOME INFORMATION FOR MARRIED BORROWERS

**11. Does your spouse have federal student loans?**

[ ] Yes - Continue to Item 12.

[ ] No - Skip to Item 14.

**12. Provide the following information about your spouse and then continue to Item 13.**

a. Spouse's SSN:

_____

b. Spouse's Name:

_____

c. Spouse's Date of Birth:

_____

**13. If you are placed on the ICR plan, do you want to repay your Direct Loans jointly with your spouse?**

[ ] Yes - Continue to Item 14.

[ ] No - Continue to Item 14.

**14. When you filed your last federal income tax return, did you file jointly with your spouse?**

[ ] Yes - Continue to Item 15.

[ ] No - Skip to Item 20.

**15. Did you and your spouse file a federal income tax return for either of the past two tax years?**

[ ] Yes - Continue to Item 16.

[ ] No - Skip to Item 18.

**16. Has your income significantly changed since you filed your last federal income tax return?** For example, have you lost your job or experienced a drop in income?

[ ] Yes - Skip to Item 18.

[ ] No - Continue to Item 17.

**17. Has your spouse's income significantly changed since your spouse filed his or her last federal income tax return?** For example, has your spouse lost his or her job or experienced a drop in income?

[ ] Yes - Continue to Item 18.

[ ] No - Provide your and your spouse's most recent federal income tax return or transcript. Skip to Section 6.

**18. Do you currently have taxable income?** Check "No" if you do not have any income or receive only untaxed income.

[ ] Yes - Provide documentation of your income as instructed in Section 5. Continue to Item 19.

[ ] No - Continue to Item 19.

Remember, any person who makes a knowingly false statement or misrepresentation on this form may be subject to fines, imprisonment, or both.

Borrower Name: Grace Salvatore

Borrower SSN: ⬛⬛⬛

6314198

## SECTION 4B: LOAN AND INCOME INFORMATION FOR MARRIED BORROWERS (CONTINUED)

**19. Does your spouse currently have taxable income?** Check "No" if your spouse has no taxable income or receives only untaxed income.

☐ Yes - Provide documentation of your spouse's income as instructed in Section 5.

☐ No - Skip to Section 6.

**20. Did you file a federal income tax return for either of the past two tax years?.**

☐ Yes - Continue to Item 21.

☐ No - Skip to Item 22.

**21. Has your income significantly changed since you filed your last federal income tax return?** For example, have you lost your job or experienced a drop in income?

☐ Yes - Continue to Item 22.

☐ No - Provide your most recent federal income tax return or transcript. Skip to Item 23.

**22. Do you currently have taxable income?** Check "No" if you have no taxable income or receive only untaxed income.

☐ Yes - Provide documentation of your income as instructed in Section 5. Continue to Item 23.

☐ No - Continue to Item 23.

**23. Are you separated from your spouse?**

☐ Yes - Provide documentation of only your income as instructed in Item 21 or 22 and then skip to Section 6.

☐ No - Continue to Item 24.

**24. Are you reasonably able to access information about your spouse's income and able to have your spouse sign this application?**

☐ Yes - Continue to Item 25.

☐ No - Provide documentation of only your income as instructed in Item 21 or 22 and then skip to Section 6.

**25. Did your spouse file a federal income tax return for either of the past two tax years?.**

☐ Yes - Continue to Item 26.

☐ No - Skip to Item 27.

**26. Has your spouse's income significantly changed since your spouse filed his or her last federal income tax return?** For example, has your spouse you lost a job or experienced a drop in income?

☐ Yes - Continue to Item 27.

☐ No - Provide your spouse's most recent federal income tax return or transcript. This information will only be used for the REPAYE Plan. Skip to Section 6.

**27. Does your spouse currently have taxable income?** Check "No" if your spouse has no taxable income or receive only untaxed income.

☐ Yes - Provide documentation of your spouse's income as instructed in Section 5. This information will only be used for the REPAYE Plan.

☐ No - Skip to Section 6.

> Remember, any person who makes a knowingly false statement or misrepresentation on this form may be subject to fines, imprisonment, or both.

## SECTION 5: INSTRUCTIONS FOR DOCUMENTING CURRENT INCOME

**You only need to follow these instructions if, based on your answers in Section 4, you and your spouse (if applicable) are required to provide documentation of your current income instead of a tax return or tax transcript. After gathering the appropriate documentation, continue to Section 6.**

- You must provide documentation of **all taxable income** you and your spouse currently receive.

- **Documentation will usually include** a pay stub or letter from your employer listing your gross pay.

- You must provide at least **one piece** of documentation for each source of taxable income.

- **Taxable income includes,** for example, income from employment, unemployment income, dividend income, interest income, tips, and alimony.

- Do not provide documentation of **untaxed income** such as Supplemental Security Income, child support, or federal or state public assistance.

- **If documentation is not available or you want to explain your income,** attach a signed statement explaining each source of income and giving the name and the address of each source of income.

- Write on your documentation **how often you receive the income,** for example, "twice per month" or "every other week."

- The **date** on any supporting documentation you provide must be **no older than 90 days** from the date you sign this form.

- Copies of documentation are acceptable.

## SECTION 6: BORROWER REQUESTS, UNDERSTANDINGS, AUTHORIZATION, AND CERTIFICATION

If I am requesting an income-driven repayment plan or seeking to change between income-driven repayment plans, **I request:**

- That my loan holder place me on the plan I selected in Section 2 to repay my eligible Direct Loan or FFEL Program loans held by the holder to which I submit this form.

- If I do not qualify for the plan or plans I requested, that my loan holder place me on the plan with the lowest monthly payment amount.

- If I selected more than one plan, that my loan holder place me on the plan with the lowest monthly payment amount from the plans that I requested.

- If more than one of the plans that I selected provides the same initial payment amount, or if my loan holder is determining which income-driven plans I qualify for and I qualify for more than one of those plans, my loan holder will use the following order in choosing my plan: REPAYE (if my repayment period is 20 years), PAYE, REPAYE (if my repayment period is 25 years), IBR, and then ICR.

If I am currently repaying my Direct Loans under the IBR plan and am requesting to change to another income-driven plan, I must be placed on the Standard Repayment Plan, and cannot change to the plan that I requested until I make a payment under the Standard Repayment Plan or make a payment under a reduced-payment forbearance.

If I check the box below, **I request** that my loan holder grant me a reduced-payment forbearance for one month so that I can move from the IBR plan to my new income-driven repayment plan.

☐ I want a one-month reduced-payment forbearance in the amount of $ _____ (must be at least $5).

**I understand** that:

- If I do not provide my loan holder with this completed form and any other required documentation, I will not be placed on the plan that I requested.

- I may choose a different repayment plan for any student loans that are not eligible for income-driven repayment.

- If I requested a reduced-payment forbearance of less than $5, above, my loan holder will grant my forbearance request in the amount of $5.

- If I am requesting the ICR plan, my initial payment amount will be the amount of interest that accrues each month on my loan until my loan holder receives the income documentation needed to calculate my payment amount. If I cannot afford the initial payment amount, I may request a forbearance by contacting my loan holder.

- If I have FFEL Program loans, my spouse may be required to give my loan holder access to his or her loan information in the National Student Loan Data System (NSLDS). My loan holder will contact me with further instructions.

- My loan holder may grant me a forbearance while processing my application or to cover any period of delinquency that exists when I submit my application.

**I authorize** the loan holder to which I submit this request (and its agents or contractors) to contact me regarding my request or my loan(s), including repayment of my loan(s), at any number that I provide on this form or any future number that I provide for my cellular telephone or other wireless device using automated telephone dialing equipment or artificial or prerecorded voice or text messages.

**I certify** that all of the information I have provided on this form and in any accompanying documentation is true, complete, and correct to the best of my knowledge and belief.

**Borrower's Signature** danielle r salvatore _____    **Date** 01/07/2016

**Spouse's Signature** _____    **Date** _____

**If you are married, your spouse is required to sign this form unless you answered "yes" to Item 23 or "no" to Item 24.**

EXHIBIT C

## INCOME-DRIVEN REPAYMENT PLAN REQUEST:

**For the Revised Pay As You Earn (REPAYE), Pay As You Earn (PAYE), Income-Based (IBR), and Income-Contingent (ICR) repayment plans under the William D. Ford Federal Direct Loan (Direct Loan) and Federal Family Education Loan (FFEL) Programs**

OMB No. 1845-0102
Form Approved
Exp. Date 10/31/2018

**IDR**

WARNING: Any person who knowingly makes a false statement or misrepresentation on this form or on any accompanying document is subject to penalties that may include fines, imprisonment, or both, under the U.S. Criminal Code and 20 U.S.C. 1097.

### SECTION 1: BORROWER IDENTIFICATION

PHEAA
JAN 1 4 2016
REC MGMT

Please enter or correct the following information.
☐ box if any of your information has changed.
SSN ▓▓▓▓
Name  danielle r salvatore
Address ▓▓▓▓
City, State, Zip Code  SELMA TX 78154
Telephone - Prima ▓▓▓▓
Telephone - Altern ▓▓▓▓
E-mail (Optional) ▓▓▓▓

### SECTION 2: REPAYMENT PLAN OR RECERTIFICATION REQUEST

**READ BEFORE COMPLETING THIS FORM:**
- You can apply online at StudentLoans.gov. It is faster and easier to complete this form online
- Income-driven repayment plans offer many benefits, but may not be right for everyone.
- You can learn more about these plans at StudentAid.gov/IDR by reading Sections 9 and 10.
- It's simple to explore all of your repayment options at StudentAid.gov/repayment-estimator
- You can find out which types of loans you have and who your loan holder or servicer is at nslds.ed.gov
- If you need help completing this request, contact your loan holder or servicer for free assistance.
- You may have to pay income tax on any loan amount forgiven under an income-driven plan.

1. Select the reason you are submitting this form (Check only one):

☐ I am not in an income-driven repayment plan, but want to enter one - Continue to Item 2.

[X] I am already in an income-driven repayment plan and am submitting documentation for the annual recalculation of my payment - Skip to Item 5.

☐ I am already in an income-driven repayment plan and am submitting documentation early because I want my loan holder to recalculate my payment immediately - Skip to Item 5.

☐ I am already in an income-driven repayment plan, but want to change to a different income-driven repayment plan - Continue to Item 2.

2. Choose a plan and then continue to Item 3.

[X] (Recommended) I want my loan holder to place me on the plan with the lowest monthly payment.
☐ REPAYE
☐ PAYE
☐ IBR
☐ ICR

3. Do you have multiple loan holders or servicers?

☐ Yes - Submit a separate request to each loan holder or servicer. Continue to Item 4.

☐ No - Continue to Item 4.

4. Are you currently in a deferment or forbearance?

☐ No - Continue to Item 5.

☐ Yes, but I want to start making payments under my plan immediately - Continue to Item 5.

☐ Yes, but I do not want to start repaying my loans until the deferment or forbearance ends - Continue to Item 5.

If you have FFEL Program loans, they may only be repaid under IBR. If you request a different plan, your loan holder will consider you for IBR on your FFEL Program loans. You may be able to consolidate your FFEL Program loans into a Direct Consolidation Loan to take advantage of other income-driven plans by visiting StudentLoans.gov.

### SECTION 3: FAMILY SIZE INFORMATION

5. How many children, including unborn children, are in your family and receive more than half of their support from you?

0.   Continue to Item 6.

A definition of "family size" is available in Section 9. Do not enter a value for you or your spouse. Those values are automatically included, if appropriate.

6. How many people, excluding your spouse and children, live with you, and receive more than half of their support from you?

0.   Continue to Item 7.

7. What is your marital status?

[X] Single - Continue to Item 8.
☐ Married - Skip to Item 11.

### SECTION 4A: INCOME INFORMATION FOR SINGLE BORROWERS

**8.** Did you file a federal tax return for either of the past two years?

[X] Yes - Continue to Item 9.

[ ] No - Skip to Item 10.

**9.** Has your income significantly changed? For example, have you lost your job or experienced a drop in income?

[X] Yes - Continue to Item 10.

[ ] No - Provide your most recent federal income tax return or transcript. Skip to Section 5.

**10.** Do you currently have taxable income? Check "No" if you do not have any income or receive only untaxed income.

[X] Yes - Skip to Section 5.

[ ] No - Skip to Section 6.

Remember, any person who makes a knowingly false statement or misrepresentation on this form may be subject to fines, imprisonment, or both.

## SECTION 4B: LOAN AND INCOME INFORMATION FOR MARRIED BORROWERS

**11.** Does your spouse have federal student loans?

[ ] Yes - Continue to Item 12.

[ ] No - Skip to Item 14.

**12.** Provide the following information about your spouse and then continue to Item 13:

Spouse's SSN:

Spouse's Name:

Spouse's Date of Birth:

**13.** If placed on the ICR plan, do you want to repay your Direct Loans jointly with your spouse?

[ ] Yes - Continue to Item 14.

[ ] No - Continue to Item 14.

**14.** When you filed your last federal income tax return, did you file jointly with your spouse?

[ ] Yes - Continue to Item 15.

[ ] No - Skip to Item 20.

**15.** Did you and your spouse file a federal income tax return for either of the past two years?

[ ] Yes - Continue to Item 16.

[ ] No - Skip to Item 18.

**16.** Has your income significantly changed since you filed your last federal income tax return? For example, have you lost your job or experienced a drop in income?

[ ] Yes - Skip to Item 18.

[ ] No - Continue to Item 17.

**17.** Has your spouse's income significantly changed since your spouse filed his or her last federal income tax return? For example, has your spouse lost his or her job or experienced a drop in income?

[ ] Yes - Continue to Item 18.

[ ] No - Provide your and your spouse's most recent federal income tax return or transcript. Skip to Section 6.

**18.** Do you currently have taxable income? Check "No" if you do not have any income or receive only untaxed income.

[ ] Yes - Provide documentation of your income as instructed in Section 5. Continue to Item 19.

[ ] No - Continue to Item 19.

Remember, any person who makes a knowingly false statement or misrepresentation on this form may be subject to fines, imprisonment, or both.

**19.** Does your spouse currently have taxable income? Check "No" if your spouse has no taxable income or receives only untaxed income.

[ ] Yes - Provide documentation of your spouse's income as instructed in Section 5.

[ ] No - Skip to Section 6.

**20.** Did you file a federal income tax return for either of the past two years?

[ ] Yes - Continue to Item 21.

[ ] No - Skip to Item 22.

**21.** Has your income significantly changed since you filed your last federal income tax return? For example, have you lost your job or experienced a drop in income?

[ ] Yes - Continue to Item 22.

[ ] No - Provide your most recent federal income tax return or transcript. Skip to Item 23.

**22.** Do you currently have taxable income? Check "No" if you have no taxable income or receive only untaxed income.

[ ] Yes - Provide documentation of your income as instructed in Section 5. Continue to Item 23.

[ ] No - Continue to Item 23.

**23.** Are you separated from your spouse?

[ ] Yes - Provide documentation of only your income as instructed in Item 21 or 22 and then skip to Section 6.

[ ] No - Continue to Item 24.

**24.** Are you reasonably able to access information about your spouse's income and able to have your spouse sign this application?

[ ] Yes - Continue to Item 25.

[ ] No - Provide documentation of only your income as instructed in Item 21 or 22 and then skip to Section 6.

**25.** Did your spouse file a federal income tax return for either of the past two years?

[ ] Yes - Continue to Item 26.

[ ] No - Skip to Item 27.

**26.** Has your spouse's income significantly changed since your spouse filed his or her last federal income tax return? For example, has your spouse lost his or her job or experienced a drop in income?

[ ] Yes - Continue to Item 27.

[ ] No - Provide your spouse's most recent federal income tax return or transcript. This information will only be used for the REPAY Plan. Skip to Section 6.

**27.** Does your spouse currently have taxable income? Check "No" if your spouse has no taxable income or receives only untaxed income.

[ ] Yes - Provide documentation of your spouse's income as instructed in Section 5. This information will only be used for the REPAY Plan.

[ ] No - Skip to Section 6.

## SECTION 5: INSTRUCTIONS FOR DOCUMENTING CURRENT INCOME

You only need to follow these instructions if, based on your answers in Section 4, you and your spouse (if applicable) are required to provide documentation of your current income instead of a tax return or tax transcript. After gathering the appropriate documentation, continue to Section 6.

- You must provide documentation of all taxable income you and your spouse currently receive.
- Documentation will usually include a pay stub or letter from your employer listing your gross pay.
- You must provide at least one piece of documentation for each source of taxable income.
- Taxable income includes, for example, income from employment, unemployment income, dividend income, interest income, tips, and alimony.
- Do not provide documentation of untaxed income such as Supplemental Security Income, child support, or federal or state public assistance.
- If documentation is not available or you want to explain your income, attach a signed statement explaining each source of income and giving the name and the address of each source of income.
- Write on your documentation how often you receive the income, for example, "twice per month" or "every other week".
- The date on any supporting documentation you provide must be no older than 90 days from the date you sign this form.

· Copies of documentation are acceptable.

## SECTION 6: BORROWER REQUESTS, UNDERSTANDINGS, AUTHORIZATION, AND CERTIFICATION

If I am requesting an income-driven repayment plan or seeking to change between income-driven repayment plans, I request:
· That my loan holder place me on the plan I selected in Section 2 to repay my eligible Direct Loan or FFEL Program loans held by the holder to which I submit this form.
· If I do not qualify for the plan or plans I requested, that my loan holder place me on the plan with the lowest monthly payment amount.
· If I selected more than one plan, that my loan holder place me on the plan with the lowest monthly payment amount from the plans that I requested.
· If more than one of the plans that I selected provides the same initial payment amount, or if my loan holder is determining which income-driven plans I qualify for and I qualify for more than one of those plans, my loan holder will use the following order in choosing my plan: REPAYE (if my repayment period is 20 years), PAYE, REPAYE (if my repayment period is 25 years), IBR, and then ICR.

If I am currently repaying my Direct Loans under the IBR plan and am requesting to change to another income-driven plan, I must be placed on the Standard Repayment Plan, and cannot change to the plan that I requested until I make a payment under the Standard Repayment Plan or make a payment under a reduced-payment forbearance.

If I check the box below, I request that my loan holder grant me a reduced-payment forbearance for one month so that I can move from the IBR plan to my new income-driven repayment plan.

☐ I want a one-month reduced-payment forbearance in the amount of $ _____ (must be at least $5).

I understand that:
· If I do not provide my loan holder with this completed form and any other required documentation, I will not be placed on the plan that I requested
· I may choose a different repayment plan for any student loans that are not eligible for income-driven repayment.
· If I requested a reduced-payment forbearance of less then $5, above, my loan holder will grant my forbearance request in the amount of $5.
· If I am requesting the ICR plan, my initial payment amount will be the amount of interest that accrues each month on my loan until my loan holder receives the income documentation needed to calculate my payment amount. If I cannot afford the initial payment amount, I may request a forbearance by contacting my loan holder.
· If I have FFEL Program loans, my spouse may be required to give my loan holder access to his or her loan information in the National Student Loan Data System (NSLDS). My loan holder will contact me with further instructions.
· My loan holder may grant me a forbearance while processing my application or to cover any period of delinquency that exists when I submit my application.

I authorize the loan holder to which I submit this request (and its agents or contractors) to contact me regarding my request or my loan(s), including repayment of my loan(s), at any number that I provide on this form or any future number that I provide for my cellular telephone or other wireless device using automated telephone dialing equipment or artificial or prerecorded voice or text messages.

I certify that all of the information I have provided on this form and in any accompanying documentation is true, complete, and correct to the best of my knowledge and belief.

| Borrower Signature | danielle r salvatore | Date | 01/07/2016   01/07/2016 |
|---|---|---|---|
| Spouse's Signature | | Date | |

If you are married, your spouse is required to sign this form unless you answered "yes" to Item 23 or "no" to Item 24.

## SECTION 7: WHERE TO SEND THE COMPLETED REQUEST

Return the completed form and any required documentation to:

(If no address is shown, return to your loan holder or servicer.)
   If you need help completing this form,

(If no telephone number is shown, call your loan servicer.)

## SECTION 8: INSTRUCTIONS FOR COMPLETING THE FORM

Type or print using dark ink. Enter dates as month-day-year (mm-dd-yyyy). Use only numbers. Example: March 14, 2015 = 03-14-2015. Include your name and account number on any documentation that you are required to submit with this form. Return the completed form and any required documentation to the address shown in Section 7.

## SECTION 9: DEFINITIONS

### COMMON DEFINITIONS FOR ALL INCOME-DRIVEN REPAYMENT PLANS:

   The William D. Ford Federal Direct Loan (Direct Loan) Program includes Direct Subsidized Loans, Direct Unsubsidized Loans, Direct PLUS Loans, and Direct Consolidation Loans.

   The Federal Family Education Loan (FFEL) Program includes Federal Stafford Loans (both subsidized and unsubsidized), Federal PLUS Loans, Federal Consolidation Loans, and Federal Supplemental Loans for Students (SLS).

   The poverty guideline amount is the figure for your state and family size from the poverty guidelines published annually by the U.S. Department of Health and Human Services (HHS). The HHS poverty guidelines are used for purposes such as determining eligibility for certain federal benefit programs. If you are not a resident of a state identified in the poverty guidelines, your poverty guideline amount is the amount used for the 48 contiguous states.

   Family size always includes you and your children (including unborn children who will be born during the year for which you certify your family size), if the children will receive more than half their support from you.

   For the PAYE, IBR, and ICR Plans, family size also always includes your spouse. For the REPAYE plan, family size includes your spouse even if your spouse's income is excluded from the calculation of your payment amount because you are (1) separated from your spouse or (2) unable to access your spouse's income information.

   For all plans, family size also includes other people only if they live with you now, receive more than half their support from you now, and will continue to receive this support for the year that you certify your family size. Support includes money, gifts, loans, housing, food, clothes, car, medical and dental care, and payment of college costs.

   For the purposes of these repayment plans, your family size may be different from the number of exemptions you claim on your federal income tax return.

   Capitalization is the addition of unpaid interest to the principal balance of your loan. This will increase the principal balance and the total cost of your loan.

   A deferment is a period during which you are entitled to postpone repayment of your loans. Interest is not generally charged to you during a deferment on your subsidized loans. Interest is always charged to you during a deferment on your unsubsidized loans.

   A forbearance is a period during which you are permitted to postpone making payments temporarily, allowed an extension of time for making payments, or temporarily allowed to make smaller payments than scheduled.

   The holder of your Direct Loans is the U.S. Department of Education (the Department). The holder of your FFEL Program loans may be a lender, secondary market, guaranty agency, or the Department. Your loan holder may use a servicer to handle billing, payment, repayment options, and other communications on your loans. References to "your loan holder" on this form mean either your loan holder or your servicer.

   A partial financial hardship is an eligibility requirement for the IBR and PAYE plans. You have a partial financial hardship when the annual amount due on all of your eligible loans (or, if you are also required to provide documentation of your spouse's income, the annual amount due on all of your eligible loans and your spouse's eligible loans) exceeds 10% (for the PAYE plan and for new borrowers under the IBR plan) or 15% (for those who are not new borrowers under the IBR plan) of the amount by which your adjusted gross income (AGI) exceeds 150% of the annual poverty guideline amount for your family size and state of residence. The annual amount due is calculated based on the greater of (1) the total amount owed on eligible loans at the time those loans initially entered repayment, or (2) the total amount owed on eligible loans at the time you initially request the PAYE or IBR plan. The annual amount due is calculated using a standard repayment plan with a 10-year repayment period, regardless of loan type. When determining whether you have a partial financial hardship for the PAYE plan, the Department will include any FFEL Program loans that you have into account even though those loans are not eligible to be repaid under the PAYE plan, except for: (1) a FFEL Program loan that is in default; (2) a Federal PLUS Loan made to a parent borrower; or (3) a Federal Consolidation Loan that repaid a Federal or Direct PLUS Loan made to a parent borrower.

   The standard repayment plan has a fixed monthly payment amount over a repayment period of up to 10 years for loans other than Direct or Federal Consolidation Loans, or up to 30 years for Direct and Federal Consolidation Loans.

EXHIBIT D

September 2015

# Student loan servicing

Analysis of public input and recommendations for reform


Consumer Financial
Protection Bureau

# Table of contents

**Table of contents**................................................................................1

**Executive summary**..........................................................................3

**About this report** ............................................................................6

**Introduction** ....................................................................................8

**1.   Public input on student loan servicing practices** ...........................16

    1.1   Borrower benefits and protections........................................................17

    1.2   Servicing transfers ........................................................... 45

    1.3   Customer service and error resolution................................... 63

    1.4   Payment processing ...........................................................71

    1.5   Practices impacting specific borrower segments ...................89

**2.   Public input on analogies to servicing approaches in other markets**.....................................................................................**103**

    2.1   Practices and protections for struggling or delinquent borrowers...... 105

    2.2   Practices and protections related to servicing transfers ......................114

    2.3   Practices and protections related to customer service and error resolution............................................................................119

    2.4   Practices and protections related to the processing of payments........ 122

**3.   Recommendations**.................................................................................**133**

   3.1   Consistent ............................................................... 136

   3.2   Accurate and actionable....................................... 138

   3.3   Accountable............................................................ 140

   3.4   Transparent............................................................ 142

**Conclusion**.................................................................................**146**

**Contact information** ...............................................................**147**

**Appendix A:** ...............................................................................**148**

   Joint statement of principles on student loan servicing.............................. 148

2

# Executive summary

- More than 41 million Americans collectively owe more than $1.2 trillion in student loan debt, making student loan debt the second-largest class of consumer debt behind mortgages. The student loan market continues to show elevated levels of distress relative to other types of consumer debt, despite recent improvements in the labor market and the near-universal availability of income-driven repayment plans for borrowers with federal student loans experiencing financial hardship. The Bureau estimates that more than 1-in-4 student loan borrowers are now delinquent or in default on a student loan.

- Significant data gaps exist in the higher education sector, including data related to loan performance, student outcomes, and certain key demographic, labor, and wage data about student loan borrowers. Evidence suggests that some borrowers who default share certain characteristics, including attendance at proprietary schools or failure to complete a program of study. Improved access to key data is needed, including accesss to data related to predictors of future borrower distress, performance of borrowers in alternative repayment arrangements, and the efficacy of various interventions, and should inform policymakers and market participants seeking to target resources and reduce defaults.

- Student loan servicers are a critical link between borrowers and lenders. Servicers manage borrowers' accounts, process monthly payments, manage enrollment in alternative repayment plans, and communicate directly with borrowers, including borrowers in distress. There are no consistent, market-wide federal standards for student loan servicing and servicers generally have discretion to determine policies related to many aspects of servicing operations.

- In May 2015, the Bureau joined with the Department of Education and the Department of the Treasury to launch a public inquiry into student loan servicing practices. The Bureau published a notice in the *Federal Register* requesting comments from the public on student loan servicing. In response, the Bureau received more than 30,000 comments

describing specific student loan servicing practices that may be contributing to student debt stress, and offering specific recommendations for ways to improve student loan servicing, encourage borrower success, and mitigate defaults. Although not necessarily representative of the experience of more than 41 million student loan borrowers, public comments help to illustrate where there may be a mismatch between borrowers' needs and actual service delivered.

- Comments from individual student loan borrowers describe how they encounter servicing problems or practices that discourage utilization of alternative repayment plans, including income-driven repayment plans. A number of comments describe how some borrowers may end up in default when they are unable to obtain an alternative repayment plan. Comments also describe how some servicing practices subsequently can result in payment shock, lost benefits, and increased interest charges for borrowers enrolled in these plans.

- Commenters detail problems related to customer service, including issues for borrowers seeking to resolve servicing errors. Commenters describe how these problems create barriers for borrowers experiencing financial hardship who are seeking to avoid default, and may cause significant credit reporting harm.

- Commenters describe how payment processing and servicing transfer practices create problems for borrowers trying to repay student debt. Public comments from individual borrowers describe how these practices cause payment processing problems, increase interest charges and late fees, prolong repayment, and create confusion for student loan borrowers. Loan servicers also comment that the complexity of the student loan programs may contribute to these problems.

- Commenters, including student loan borrowers, student loan market participants, state law enforcement officials and banking regulators, policy experts, and organizations representing consumers, workers, people of color, and institutions of higher education, call on policymakers to develop student loan servicing standards. Some comments identify existing protections for consumers with credit cards or mortgages, suggesting that these protections may serve as a guide as policymakers and market participants consider a framework to improve student loan servicing practices.

- In addition, the Bureau received comments from servicers, lenders, and organizations representing the student loan industry. Many of the public and industry commenters

4

offer specific recommendations regarding ways to improve student loan servicing, encourage borrower success, and mitigate defaults.

- Industry commenters, including the two largest participants in the student loan servicing market, identify certain student loan servicing practices where there is significant diversity in the marketplace and suggest that policymakers require consistent approaches to common servicing functions, while taking into account important variations in product terms and features. Other industry commenters suggest alternate approaches related to specific practices or dispute the need for additional action.

- In this report, the Bureau suggests a framework to improve student loan servicing practices, recommending consistent standards for the student loan servicing market, strengthened servicer communications that provide information in a manner that leads to better borrower outcomes, continued emphasis on accountability and oversight by federal and state regulators, and public access to robust data on student loan performance.

- In September 2015, the Bureau, the Department of Education, and the Department of the Treasury issued a *Joint Statement of Principles on Student Loan Servicing*, proposing a framework similar to the recommendations included in this report.

# About this report

This report reviews and discusses public comments submitted in response to a Request for Information Regarding Student Loan Servicing published in the *Federal Register* in May 2015 (Docket ID: CFPB-2015-0021). The notice details a series of topics and questions to elicit feedback from the public, including:

- How existing student loan servicing industry practices affect repayment;

- Whether protections in place in other markets for consumer financial products and services should be instructive to policymakers and market participants seeking to improve the delivery of service, including:

    □ Protections in place for homeowners repaying mortgages,

    □ Protections in place for homeowners facing foreclosure or experiencing financial distress,

    □ Protections in place for consumers with credit cards; and

- How the availability of data on student loan origination and performance influences policymakers, market participants, and members of the public seeking to strengthen student loan servicing.

Members of the public, including student loan borrowers, financial services providers including but not limited to lenders and servicers in the mortgage, credit card, and student loan markets,

organizations representing students and student loan borrowers, colleges and universities, students, and families were encouraged to submit comments.[1]

In addition, a number of student loan market participants, including student loan servicers and recent entrants to the student loan market, provided supplemental data and other information related to certain student loan servicing practices, which informed the analysis contained in this report. The Bureau also considered complaints from individual consumers, submissions to the Bureau's "Tell Your Story" function, and other qualitative input from consumers and other stakeholders.

Readers should note that the public comments and other qualitative inputs described in this report are not necessarily representative of the experience of over 41 million borrowers in the student loan market. Public comments help to illustrate where there may be a mismatch between borrower needs and actual service delivered. Policymakers and market participants will likely find the inventory of borrower experiences and servicing practices helpful in further understanding the diversity of consumer experience in the market.

---

[1] Consumer Financial Protection Bureau, *Request for Information Regarding Student Loan Servicing* (May 2015), *available at* http://www.consumerfinance.gov/students/request-for-information-on-student-loan-servicing.

# Introduction

More than 41 million Americans owe student loan debt. In less than a decade, the volume of outstanding federal student loan debt has more than doubled, rising from $516 billion in 2007 to greater than $1.2 trillion in the third quarter of 2015,[2] surpassing all other categories of consumer debt aside from mortgages. During the same period, the number of federal student loan borrowers has grown by nearly 45 percent, rising from 28.3 million to 40.8 million.[3] As the size of the overall market has increased,[4] the average debt burden shouldered by an individual borrower grew by nearly 60 percent, rising from slightly more than $18,000 in 2007 to nearly $30,000 in the third quarter of 2015.[5] The median debt burden has also grown by nearly 50 percent over a similar period, according to one recent analysis of borrowers entering repayment, increasing from approximately $13,000 in 2007 to nearly $20,000 in 2014.[6]

---

[2] *See* U.S. Department of Education, *Federal Student Aid Portfolio Summary*, *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/PortfolioSummary.xls.

[3] *Id.*

[4] This estimate does not include private student loans. The market for private student loans is opaque, as market participants generally do not make available key origination and performance information, and reporting requirements on outstanding balances and performance are extremely limited.

[5] *See* U.S. Department of Education, *Federal Student Aid Data Center: Federal Student Aid Portfolio Summary* (accessed on Aug. 22, 2015), *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

[6] Adam Looney & Constantine Yannelis, A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions they Attend Contributed to Rising Loan Defaults, The Brookings Institution (Sept. 2015), available at http://www.brookings.edu/~/media/projects/bpea/fall-2015_embargoed/conferencedraft_looneyyannelis_studentloandefaults.pdf.

**FIGURE 1:**    AVERAGE BALANCE PER BORROWER (FEDERAL STUDENT LOANS)[7]



Unlike other types of consumer debt, which have realized reduced levels of delinquency and default compared to highs reached following the Great Recession, the student loan market continues to show signs of distress.[8] The Bureau estimates that a quarter of student loan borrowers are, collectively, either delinquent or in default on more than $175 billion in student debt.[9] Borrowers with certain characteristics, including borrowers who attend proprietary schools and borrowers who do not successfully complete a program of study, comprise an

---

[7] *See* U.S. Department of Education, *Federal Student Aid Data Center: Federal Student Aid Portfolio Summary* (accessed on Aug. 22, 2015), *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

[8] *See* Federal Reserve Bank of New York, *Quarterly Report on Household Debt and Credit* (Aug. 2015), *available at* http://www.newyorkfed.org/householdcredit/2015-q2/data/pdf/HHDC_2015Q2.pdf.

[9] U.S. Department of Education, *Federal Student Loan Portfolio: Direct Loan and Federal Family Education Loan Portfolio by Loan Status* (accessed on Sept. 28, 2015), *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/PortfoliobyLoanStatus.xls; U.S. Department of Education, *Federal Perkins Loan Program Status of Default as of June 30, 2014* (Mar. 2015), *available at* http://ifap.ed.gov/perkinscdrguide/attachments/1314PerkinsCDR.pdf;  U.S. Department of Education and Consumer Financial Protection Bureau, *Private Student Loans* (July 2012), *available at* http://www.consumerfinance.gov/reports/private-student-loans-report/; U.S. Department of Education, *Federal Student Loan Portfolio: Direct Loan Portfolio by Delinquency Status* (accessed on Sept. 28, 2015), *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/DLPortfoliobyDelinquencyStatus.xls.

outsized share of all loan defaults.[10] Recent data released by the Department of Education shows that the total volume of defaulted student loans continues to climb—over the past 24 months, the total volume of federal student loans in default, on a dollar basis, has grown by nearly 25 percent.[11]

There are also significant gaps in available data about higher education and student loan performance, including key outcome measures such as job attainment and wage information, which may offer insight into underlying drivers of distress in the student loan market. For example, current data may be insufficient to assess whether this borrower distress can be attributed to specific features of the higher education sector or cyclical effects of a market economy.[12] Policymakers and researchers note that filling these gaps will improve public understanding of servicing practices and market trends, and allow policymakers, regulators, and market participants to effectively target resources to improve borrower outcomes.[13]

A growing body of evidence suggests that rising levels of student loan indebtedness may also have had spillover effects on other segments of the economy—potentially limiting borrowers' access to credit, diminishing savings, reducing homeownership, threatening retirement security, and inhibiting borrowers from pursuing careers as healthcare providers and educators in underserved communities, or as entrepreneurs.[14]

---

[10] *See, e.g.*, Looney & Yannelis, *supra* note 6.

[11] *See* U.S. Department of Education, *Federal Student Loan Portfolio: Direct Loan and Federal Family Education Loan Portfolio by Loan Status* (accessed on Aug. 22, 2015), *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/PortfoliobyLoanStatus.xls.

[12] *See, e.g.*, Federal Reserve Bank of New York, *Opening Remarks at the Convening on Student Loan Data Conference* (Mar. 4, 2015), *available at* http://www.ny.frb.org/newsevents/speeches/2015/dud150304.html.

[13] *Id.*; *see also* Susan Dynarski, *We're Frighteningly in the Dark About Student Debt*, N.Y. Times (Mar. 20, 2015), *available at* http://www.nytimes.com/2015/03/22/upshot/were-frighteningly-in-the-dark-about-student-debt.html.

[14] For further discussion of the spillover effects of student debt on the economy, *see* Consumer Financial Protection Bureau, *Student Loan Affordability* (May 2013), *available at* www.consumerfinance.gov/reports/student-loan-affordability.

Elevated levels of student loan borrower distress exist despite the availability of a range of protections for borrowers that are designed to mitigate delinquency and default, including income-driven repayment plans provided for by law for the vast majority of borrowers with federal student loans.[15]

Student loan servicers serve as a link between borrowers and lenders or loan holders. Servicers manage borrowers' accounts, process monthly payments, and communicate directly with borrowers. When facing unemployment or other financial hardship, borrowers must contact student loan servicers to enroll in alternative repayment plans, including income-driven repayment plans for borrowers with federal loans, obtain deferments or forbearances, or request a modification of loan terms. A servicer is often different than the lender, and a borrower typically has little or no control over which company services their loan.

Servicers generally must comply with applicable federal and state consumer financial laws and regulations and, for certain older federal student loans, regulations promulgated by the Department of Education and authorized by the Higher Education Act (HEA). In addition, loan holders generally require servicers to satisfy performance metrics included in servicing contracts. However, there is no existing, comprehensive federal statutory or regulatory framework providing consistent standards for the servicing of all student loans.[16]

The ability to assess the overall quality of student loan servicing is limited by lack of data, particularly for loans not held by the federal government; however, existing evidence—

---

[15] Readers should note that access to both Income-Based Repayment (IBR) and Pay As You Earn (PAYE) is limited to borrowers with federal loans used to finance their own education. Parents with federal student loans made under the Parent PLUS program may use another income-driven repayment plan, Income-Contingent Repayment (ICR), but must first refinance any parent loans into a new Direct Consolidation Loan in order to be eligible. *See* U.S. Department of Education, *Income-Driven Plans*, *available at* https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

[16] In 2014, the Bureau expanded its examination program for student loan servicing to supervise both large depository institutions and larger nonbank student loan servicers for compliance with federal consumer law, including the prohibition against unfair, deceptive, and abusive practices under the Dodd-Frank Act. This is the first examination program at the federal level focused on both bank and nonbank actors in the student loan servicing market. *See* Consumer Financial Protection Bureau, *CFPB Examination Procedures: Education Loan Examination Procedures* (Dec. 2013), *available at* http://files.consumerfinance.gov/f/201312_cfpb_exam-procedures_education-loans.pdf. Student loan servicers, however, were required to comply with all applicable federal and state law, including federal consumer financial law, even before the Bureau expanded its examination program.

11

including recent actions by federal regulators[17] and law enforcement agencies[18]— suggests that current servicing practices may not meet the needs of borrowers or loan holders, including, in the case of federal loans held by the Department of Education, the needs of taxpayers.

A number of commenters draw parallels to mortgage servicing problems experienced by homeowners in the run up to, during, and in the immediate aftermath of the financial crisis. Macroeconomic conditions declined, unemployment rose, and household balance sheets deteriorated. Over this period, millions of American families struggled to manage mortgage payments and faced foreclosure. In response, federal agencies and financial institutions deployed mortgage loss mitigation initiatives designed to help borrowers avoid foreclosure. As foreclosures spread from borrowers with sub-prime and exotic mortgages to a broader segment of American homeowners, policymakers, consumer advocates, and leaders in the mortgage industry identified certain mortgage servicing practices as a significant source of distress for a growing share of homeowners.[19]

---

[17] *See, e.g.*, Consumer Financial Protection Bureau, *Press Release: CFPB Supervision Report Highlights Risky Practices in Student Loan Servicing* (Oct. 2014), *available at* http://www.consumerfinance.gov/newsroom/cfpb-supervision-report-highlights-risky-practices-in-student-loan-servicing (identifying illegal practices by student loan servicers proportionally allocating partial payments among loans in a student loan account in a manner that maximized late fees, charging improper late fees, and misrepresenting discharging student loans in bankruptcy); *see also* Consumer Financial Protection Bureau, *Press Release: CFPB Orders Discover Bank to Pay $18.5 Million for Illegal Student Loan Servicing Practices* (July 2015), *available at* http://www.consumerfinance.gov/newsroom/cfpb-orders-discover-bank-to-pay-18-5-million-for-illegal-student-loan-servicing-practices (ordering Discover to refund $16 million to consumers, pay a $2.5 million penalty for illegal practices of overstating the minimum amounts due on billing statements, failure to provide accurate tax information, and misleading consumers that did not qualify for the student loan tax deduction. In addition, Discover was fined for engaging in illegal debt collection tactics by calling consumers early in the morning and late at night, often excessively.).

[18] *See, e.g.*, U.S. Department of Justice, *Press Release: Nearly 78,000 Service Members to Begin Receiving $60 Million Under Department of Justice Settlement with Navient for Overcharging on Student Loans* (May 2015), *available at* http://www.justice.gov/opa/pr/nearly-78000-service-members-begin-receiving-60-million-under-department-justice-settlement; Federal Deposit Insurance Corporation, *FDIC Announces Settlement with Sallie Mae for Unfair and Deceptive Practices and Violations of the Servicemembers Civil Relief Act* (May 2014), *available at* http://www.fdic.gov/news/news/press/2014/pr14033.html.

[19] For further discussion, *see* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1 (2011), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1324023; *Problems in Mortgage Servicing From Modification to Foreclosure: Hearing before the S. Comm. on Banking, Housing, and Urban Affairs*, 111th Cong. (Nov. 16, 2010) (testimony of Thomas J. Miller, Iowa Att'y Gen.), *available at*

Over the past two years, senior government officials,[20] federal regulators,[21] state law enforcement agencies,[22] consumer advocates,[23] and others have suggested that the steps taken by policymakers to strengthen servicing protections for homeowners may offer an instructive analogy for policymakers and market participants with regard to the student loan servicing market. As one state banking regulator notes, when drawing a parallel between servicing problems experienced by consumers with mortgages and student loan borrowers, "this is not déjà vu. We have been here before."[24]

In May 2015, the Bureau, in coordination with leaders from the Department of Education and the Department of the Treasury, launched a public inquiry into student loan servicing practices.[25] In support of this initiative, the Bureau published a notice in the *Federal Register* soliciting input on potential solutions to improve the delivery of service to student loan borrowers in repayment.[26]

---

http://www.banking.senate.gov/public/index.cfm?FuseAction=Hearings.Testimony&Hearing_ID=df8cb685-c1bf-4eea-941d-cf9d5173873a&Witness_ID=0c61c591-40e3-45d4-90e6-5aad94fd6152.

[20] *See, e.g.*, U.S. Department of Education, *Remarks of Undersecretary Ted Mitchell at the Federal Student Aid (FSA) Servicing Summit in Atlanta, GA* (Dec. 2014), *available at* http://www.ed.gov/news/speeches/prepared-remarks-us-under-secretary-education-ted-mitchell-federal-student-aid-fsa-servicing-summit-atlanta-ga; U.S. Department of the Treasury, *Remarks of Deputy Secretary Raskin on Student Loans at the National Consumer Law Center's Annual Consumer Rights Litigation Conference* (Nov. 2014), *available at* http://www.treasury.gov/press-center/press-releases/Pages/JL2689.aspx.

[21] *See, e.g.*, *The U.S. Economic and Fiscal Outlook: Hearing Before the S. Comm. on the Budget*, 113th Cong. (May 8, 2014) (testimony of Janet Yellen, Chair of the Board of Governors of the Federal Reserve System), *available at* http://www.budget.senate.gov/republican/public/index.cfm/2014/5/the-u-s-economic-and-fiscal-outlook.

[22] *See, e.g.*, Office of the Attorney General, State of Illinois, *Letter from Lisa Madigan to Secretary Duncan* (June 1, 2015), *available at* http://www.illinoisattorneygeneral.gov/pressroom/2015_06/ArneDuncanLetter.pdf.

[23] *See, e.g.*, CFPB-2015-0021-0356; CFPB-2015-0021-0861.

[24] CFPB-2015-0021-0381.

[25] Consumer Financial Protection Bureau, *Press Release: CFPB Launches Public Inquiry Into Student Loan Servicing Practices* (May 2015), *available at* http://www.consumerfinance.gov/newsroom/cfpb-launches-public-inquiry-into-student-loan-servicing-practices/.

[26] Consumer Financial Protection Bureau, *Request for Information Regarding Student Loan Servicing*, 80 Fed. Reg. 29302 (May 21, 2015), *available at* https://federalregister.gov/a/2015-12276.

The Bureau received an overwhelming response, with more than 30,000 comments submitted by the public.[27] Commenters include:

- **More than 8,000 comments** from individual consumers sharing unique experiences related to student loan servicing and more than 22,000 additional comments from members of the public calling for strong standards to protect student loan borrowers in repayment;

- **More than 110 membership organizations** in 35 states and the District of Columbia, submitting comments on behalf of millions of people belonging to organizations representing student loan borrowers, workers, students, communities of color, senior citizens, young people, members of the faith community, and stakeholders in the higher education sector;

- **20 state attorneys general and banking regulators**; and

- **More than 50 organizations** including trade associations representing large depository institutions and specialty student loan market participants, individual participants in the student loan market including banks, credit unions, incumbent student loan servicers, specialty student loan refinance providers, credit counselors, and other providers of consumer financial products and services.

Part One of this report analyzes how these comments, along with available data and other input related to the student loan servicing market, describe existing student loan servicing practices, policies, and procedures. Part Two discusses how specific protections available to consumers in other markets may be instructive, as cited in public comments. Finally, Part Three discusses

---

[27] For a complete collection of comments received in response to this request, *see* http://www.regulations.gov/#!docketDetail;D=CFPB-2015-0021. Public comments and other qualitative inputs described in this report are not necessarily representative of the experience of over 41 million borrowers in the student loan market; however, comments help to illustrate where there may be a mismatch between borrower needs and actual service delivered.

some of the policy options raised in the public comments and offers the Bureau's recommendations to improve the delivery of student loan servicing.[28]

---

[28] As discussed in greater detail in Part Three of this report, policymakers, state and federal regulators and law enforcement agencies, and the public continue to encounter significant obstacles when attempting to analyze and assess risks to consumers in certain segments of the student loan market, in part due to significant limitations on data related to loan performance. Where possible, this report seeks to analyze existing sources of data about student loan servicing operations, including information disclosed to investors through certain public filings and other sources of public information about student loan performance. To support the development of this report, several participants in the student loan market provided supplemental information related to certain aspects of their student loan servicing businesses. Readers should note that, similar to comments submitted by individual student loan borrowers, data provided by a single market participant may not be representative of the entire market and readers should not draw conclusions about prevalence based on this data.

# 1. Public input on student loan servicing practices

The Bureau received comments from individual borrowers, student loan market participants, and other stakeholders identifying a range of student loan servicing practices that may pose risks for borrowers seeking to repay student debt.

The student loan market is comprised principally of three types of student loans: (1) federally-guaranteed loans made through the Federal Family Education Loan Program (FFELP) by private-sector lenders; (2) federal loans made directly to borrowers by the Department of Education through the William D. Ford Direct Loans program (Direct Loans); and (3) private student loans.[29] The origination of FFELP loans ended in 2010, but there remains approximately $350 billion in outstanding FFELP loans.[30] To the extent possible, the following discussion seeks to focus on the servicing practices, policies, and procedures that are common to all three types of student loans.

Public comments received by the Bureau generally fall into five broad categories.

---

[29] There are additional federal programs under Title IV that also authorize student loans. For example, one such program finances loans made directly by certain post-secondary education institutions through their financial aid offices. *See* 20 U.S.C. § 1087aa. Another program offers grants to those who pledge to become teachers. If the recipients do not become teachers, then the disbursed funds are converted from grants to loans. *See* 20 U.S.C. § 1070g-2.

[30] U.S. Department of Education, *Federal Student Aid Annual Report* (2014), *available at* https://www2.ed.gov/about/reports/annual/2014report/fsa-report.pdf.

- **Borrower benefits and consumer protections.** Commenters describe problems related to servicers' disclosure of, facilitation of enrollment in, and recertification for certain alternative repayment programs and other borrower benefits, including income-driven repayment plans for federal loans. Commenters also suggest that servicers' practices related to these programs may contribute to borrowers forfeiting eligibility for certain benefits, increase costs over the lifetime of loans, and result in loan defaults.

- **Servicing transfers.** Commenters state that servicing transfers, which have been a widespread feature of the student loan market since early in this decade, may result in processing problems, leading to surprise fees, damaged credit, lost repayment benefits and loan records, among other problems.

- **Customer service and error resolution.** Commenters discuss how breakdowns in customer service and barriers to resolving servicers' errors can cause performing borrowers to fall behind or drive delinquent borrowers into default.

- **Payment processing.** Commenters identify a range of specific practices related to processing payments that may cause significant problems for borrowers seeking to repay student loans.

- **Practices that affect specific borrower segments.** Commenters identify servicing practices specific to military families and older borrowers. In addition, commenters describe how illegal practices by certain student loan "debt relief" companies prey on low-income and economically-vulnerable student loan borrowers.

# 1.1   Borrower benefits and protections

Student loan borrowers may be eligible for a range of benefits and protections, such as alternative repayment plans for borrowers in distress, which may reduce the total cost of their debt or provide flexibility when experiencing financial distress. Student loan servicers generally inform borrowers of available benefits and protections, process enrollments, and apply benefits to borrowers' accounts. For borrowers experiencing financial hardship, flexible repayment options can be a powerful tool to keep borrowers on track to satisfy their obligations, particularly income-driven plans available to the vast majority of borrowers with federal loans experiencing financial distress. Some commenters note that when borrowers are unable to

access these benefits and protections, the consequences can be significant, particularly for those borrowers who end up in default.[31]

## Overview of student loan borrower benefits and consumer protections

The standard repayment arrangement for both private and federal student loans is a 10-year repayment schedule requiring payment of 120 equal monthly installments. Borrowers generally begin to repay student loans following a period of deferment that coincides with the period during which a borrower is enrolled in school at least half-time. Borrowers with federal student loans may also postpone payment for six months following separation from school, which is a loan feature shared by some private student loans. Many student loans feature specific benefits to encourage behavior associated with future borrower success, such as an interest rate reduction awarded following enrollment in a servicer's automatic payment function. For borrowers seeking additional flexibility, student loans generally feature a range of alternative repayment options, including periods of cessation of payment during financial hardship and a range of other alternative repayment plans.

As many commenters note, these repayment benefits in turn make the repayment environment particularly complicated for student loan borrowers and market participants.[32] Private student loans, FFELP loans, and Direct Loans all feature a range of different borrower benefits and protections that can affect borrower performance, payment amount, interest rate, and other key loan terms and features.[33]

---

[31] For further discussion, *see* Section 1.1.1; *see also, e.g.*, CFPB-2015-0021-0364.

[32] *See, e.g.*, CFPB-2015-0021-0974; CFPB-2015-0021-0355; CFPB-2015-0021-0357.

[33] The wide array of features associated with Federal student loans reflect the efforts of prior Congresses and Administrations to provide benefits and incentives to promote key national objectives, such as promoting equal educational opportunity. As a result, since 1958, the range and scope of benefits, requirements, and other Federal student loan terms have changed, reflecting shifts in policy priorities and budget constraints inherent in such a long-standing federally funded educational benefit program. Balancing such objectives and conditions on the one hand, with product homogeneity and simplicity for borrowers past, present and future on the other, will thus likely remain a challenge in the future.

These repayment benefits may come in a variety of forms, including entitlements under federal law, contractual features found in student loan promissory notes, or special programs initiated by lenders or servicers. The terms of these benefits and protections may differ significantly depending on the type of student loan, but generally, these programs do share certain common features and are deployed to assist borrowers in similar ways.[34] Specifically, most borrower benefits and protections offer one or more of the following:

- Cessation of payment (deferment or forbearance);

- Temporary or permanent reduction of interest rate;

- Extension of repayment term;

- Reduction of monthly payment; and

- Termination of obligation to repay (loan forgiveness, cancellation, discharge, co-signer release).

Student loan servicers' successful administration of these programs may depend in part on their capacity to accurately inform borrowers of available options. Consequently, well-conceived consumer protections may not be effective absent high-quality student loan servicing.

In certain circumstances, a student loan servicer may advise a borrower about benefits that are mutually exclusive, or that a borrower's selection of a particular repayment arrangement or loan feature may result in that borrower losing eligibility for another program or benefit.[35]

---

[34] The Direct Loan program offers additional consumer protections beyond those offered to borrowers with other types of federal student loans, including additional income-driven repayment plans, loan forgiveness options, and other options designed to protect borrowers, mitigate defaults, and encourage borrower success. These benefits and protections make Direct Loans unique relative to other loan types and are intended to ensure that any borrower has the tools necessary to satisfy his or her financial obligation. When considering the complexity that these programs bring to the student loan servicing market, readers should also consider the significant benefits they offer to borrowers.

[35] *See, e.g.*, Consumer Financial Protection Bureau, *Public Service & Student Debt* (Aug. 2013), *available at* http://files.consumerfinance.gov/f/201308_cfpb_public-service-and-student-debt.pdf; Consumer Financial Protection Bureau, *The Next Front? Student Loan Servicing and the Cost to our Men and Women in Uniform* (Oct. 2012), *available at* http://www.consumerfinance.gov/reports/the-next-front-student-loan-servicing-and-the-cost-to-our-men-and-women-in-uniform/.

Understanding these trade-offs is critical to understanding the complexity of the current servicing environment for student loans. As one large market participant notes:

> *We service loans made under an increasingly complex student loan program. Since 1990, the number of repayment options available to borrowers has increased from two to 15—including multiple income-driven repayment plans with similar sounding names and differing eligibility criteria. There are now eight forgiveness programs and over 35 different deferment and forbearance options.*[36]

Other commenters note that delivering adequate service is particularly critical in the student loan servicing market for exactly these reasons—borrowers experiencing financial hardship may not be able to understand and enroll in appropriate programs without assistance from their student loan servicer.[37]

The following discussion highlights problems commenters identify regarding the features identified above, as well as the servicing practices implemented to ensure these features are appropriately administered. In particular, commenters note problems related to servicers' practices regarding:

- Alternative repayment plans;

- Forbearance;

- Repayment incentives; and

- Loan forgiveness, discharge, and cancellation.

## 1.1.1   Alternative repayment plans

Both private and federal student loans feature a range of alternative repayment plans designed to provide borrowers with additional flexibility when entering repayment or experiencing financial hardship. Commenters state that these protections often mean the difference between

---

[36] CFPB-2015-0021-0355.

[37] *See, e.g.*, CFPB-2015-0021-0364; CFPB-2015-0021-0861.

keeping up with a financial obligation and becoming delinquent. A number of commenters suggest problems related to the administration of these plans may be contributing to elevated levels of student loan defaults.[38]

**Alternative repayment plans for private student loans.** In order to assist borrowers experiencing financial hardship or distress, a number of large private student lenders have developed alternative repayment options that take into account borrowers' financial circumstances.[39] Commenters state that some servicers of private student loans may evaluate borrowers experiencing financial hardship against the range of loss mitigation options offered by each lender and facilitate enrollment should a program be available.[40]

**Alternative repayment plans for federal student loans.** The vast majority of borrowers with federal student loans have the right under federal law to a series of income-driven repayment plans, which are a type of alternative repayment plan. These plans are authorized by Title IV of the Higher Education Act (HEA), and consider borrowers' adjusted gross income and family size in order to determine, based on a federal formula, borrowers' monthly payments.[41]

Borrowers that are eligible for a reduced monthly payment under this formula are considered to have demonstrated Partial Financial Hardship (PFH). Borrowers must demonstrate PFH in order to enroll and must continue to demonstrate PFH each year in order to maintain eligibility for reduced payment levels by certifying their income on an annual basis.[42] For borrowers who

---

[38] *See, e.g.*, CFPB-2015-0021-0356; CFPB-2015-0021-0856; CFPB-2015-0021-0353.

[39] *See, e.g.*, CFPB-2015-0021-0355; CFPB-2015-0021-0974. As the Bureau has noted in other publications, there remain questions about the scale of these programs. For further discussion of alternative repayment programs and private student loans, *see* Consumer Financial Protection Bureau, *Annual Report of the CFPB Student Loan Ombudsman* (Oct. 2014), *available at* http://www.consumerfinance.gov/reports/annual-report-of-the-cfpb-student-loan-ombudsman-2014/; *see also* Kevin Wack, *Wells Fargo, Discover to Start Modifications of Student Loans*, American Banker (Nov. 20, 2014), *available at* http://www.americanbanker.com/news/consumer-finance/wells-fargo-discover-to-start-modifications-of-student-loans-1071343-1.html.

[40] *See, e.g.*, CFPB-2015-0021-0856.

[41] *See, e.g.*, 34 C.F.R. § 685.209 (PAYE, only available for Direct Loans or loans consolidated into Direct Loans); 34 C.F.R. § 685.221 (IBR under the Direct Loan program); 34 C.F.R. § 682.215 (IBR under FFELP).

[42] *Id.*

are unemployed or who have very low wages, a monthly payment under these arrangements may be as low as $0.00.[43] For borrowers with low wages over a long term, these programs also offer loan forgiveness following 20 or 25 years of payments.[44]

As discussed below, commenters identify a range of servicing practices that they assert may make it difficult for borrowers seeking to access these benefits. Commenters suggest that these practices are particularly concerning given the apparent relationship between income-driven repayment plan enrollment and borrower success.[45] According to data recently released by the Department of Education regarding Direct Loans, borrowers in Pay As You Earn (PAYE) and Income-Based Repayment (IBR) (the most generous income-driven repayment plans) had the lowest delinquency rates.[46] In contrast, borrowers enrolled in a standard 10-year repayment plan fared nearly seven times worse than borrowers enrolled in PAYE (Figure 2).[47]

---

[43] *Id.* Payments may be $0.00 based on demonstration of PFH under an income-driven repayment plan. Alternatively, payments may be $0.00 for months during which a borrower obtained an Economic Hardship Deferment.

[44] For the purpose of calculating eligibility for loan forgiveness under IBR or PAYE, servicers are expected to track and evaluate the number of qualified payments made by borrowers in order to ensure that, in total, 20 or 25 years of payments have been provided, for PAYE and IBR, respectively. 34 C.F.R. § 685.209(a)(6)(i); 34 C.F.R. § 685.221(f)(1). For the purpose of determining eligibility for loan forgiveness, "payments" can include months during which a $0.00 payment was made. *See, e.g.*, 34 C.F.R. § 685.209(a)(6). Months during which a borrower enrolled in forbearance do not qualify toward loan forgiveness. *See, e.g.*, 34 C.F.R. § 685.209.

[45] *See, e.g.*, CFPB-2015-0021-0356. Some observers also suggest that income-driven repayment plan (IDR) borrowers outperform borrowers in other repayment plans because these plans are largely utilized by higher-income borrowers with graduate degrees and above-average levels of student debt. Although public data on wages of borrowers in IDR is limited, one large student loan servicer provided data to the Bureau related to IDR utilization by its customers with Direct Loans. This data shows that, of the greater than 1 million Direct Loan borrowers on its platform enrolled in IBR or PAYE, 50 percent reported adjusted gross income between $0 and $20,000 and 84 percent reported AGI less than $50,000. 95 percent of these borrowers reported AGI less than $75,000. *See also* Government Accountability Office, *Federal Student Loans: Education Could Do More to Help Ensure Borrowers are Aware of Repayment and Forgiveness Options* (Aug. 25, 2015), *available at* http://www.gao.gov/products/GAO-15-663.

[46] U.S. Department of Education: Federal Student Aid, *Servicing Summit Portfolio Overview* (Dec. 2014), *available at* http://fsaconferences.ed.gov/conferences/library/2014/servicing/2014ServicingSummitPortfolioOverview.ppt.

[47] The limited data available about the utilization of these plans has been released by the Department of Education related to performance of the Direct Loan program. There may be significant cohort effects that contribute to information about performance by repayment plan. For example, by definition, borrowers in PAYE may not have federal loans originated prior to 2007. Readers should also note that IDR utilization has nearly doubled since 2013

**FIGURE 2:**   DELINQUENCY RATES BY REPAYMENT PLAN (FEDERAL DIRECT LOANS)[48]



Delinquency Rate is calculated by: $ [31-270 days past due]/$ [all repayment], as reflected in a December 2014 presentation prepared by Federal Student Aid.[49] This figure does not consider use of forbearance or deferment.

Beginning in November 2013, the Department of Education has made a targeted effort to boost enrollment in these plans among borrowers with loans made through the Direct Loan program, using direct-to-consumer email outreach to augment communications provided by student loan

---

and a significant number of borrowers may not have been required to recertify income under these arrangements. In addition, significant gaps remain related to utilization and performance of alternative repayment arrangements for both FFELP and private student loans. These gaps in data are addressed further in Part Three of this report.

[48] *See* U.S. Department of Education: Federal Student Aid, *Servicing Summit Portfolio Overview* (Dec. 2014), *available at* http://fsaconferences.ed.gov/conferences/library/2014/servicing/2014ServicingSummitPortfolioOverview.ppt.

[49] *Id.*

servicers.[50] Since June 2013, the number of Direct Loan borrowers enrolled in an income-driven repayment plan has more than doubled (Figure 3).[51]

**FIGURE 3:**   INCOME-DRIVEN REPAYMENT PLAN UTILIZATION OVER TIME (DIRECT LOANS)[52]



The following discussion highlights specific servicing practices related to enrolling in alternative repayment plans, as identified in public comments and other input received by the Bureau.

---

[50] U.S. Department of Education, *Press Release: U.S. Department of Education Announces Additional Efforts to Inform Student Borrowers of Repayment Options* (Nov. 4, 2013), *available at* http://www.ed.gov/news/press-releases/us-department-education-announces-additional-efforts-inform-student-borrowers-repayment-options.

[51] This data does not indicate whether a borrower enrolled in an income-driven repayment plan is making a monthly payment that reflects his or her income (a PFH payment). As discussed in further detail below, borrowers must recertify income on an annual basis in order to retain a payment amount that reflects their financial circumstances; however, borrowers who fail to recertify or are no longer eligible to make a PFH payment are still considered "enrolled" in an IDR, for the purpose of current data compilation and reporting. Other measures suggest that many borrowers enrolled in income-driven repayment plans may not be making payments that reflect their income.

[52] *See* U.S. Department of Education, *Federal Student Aid Data Center: Direct Loan Portfolio by Payment Plan* (accessed on Aug. 22, 2015), *available at* https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

## Obtaining basic information about alternative repayment plans

**Borrowers may not be informed about the availability of certain alternative repayment plans or may be encouraged by servicing personnel to enroll in alternatives that may not be in their best interest.** Comments from individual student loan borrowers and organizations representing public service workers note that servicers of both private and federal student loans may not inform borrowers experiencing financial hardship about available alternative repayment plans.[53] Instead, commenters state that servicers may advise borrowers to postpone payments through forbearance or deferment or instruct borrowers that the only available option is to pay the full amount due.[54]

One comment from an organization representing consumers states that enrolling in forbearance or deferment, rather than an available long-term alternative repayment plan, may have significant negative consequences for borrowers' ability to satisfy their student loan debt over the long-run.[55] Periods of nonpayment, such as forbearance, can significantly increase the amount of unpaid interest, cause borrowers' total debt to grow, and ultimately prevent borrowers from making progress toward satisfying their obligation to repay the debt owed.[56]

---

[53] *See, e.g.*, CFPB-2015-0021-5190; CFPB-2015-0021-0366.

[54] *See, e.g.*, CFPB-2015-0021-0861; CFPB-2015-0021-1143.

[55] *See* CFPB-2015-0021-0378; *see also* CFPB-2015-0021-0861.

[56] *See, e.g.*, CFPB-2015-0021-2802. Readers should note that there also are some circumstances where borrowers, when presented with a range of available options, may prefer a short-term option that permits them to cease making payments, particularly for borrowers with subsidized federal student loans seeking deferments for issues other than financial hardship, including borrowers returning to school. *See* Susan Dynarski, *An Economist's Perspective on Student Loans in the United States*, Brookings Institute (Sept. 2014), *available at* http://www.brookings.edu/~/media/research/files/papers/2014/09/economist_perspective_student_loans_dynarski/economist_perspective_student_loans_dynarski.pdf (stating "Here we have a classic 'principal-agent' problem, with the agent (the student loan servicers) having little incentive to act in the best interests of the principal (the federal government). Student loan servicers don't have much incentive to prevent borrowers from defaulting, because the servicers either don't own the underlying loans or, if they do, face few costs if a borrower defaults. Restructuring a borrower's payments and preventing default requires effort, and the beneficiary of this effort is the government and the student – not the servicer.").

Another comment from an organization representing consumers notes that the student loan servicing business model rewards companies that minimize the length and complexity of customer contacts.[57] The commenter asserts that this arrangement may in turn create a financial incentive for servicers to direct borrowers into alternative repayment arrangements that mitigate delinquency in the short-term, such as forbearance, but may not be in borrowers' best long-term interest.[58]

**Federal student loan borrowers may not be informed about interest subsidies, loan forgiveness, or other benefits associated with income-driven payment plans.**
One industry commenter states that, "[customer service] representatives must be fully versed on the complete range of repayment options associated with each student loan, including income dependent repayment plans, and be able to explain the positives and negatives associated with repayment alternatives, including deferments and forbearances."[59] Comments from individual student loan borrowers further suggest that in some cases, borrowers with federal student loans are not told about the availability of income-driven repayment plans and associated benefits unless they affirmatively inquired.[60] These comments state that when borrowers are trying to find the right option for their needs, servicing personnel may not explain how these benefits

---

[57] *See* CFPB-2015-0021-0373.

[58] *Id.*

[59] *See* CFPB-2015-0021-0974.

[60] *See, e.g.,* CFPB-2015-0021-2275; *see also* Comment from The Project on Predatory Student Lending and The National Consumer Law Center to the Department of Education on Intent to Establish Negotiated Rulemaking Committee, Docket ID: ED–2014–OPE–0214 (Nov. 4, 2014), *available at* http://www.studentloanborrowerassistance.org/wp-content/uploads/2013/05/comments-paye-nov2014.pdf ("Servicers also tend to push borrowers into the most readily available solutions, such as forbearance, instead of helping borrowers choose a plan that will be beneficial in the long term. Unfortunately, most borrowers are unaware that their loans accrue significant interest while in forbearance, or are unaware of viable alternatives like income-driven repayment plans, and are left much worse off. For example, we represent a client who is struggling to remain current on a federal student loan. She makes only $5,000 a year and had been living in a shelter for victims of domestic violence for an extended period before moving in with a friend. Her son is living with other family members while she tries to find work. When she called her federal loan servicer seeking relief, her loan was placed in short term forbearance. She has continued to receive various forbearances and deferments over the last several years. Although she clearly qualifies for and would benefit from an income-driven repayment plan, her loan servicer has never mentioned or explained this to her. It took a phone call from an insistent attorney for the servicer to acknowledge that she is eligible for an income-driven plan."); CFPB-2015-0021-0378; CFPB-2015-0021-0861.

work or how the selection of a repayment plan can affect borrowers' long-term financial circumstances.[61] According to one comment from a student loan borrower:

> [T]he availability of ANY student loan repayment system is poor at best. The online system only allows for minimal direct contact with a person and is completely inflexible. When you do reach someone on the phone, after an eternal wait, they do not provide thorough information regarding all the options available to anyone in repayment. Had I [been] advised of the [IBR] program, I could have started repayment earlier rather than spending time wasted in forbearance.[62]

**Private student loan borrowers in financial distress may not be able to access accurate information about options to avoid default.** Some servicers may have authorization from loan holders to offer reduced monthly payments for certain private student loan borrowers.[63] However, these plans may not be advertised on servicers' websites and may not be included in borrowers' promissory notes or loan contracts. Comments from individual borrowers further state that when borrowers try to contact their servicers to obtain information, they receive conflicting advice from customer service representatives about availability or eligibility criteria for alternative repayment programs.[64] Commenters explain that when borrowers do not proactively contact their servicer to learn more about repayment options, they may continue to struggle to make payments or end up in default.[65]

## Enrolling and applying for alternative repayment plans

**Federal student loan borrowers may be enrolled in a repayment plan that does not reflect their choice due to paperwork processing errors.** Borrowers with federal

---

[61] *See, e.g.*, CFPB-2015-0021-1039; CFPB-2015-0021-5683.

[62] CFPB-2015-0021-0597.

[63] *See* Kevin Wack, *Wells Fargo, Discover to Start Modifications of Student Loans*, American Banker (Nov. 20, 2014), *available at* http://www.americanbanker.com/news/consumer-finance/wells-fargo-discover-to-start-modifications-of-student-loans-1071343-1.html.

[64] *See, e.g.*, CFPB-2015-0021-0229.

[65] *See, e.g.*, CFPB-2015-0021-0245.

student loans can request that their student loan servicer select the income-driven repayment plan with the lowest monthly payment, an option designed to assist borrowers when selecting between multiple, seemingly-similar options.[66] Comments from individual student loan borrowers and borrower assistance organizations state that servicers may enroll borrowers in a repayment plan that does not reflect the borrower's choice and borrowers must contact their servicer a second time to re-enroll in the plan with the lowest monthly payment amount.[67]

Industry commenters note that the complexity of federal student loan repayment arrangements may contribute to the problems borrowers experience when seeking to enroll in income-driven repayment plans.[68] One trade association representing members of the student loan servicing industry also cited the content and timing of required disclosures related to federal student loans made under FFELP as contributing to confusion for borrowers with loans made under this program.[69] For example, this commenter states that, "the HEA requires servicers to provide the borrower with a written notice of all the repayment plans and ask the borrower to choose one. Borrowers who fail to choose a plan are put in standard repayment. The majority of borrowers fail to choose a repayment plan; when these borrowers are put into standard repayment, many call right after receiving their first bill, saying that they can't afford their payment."[70]

**Borrowers with new Direct Consolidation Loans report encountering processing problems when attempting to enroll in income-driven repayment plans.** Borrowers also comment that they attempted to enroll in an income-driven repayment plan following a federal student loan consolidation, but were mistakenly enrolled in standard repayment plans.[71] These errors may produce a payment amount that does not reflect borrowers' income and may

---

[66] U.S. Department of Education, *Income-Driven Plans*, *available at* https://studentaid.ed.gov/sa/repay-loans/understand/plans/income-driven.

[67] *See, e.g.*, CFPB-2015-0021-5376; CFPB-2015-0021-0861.

[68] *See, e.g.*, CFPB-2015-0021-0357; CFPB-2015-0021-0859.

[69] *See* CFPB-2015-0021-0357.

[70] *Id.*

[71] *See, e.g.*, CFPB-2015-0021-0861.

also produce significant additional financial distress for borrowers that are already experiencing hardship. In addition, for borrowers electing to consolidate in order to pursue Public Service Loan Forgiveness (PSLF), improper processing of enrollment paperwork can result in the selection of a repayment plan that may not qualify toward loan forgiveness or may increase costs over the lifetime of the loan for borrowers who ultimately do qualify for loan forgiveness.[72] No comments from market participants or organizations representing members of student loan servicing industry discuss this issue.

**Borrowers report encountering delays and processing errors when attempting to certify income while enrolling in an income-driven repayment plan.** For most borrowers, income is documented based on the submission of a federal tax return, which may be done electronically, along with a standard enrollment form used by all student loan servicers of eligible loans.[73] Some comments from borrowers note that servicers may incorrectly certify borrowers' income or miscalculate payment amounts.[74] Other borrower comments note that processing delays may lead to missed payments, late fees, or unnecessary use of forbearance.[75] One commenter told us:

> *Most recently, now that I'm on the IBR repayment plan, for the past 6 months, they*
> *have made error after error after error in rejecting my income verification forms*
> *despite them being correct; they have now continued to keep me in forbearance even*

---

[72] For a borrower to receive the maximum benefit under the Public Service Loan Forgiveness program, a borrower needs to enroll in an income-driven repayment plan. Every month a borrower makes payments under a non-income-driven plan, the borrower may increase the lifetime cost of his or her loan. Alternatively, every month during which a borrower makes monthly payment at a level lower than the payment required under a standard 10-year repayment plan, the borrower will decrease the lifetime costs of his or her loan. *See* 20 U.S.C. § 1028e(b)(7); 34 C.F.R. § 685.219(c); 34 C.F.R. § 682.215(e). For further discussion, *see* Consumer Financial Protection Bureau, *Public Service and Student Debt* (Aug. 2013), *available at* http://files.consumerfinance.gov/f/201308_cfpb_public-service-and-student-debt.pdf.

[73] *See* 34 C.F.R. § 682.215(a)(4); 34 C.F.R. § 685.209(a)(1)(v).

[74] *See, e.g.*, CFPB-2015-0021-0100; CFPB-2015-0021-0099.

[75] *See, e.g.*, CFPB-2015-0021-1053.

*after a supervisor told me 2 months ago I was all clear and had nothing to worry about. Everyone answering their phone calls tells me something different.*[76]

Although no industry commenters address problems related to lost paperwork or processing errors directly, industry commenters state that the complexity and variety of available income-driven repayment plans can lead to problems for borrowers.[77] One trade association representing student loan servicers and debt collectors states that given this complexity, "the result can be bewildering."[78]

A comment from a student loan servicer states:

*Based on data [from] servicing records, we found that more than half of borrowers enrolling in IDR for the first time could not navigate the options on their own and one in five customers renewing required support.*[79]

**Borrowers seeking to certify income using documentation other than a federal tax return report receiving inconsistent or inaccurate information.** Borrowers who do not file federal tax returns or whose most recent tax return does not accurately reflect their current financial circumstances are permitted to submit alternative documentation of income (ADOI). The Department of Education only requires a pay stub to certify income,[80] but comments from borrowers report that their servicers provide very little guidance on how to certify annual income through the ADOI process.[81] Borrowers report that sometimes they are asked to submit

---

[76] CFPB-2015-0021-0099.

[77] *See, e.g.*, CFPB-2015-0021-0357; CFPB-2015-0021-0859.

[78] *See* CFPB-2015-0021-0859.

[79] *See* CFPB-2015-0021-0355.

[80] U.S. Department of Education, *Federal Student Aid Income-Driven Repayment Plans for Federal Student Loans*, *available at* https://studentaid.ed.gov/sa/sites/default/files/income-driven-repayment.pdf.

[81] Additionally, if borrowers have no income, such as during a period of unemployment, or if borrowers earn only untaxed income, borrowers can state this information on the application and they are not required to supply any further documentation. *See* 34 C.F.R. § 685.209(b)(3)(i); 34 C.F.R. § 682.215(e)(1)(ii).

an additional "self-certifying statement" declaring their annual income, without knowing whether it will be sufficient to qualify for an income-driven repayment plan.[82]

Commenters report that problems certifying income resulted in borrowers having higher payments than they can afford or higher payments than they are entitled to under federal law.[83] One organization that provides assistance to low-income student loan borrowers told us:

> *The problems are likely caused by a combination of inferior information systems, staff incompetence, skewed monetary incentives and lack of training. Regardless of causes, the result is that servicers frequently lose documents and repeatedly ask borrowers to provide documents they have already submitted. Far too often, servicers provide inferior administration of basic programs such as income based repayment (IBR), including problems with initial application and re-certification.*[84]

One trade association recommends eliminating the ADOI process for borrowers who have already provided an initial certification of income under an income-driven repayment plan, particularly for borrowers who are not required to file a tax return.[85]

## Staying on track in an alternative repayment plan

Commenters note that servicing issues related to certifying income continue for borrowers even after they successfully enroll in income-driven repayment plans. As noted above, borrowers enrolled in income-driven repayment plans are required to submit documentation recertifying their income on an annual basis in order to continue making monthly payments tied to their income (PFH payments).

---

[82] *See, e.g.*, CFPB-2015-0021-0861.

[83] *See* 34 C.F.R. § 682.215(b)(1) (stating that a borrower is entitled to an annual payment not exceeding "15 percent of the difference between the borrower's [adjusted gross income] and 150 percent of the poverty guideline for the borrower's family size."); *see, e.g.*, CFPB-2015-0021-0252.

[84] CFPB-2015-0021-0861.

[85] *See* CFPB-2015-0021-0859.

Although there is no available market-wide data on recertification rates in these programs, in April 2015, the Department of Education released information about outcomes for a sample of borrowers in the Direct Loan program.[86] This sample indicated that 57 percent of borrowers did not have a timely recertification of income processed.[87] In addition, nearly one in three borrowers in the sample did not recertify within the six months following their deadline, the furthest point-in-time for which there is available data.[88]

---

[86] U.S. Department of Education, *Sample Data on IDR Recertification Rates of ED-Held Loans* (2015), *available at* http://www2.ed.gov/policy/highered/reg/hearulemaking/2015/paye2-recertification.pdf.

[87] *Id.* Readers should note that this sample and the accompanying analysis provided by the Department of Education did not attribute causation when borrowers did not have a timely recertification processed. This data may include both borrowers who did not submit timely paperwork and borrowers who submitted timely paperwork but did not have their paperwork processed in a timely manner. Due to limitations in this data, this discussion does not attempt to separate these two issues. This data released by the Department of Education looks at outcomes for borrowers who missed their income recertification for up to six months. The Department of Education notes that this was done in an attempt to distinguish those borrowers who would have benefited from on-time recertification. The Department of Education estimates that 15 percent of the borrowers who missed their recertification deadline and did not recertify within six months were delinquent at the time of the snapshot.

[88] *Id.*

**FIGURE 4:**  RECERTIFICATION FOR DIRECT LOAN BORROWERS IN IDR[89]
(NOVEMBER 2013-JUNE 2014)



Federal rules[90] for these repayment plans include significant negative consequences for borrowers who continue to be eligible for PFH payments and wish to remain enrolled, but for whom recertification is not timely, such as:

- **Payment shock.** When borrowers' recertification is not timely, borrowers receive billing statements reflecting a monthly payment calculation based on the amount they would have owed under the standard 10-year repayment plan prior to entering an income-driven repayment plan (known as the permanent standard payment amount).[91]

---

[89] This chart is based on a sample of Direct Loans for which recertification was due between November 2013 and June 2014. U.S. Department of Education, *Sample Data on IDR Recertification Rates for ED-Held Loans* (Feb. 2015), *available at* http://www2.ed.gov/policy/highered/reg/hearulemaking/2015/paye2-recertification.xls.

[90] *See, e.g.*, 34 C.F.R. §§ 682.215, 685.209, 685.221.

[91] "Permanent standard payment" is the industry term used in reference a borrower's standard payment amount that would otherwise be due under a standard 10-year repayment period.

In many cases, this amount can be significantly higher than the amount paid the previous month, since it does not reflect borrowers' financial circumstances.

- **Interest capitalization.** Many borrowers enrolled in income-driven repayment plans pay less each month than the interest that accrues on their loans. These borrowers' loan balances will grow over time as they continue to make PFH payments. However, these plans do offer an important protection for borrowers who recertify on time each year—unpaid interest does not get added to the outstanding principal balance. Borrowers for whom recertification is not timely forfeit this benefit and unpaid interest is capitalized. Borrowers enrolled in PAYE or Income-Contingent Repayment (ICR) do have a limited protection against the negative effects of interest capitalization—capitalization of unpaid interest is limited to 10 percent of the outstanding principal balance.[92] There are no restrictions on the amount of unpaid interest that may be capitalized for borrowers enrolled in IBR.[93] For borrowers who may experience PFH for a number of years, capitalization of unpaid interest can substantially increase the total cost of their loans.[94]

- **Lost credit toward loan forgiveness.** IBR and PAYE offer borrowers loan forgiveness after 25 or 20 years of payments, respectively. Borrowers who have high debt or low income over a long period of time can still satisfy their financial obligations by continuing to make on-time PFH payments, even if these payments are not high enough to pay down principal. For these borrowers enrolled in income-driven repayment plans, every month that they make a qualifying payment satisfies a prerequisite to obtain loan forgiveness. However, if a servicer fails to promptly process an application for either of these repayment plans, a borrower may experience two kinds of negative consequences. First, a borrower may be forced to pay the higher monthly payment, thus decreasing the

---

[92] For borrowers enrolled in PAYE, capitalization is capped at 10 percent of the principal balance at the time the borrower enrolled in PAYE. For borrowers enrolled in ICR, capitalization is capped at 10 percent of the principal balance at the time the borrower entered repayment. 34 C.F.R. §§ 685.209(a)(2)(iv)(B)(1) (PAYE), (b)(3)(iv) (ICR).

[93] *See* 34 C.F.R. § 685.221 (IBR for Direct Loans); 34 C.F.R. § 682.215 (IBR for FFELP).

[94] *See* 34 C.F.R. § 685.221(b)(4) (IBR for Direct Loans); 34 C.F.R. § 682.215(b)(5) (IBR for FFELP); 34 C.F.R. § 685.209(a) (PAYE); 34 C.F.R. § 685.209(b) (ICR).

amount entitled to be forgiven.[95] Second, delayed processing could force a borrower to use forbearance, thus extending the eligibility date for forgiveness by each month that it takes to approve the recertification application.[96] Both of these could result in hundreds or thousands of dollars in additional extra payments paid by the borrower.

- **Lost subsidy.** For borrowers with subsidized federal loans, both IBR and PAYE feature a protection that limits the interest charges for borrowers who demonstrate PFH.[97] For three consecutive years (36 months) from the date of a borrower's first enrollment in an income-driven repayment plan, any unpaid interest for borrowers making PFH payments is paid by the Department of Education. The eligibility period for this benefit begins upon initial enrollment and will not halt if a borrower fails to recertify. This means that these borrowers forfeit a significant benefit every month during which a borrower makes a payment amount at the permanent standard level or uses forbearance while waiting for a late recertification to be processed. [98]

Commenters identify specific problems related to recertification, including issues involving notices, paperwork processing delays, and incorrect information from customer service personnel. As outlined above, the costs to borrowers who do not have a timely recertification processed by their student loan servicers can be substantial.

**Notices of recertification may not be adequate to facilitate successful recertification.** Federal student loan servicers are required to provide borrowers enrolled in income-driven repayment plans with a written notice when the repayment plans are set to expire. Department of Education regulations require that borrowers receive notice that they

---

[95] *See, e.g.*, CFPB-2015-0021-5718.

[96] *See, e.g.*, CFPB-2015-0021-3472.

[97] *See* 34 C.F.R. § 685.209(a)(2)(iv)(A)(1) (PAYE); 34 C.F.R. § 682.215(b)(5) (FEELP); 34 C.F.R. § 685.221(b)(4) (Direct Loan).

[98] For further discussion of the negative consequences associated with failure to timely recertify under an income-driven repayment plan, *see* Consumer Financial Protection Bureau, *When you make student loan payments on an income-driven plan, you might be in for a payment shock* (Aug. 2015), *available at* www.consumerfinance.gov/blog/when-you-make-student-loan-payments-on-an-income-driven-plan-you-might-be-in-for-a-payment-shock.

must submit an application, income verification, and documentation no earlier than 90 days and no later than 60 days prior to the annual deadline.[99] The notice should also contain information on how to recertify in order to continue making partial financial hardship payments and a deadline by which this information must be received.[100] Industry commenters note that these regulations establish a floor for borrower communications related to this process and may provide additional information to supplement required notices.[101]

Some comments from borrowers note that they never receive these notices.[102] Comments from organizations representing individual borrowers also state that borrowers receive notices that may not clearly provide information about when an application is due or how to recertify, causing them to miss their deadlines to recertify and face the negative consequences outlined above. [103] One trade association representing student loan servicers states, when discussing limitations of required student loan disclosures:

> *"Too many words and not enough pictures" may be overstating and trivializing the issue, but it does aptly describe the problem. The issue is really about providing borrowers with the right information at the right time, rather than inundating them with text-heavy disclosures that are ignored or discarded.*[104]

**Borrowers report that recertification paperwork processing delays result in missed deadlines.** When a servicer obtains a completed application with a borrower's tax return or other income verification, Department of Education regulations require that the servicer calculate a new payment amount.[105] Moreover, if a borrower submits income

---

[99] 34 C.F.R. § 682.215(e)(3); 34 C.F.R. § 685.209(a)(5).

[100] *Id.*

[101] *See, e.g.*, CFPB-2015-0021-0355.

[102] *See, e.g.*, CFPB-2015-0021-1052.

[103] *See, e.g.*, CFPB-2015-0021-0373.

[104] CFPB-2015-0021-0357.

[105] 34 C.F.R. § 682.215(e)(8)(i); 34 C.F.R. § 685.209(a); 34 C.F.R. § 685.221(b)(1).

36

documentation and a recertification application within 10 days of the annual recertification deadline, the servicer is required to maintain the current payment amount until the income documentation is processed and the new payment amount can be calculated.[106] Although this regulation protects these borrowers against the payment shock that results from a failure to recertify on time, some borrowers could face interest capitalization, forfeited interest subsidy, or delayed loan forgiveness, depending on servicers' policies.[107]

Comments from student loan borrowers suggest that servicers may not consistently apply the protection against payment shock, despite federal regulatory requirements.[108] Commenters note that borrowers may submit the required paperwork but servicers may take up to two months to process an application, during which the borrowers' annual recertification deadlines may pass.[109] Comments from borrowers also state that processing delays may cause borrowers' payments to revert to their standard 10-year monthly payments, even if paperwork is received by the deadline.[110]

One trade association states that federal student loan servicers have found that "of the borrowers that fall out of IDR plans during the renewal process, most are falling out due to their failure to respond to requests from their servicer to complete the necessary documentation to [retain a PFH payment]."[111] This commenter also states that the current recertification process has "fundamental" problems that cannot be fixed solely through "additional communication attempts or more disclosures."[112]

---

[106] 34 C.F.R. § 682.215(e)(8)(ii).

[107] *Id.*

[108] *See, e.g.*, CFPB-2015-0021-1053.

[109] *See, e.g.*, CFPB-2015-0021-0218.

[110] *See, e.g.*, CFPB-2015-0021-1361.

[111] CFPB-2015-0021-0859.

[112] *Id.*

Some borrowers comment that they are not financially prepared to make a student loan payment at the higher standard 10-year monthly payment since that payment amount does not reflect their current financial situation.[113] If borrowers are unable to afford the higher monthly payment, they may be forced to miss payments while the application is pending, possibly resulting in negative credit reporting.[114]

**Borrowers enrolled in automatic payments may face additional costs when recertification is not processed on time.**[115] Borrowers enrolled in automatic payments (auto-debit) with their servicers report unexpectedly higher payments being withdrawn from their bank account automatically when recertification under an IDR is not processed by their annual deadline.[116] Borrowers who do not maintain a high enough balance in their checking accounts to cover an unexpected higher payment may be charged overdraft fees by their financial institutions or fees for insufficient funds (NSF) by their servicers if their payments are rejected by their banks.

## 1.1.2   Forbearance

Forbearance is a common feature of both private and federal student loans through which a borrower may request a cessation of payment for a limited period of time. For borrowers experiencing short-term problems managing student loan payments, forbearance can be an important tool to provide flexibility.[117]

---

[113] *See, e.g.*, CFPB-2015-0021-1052; CFPB-2015-0021-0252.

[114] *Id.*

[115] In Fall 2013, one in five borrowers (more than two million) were making automatic electronic payments. The Institute for College Access & Success, *Should All Student Loan Payments be Income-Driven? Trade-offs and Challenges* (Apr. 2014), *available at* http://ticas.org/sites/default/files/pub_files/TICAS_IDR_White_Paper.pdf.

[116] *See, e.g.*, CFPB-2015-0021-1798; CFPB-2015-0021-1101.

[117] For federal student loan borrowers, HEA provides a range of options to suspend monthly payments, including deferments and forbearances for borrowers experiencing financial distress. Deferment may feature other benefits in addition to cessation of payment, including subsidized interest during periods of non-payment. Forbearances do not feature these benefits. When evaluating servicing practices related to income-driven repayment plan utilization as they relate to the availability of other benefits, readers should note that there may be economic reasons why a

For both private and federal student loans, interest continues to accrue and may be capitalized (added back to borrower's outstanding principal balance), causing a borrower's outstanding obligation to grow throughout periods of forbearance. Requests to enroll in forbearance may be processed either over the phone or through a written application. Policies and procedures related to forbearance applications may vary by servicer, by loan type, or based on a borrower's circumstances. Commenters identify a range of problems related to processing forbearance applications and servicing accounts during periods of nonpayment.

**Borrowers requesting forbearance may experience processing delays and unclear eligibility requirements.** In order to apply for forbearance, some servicers require that the borrower complete a written application to prove financial hardship, particularly for borrowers with private student loans. Federal regulations permit oral or written applications for forbearance, generally determined at the discretion of the student loan servicer.[118] Borrowers describe an array of processing problems, such as servicers placing certain loans into forbearance while leaving others in repayment, despite requesting all loans be put into forbearance.

Comments from individual borrowers also note that borrowers may complete a forbearance application and receive verbal confirmation that their loans are placed in forbearance, only to find out days or weeks later that the application was denied.[119] Such communication breakdowns may lead to missed payments or default. Indeed, in some cases, commenters report borrowers receiving approval to enter forbearance, and later discovering that the forbearance was not processed only once they are contacted by a debt collector.[120]

Industry commenters note that administering forbearances involves significant training and resources for customer service operations. One industry commenter notes that servicing

---

borrower would prefer a deferment for a subsidized federal student loan over an income-driven repayment plan with a $0.00 monthly payment.

[118] 34 C.F.R. § 682.211 and 34 C.F.R. § 685.205.

[119] *See, e.g.*, CFPB-2015-0021-1066.

[120] *See, e.g.*, CFPB-2015-0021-5458.

personnel "must be fully versed on the complete range of repayment options associated with each student loan, including income dependent repayment plans, and be able to explain the positives and negatives associated with repayment alternatives, including deferments and forbearances. . . . These are specialized areas of knowledge that require a thorough understanding of the applicable rules and regulations."[121]

**Borrowers also report that, for some private student loans, servicers may require an unaffordable forbearance application fee.** Borrowers comment that some servicers require a forbearance fee or "good-faith" payment in order to apply for temporary forbearance programs for some private student loans.[122] These payments may be a precondition to place the loan in forbearance for a three-month period.[123] For some borrowers with multiple loans, the total cost of forbearance fees in aggregate may be greater than the original loan payment itself. Commenters report that these fees may contribute to fragile financial situations for some borrowers, driving them deeper into debt. Borrowers state that in some cases, they cannot afford either the forbearance fees or their required monthly payment and consequently default on their loans.

Industry comments note that no forbearance fees are charged for federal student loans.[124] One comment from a student loan servicer states that it requires a reduced monthly payment for private student loan borrowers during periods of forbearance "to emphasize the terms and implications of their decision to use forbearance," further noting that this reduced monthly payment is applied to a borrower's account consistent with the servicer's standard payment application policy.[125] No industry commenters provided information related to how the level of fees or reduced monthly payments is determined for borrowers seeking forbearance.

---

[121] CFPB-2015-0021-0974.

[122] *See, e.g.*, CFPB-2015-0021-1032.

[123] *See, e.g.*, CFPB-2015-0021-1137.

[124] *See, e.g.*, CFPB 2015-0021-0355.

[125] *Id.*

## 1.1.3   Repayment incentives

As discussed above, private and federal loans feature a range of incentives to encourage successful repayment, including interest rate reductions for certain behavior associated with future borrower success.  For example, Direct Loan borrowers are entitled to an interest rate reduction upon enrollment in automatic payments.  Student loan servicers generally administer these benefits. Commenters report problems related to servicing practices associated with these features, including breakdowns in enrollment and processing.

**Borrowers note that interest rate reductions associated with certain borrower behavior may not be applied to borrowers' accounts without contacting servicing personnel to request an earned benefit.** Borrowers may be entitled to a reduced interest rate once borrowers complete their programs of study or following a series of on-time monthly payments.[126] In other cases, borrowers may be entitled to an interest rate reduction following enrollment in a servicer's automatic bill-pay function. Federal regulations permit a range of benefits for borrowers with FFELP loans.[127] Direct Loan borrowers also receive rate reductions, but this incentive is limited to a benefit following enrollment in automatic payments.[128] Commenters report borrowers may have to make multiple requests to student loan servicers in order to ensure these benefits are appropriately applied or, following the correction of a processing error, to ensure that benefits are applied retroactively to the date on which the borrower should have qualified.[129] One industry commenter notes that it immediately applies an interest rate incentive for automatic payment enrollment when automatic payments are initiated.[130] In addition, the servicer notes that the automatic payment may also be revoked following a series of rejected payments due to insufficient funds, in order to protect the

---

[126] These are two examples of borrower benefits found in loans originated under the FFEL program, as authorized in 34 C.F.R. § 682.200.

[127] 34 C.F.R. § 682.200; 34 C.F.R. § 685.211.

[128] U.S. Department of Education, *Master Promissory Note: William D. Ford Direct Loan Program*, *available at* http://www.direct.ed.gov/pubs/dlmpn.pdf.

[129] *See, e.g.*, CFPB-2015-0021-2014; CFPB-2015-0021-1092.

[130] CFPB-2015-0021-0355.

borrower against additional NSF fees, and that the associated interest rate benefit is not awarded when borrowers automatic payments are suspended.[131]

## 1.1.4    Cancellation, discharge, and loan forgiveness

Both private and federal student loans feature a range of loan forgiveness, cancellation, and discharge options depending on borrowers' circumstances. Student loan servicers may provide information to borrowers about available options related to cancellation, evaluate eligibility, and apply benefits and protections to borrowers' accounts.

**Borrowers with federal student loans, including borrowers who are disabled, may not be made aware of available options to cancel or discharge student debt.** Commenters note that many borrowers who are disabled continue to repay student loans, even under precarious financial circumstances.[132] In some cases, commenters note that these borrowers provide information about their financial circumstances to servicing personnel, but are never informed about options to discharge student debt due to their Total and Permanent Disability (TPD).[133] In these cases, borrowers who are disabled with limited financial resources may make unnecessary extra payments toward their loans.[134]  Federal regulations require servicers to take certain steps to facilitate the claim process once a borrower notifies the lender of his intent to pursue a claim, but these regulations do not require affirmative disclosure.[135]

One industry commenter notes that the federal process for disability discharge has improved significantly and is now "more consumer-friendly," and adding that it expects this process to continue to improve as the Department of Education takes steps to match borrowers who are

---

[131] *Id.*

[132] *See, e.g.*, CFPB-2015-0021-0253.

[133] *See, e.g.*, CFPB-2015-0021-4400.

[134] *See, e.g.*, CFPB-2015-0021-2647.

[135] *See, e.g.*, 34 C.F.R. § 682.402(c)(2); 34 C.F.R. § 685.213(b).

disabled with data provided by the Social Security Administration related to recipients of Social Security Disability Income (SSDI).[136]

**Borrowers with private student loans may find no options available to discharge or cancel debt if they become disabled, or, for co-signed loans, if the primary borrower dies or becomes disabled.** Commenters note that there is no equivalent, streamlined process for discharging a private student loan upon the death or disability of a borrower or co-signer.[137] Industry commenters note that similar discharge requirements to those in place for federal student loans may be included in some loan contracts or promissory notes under certain circumstances, but are not universally available.[138] While a number of student loan companies do note that they voluntarily offer limited discharges for some borrowers under certain circumstances,[139] commenters note that, for some servicers, the process for applying for these discharges may be unclear and criteria for assessing eligibility may not be publicly available. Commenters further note that some borrowers find that attempts to navigate this process and obtain discharge are not successful.[140] In most cases, student loan servicers are responsible for administering discharge programs for private student loans, including determinations about eligibility and communications with borrowers.[141]

**Borrowers seeking loan forgiveness under the Public Service Loan Forgiveness (PSLF) program report encountering servicing breakdowns that limit available benefits and prolong repayment.** The PSLF program provides borrowers with Direct Loans working for a public service organization with loan forgiveness following 120 on-time monthly payments made while enrolled in a qualifying repayment plan. Federal regulations establish criteria to determine eligibility for this program, defining qualifying public service

---

[136] *See* CFPB-2015-0021-0357.

[137] *See, e.g.*, CFPB-2015-0021-0861.

[138] *See, e.g.*, CFPB-2015-0021-0355.

[139] *See, e.g.*, CFPB-2015-0021-0355.

[140] *See, e.g.*, CFPB-2015-0021-0861.

[141] *Id.*

organizations, qualifying repayment plans, and what constitutes a timely qualifying payment.[142] The repayment plans that generally provide borrowers with the largest benefit are income-driven repayment plans.[143] Borrowers with FFELP loans may be eligible to pursue PSLF if they consolidate their FFELP loans into a new Direct Consolidation Loan, but will only be able to count payments made under the Direct Consolidation Loan toward loan forgiveness.[144]

Comments from individual student loan borrowers identify a range of problems related to information provided by student loan servicers about the PSLF program, including information about qualifying repayment plans[145] and qualifying employment.[146] Comments from other borrowers also discuss the negative financial impact of relying on incorrect information, since every monthly payment made under an arrangement that does not qualify for PSLF will result in delayed loan forgiveness and may require additional payments by the borrower.[147]

Borrowers who successfully complete a PSLF Employment Certification Form (ECF) are transferred to a new servicer for further assistance. The student loan servicer administering the PSLF program on behalf of the Department of Education comments that it invests in additional training and ensures that servicing personnel have "a full understanding of the rules for general program eligibility, the types of loans that may be eligible for forgiveness, the definitions associated with qualifying employment, and the complex rules that define qualifying payments."[148]

---

[142] 34 C.F.R. § 685.219.

[143] For further discussion of public service benefits, including PSLF, *see* Consumer Financial Protection Bureau, *Public Service and Student Debt* (Aug. 2013), *available at* http://files.consumerfinance.gov/f/201308_cfpb_public-service-and-student-debt.pdf.

[144] 34 C.F.R. § 685.219.

[145] *See, e.g.*, CFPB-2015-0021-0937.

[146] *See, e.g.*, CFPB-2014-0021-0251.

[147] *See, e.g.*, CFPB-2015-0021-0499.

[148] CFPB-2015-0021-0974.

One comment from an organization representing student loan borrowers suggests that economic incentives may not encourage some student loan servicers to provide information about this program, stating that "servicers may be reluctant to inform borrowers of PSLF and direct them to complete the annual employment certification form for PSLF because doing so currently leads to the loan being reassigned to a specialty server."[149]

# 1.2   Servicing transfers

Repaying a student loan can take a decade or more for the vast majority of borrowers. During the course of their repayment terms, borrowers may be assigned to different servicers at different points in time. As discussed above, borrowers generally do not have control over the company that services their loans. A servicing transfer is the process of moving a borrower's account from one student loan servicer to a new servicer. Borrowers generally do not have control over the timing of when loans are transferred, or the identity of their new servicer. Although the decision to transfer a loan is generally made by the holder of the loan, servicers are responsible for executing the transfer.

Servicers may have different policies and procedures related to payment posting, allocation, and processing, as well as the administration of certain borrower benefits. As a result, when servicers change, borrowers may need to navigate a range of new policies and procedures. In addition, when errors occur during servicing transfers, commenters note that this can affect every aspect of the student loan repayment process, leading to problems for both borrowers and market participants. One commenter suggested:

---

[149] CFPB-2015-0021-0356.

> *When a borrower's loan is transferred, the company transferring the loan and the*
> *company acquiring the loan must work together to ensure a smooth process for the*
> *borrower. The borrower and the servicer both lose when a communication lapse*
> *occurs.*[150]

Historically, servicing transfers have been a common feature of the student loan market. For borrowers with private student loans or federally-guaranteed loans held by private investors (commercial FFELP), a student loan servicer may change following the sale of a loan to a new loan holder. A transfer may also occur at the discretion of the new loan holder, which may elect to service a student loan on its own servicing platform (first-party servicing) or contract out to a specialty student loan servicer (third-party servicing). Holders may move loans between servicers at their discretion, resulting in multiple loan transfers without a loan sale or change in holder. For loans owned by the federal government, servicing transfers may occur at the direction of the Department of Education or may be triggered by borrowers seeking loan forgiveness through the Public Service Loan Forgiveness program.[151] In recent years, a number of significant market and policy changes have resulted in elevated levels of servicing transfer activity for borrowers with all types of student loans.

## Servicing transfers and the financial crisis

Leading up to and during the immediate aftermath of the financial crisis, there was significant disruption in the capital markets as investor demand for asset-backed securities, including student loan asset-backed securities (SLABS), declined sharply.[152] In the private student loan market, this disruption produced a sharp drop-off in new originations and a number of market

---

[150] CFPB-2015-0021-0354.

[151] *See also* CFPB-2015-0021-0861.

[152] For a further discussion of the relationship between securitization and education finance, *see* Consumer Financial Protection Bureau, *Student Loan Affordability* (May 2013), *available at* http://www.consumerfinance.gov/reports/student-loan-affordability and U.S. Department of Education and Consumer Financial Protection Bureau, *Private Student Loans* (July 2012), 24, *available at* http://www.consumerfinance.gov/reports/private-student-loans-report.

participants exited the market entirely. Subsequently, private student lending activity became concentrated at a number of very large depository institutions.[153] As the number of lenders originating new private student loans declined, a few remaining market participants acquired existing portfolios of private student loans from companies exiting the origination market.[154] For hundreds of thousands of borrowers with private student loans, the sale of these existing loan portfolios triggered a servicing transfer.[155]

For participants in the market for federally-guaranteed student loans, extraordinary intervention by the federal government mitigated the impact of the contraction in the capital markets on new originations. In 2008, the Ensuring Continued Access to Student Loans Act (ECASLA) was enacted, providing the Secretary of Education, with the consent of the Secretary of the Treasury and the Director of the Office of Management and Budget, the authority to establish mechanisms to ensure that students and families had continued access to federal student loans regardless of conditions in the credit markets.[156] ECASLA permitted the Secretary of Education to purchase certain FFELP loans, provided that the owners of these government-guaranteed loans use the proceeds to originate new federal student loans for borrowers.[157] By the end of 2010, under this authority, the Department of Education acquired $110 billion in loans

---

[153] *See generally* U.S. Department of Education and Consumer Financial Protection Bureau, *Private Student Loans* (July 2012), 24, *available at* http://www.consumerfinance.gov/reports/private-student-loans-report.

[154] *See, e.g.*, Discover Financial Services, Press Release: Discover Financial Services to Acquire $4.2 Billion of Private Student Loans and the Ongoing Business of The Student Loan Corporation (Sept. 17, 2010), *available at* http://investorrelations.discoverfinancial.com/phoenix.zhtml?c=204177&p=irol-newsArticle&ID=1472503.

[155] *Id.* Readers should note that there is no public data on student loan servicing transfers for private, FFELP, or Direct Loans.

[156] Pub. L. No. 110-227, 122 Stat. 740 (2008).

[157] *Id.*; *see also* U.S. Department of Education, *Ensuring Continued Access to Student Loans Act (ECASLA) Annual Report to Congress* at 4 (July 2011), *available at* https://studentaid.ed.gov/sa/sites/default/files/fsawg/datacenter/library/July2011ECASLAReport.pdf [hereinafter *ECASLA Annual Report*].

made by private lenders through the FFELP program and transferred loan servicing to third-party servicers under contract with the Department of Education.[158]

## Continued consolidation of federally-guaranteed loans

In 2010, Congress enacted the SAFRA Act, which instructed the Department of Education to halt new originations under the FFELP program and shift primarily to direct lending, providing federal student loans directly to borrowers under the Direct Loan program.[159] The student loan servicing business model has high fixed costs and rewards participants able to service a large volume of loans. The wind-down of FFELP effectively eliminated the primary source of new servicing volume for many specialty student loan market participants, since the Department of Education became the only channel for new federal student loan servicing volume. Consequently, this statutory change has spurred significant changes in the market for student loan servicing, leading to the concentration of the servicing of legacy FFELP loans at a few very large specialty student loan servicers.

Recognizing that they could no longer originate FFELP loans, some large depository institutions have either reoriented their education finance businesses to focus exclusively on private student lending or sought to exit the education finance market entirely. In both cases, these financial institutions have sought to sell existing portfolios of commercial FFELP loans.[160] In addition, non-profit specialty student lenders that had previously used their own servicing platforms

---

[158] *See ECASLA Annual Re*port at 17. For further discussion, *see* U.S. Department of Education, *Loan Servicing Update* (July 2012), *available at*
www.ifap.ed.gov/presentations/attachments/NASFAA2012LoanServicingUpdate.ppt.

[159] *See* Pub. L. No. 111-152, §§ 2101-2213, 124 Stat. 1071 (2010). The Direct Loan Program actually began in 1992, *see* Pub. L. No. 102-325, 106 Stat. 569 (1992), but Federal Direct Loans constituted only a small portion of Federal student lending before the enactment of the SAFRA Act in 2010.

[160] For example, in April 2014, CIT Group sold a portfolio of $3.6 billion in FFELP loans to Nelnet, exiting the education finance market. In July 2014, Wells Fargo sold a portfolio of $9.7 billion in FFELP loans to Navient, reorienting their education finance unit to focus on private education loans. Fitch Ratings, *More Institutions Likely to Sell US Student Loans* (July 2014), *available at*
https://www.fitchratings.com/gws/en/fitchwire/fitchwirearticle/More-Institutions-Likely?pr_id=839398.

continue to outsource student loan servicing to larger third-party servicers.[161] These changes have resulted in a noteworthy number of servicing transfers.[162]

Looking forward, observers expect a small number of specialty student loan market participants to continue to acquire outstanding portfolios of privately-held loans made under FFELP (commercial FFELP) and private student loans, triggering servicing transfers for more student loan borrowers.[163]

In addition, servicing transfers may be an enduring feature of servicing for the Direct Loan program. As discussed in Section 1.1.4, borrowers with federal Direct Loans seeking to obtain loan forgiveness under the Public Service Loan Forgiveness program or through the Teacher Loan Forgiveness program are automatically transferred to a specialty student loan servicer contracted by the Department of Education to administer these programs.[164]

**Problems related to servicing transfers can impact borrowers and increase costs for market participants.** One student loan servicer shared information with the Bureau related to common problems affecting borrowers in the aftermath of one very large servicing transfer. Readers should note that data provided by a single market participant may not be representative of the entire market and readers should not draw conclusions about prevalence

---

[161] *See, e.g., Press Release: Access Group, Inc. Selects ACS, A Xerox Company for Loan Servicing* (Dec. 23, 2011), *available at* http://www.prnewswire.com/news-releases/access-group-inc-selects-acs-a-xerox-company-for-loan-servicing-136159313.html.

[162] *See* Marian Wang, *Student Loan Borrowers Dazed and Confused by Servicer Shuffle*, ProPublica (Apr. 23, 2012), *available at* http://www.propublica.org/article/student-loan-borrowers-dazed-and-confused-by-servicer-shuffle ("The [servicing] switch . . . will ultimately include millions of loans."). In addition, in 2012, the Department of Education chose to terminate its contract with the third-party student loan servicer that, prior to 2009, had served as the sole student loan servicer for the Direct Loan program.  All loans owned by the federal government and serviced by this company, Affiliated Computer Services or ACS, a division of Xerox, Inc., were transferred to other servicers under contract with the Department of Education. In December 2013, ACS ceased all servicing operations under the Direct Loan Servicing Center brand. These changes resulted in servicing transfers for millions of borrowers.

[163] *See, e.g.,* American Banker, *B of A Bids Adieu to Its Student Loans (Or Does It?)* (Feb. 2, 2015), *available at* http://www.americanbanker.com/news/national-regional/b-of-a-bids-adieu-to-its-student-loans-or-does-it-1072491-1.html.

[164] *See also* CFPB-2015-0021-0974.

based on this data. However, in the absence of public data related to loan performance and servicing transfers, this information may offer helpful context.

In this case, the servicer noted that out of the more than 2.5 million accounts transferred, the company encountered problems with more than one out of five borrower accounts. These problems largely related to the transfer of records and other basic account information. The problems substantially increased costs for the new servicer because of the additional manual processing required in order to correct improperly transferred accounts. The cause of many of these problems may have originated with servicing errors made by the transferor servicer. Issues identified by this company include:

- **Incorrect balance information leading to a change in monthly payment amount.** Resulting from incorrect information about borrowers' loan balances, more than 500,000 borrowers experienced an increase or decrease in monthly payment amount following transfer as necessary to ensure borrowers repaid their loans consistent with their scheduled loan term.

- **Incorrect balance information that would have produced balloon payments.** Of the more than 500,000 borrowers identified above, more than 100,000 borrowers required significant revisions to amortization schedules, including changes that resulted in higher monthly payments. Had the new servicer failed to address this issue on its own, these borrowers would have been required to pay balloon payments at the end of their scheduled repayment period. The size of the balloon payments varied by borrower and thousands of borrowers would have owed balloon payments of $500 or more.

- **Multiple consecutive forbearances prior to transfer.** More than 20,000 borrowers had received multiple consecutive forbearances prior to transfer and, in the most extreme cases, borrowers had not been required to make payments for 5 years or more.[165] These borrowers' balances had increased significantly due to accumulation of

---

[165] Public comments and input from other market participants also suggest that the widespread use of forbearance for certain borrowers may have conflicted with guidance provided by the Department of Education. *See* 34 C.F.R. § 685.205 (limiting oral forbearances to 120 days and prohibiting consecutive oral forbearances). For the purpose of this discussion, diversity among servicers' loan handling policies, including practices by a single servicer that may result in consumer harm, also illustrate how the process of transferring loans between servicers can identify servicing errors and potentially expose servicers or borrowers to additional costs.

unpaid interest during this period. The new servicer's attempts to notify borrowers transitioning from forbearance to repayment status reportedly caused borrower distress and confusion.

- **Trailing and missing payments.** In some cases, the old servicer processed payments prior to transfer that it did not apply to borrowers' accounts. As a result, borrowers received bills from the new servicer for payments that were not owed. In some cases, the new servicer attempted to debit unnecessary extra payments from borrowers' checking accounts, which were rejected due to insufficient funds. Borrowers also experienced incorrect delinquencies and were required to provide additional documentation, including proof of payment, to the new servicer in order to correct account errors.

Commenters note that there remains diversity among market participants' policies and practices prior to, during, and following a servicing transfer. In some cases, errors similar to those described above may be identified and proactively remediated by a new servicer without the borrowers' knowledge. Commenters also suggest that servicers may not identify problems until borrowers contact customer service representatives to request assistance, such as in response to an unexpected jump in the monthly payment or a notice of a balloon payment at the end of a borrower's repayment term.

As described in more detail below, commenters identify a range of different problems related to servicing transfers. This section will discuss specific problems identified by commenters related to:

- Notice;

- Lost payments and surprise late fees;

- Transfer of repayment benefits and repayment plans; and

- Access to basic account information, record retention, and continuity of contact.

51

## 1.2.1   Notice of servicing transfer

Commenters state that notice of servicing transfer is a critical protection for borrowers who will be required to use a new company as their primary point of contact for their student loans.[166] Following a servicing transfer, student loan borrowers are immediately expected to remit payment on-time each month following policies and procedures established by their new servicer and, in some cases, this may also include a requirement that the borrower re-enroll in automatic payments through their new servicer.[167] Timely and accurate notices may benefit borrowers entering into a relationship with a new company, serving as a mechanism to help inform borrowers about changes in payment processing policies, upward or downward adjustments to monthly payment amounts, or any delays or disruptions in automatic payments.

For borrowers with FFELP loans, federal regulations require notice to be sent by the new servicer within 45 days following the transfer, or the date on which the assignee receives a legally enforceable right to receive payment from the borrower, in the event of a sale.[168] These regulations do not require notice prior to transfer. No comparable regulatory requirements exist for borrowers with private student loans or Direct Loans. One comment from a student loan servicer states that it voluntarily implemented an additional notice regime for servicing transfers involving FFELP and private student loans, supplementing regulatory requirements for FFELP loans.[169]

**Borrowers report they did not receive notice that their loans were being transferred to new servicers.** Some comments from individual student loan borrowers state that borrowers were unaware that their loans were being transferred to a new servicer.[170] Some commenters state that they believe communications from their new servicers may have been a

---

[166] *See, e.g.*, CFPB-2015-0021-0861; CFPB-2015-0021-0377.

[167] *See, e.g.*, CFPB-2015-0021-0355.

[168] 34 C.F.R. §§ 682.208(e), (h).

[169] *See* CFPB 2015-0021-0355.

[170] *See, e.g.*, CFPB-2015-0021-1028.

mistake or scam.[171] Other comments from borrowers state that borrowers did not know where to send their payments[172] and, as described in further detail below, commenters note that the lack of notice contributed to significant payment processing breakdowns, including missing or misdirected payments and unexpected delinquencies.[173]

One student loan borrower told us:

> *Recently, [my lender] sold off my loans to [another company]. It didn't seem like much of a deal. Of course, they didn't inform me it was happening until after [the new company] did. At first I was worried it was a scam and that, somehow, someone had gotten my loan account information. I ended up calling [my lender] about it, having it confirmed as legitimate, and then getting the email telling me it was happening.*[174]

**Variation in payment policies across servicers may adversely affect borrowers when transferee servicers do not provide advance notice of different policies.**
Borrowers note that they may receive no notice when payment processing policies change, and that this may lead to payment processing problems when their preferred payment channels do not exist at their new servicer. In such instances, borrowers may make assumptions about payment options based on the previous servicers' practices.

For example, a borrower may be able to submit same-day payments using a debit or credit card under certain servicers' policies; however, after a servicing transfer, the borrower may be required to pay with a check or through an electronic transfer from a checking or savings account. Commenters note that changes to payment policies resulting from a change in servicer can interfere with the borrowers' ability to manage their loans, especially without sufficient advance notice to allow the borrower to adjust their payment routine.[175]

---

[171] *See, e.g.*, CFPB-2015-0021-0563.

[172] *See, e.g.*, CFPB-2015-0021-0712; CFPB-2015-0021-0091.

[173] *See, e.g.*, CFPB-2015-0021-0809.

[174] CFPB-2015-0021-0387.

[175] *See* CFPB-2015-0021-1026.

One student loan servicer notes that it provides notices before and after transfer, as part of a broader initiative for its FFELP and private student loan customers to model its servicing transfer policies and procedures on "mortgage transfer rules."[176]

**Borrowers report that they receive no notice when new servicers' policies regarding alternative repayment arrangements differ from their previous servicers' policies.**[177] In some cases, servicers elect not to continue certain payment arrangements agreed to by the previous servicer.[178] While this can present difficulties for borrowers by itself, borrowers who do not receive timely and accurate notice of changes in repayment arrangements may lose an opportunity to contact their student loan servicers and make alternative arrangements, which may hinder their ability remain on track to successfully repay their obligations.[179] Federal regulations do not require such notices for borrowers with FFELP loans and no regulatory notice requirements exist related to servicing transfers for private student loans or Direct Loans.[180]

Commenters tell us that borrowers may experience difficulties when attempting to enroll or recertify an income-based repayment plan if a servicing transfer occurs while an application is under review. Following a transfer, the new servicer may not process the application or the paperwork may not be transferred to the new servicer, causing the borrower's payment to revert to the permanent standard amount.

One commenter told us that he submitted an application to recertify his income-based repayment plan with his prior student loan servicer.[181] Following a transfer, his new servicer did not process the paperwork and his payment reverted to his permanent standard repayment,

---

[176] CFPB-2015-0021-0355.

[177] *See* CFPB-2015-0021-0387; CFPB-2015-0021-0298; CFPB-2015-0021-1026.

[178] *See* CFPB-2015-0021-0229.

[179] *See* CFPB-2015-0021-0551; CFPB-2015-0021-0953.

[180] 34 C.F.R. § 682.208.

[181] CFPB-2015-0021-0995.

causing his payments to increase dramatically.[182] The commenter told us that he did not know his payment increased and he continued to submit a payment equal to the income-based repayment amount.[183] The commenter was surprised to learn that he was delinquent on his loans and subsequently lost several qualifying payments toward Public Service Loan Forgiveness.[184]

## 1.2.2   Payments to previous servicer and disruptions to automatic payments

Following transfer, a number of commenters note significant problems when attempting to reconcile payments made toward their loans with current information available about their accounts. These problems include payments made to their previous servicer not being posted or transferred in a timely manner and disruptions to automatic payments (auto-debit), both of which can lead to unexpected late fees and delinquencies.

**Commenters note that following transfer, payments made to the previous servicer may be lost or may be processed but not posted to borrowers' accounts, even when borrowers follow servicers' instructions.** Commenters note that their old servicers may have accepted and processed payments after their accounts were transferred to a new servicer.[185] In these cases, both servicers may not have elected to establish a process to transfer misdirected payments in a timely manner. Borrowers may be notified that their accounts are delinquent and that they have been assessed unexpected late fees, despite making timely payments that were processed by their previous servicer. Commenters also note that borrowers may need to navigate customer service departments at both companies in order to reconcile their payment histories, reverse late fees, and resolve improper delinquencies.[186] Recognizing that there are no

---

[182] *Id.*

[183] *Id.*

[184] *Id.*

[185] *See, e.g.*, CFPB-2015-0021-1779.

[186] *See, e.g.*, CFPB-2015-0021-0648; CFPB-2015-0021-0245.

regulatory requirements that govern the handling of payments during transfer, one student loan servicer states that it recently implemented a policy "ensuring that payments received by the prior servicer are forwarded to [the company] on a timely basis and applied effective on the prior servicer's receipt date."[187]

**Following transfer, borrowers may also encounter disruptions in automatic payments.** As discussed further in Section 1.4, automatic payments (auto-debit) are a common arrangement for student loan borrowers in repayment. Servicing transfers may pose specific risks for borrowers enrolled in automatic payments because these borrowers may take for granted that their payment will be debited on-time each month. Commenters note that following a servicing transfer, borrowers' auto-debit enrollment and bank account information may not always be transferred to their new servicers.[188] This can cause disruptions for borrowers, especially when many may not have sufficient warning to modify their payment methods or enroll in automatic payments with the new servicers before the next payments are due. In addition, some commenters note that following a transfer, their former servicers failed to discontinue automatic withdrawal of the borrowers' monthly payments and the borrowers had to contact the old servicers to stop automatic debit and then re-enroll with the new servicers.[189] One comment from a borrower states:

---

[187] CFPB-2015-0021-0355.

[188] *See, e.g.*, CFPB-2015-0021-0861.

[189] *See, e.g.*, CFPB-2015-0021-5715.

*When my loan was switched to being serviced by [company], I had checked my loan information on the Dept. of Education website a few days before my payment was due to be automatically withdrawn. What I saw was no balance information, no payment information...everything was gone, and I'd received no notification of any kind . . . I work for a bank in consumer lending, and we would never make it so difficult for our customers who are trying to pay off their debts. Why are students being treated this way, when all we're doing is trying to better ourselves with educations and trying to pay off our loans?*[190]

One industry comment notes that "smooth transfer is in the servicers' best interest, as well as that of the affected consumers. The timing of the transfer is carefully coordinated to ensure that, as much as possible, it does not adversely affect time-sensitive issues such as payment due dates and ACH payments."[191]

## 1.2.3   Change in repayment incentives or repayment plans

Following transfer, student loan servicers calculate borrowers' monthly payments, administer any alternative payment arrangements established by the prior servicer, and apply any repayment incentives secured earlier in the repayment process (e.g., interest rate reductions awarded following a series of on-time monthly payments), to the extent that they are required under regulations or in the promissory note. Commenters note problems when incentives or repayment plans do not transfer with a student loan, which may present unique challenges for borrowers experiencing financial distress and relying on an alternative repayment plan agreed to by their prior servicers.[192] There are currently no federal regulations that address practices related to repayment incentives or repayment plans during a servicing transfer.

**Individual student loan servicers may offer borrowers incentives to encourage certain types of repayment behavior. When these features are not included in**

---

[190] CFPB-2015-0021-0009.

[191] CFPB-2015-0021-0357.

[192] *See, e.g.*, CFPB-2015-0021-0671.

57

**borrowers' promissory notes, benefits may vanish following transfer.** Some student loans feature interest rate reductions, generally after a series of on-time payments or in exchange for auto-debit enrollment, as an advertised benefit to encourage timely repayment.[193] These benefits may be found in federal regulations, as part of the contractual terms of the loan, or may be offered by servicers themselves.[194] As discussed in the previous section, when the benefits are part of the borrower's student loan contract, servicers may be responsible for evaluating eligibility for these benefits and applying them to borrowers' accounts. When servicing transfers occur, non-contractual incentives offered by the old servicer may not transfer with borrowers' accounts or the new servicer may not automatically apply contractual interest rate reductions, leading to increased interest rates.[195]  One borrower states:

> *I am majorly confused by my Federal student loans. When I consolidated, I was told a certain interest rate and incentives that would lower my interest rate. I really cared less about who the servicer is and will be in the future. Now, years later, I am told that subsequent servicers have the right to revoke those incentives because new servicers did not agree to those terms. That is completely not fair to borrowers. That just seems illogical and even illegal to me.*[196]

For example, commenters note that when automatic payments are halted following a servicing transfer, any associated interest rate benefit is also suspended.[197]  Servicers also may require borrowers to re-enroll in auto-debit in order to reapply this benefit, increasing costs in the interim.[198] Borrowers note that the increased interest rates lead to increased costs over the life of loan merely because the loan was transferred to a new servicer.

---

[193] For further discussion, *see* 1.1.3.

[194] *See, e.g.*, CFPB-2015-0021-0355.

[195] *See, e.g.*, CFPB-2015-0021-1049; CFPB-2015-0021-0551.

[196] CFPB-2015-0021-0671.

[197] *See, e.g.*, CFPB-2015-0021-1495.

[198] *See, e.g.*, CFPB-2015-0021-2830; CFPB-2015-0021-1576; CFPB-2015-0021-0937; CFPB-2015-0021-1049.

**Borrowers pursuing benefits that require servicers to monitor payment histories report breakdowns when attempting to reconcile conflicting information subsequent to transfer.** Some benefits for private and federal student loan borrowers require servicers to evaluate borrowers' payment histories when assessing eligibility. For instance, borrowers seeking Public Service Loan Forgiveness are required to make 120 on-time payments to qualify for loan forgiveness.[199] Alternatively, private student loan borrowers seeking to release a co-signer may need to make a certain number of on-time payments to release the co-signer from his obligation to repay the loan.[200] Therefore, accurate payment histories are necessary for borrowers seeking to qualify for these benefits. As one industry commenter notes, when explaining how it has voluntarily implemented policies to improve the delivery of service during servicing transfers:

> [Servicer] has in place policies and procedures that facilitate the smooth and seamless transfer of borrower information and documentation in the case of loan transfers. [Servicer] provides the transferring lender with a set of procedures and a loan transfer checklist that it recommends be followed as part of the transfer process. This includes sending the borrower a "goodbye" letter and adhering to procedures that assure that all of a borrower's payments, including those made following the loan transfer, are credited to the borrower's account.[201]

Other comments from individual borrowers identify delays and other processing problems when trying to ensure basic information about historical payments provided by previous servicers are consistent with account information presented by new servicers. One commenter told us:

---

[199] As discussed above, upon completion of an Employment Certification Form (ECF), Direct Loan borrowers pursuing the Public Service Loan Forgiveness program are automatically transferred to the specialty servicer that administers this program. Presently, this company is responsible for validating qualifying employment and assessing qualifying payment history, including payment histories documented by previous student loan servicers. When the first student loan borrowers are eligible for loan forgiveness under this program on October 1, 2017, this servicer will also be responsible for evaluating applications for loan forgiveness. For more discussion on Public Service Loan Forgiveness, *see* Section 1.1.4.

[200] For further discussion on co-signer release, *see* Section 1.5.2.

[201] CFPB-2015-0021-0974.

*I was required to transfer servicers as a result of PSLF. When my loans transferred . . . I lost 3 payments that [my servicer] had tracked/approved, and should have applied toward my PSLF payments . . . It is very frustrating because the PSLF is hopefully going to be my saving grace someday from the mounting sea of debt that is my student loans! . . . Please do something to help students get out of debt faster.*[202]

**Borrowers who have negotiated alternative payment arrangements, including income-driven repayment plans, with their prior servicers may experience disruptions and some borrowers may experience changes in repayment terms.** The Bureau also heard from borrowers experiencing changes in repayment plans following a change in servicer. These borrowers note that documents may not be transferred to their new servicer, requiring borrowers to start over on loan modifications or forbearance applications. For borrowers experiencing financial hardship, additional processing time caused by lost paperwork can increase the likelihood of missed payments, damaged credit, or other negative consequences. As one borrower notes:

*My loan was bought by [a new company]. I had all my paperwork in place with a deferment in place with the previous servicer. However, all communication by [the new company] was sent to an old email address to the spam folder. Not checking the email often, I had no idea what was going on until it was done. I wished they would have used mail or called me about it. I also feel like I should have had a choice about my loans being moved.*[203]

## 1.2.4   Access to information after servicing transfers

Accurate and timely processing of student loan payments may require student loan servicers to have a complete understanding of borrowers' accounts, the terms included in borrowers' loan contracts, and specific instructions provided by borrowers related to payment handling or alternative repayment arrangements.[204] When servicing transfers occur, commenters note a

---

[202] CFPB-2015-0021-0204.

[203] CFPB-2015-0021-0524.

[204] For further discussion on payment processing issues, *see* Section 1.4.

range of problems related to record retention and customer service, and problems resolving errors once they are identified. There are no federal regulations that establish specific record retention requirements for student loan servicers following servicing transfers.

**Borrowers may experience problems obtaining documents or information from their new servicer following a transfer, particularly when all records associated with borrowers' accounts are not transferred to the new company.**[205] Basic account information, including historical payment records, may not be retained following transfer or may not be accessible through the new servicer's borrower-facing electronic account platform. When borrowers are unable to access historical account documentation, they have difficulty tracking eligibility toward future benefits and protections that depend on payment history. Inaccessible information may also cause problems for borrowers to understand how historical payments have been applied and how prior payments affect outstanding principal and interest. Borrowers enrolled in payment arrangements without a fixed term, including income-driven repayment plans, note that this is particularly important:

> *I have a student loan w/ [student loan servicer]. I am on an income based repayment program with them and have around $50,000 in debt. When I go to their portal I can see my payment history but nowhere does it show how my overall loan balance and total loan interest history on a monthly basis. I make payments every month but have no idea how it is applied to my loan balance and what the new balance for both interest and principle looks like once the payment is applied.*[206]

Comments from two large student loan servicers both identify proactive steps taken to ensure documentation is properly transferred during a servicing transfer.[207] These practices include imposing obligations on transferor servicers in order to ensure that documentation is appropriately accounted for and transferred successfully.

---

[205] *See, e.g.*, CFPB-2015-0021-5068.

[206] CFPB-2015-0021-1018.

[207] *See* CFPB-2015-0021-0355; CFPB-2015-0021-0974.

**Commenters state that, following transfer, borrowers may be unable to contact customer service personnel empowered to resolve problems related to missing documents or lost information.** Comments from individual borrowers state that when basic information was unavailable through their new servicers' online systems, they were also unable to obtain contact information for their new servicers' personnel, who have access to those documents.[208] Student loan borrowers report that they may be told to contact their old servicers, only to be passed back to their new servicers, with no clear way to resolve problems.[209]

> *When I started college in 1994 I took the financial advisors' advice and saved all paperwork related to every student loan I obtained. At some point, I could no longer follow my debt trail. My loans were transferred to various lenders and loan service companies and I didn't always understand how they were divided the loans and how payments were applied.*[210]

Other commenters report borrowers facing multiple changes in customer service personnel at each company, without reaching personnel empowered to handle their situation:

> *There [were] delays from the time the lending organizations transferred my loans to an outside servicing agencies. On many occasions, I was kept in the dark for several months until I receive a "notification". Also, when I tried to follow up with my original lenders to get a status update, their answer was always "your loan was transferred to an outside servicing agency and therefore you have to wait until they send you a notification letter". I was given the runaround when I tried to figure out why . . .* [211]

Many of the specific problems identified in this section are similar in substance to the problems identified by commenters elsewhere in this report. Commenters note that servicing transfers may leave some borrowers more vulnerable to processing problems and particularly dependent

---

[208] *See, e.g.*, CFPB-2015-0021-0513.

[209] *See, e.g.*, CFPB-2015-0021-0522.

[210] CFPB-2015-0021-0513.

[211] CFPB-2015-0021-0522.

on customer service personnel to resolve errors.[212] Taken together, the preceding discussion of the scale of errors following one large servicing transfer and the problems identified by individual commenters in this section, suggests that the current servicing environment may fail to serve some borrowers when servicing transfers occur.

# 1.3   Customer service and error resolution

Servicers' duties may include responding to borrower inquiries related to any aspect of the student loan repayment process, including inquiries related to basic account information, loan terms, payment histories, the processing of payments, the application of borrower benefits or alternative repayment arrangements, and the furnishing of information to credit reporting agencies.

When problems occur, commenters note that borrowers rely on student loan servicing personnel to quickly identify the underlying issues which resulted in the servicing error, resolve these issues in a timely manner, and communicate with the borrower once the error has been resolved.[213] Additionally, commenters note that borrowers rely on servicers to furnish accurate, updated information to credit reporting agencies reflecting this resolution. When servicers provide conflicting or inaccurate information or fail to resolve errors in a timely manner, commenters note that this may undermine borrowers' trust in servicing personnel and may prevent borrowers from accessing tools to avert default.[214]

Commenters express that many of servicing problems identified in Part One of this report are exacerbated by inadequate customer service.[215] Comments from individual student loan borrowers identify a range of difficulties related to customer service, including:

---

[212] *See, e.g.*, CFPB-2015-0021-0378.

[213] *See, e.g.*, CFPB-2015-0021-0354.

[214] *See, e.g.*, CFPB-2015-0021-0373.

[215] *See, e.g.*, CFPB-2015-0021-0358.

- Access to timely and accurate account information;

- Handling of customer inquiries and complaints; and

- Requests to resolve errors, escalate complaints, and appeal decisions.

## 1.3.1   Access to timely and accurate account information

Commenters note that borrowers generally rely on servicing personnel to provide accurate, timely information related to account terms and conditions, payment history, and borrower benefits and protections, including alternative repayment options.[216] Commenters discuss a range of problems encountered when borrowers seek to obtain information about their loans and associated benefits. For servicers serving borrowers with FFELP loans, there are a series of "due diligence" requirements included in the Higher Education Act and implementing regulations that mandate certain written disclosures for borrowers in repayment and for delinquent borrowers.[217] No equivalent disclosure requirements exist in federal regulations for the servicing of private student loans or Direct Loans. There are no federal regulatory requirements related to accuracy of information provided by student loan servicers.

**Borrowers may not be able to access information about their payment history, including information about late payments or how individual payments have been allocated between interest and principal.** Many servicers provide payment histories electronically through the borrower's online account or upon request by the borrower.[218] Comments from individual borrowers and organizations representing consumers note that access to these records may be limited and that information contained in these records may not be sufficiently detailed for borrowers to gain a complete understanding of how their account has been serviced. The Bureau has also heard from borrowers who have been denied a complete

---

[216] *See, e.g.*, CFPB-2015-0021-0364.

[217] 34 C.F.R. § 682.208; 34 C.F.R. § 682.205.

[218] *See, e.g.*, CFPB-2015-0021-0974; CFPB-2015-0021-0355.

payment history after requesting it from their servicer or who have been provided incomplete or partial histories of payments upon request.[219]

One comment from a student loan servicer notes that access to complete payment histories are available electronically through the company's servicing portal. This company notes that information is also available about how payments were applied to specific loans grouped together for billing purposes and includes historical information about application to principal and interest.[220] Other industry comments do not address, in detail, practices related to access to payment histories.

As discussed in greater detail elsewhere in Part One, borrowers may use payment histories to monitor and track that they have made the correct number of requisite payments to qualify for certain borrower benefits, including the Public Service Loan Forgiveness program[221] or co-signer release.[222] Other commenters note that access to timely and accurate account information is particularly important for borrowers seeking to refinance their student loans.[223]

**Borrowers may not be able to access documentation about their loans, including original loan contracts.** Some borrowers express frustration that servicers fail to provide documents upon request, including original promissory notes or disclosures.[224] Commenters note that access to these documents enables borrowers to ensure that their loans are being properly serviced and all terms and conditions are met.[225] However, borrowers state that they struggle to obtain this documentation or are told that the servicer does not have the original

---

[219] *See, e.g.*, CFPB-2015-0021-5068.

[220] *See* CFPB-2015-0021-0355.

[221] *See* Section 1.1.4; *see also* 34 C.F.R. § 685.219.

[222] As discussed in Section 1.5, lenders frequently advertise that a co-signer to a loan may be released from his obligation to repay the loan after a certain number of on-time payments of principal and interest. *See also* CFPB-2015-0021-0361; CFPB-2015-0021-0355.

[223] *See, e.g.*, CFPB-2015-0021-0985.

[224] *See, e.g.*, CFPB-2015-0021-1390; CFPB-2015-0021-3142.

[225] *See, e.g.*, CFPB-2015-0021-0861.

documentation associated with a borrower's loans. Borrowers further explain that if a customer service representative fails to provide them with the requested information, they do not have a formal way to escalate their request for further review or a mechanism to hold their servicer accountable for lost documentation.[226]

**Servicing personnel may provide borrowers with conflicting, inconsistent, or inaccurate information.** Because borrowers may have to make decisions about payment plans, benefits, and protections at many points throughout the student loan repayment process, commenters note that access to accurate and actionable information from customer service personnel is a critical function for servicers. The Bureau has heard from borrowers that are unable to get basic information about loan terms and conditions when they contact their servicer.[227] Commenters note that in some circumstances, they may contact a customer service representative only to call back and receive a different answer from another customer service representative.[228] In other cases, the information provided by customer service personnel may not match information provided on consumer-facing websites. Borrowers express frustration and raise questions about how to resolve uncertainty when they get inaccurate, incomplete, or conflicting information.[229] One borrower comments:

> *I participate in income-based repayment (IBR) and am making payments toward public service loan forgiveness (PSLF). Unfortunately, the process of consolidating my loans and providing the necessary information to qualify for IBR/PSLF was riddled with misinformation and poor communication. Although I am finally making payments (and happy to do so), the process took about 6 months for [my current servicer] to sort out my paperwork and follow up with me about next steps. On several occasions, I received bad information from the phone representatives and at one point I*

---

[226] *See, e.g.*, CFPB-2015-0021-0861.

[227] *See, e.g.*, CFPB-2015-0021-0229; CFPB-2015-0021-5714.

[228] *See, e.g.*, CFPB-2015-0021-0218.

[229] *See, e.g.*, CFPB-2015-0021-0934.

*called three different representatives and was given very different explanations about what documentation was needed.*[230]

## 1.3.2   Requests to resolve errors, escalate complaints, and appeal decisions

When problems occur, borrowers may depend on customer service personnel to help them understand how issues are resolved, including whether resolution can be obtained during a single contact with their servicer or whether resolving an issue requires additional documentation or processing.[231]

Borrowers note that a range of problems can arise when contacting their servicer for assistance. Commenters note that even when borrowers attempt to escalate or appeal decisions, error resolution processes may not be sufficient to address borrowers' concerns. One industry commenter notes that federal regulations for FFELP loans require servicers to reply to inquiries within 30 days.[232] There are no equivalent regulatory requirements for Direct Loans or private student loans.

**Commenters report that servicing personnel may not address borrower concerns, either declining to provide requested assistance or failing to deliver on the assistance offered to the borrower.** Some borrowers report that they contact their servicer to ask a question or document an issue with their account, only to be ignored by their servicer.[233] When they request help, either through an online platform or via telephone, borrowers comment that servicing personnel may not have sufficient knowledge to provide guidance when borrowers seek to have an issue addressed.[234] After contacting their servicer, some borrowers

---

[230] CFPB-2015-0021-1151.

[231] *See, e.g.*, CFPB-2015-0021-1064.

[232] *See* CFPB 2015-0021-0357; *see also* 34 C.F.R. § 682.208(c).

[233] *See, e.g.*, CFPB-2015-0021-0358.

[234] *See, e.g.*, CFPB-2015-0021-0359.

tell us that, despite assurances from customer service personnel that their issue was being handled, there is no way to track next steps performed by the company or assess whether resolution was sufficient to resolve the underlying problem.[235] Some commenters raise concerns that servicing personnel focused on minimizing the length of customer contacts with little regard for resolving borrowers' issues.[236]

> *I submitted a payment for $75 and my service processor lost the payment. Somehow they were able to send me a letter stating they had received a check but did not know which account to apply it to. From there I was instructed to send a copy of the original check in reference to the letter. I received no confirmation and my account went into default. The people who handled my phone call transferred me from department to department and still after 4 years have not been able to remedy the situation because my loan has been transferred to 2 different loan services since my initial complaint.*[237]

One industry commenter states that it recently launched a new process for tracking and transferring customer requests in order to "provide customers with up-to-date information on the status of pending change requests, including account adjustments required due to customer request or [servicer] processing error."[238]

**Borrowers may not know how to initiate a formal review process when attempting to resolve an account error.** Commenters note that there may be significant variation in borrowers' experiences when attempting to request escalated review by servicing personnel.[239] Commenters also note that servicers may not offer an escalated review feature in a uniform or

---

[235] *See, e.g.*, CFPB-2015-0021-0431.

[236] *See, e.g.*, CFPB-2015-0021-0373.

[237] CFPB-2015-0021-0259.

[238] CFPB-2015-0021-0355.

[239] *See, e.g.*, CFPB-2015-0021-0861.

68

accessible manner.[240] In some cases, borrowers are able to initiate a formal error resolution process with their student loan servicer.[241]

**Borrowers may encounter barriers when attempting to escalate inquiries or complaints to senior servicing personnel, if the initial error resolution process falls short.** Commenters tell us that they contact their servicer but are often transferred to multiple departments or multiple customer service representatives when seeking assistance.[242] When borrowers attempt to escalate their concerns to senior servicing personnel, borrowers complain that they experience long wait times in order to speak to a manager or specialized personnel with the ability to access certain information on their loans.[243]  In some cases, borrowers may wait days or weeks in order to receive a response. One comment from an individual student loan borrower notes:

> *Most of the time the representatives don't have answers to my questions and they just transfer me to different departments and no one can help. Not even the supervisors.*[244]

Industry comments did not generally address escalation or appeals processes for student loan borrowers; however, one student loan servicer notes that it "has policies in place ensuring that all contacts with and from borrowers are documented and available to customer service representatives and others with a need to access such information. [The servicer] has specialized teams to research and respond to escalated inquires and customer complaints."[245]

---

[240] *See, e.g.*, CFPB-2015-0021-0861.

[241] *See, e.g.*, CFPB-2015-0021-0861.

[242] *See, e.g.*, CFPB-2015-0021-0755.

[243] Commenters from the National Consumer Law Center note that this "inferior" customer service may be caused by "information systems, staff incompetence, skewed monetary incentives and lack of training" for customer service representatives. CFPB-2015-0021-0861; *see also* CFPB-2015-0021-0755.

[244] CFPB-2015-0021-5720.

[245] *See* CFPB-2015-0021-0974.

**Some private student loan borrowers experiencing financial hardship may not be able to obtain a determination from their servicer about eligibility for an alternative repayment plan.**[246] Borrowers express frustration about the process for obtaining a decision. Some borrowers explain that customer service representatives are unable to identify appropriate personnel who can make a determination about repayment options.[247] Borrowers in these circumstances also express frustration when they are denied alternative payment arrangements,[248] particularly when servicing personnel decline to provide information about how a decision was reached.[249]

**Limited ability of some servicers to resolve complaints may drive borrowers to submit complaints with regulators and law enforcement agencies.**[250] Commenters also note that customer service personnel may not direct borrowers to appropriate servicing personnel, in effect limiting the volume of borrowers able to receive timely and responsive assistance.[251] When borrowers run into dead ends while trying to obtain assistance, they may submit complaints through alternative channels in order to ensure their concerns are addressed.[252] In some cases, borrowers note that they submit complaints with federal or state regulators in order to ensure that appropriate personnel review their account.[253] Commenters note that, particularly for borrowers experiencing financial distress, added time spent appealing to a regulator in order to get the attention of their servicer means further delay.

---

[246] *See* CFPB-2015-0021-1371.

[247] *See* CFPB-2015-0021-0975; CFPB-2015-0021-0499.

[248] *See* CFPB-2015-0021-0371; CFPB-2015-0021-0975.

[249] *See* CFPB-2015-0021-0975.

[250] *See* CFPB-2015-0021-3582.

[251] *See* CFPB-2015-0021-0854; CFPB-2015-0021-0885; CFPB-2015-0021-0364.

[252] *See, e.g.*, CFPB-2015-0021-6129.

[253] *See, e.g.*, CFPB-2015-0021-6126.

# 1.4   Payment processing

As discussed in the preceding sections, student loan servicers' policies and procedures can affect the execution of many aspects of the student loan repayment process. The following section discusses payment processing functions common across the student loan servicing market and how, when errors related to these functions occur, it can cause substantial problems for borrowers seeking to repay student debt.

Payment processing is the term used in this analysis to capture all policies, procedures, and practices in place to facilitate the remittance, posting, and application of payments to borrowers' accounts. The following section will focus on three broad categories of practices identified in public comments and other input received by the Bureau:

- Payment posting, payment application, and late fees;

- Payment allocation and non-standard payment handling; and

- Billing and payoff statements.

## Features of student loan payment processing

Several market features make the processing of student loans payments distinct from processing payments for other financial products. These distinctions underpin the following discussion of payment processing in this section.

**Billing groups.** Typically, a borrower will take out several loans while attending college, usually with one or more disbursements each semester. These loans may have different principal balances, interest rates, amortization schedules, or other terms and conditions. If these loans are serviced by a single company, the servicer may have broad discretion to manage the multiple loans. Typically, servicers decide to bundle multiple loans into a single "billing group" and consolidate those loans that they service on one periodic statement.

Student loan contracts or promissory notes generally relate to a single loan with a single set of terms, conditions, and features. Although these contracts typically prescribe how a payment should be applied to an individual loan, student loan contracts do not usually include provisions related to the grouping of loans for billing purposes. Consequently, servicers' policies and procedures determine how payments are divided among loans in a billing group, particularly for

non-standard payments and in circumstances where a borrower has not provided instructions related to payment handling.

Servicers do not generally group loans of different types together. When a servicer handles multiple FFELP and private student loans for a borrower, these loans may be serviced on the same platform and consolidated into a single billing statement, but FFELP and private student loans will remain in separate billing groups, with separate monthly payment amounts. In contrast, servicers are required by the Department of Education to separate Direct Loan servicing from other servicing activity, offering Direct Loan borrowers a different online portal, different billing statements and separate customer service operations, even if the borrower has FFELP or private student loan handled by the same company.

**Paid ahead status.** Many student loans include a billing provision that permits (or requires) a servicer to advance a borrower's due date upon receipt of a prepayment, should the prepayment be sufficient to satisfy an installment due in one or more subsequent billing cycles. In effect, if a borrower makes a payment sufficient to cover multiple scheduled payments, a servicer will accept the payment and a borrower's billing statement will reflect that no payment is due until a future date determined by the size of the prepayment. For this period, a student loan is considered to be in "paid ahead" status.[254] Federal regulations for the servicing of FFELP loans[255] and Direct Loans[256] require servicers to advance borrowers' due dates upon the receipt of prepayments. No similar regulatory requirements exist for the servicing of private student loans.

**Borrower instructions.** Many borrowers provide instructions to student loan servicers in order to direct the application of a payment to certain loans or to instruct the servicer to manage

---

[254] The "paid ahead" process may be an automated feature of a servicer's platform and may be applied to all loans a servicer handles.  Alternatively, it may be required by contract or by certain regulations governing certain federal student loans and may only be applied to eligible segments of a servicer's loan portfolio.

[255] 34 C.F.R. § 682.209(b)(2)(ii).

[256] 34 C.F.R. § 685.211(a)(3).

an account in a specific manner.[257] Borrowers may provide these instructions concurrently with each monthly payment or as an individual request to direct handling of a single payment, in order to direct a specific handling process. Alternatively, some borrowers attempt to provide "standing instructions" to serve as a replacement for a student loan servicer's default payment handling policies and procedures and to direct the application of payments to a borrower's account under circumstances described by the borrower on a recurring basis.

Industry commenters generally note that servicers can process payments in accordance with specific payment processing instructions provided by borrowers.[258] However, some servicers previously told the Bureau that their information systems do not support standing instructions and that borrowers may be required to repeatedly provide instructions alongside each payment.[259]

**Payment channels.** Student loan servicers generally receive a payment from a student loan borrower through one of three channels: 1) as an electronic payment debited by the servicer from a borrower's bank account, either through a single payment made through a servicer's secure web platform or through the servicer's auto-debit function, 2) as an electronic payment sent to a student loan servicer through a third-party electronic bill pay feature (most commonly the bill pay feature of a borrower's bank account), or 3) as a paper check. Market participants have noted that a borrower's ability to provide special processing instructions along with a payment may be determined by the payment channel chosen.[260] Some servicers permit co-signers to make payments through any of these channels, while others do not permit co-signers access to online payment platforms, instead directing co-signers to remit payments through

---

[257] *See, e.g.*, Consumer Financial Protection Bureau, *Consumer Advisory: Stop Getting Sidetracked by your Student Loan Servicer* (Oct. 2013), *available at* http://www.consumerfinance.gov/blog/consumer-advisory-stop-getting-sidetracked-by-your-student-loan-servicer/.

[258] *See, e.g.*, CFPB-2015-0021-0355.

[259] *See, e.g.*, Consumer Financial Protection Bureau, *Letter from Rohit Chopra on Payment Processing* (2014), *available at* http://files.consumerfinance.gov/f/201402_cfpb_letter_payment-processing.pdf.

[260] For further discussion, *see* Consumer Financial Protection Bureau, *Letter from Rohit Chopra on Payment Processing* (Feb. 3, 2014), *available at* http://files.consumerfinance.gov/f/201402_cfpb_letter_payment-processing.pdf.

third-party bill pay features or by paper check.[261] In addition, third-parties including employers, specialty student loan refinance providers and family members, may be directed to remit payments through third-party bill pay or paper check.

The following section discusses circumstances where commenters note that current student loan servicing practices can result in increased costs to consumers and other problems. Commenters note that the interplay between billing groups, payment channels and borrower instructions can lead to significant variation in outcomes for borrowers in seemingly similar circumstances.

## 1.4.1   Payment posting, application and instructions

Commenters state that the process of receiving and applying payments to borrowers' accounts is a consistent feature of all types of student loan servicing and is the most basic function for a student loan servicer.[262]

Commenters report a range of problems experienced by borrowers who remit monthly payments in the amount instructed by their student loan servicer, but continue to encounter errors that lead to the payments being treated as missed, unexpected late fees, and surprise interest charges. Commenters raised concerns related to practices in three general categories: 1) the timing of payments being posted to student loan accounts; 2) the allocation of payments to accounts with multiple loans; and 3) payments by third parties, such as co-signers.

### Timing of payment posting

**Commenters report delays in the posting of payments, resulting in additional accrued interest and late fees**. Comments from student loan servicing market participants state that, generally, servicers are able to post payments as of the date of receipt.[263] These commenters note that when a payment is sent by U.S. mail, the payment is posted as of the day

---

[261] For a detailed discussion of payment processing issues encountered by co-signers, *see* Consumer Financial Protection Bureau, *2015 Mid-year update on Student Loan Complaints* (June 2015), *available at* http://www.consumerfinance.gov/reports/2015-mid-year-update-on-student-loan-complaints.

[262] *See, e.g.*, CFPB-2015-0021-0355; CFPB-2015-0021-0974; CFPB-2015-0021-0364.

[263] *See, e.g.*, CFPB-2015-0021-0355.

it arrives to the servicer, and when a payment is made electronically, it is posted to the account almost immediately. However, the Bureau has heard from borrowers that some servicers may take a week or more to post a payment to a borrower's account.[264] Commenters report that the delay may result in additional accrued interest or result in a late fee if the payment is not posted promptly.[265]

For example, one commenter notes:

> *[I experienced a] [d]elay of up to 21 days to apply payment received to loans, thus accruing a higher amount of interest. This was never adjusted. [And] [n]ot applying a payment received at all on one occasion, which, again, took intervention on my behalf to fix.*[266]

Industry comments generally did not address payment posting policies;[267] however two industry commenters note that they post payments effective on the date received.[268]

**Commenters state that borrowers pursuing certain incentives or consumer protections may not be able to receive credit for timely payments due to payment posting delays.** For borrowers seeking certain student loan repayment incentives, timely posting of payments are critical to make progress under these programs.[269] For example, posting delays can cause payments to be disqualified for the purpose of computing eligibility for loan forgiveness, effectively extending borrowers' repayment terms by requiring borrowers to make

---

[264] *See, e.g.*, CFPB-2015-0021-1123.

[265] *See, e.g.*, CFPB-2015-0021-0226.

[266] CFPB-2015-0021-1123.

[267] *See, e.g.*, CFPB-2015-0021-0859; CFPB-2015-0021-0375; CFPB-2015-0021-0357.

[268] *See, e.g.*, CFPB-2015-0021-0974; CFPB-2015-0021-0355.

[269] For a detailed discussion of the relationship between on-time payments and loan forgiveness under various student loan borrower benefits and consumer protections, see Section 1.1.4.

unnecessary additional monthly payments toward a loan that would otherwise be eligible to be forgiven.[270]

Industry commenters did not specifically address the relationship between payment posting practices and loan repayment incentives or consumer protections.

## Misallocation of payments

**Commenters note payment processing errors when a single payment is submitted to cover multiple loans.** As discussed above, most servicers combine a borrower's loans into billing groups, sending one periodic statement to cover all loans of a given type serviced by the servicer. Commenters explain that servicers may not correctly allocate a payment to loans grouped together for billing purposes, even when a borrower makes a payment for the exact amount on her billing statement, resulting in unexpected delinquencies or late fees.[271]

We have heard that some payments may only be allocated to a single loan in a borrower's account leaving a past due balance on the remaining loans. For example, one organization representing consumers told us about a borrower whose servicer misapplied her payment which resulted in over $800 in late fees on one loan and an overpayment the other loan.[272]

We have also heard that in some cases when a borrower has private and federal student loans with the same servicer, a single payment may be allocated only toward one type of student loans, overpaying these loans, while failing to cover the other type of student loans. Borrowers complain that they are unaware of the payment allocation error until they receive notice that some of their loans are past due and in danger of default.

---

[270] For further discussion of PSLF, *see* Section 1.1.4.  The Bureau has heard from borrowers who submit on-time payments only to find out that the servicer failed to accurately process the payment or have not been posted to the borrower's account, leaving borrowers to question whether those payments will still qualify for PSLF. *See, e.g.*, CFPB-2015-0021-0204.

[271] *See, e.g.*, CFPB-2015-0021-0581.

[272] CFPB-2015-0021-0358.

## Payment processing instructions

**Commenters note that they may be unable to direct their servicer to process payments in accordance with their instructions.** Commenters explain that there are a variety of circumstances where specific instructions are needed to ensure that servicers handle payments consistent with an individual borrower's preference.[273] As previously stated, student loans often have different interest rates and features. Therefore, some borrowers may attempt to pay off loans with a higher interest rate or balance by submitting payment instructions to their servicer along with their monthly payment.

One trade association representing depository institutions notes that lenders are not permitted to contravene borrower instructions.[274] Another industry commenter notes that student loan servicers generally follow payment handling instructions provided by borrowers.[275]

Borrowers in these circumstances report that some servicers did not honor their instructions to apply a prepayment toward the specific loan but, instead, proportionally allocated the excess funds across all loans.[276]

In other cases, borrowers report that servicers may ignore borrower instructions provided electronically through a financial institution's "bill pay" function or instructions hand-written in the memo field of a paper check.[277] Servicers have told us that their information systems may not be equipped to process these instructions.[278]

---

[273] *See, e.g.*, CFPB-2015-0021-0861; CFPB-2015-0021-0975.

[274] *See* CFPB-2015-0021-0370.

[275] *See* CFPB-2015-0021-0357.

[276] *See, e.g.*, CFPB-2015-0021-6120.

[277] *See, e.g.*, CFPB-2015-0021-0503.

[278] For a further discussion of student loan servicing payment processing policies and systems limitations, *see* Consumer Financial Protection Bureau, *Letter from Rohit Chopra on Payment Processing* (2014), *available at* http://files.consumerfinance.gov/f/201402_cfpb_letter_payment-processing.pdf.

77

One comment from a borrower said, "On several occasions I have stapled instructions to my check, sent multiple checks, each with instructions, and used electronic payments. Numerous times my instructions were ignored."[279]

Commenters also told us that when they provide customer service personnel with verbal instructions and request that these instructions direct payment handling on a standing basis, they often encounter inconsistent payment handling.

**Commenters report frustration when standing instructions are accepted, but only honored intermittently.** One borrower told us that in some months, his payment would be applied pursuant to his instructions while in other months his payment would be applied as if he had never contacted his servicer.[280] Despite repeated attempts to identify how to ensure his instructions would be applied to his account consistently, the commenter notes that he needed to contact his servicer following each payment and provide new instructions on how the payment should be processed.[281]

## Third-party payments

**Commenters note that co-signers express frustration when submitting a payment for only co-signed loans to then have the payment applied across all of the primary borrower's loans.** As noted previously, servicers generally process payments based upon a default payment allocation policy, which typically allocates a payment proportionally across all loans. However, some co-signers state that they submit payments with specific instructions directing a payment to be allocated toward only loans owed by the co-signer, but also note that these instructions may be ignored. The Bureau hears from co-signers that they are frustrated that the servicer is not well-equipped to accept payment instructions in advance in order to process payments remitted by a co-signer only toward the co-signed loans. Co-signers report

---

[279] CFPB-2015-0021-0358.

[280] *See* CFPB-2015-0021-0320.

[281] *Id.*

that they must call each month and instruct the servicer to reallocate the payment in order to ensure it applies to the specific debt for which they co-signed.[282]

**Commenters encounter problems when seeking to refinance or pay off an individual high-rate loan.** As discussed above, servicers are responsible for directing payments to specific individual loans associated with a borrower's account, even when loans are grouped together for billing purposes. This is particularly important when borrowers are seeking to refinance one or more high-rate loans in a billing group. Commenters note that servicers may automatically allocate a payment sent by a refinance provider to all loans on a borrower's account, despite instructions to apply a payment to a specific subset of loans.[283] Unwinding this type of error may increase costs for student loan servicers and specialty refinance providers. To the extent a borrower is required to pay additional interest or make additional payments on high-rate debt during this process, this type of error will increase costs for student loan borrowers.[284]

## 1.4.2   Payment allocation and non-standard payment handling

Borrowers report issues when attempting to make non-standard payments, including prepayments and partial payments.[285] When a consumer remits a non-standard payment (a payment for an amount greater or less than the amount due on a billing statement) and chooses not to provide specific instructions, a servicer will choose how this payment is applied to loans associated with a borrower's account. As noted above, student loan servicers have different

---

[282] For further discussion, *see* Consumer Financial Protection Bureau, *Mid-year update on student loan complaints* (June 2015), *available at* http://files.consumerfinance.gov/f/201506_cfpb_mid-year-update-on-student-loan-complaints.pdf.

[283] *See* CFPB-2015-0021-0985.

[284] For further discussion, *see* Consumer Financial Protection Bureau, *Mid-year update on student loan complaints* (June 2015), *available at* http://files.consumerfinance.gov/f/201506_cfpb_mid-year-update-on-student-loan-complaints.pdf.

[285] For a detailed discussion of common problems related to payment allocation, see Consumer Financial Protection Bureau, *Annual Report of the CFPB Student Loan Ombudsman* (Oct. 2013), *available at* http://www.consumerfinance.gov/reports/annual-report-of-the-cfpb-student-loan-ombudsman-2013.

default payment allocation methodologies incorporated into their student loan servicing platforms. These default methodologies govern how payments are directed to loans grouped together for billing purposes, among other functions.

For borrowers seeking to prepay a loan, servicers policies related to "paid ahead" status can also cause significant confusion and may result in consumers inadvertently forfeiting any interest rate savings associated with making a pre-payment.

## Prepayments

**Commenters report that servicers' default payment application policies may increase costs for borrowers making payments in excess of the amount due on a billing statement.** As the Bureau has noted in prior publications, when loans are grouped together for billing purposes, generally, applying additional payments to the loan with the highest interest rate may lead to the most savings for borrowers over the long term.[286] Commenters note that if a borrower does not submit explicit instructions, the servicer will generally allocate the extra payment according to a default payment allocation methodology.[287] For example, if a borrower submits a payment in excess of the total amount due for that month, a servicer may choose to allocate the excess funds *pro rata* across all loans in a billing group instead of applying the prepayment toward the loan with the highest interest rate. This practice may result in less interest savings for borrower over the life of the loan.[288]

Industry commenters note that borrower preferences may vary and that servicers generally honor borrower instructions.[289] For example, one trade association representing student loan servicers states that a borrower may wish to direct prepayments in order to pay down the

---

[286] Consumer Financial Protection Bureau, *Stop Getting Sidetracked by your Student Loan Servicer* (Oct. 2013), *available at* http://www.consumerfinance.gov/blog/consumer-advisory-stop-getting-sidetracked-by-your-student-loan-servicer/.

[287] *See* CFPB-2015-0021-0754.

[288] For further discussion of the costs associated with different payment allocation methodologies, *see* Consumer Financial Protection Bureau, *Annual Report of the CFPB Student Loan Ombudsman* (Oct. 2013).

[289] *See, e.g.*, CFPB-2015-0021-0357.

smallest outstanding loan balances as quickly as possible, minimizing the number of open accounts, even if this approach will result in greater interest charges over time.[290]

Comments describe how borrowers run into difficulty when requesting that their servicer handle prepayments in accordance with their instructions. One commenter explains:

> *I make automatic payments on my student loans from my bank. My loan servicer always applies a higher payment to the lower interest loan…I have to call every month to balance the payment so that…more is pai[d] on my higher interest loan.*[291]

In addition, borrowers have told us that servicers' processing policies may not be able to handle small additional payments that borrowers make to try to pay down their debt more quickly.[292]

## "Paid ahead" status

As discussed above, many student loan servicers automatically advance a borrower's due date upon receipt of a prepayment greater than a borrower's monthly payment.  In effect, for each multiple of a monthly payment included in a borrower's prepayment, a student loan servicer pushes forward the borrower's due date for the next payment by the corresponding number of billing cycles.

Federal regulations require student loan servicers handling FFELP loans and Direct Loans to advance borrowers' due dates under these circumstances.[293]  A Presidential Memorandum signed in March 2015 instructs the Department of Education to require Direct Loan servicers to

---

[290] For further discussion, *see* CFPB-2015-0021-0357.

[291] CFPB-2015-0021-0410.

[292] *See, e.g.*, CFPB-2015-0021-0236.

[293] *See* 34 C.F.R. § 682.209(b)(2)(ii); 34 C.F.R. § 685.211(a)(3).

81

apply prepayments to the highest interest rate loan balance.[294] As one industry commenter notes, there may be a conflict between these two requirements:

> *Using the highest interest rate rule, those borrowers who believe that they have advanced the due date on their entire account would end up being delinquent on all of their loans except one, which would be paid far ahead.*[295]

Commenters note significant confusion related to how servicers explain paid ahead status and how prepayments are accounted when calculating principal and interest.[296] In addition, commenters explain that this policy can deter borrowers from paying down loans more quickly and potentially disrupt borrowers' seeking to access certain borrower benefits and protections.[297] Although no market-wide data is available related to the use of paid ahead status, one comment from a student loan servicer notes that "about half of the borrowers who are paid ahead consistently make payments thereafter; the other half do not make payments at all or make payments in some months and not others."[298]

**Commenters explain that borrowers in paid ahead status may miss qualifying monthly payments toward other borrower benefits and protections.** As noted elsewhere in this report, loan forgiveness, co-signer release and other borrower benefits and protections require a series of on-time monthly payments in order for borrowers to qualify. Borrowers also suggest that servicers may not adequately inform borrowers of the effect of paid ahead status on how servicers count on-time payments. If a borrower receives a $0 bill and

---

[294] *See* White House, *Press Release: Presidential Memorandum on a Student Aid Bill of Rights* (Mar. 2015), *available at* https://www.whitehouse.gov/the-press-office/2015/03/10/presidential-memorandum-student-aid-bill-rights.

[295] CFPB-2015-0021-0357.

[296] *See* CFPB-2015-0021-6115.

[297] Borrowers who make a prepayment attempting to pay down principal and who do not remit subsequent monthly payments after receiving billing statements reflecting a zero dollar balance due will effectively undo the benefit of a prepayment because of additional interest accrual. This will also ensure that a borrower remains in repayment for an additional number of months.

[298] CFPB-2015-0021-0355.

subsequently does not submit a payment for that month, servicers may restart the calculation of consecutive payments for the purposes of computing certain borrower benefits, including co-signer release. In addition, borrowers seeking to maintain a record of on-time monthly payments under the Public Service Loan Forgiveness program do not get credit for months during which no payment is remitted, even if a prepayment has resulted in a loan being placed in paid ahead status and a billing statement reflects that no payment is due.[299]

Borrowers state that they may wish to opt-out of servicers policies related to paid ahead status, in order to ensure billing statements and account information reflect their desire to pay down the debt more quickly or earn credit toward these benefits, but they may encounter problems when seeking to do so. No industry commenters specifically address the relationship between paid ahead status and borrower benefits.

## Partial payments

As noted above, servicers' use default payment processing methodologies to direct the allocation of payments, absent specific instructions from borrowers. Methodologies used to handle non-standard student loan payments generally cover both prepayments and partial payments (payments made by a borrower for less than the total amount due on a periodic statement). Therefore, borrowers experiencing financial distress who submit partial payments encounter a similar set of obstacles associated with prepayments but with potentially higher stakes.

**Commenters report that borrowers struggling to afford their monthly payments may be forced to pay multiple late fees when submitting partial payments.** The Bureau has heard from borrowers who struggle to make their regularly scheduled monthly payment and submit a partial payment. Generally, if a borrower submits a payment for less than owed, the borrower will be charged a late fee, either a percentage of the total past due amount or a flat fee per loan with a past due balance.[300]

---

[299] 34 C.F.R. § 685.219.

[300] Commenters note that current policy prohibits servicers in the Direct Loan program from charging late fees to student loan borrowers with Direct Loans. *See, e.g.*, CFPB-2015-0021-0861.

We have heard from borrowers that when they submit one payment sufficient to cover the amount due on one of several loans with the same servicer, but not all loans, they are charged a late fee for each loan with a remaining balance.[301] Generally, this occurs because the lender or servicer allocated the partial payment across all loans, leaving every loan with a remaining past due balance and subject to a late fee. This practice has the effect of maximizing the number of past due loans and late fees charged to the borrower, if late fees are charged as a flat fee per loan.[302] The servicer also may furnish information about the borrower's delinquent loans to credit reporting agencies.

There are no federal regulations that require a specific late fee policy for any segment of the student loan market and there is no market-wide data available related to prevalence of different late fee policies. However, one trade association representing student loan servicers notes that servicers' policies vary, but that the most common approach is to apply late fees as proportionately based on the outstanding balance due, rather than a flat fee on a per-loan basis.[303] This commenter notes that the trade association opposes payment allocation methodologies that maximize late fees.[304] In addition, one industry commenter notes that the Department of Education directs contracted student loan servicers not to charge late fees for Direct Loans.[305]

Commenters from organizations representing student loan borrowers and other consumers note that a servicer could choose to allocate the payment to satisfy as many loan payments in full as

---

[301] *See, e.g.*, CFPB-2015-0021-0358.

[302] Readers should also note that certain payment allocation methods were part of practices found to violate federal consumer financial laws under certain circumstances.  *See, e.g.,* Consumer Financial Protection Bureau, *Press Release: CFPB Supervision Report Highlights Risky Practices in Student Loan Servicing* (Oct. 2014), *available at* http://www.consumerfinance.gov/newsroom/cfpb-supervision-report-highlights-risky-practices-in-student-loan-servicing; Federal Deposit Insurance Corporation, *FDIC Announces Settlement with Sallie Mae for Unfair and Deceptive Practices and Violations of the Servicemembers Civil Relief Act* (May 2014), *available at* http://www.fdic.gov/news/news/press/2014/pr14033.html.

[303] *See* CFPB-2015-0021-0357.

[304] *Id.*

[305] *See* CFPB-2015-0021-0355.

possible until the partial payment is exhausted.[306] These commenters state that, if flat fees are assessed on a per-loan basis, this practice would reduce the number of late fees charged to the borrower and may reduce the number of delinquent loans reported to credit reporting agencies.[307]

**Commenters report that servicers' payment handling policies may also increase interest charges for borrowers who make partial payments when loans are grouped together for billing purposes.** As discussed in the preceding section related to prepayments, when servicers apply non-standard payments across all loans in a billing group, borrowers miss out on an opportunity to pay down higher-rate debt more quickly. When borrowers remit partial payments, particularly when servicers do not charge late fees, commenters note that it may be in a borrower's best interest to satisfy the highest-rate debt in full first, before applying a partial payment to any other loans in a billing group. One trade association representing student loan servicers notes that this is not the most common default payment allocation policy in the student loan servicing market and that student loan servicers do not generally take this approach, absent borrowers' instructions.[308]

## 1.4.3   Billing and payoff statements

Commenters report that student loan borrowers encounter problems related to statements produced by student loan servicers, including periodic billing statements and payoff statements.[309] Commenters note problems related to both the information provided in

---

[306] *See, e.g.*, CFPB-2015-0021-0975; CFPB-2015-0021-0364.

[307] *See, e.g.*, CFPB-2015-0021-0975; CFPB-2015-0021-0364.

[308] *See* CFPB-2015-0021-0357. For further discussion, *see* Consumer Financial Protection Bureau, *Letter from Rohit Chopra on Payment Processing* (Feb. 2014), *available at* http://files.consumerfinance.gov/f/201402_cfpb_letter_payment-processing.pdf.

[309] Billing and payoff statements are not the only routine written communications provided by student loan servicers. For example, servicers are required to provide information related to interest paid on any qualified education loan on an annual basis in order to document payments that may be deductible for tax purposes.  26 C.F.R. § 1.221-1.

statements and the timing of statements. The problems discussed below related to payoff requests may be particularly problematic for borrowers seeking to refinance a student loan.[310]

## Periodic billing statements

**Commenters explain that billing statements may not provide accurate or complete information about borrowers' repayment options.** As discussed in Section 1.1, borrowers may be entitled to make payments under a range of different repayment plans and may also have a legal or contractual right to temporarily suspend payments or to request loan cancellation or discharge. Commenters note that billing statements present borrowers with instructions to remit an amount due under the borrower's current payment arrangement, but may not provide actionable information related to alternative repayment plans or other loan features.[311] For example, consider a borrower who is presented with several alternative repayment arrangements that all offer options to tie the monthly payment amount to a borrower's income. Borrowers could be presented with a range of options or, alternatively, could be permitted to select an option that instructs the servicer to enroll the borrower in the plan with the lowest monthly payment. The Department of Education currently uses this approach for borrowers completing ED's enrollment form for income-driven repayment plans, but this approach has not been widely-adopted with respect to other borrower communications.[312]

Commenters express concern that billing statements without actionable information about alternative repayment plans or other loan features may result in borrowers experiencing financial hardship choosing to forgo making payments entirely, rather than pursuing a repayment plan which is better suited to their financial circumstances.[313]

---

[310] For further discussion of "Roadblocks to Refinancing," *see* Consumer Financial Protection Bureau, *2015 Midyear Update of the CFPB Student Loan Ombudsman* (June 2015), *available at* http://files.consumerfinance.gov/f/201506_cfpb_mid-year-update-on-student-loan-complaints.pdf.

[311] *See, e.g.*, CFPB-2015-0021-0861.

[312] *See, e.g.*, U.S. Department of Education, *Income-Based (IBR)/Pay As You Earn/Income-Contingent Repayment Plan Request*, *available at* http://www.ifap.ed.gov/dpcletters/attachments/GEN1222AttachFINAL1845dash0102Expires20151131.pdf.

[313] *Id.*

One trade association representing student loan servicers notes that certain disclosures related to repayment options are required for FFELP borrowers,[314] but that "text-heavy" disclosures may be contributing to borrower frustration with certain servicer communications and that borrowers would be better served by providing the "right information at the right time," a principle which is shared by consumer group commenters and individual borrowers.[315]

**Commenters note that billing statements may not provide clear or complete information related to when payments are due, when late fees are assessed, and when payments do not qualify for specific borrower benefits and protections.** Billing statements may clearly provide a due date to borrowers, but may not offer additional information related to the consequences should borrowers fail to pay by the indicated date. Commenters note that student loans may have several effective due dates in a given billing cycle depending on the terms and conditions of a loan.[316] For example, a loan may have one due date which a servicer may track for the purpose of assessing eligibility for co-signer release or loan forgiveness benefits and a second due date after which a borrower may be assessed a late fee.

**Commenters note that some borrowers may not receive regular periodic billing statements or receive billing statements too close to their due date, creating challenges for borrowers seeking to manage their loan payments.** Commenters explain that, in some cases, servicers may not provide billing statements at regular intervals and that, in other cases, billing statements may only be produced a few days before the due date. Federal regulations require billing statements at a certain time for borrowers with FFELP loans, but no equivalent federal regulatory requirement exists for Direct Loans or private student loan.[317] For example, one commenter told us:

---

[314] *See, e.g.*, 20 U.S.C. § 1083(e)(1)(I).

[315] CFPB-2015-0021-0357; s*ee also* CFPB-2015-0021-0975.

[316] *See generally* Consumer Financial Protection Bureau, *Supervisory Highlights* (Fall 2014), 15-16, *available at* http://files.consumerfinance.gov/f/201410_cfpb_supervisory-highlights_fall-2014.pdf.

[317] *See* 34 C.F.R. § 682.205(a).

> *At the time . . . I was told [by my first servicer] I didn't have to make a payment until*
> *Fall 2014. [Company] bought out my loans and made me start paying immediately. In*
> *fact, they let me know 7 days before it was due when I was told I didn't have to make a*
> *payment for over another year. I had to take a one month deferment.*[318]

Some private student loans and older loans made under FFELP carry variable interest rates. In addition, many federal and private student loans offer payment plans with payment levels that may adjust periodically, based on changes on borrowers' income or payment schedule. This may result in changes to payment amounts from month-to-month, as benchmark interest rates or payment terms change. Commenters explain that borrowers depend on timely and accurate periodic statements in advance of their due date in order to financially prepare or account for increased student loan payments.[319]

## Payoff requests

**When borrowers seek to refinance or pay off a loan, commenters note that borrowers may receive inaccurate payoff notices.** Borrowers may seek to refinance a loan to take advantage of lower interest rates, lowering the borrower's monthly payments. Borrowers may also seek a payoff statement in order to consolidate loans into one monthly payment for financial simplicity. However, borrowers report receiving payoff statements with incorrect payoff balances. In some cases, borrowers do not discover that their payoff balance was incorrect until after they have remitted an incorrect amount, only to find that their account remained open with a small remaining balance, accruing interest. Some consumers note that unpaid remaining balances may be transferred to a debt collector and result in significant damage to their credit.

**Commenters also note that the process for requesting and generating payoff statements may involve delays that increase repayment costs.** Despite submitting written requests for payoff statements in accordance with servicers' policies, requests may be

---

[318] CFPB-2015-0021-0953.

[319] Commenters note that timely and accurate notifications are particularly important for borrowers with income-driven payment plans.  For further discussion of the impact of changing payment levels under these plans. *See* Part One; *see also* CFPB-2015-0021-0356.

lost, inaccurate or delayed.[320] Commenters note that borrowers expect that this process will be timely and transparent, however, some note that borrowers discover that significant delays can prolong the process of completing a refinancing, resulting in borrowers paying additional interest charges on high-rate student loan debt.[321]

One new entrant to the student loan refinance market identifies a number of these issues in its response to the *Request for Information*. This company explains:

> *It's been so problematic for borrowers that we had to develop a program called Pay-Off Assist, where we will walk a borrower through the process of getting their payoff information, regardless of servicer. As part of Pay-Off Assist, we created a guide for our customer service team that enables them to walk a borrower through the process of getting pay-off information from any servicer. This should not be necessary. Servicers should be held accountable for making payoff information readily available; it increases transparency, provides for a seamless experience and improves customer service. This should be table stakes, yet it's not today.*[322]

# 1.5   Practices impacting specific borrower segments

As discussed in previous sections, policies and procedures on student loan servicing may significantly impact a borrower's ability to successfully repay their loans. However, student loan servicing may affect certain special populations, such as servicemembers, veterans, and older Americans, at an increased level due to unique circumstances associated with these individuals.

---

[320] *See, e.g.*, CFPB-2015-0021-4657.

[321] *See* CFPB-2015-0021-1141.

[322] CFPB-2015-0021-0985.

## Servicemembers, veterans, and families with student loans

Over the past four years, the Bureau has released several reports documenting student loan complaints from military borrowers, veterans and their families. [323] Servicemembers continue to tell us how they are struggling to exercise the rights, protections, and programs afforded by their military service. They also describe how general servicing issues become even more difficult as a result of the nature of military life. Many of the characteristics of military life make servicemembers and their families especially vulnerable to problematic practices and create increased risks to manage their student loan debt.

## Older consumers and co-signers to student loans

Similarly, older consumers have submitted complaints to the Bureau about managing their own student loan debt or student loan debt for a child or grandchild.[324] Older consumers continue to tell us that they are unable to manage their student loan debt or get assistance to manage the debt while staying on track to save for retirement or pay for other necessary expenses on a reduced retirement income. Older consumers with student loan debt pose distinctive obstacles to stay on track to successful repayment of student loans.

## Student loan "debt relief" companies and economically-vulnerable consumers

As discussed in Section 1.1, borrowers may encounter obstacles when seeking to obtain a lower monthly payment for a federal student loan, despite widely-accessible alternative repayment arrangements, including income-driven repayment plans. A number of third-party "debt relief" companies have marketed services that charge up-front or recurring monthly fees in order to

---

[323] S*ee, e.g.*, Consumer Financial Protection Bureau, *The Next Front?: Student loan servicing and the cost to our men and women in uniform* (Oct. 2012), *available at* http://files.consumerfinance.gov/f/201210_cfpb_servicemember-student-loan-servicing.pdf; s*ee also* Consumer Financial Protection Bureau, *Overseas and Underserved: Student loan servicing and the cost to our men and women in uniform* (July 2015), *available at* http://files.consumerfinance.gov/f/201507_cfpb_overseas-underserved-student-loan-servicing-and-the-cost-to-our-men-and-women-in-uniform.pdf.

[324] S*ee* Consumer Financial Protection Bureau, *Sound off on student loan servicing* (June 2015)*, available at* http://www.consumerfinance.gov/blog/sound-off-on-student-loan-servicing/.

enroll borrowers in IDR plans and other free federal consumer protections. In recent months, a number of federal and state law enforcement agencies have taken action against these companies for illegal practices.

The following section discusses circumstances where commenters note that current student loan servicing practices can result in increased consumer harm to certain special populations.

## 1.5.1   Military borrowers

Like their fellow Americans, many servicemembers have student loan debt.[325] Congress has enacted a number of protections and benefits for servicemembers to help manage their student loan debt.[326] Unfortunately, the complexities of these provisions, together with problems in loan servicing, have created difficulties for many military families when attempting to manage their debt.[327] The following section discusses some of the common issues military borrowers continue to face when dealing with their student loan servicers— specifically, when attempting to use benefits afforded to them by virtue of their military service.

**Military borrowers encounter roadblocks when attempting to invoke their rights under the Servicemembers Civil Relief Act (SCRA).** Servicemembers consistently report difficulties obtaining the SCRA interest rate cap of six percent.[328] Military borrowers complain

---

[325] According to the Department of Defense, more than 40 percent of servicemembers are paying off a student loan. *See* Department of Defense, *News Briefing on Efforts to Enhance the Financial Health of the Force with Secretary Panetta* (Oct. 2012)*, available at* http://www.defense.gov/transcripts/transcript.aspx?transcriptid=5139/.

[326] *See, e.g.*, 20 U.S.C. § 1087dd(c)(2)(A); 34 C.F.R. § 674.34(h) (detailing the requirements for a military deferment) *See also* 50 U.S.C. App. § 527 (detailing that servicemembers are entitled to reduced interest rate to six percent during active-duty service on pre-service obligations); 20 U.S.C. § 1087ee(a)(2)(D); 34 C.F.R. § 674.59 (providing for principal reduction for Perkins Loans for each year of military service).

[327] For further discussion, *see* Consumer Financial Protection Bureau, *The Next Front* (Oct. 2012), *available at* http://files.consumerfinance.gov/f/201210_cfpb_servicemember-student-loan-servicing.pdf; *see also* Consumer Financial Protection Bureau, *Overseas and Underserved: Student loan servicing and the cost to our men and women in uniform* (July 2015), *available at* http://files.consumerfinance.gov/f/201507_cfpb_overseas-underserved-student-loan-servicing-and-the-cost-to-our-men-and-women-in-uniform.pdf.

[328] 50 U.S.C. App. § 527.  In May 2014, the DOJ joined with the FDIC and entered an order providing $60 million in compensation for more than 77,000 servicemembers in an action against student loan servicers Sallie Mae and Navient (formerly one company) related to their application of benefits under the SCRA to active duty members of

that servicers continue to improperly process these requests and do not clearly convey information about the application process and other requirements.

Servicemembers and their families note the frustration they experience when invoking their SCRA protections. Many times it takes a military borrower multiple calls for the servicer to properly grant his or her rights, and then additional attempts to keep the SCRA protections in place, a doubly challenging process while the servicemember is tending to other pressing concerns associated with military life. These military borrowers emphasize their need to be mission-focused and free of distractions when faced with impending deployments.

This frustration extends to family members as well. Military borrowers' spouses report that some servicers would not directly communicate with them regarding an account's interest rate, despite authorization or power of attorney permitting them to access this information while their partner is overseas. Many times, it appears that filing a complaint with the Bureau finally provided military borrowers or their families with the relief they have been unsuccessfully seeking for years.

**Borrowers rely on their servicer to provide information on repayment options, and servicers may be guiding servicemembers into less favorable options.** Military borrowers complain that while they may have some sense of the benefits available to them by virtue of their military service, they rely on their servicer to fully explain the array of benefits and assist them in selecting the most appropriate and favorable option.[329] Servicemembers state that they were guided into military deferments or forbearance and were not told that their total loan debt would balloon at the end of their military service due to accrued interest. While deferments or forbearance may provide a short-term solution by postponing monthly payments, interest continues to accrue for unsubsidized federal loans, and for private loans.

---

the military. *See* U.S. Department of Justice, *Justice Department Reaches $60 million settlement with Sallie Mae* (May 2014), *available at* http://www.justice.gov/opa/pr/justice-department-reaches-60-million-settlement-sallie-mae-resolve-allegations-charging; s*ee also* Federal Deposit Insurance Corporation, *FDIC Announces Settlement with Sallie Mae for Unfair and Deceptive Practices and Violations of the Servicemembers Civil Relief Act* (May 2014), *available at* https://www.fdic.gov/news/news/press/2014/pr14033.html.

[329] For a further discussion of the trade-offs between various military-specific student loan benefits, *see* Consumer Financial Protection Bureau, *The Next Front* (Oct. 2012), *available at* http://files.consumerfinance.gov/f/201210_cfpb_servicemember-student-loan-servicing.pdf.

Servicemembers also note that the servicers guide them into forbearance or deferment, even when the borrower is actively seeking information and assistance concerning other forms of repayment. One commenter explains how difficult some servicers make it to avoid forbearance, even when a savvy consumer knows it's not in his best interest and tries to avoid it.[330]

> [W]hen I send in my military paperwork, I get a notice about putting my loans in forbearance and all I need to do is sign the provided document and return it. I disagree with this practice because you think forbearance is great but in actuality it isn't. The loans still need to be repaid and interest still accrues during the forbearance period. So once repayment time comes, the accrued interest gets capitalized and I'm paying interest on top of interest.[331]

This commenter further reports that even though he never sent back this paperwork to complete the request for deferment, he still found his loans placed in the forbearance he never wanted. He had to call his servicer to be removed from forbearance, and his servicer confirmed that they did not have the required paperwork to have placed him in the forbearance in the first place.

Another servicemember reports calling her servicer to notify them of her orders, only to have the servicer place the loan in forbearance while interest accrued at the higher, non-SCRA protected rate.

**In cases where a servicemember does seek out a deferment, servicer communication may unduly burden the military borrower.** Military deferments are an option afforded to some active duty servicemembers that allows for postponement of monthly student loan payments under certain circumstances.[332] Certain borrowers may seek short-term

---

[330] CFPB-2015-0021-1143.

[331] *Id.*

[332] In our 2012 report, *The Next Front*, the Bureau detailed the potential costs associated with military deferments. For both unsubsidized federal and private loans, interest will continue to accrue on the outstanding debt while monthly payments are postponed. Generally, unpaid interest is capitalized (added to the outstanding principal balance) once a borrower begins to repay his or her loan. *See* Consumer Financial Protection Bureau, *The Next Front* (Oct. 2012), *available at* http://files.consumerfinance.gov/f/201210_cfpb_servicemember-student-loan-servicing.pdf.

flexibility from a military deferment, and if their federal student loans are subsidized (subsidized loans are effectively interest-free during periods of military deferment), there may be a less impactful financial downside to a deferment. If a deferment or forbearance option is available, servicers generally communicate the requirements of that option, and process the request itself, should a borrower seek one out. Yet we continually hear from military borrowers describing a range of breakdowns and roadblocks related to this repayment option.

Insufficient communication around military deferment often undermines attempts to successfully repay loans. Borrowers report that servicers fail to provide essential information regarding application criteria and engage in unnecessary delays in processing the paperwork prior to deployment. Borrowers also state that their servicers' denial of the requested military deferment lacks clear explanation and may be inaccurate. These issues may lead to surprise delinquencies, defaults, and collection efforts upon the completion of military service or upon return from a deployment. Because policies and procedures for military deferment differ between student loan servicers and between loan types, clear communication is necessary in order for military borrowers to successfully navigate these programs and is critical to ensure that these borrowers can continue to manage their student loan debt while serving their country.

**Veterans who are disabled may be unnecessarily harmed by servicers' credit reporting practices for total and permanent disability discharge (TPD).** Some borrowers are entitled to discharge federal student loans due to a total and permanent disability (TPD).[333] Under federal law, veterans that are considered 100-percent disabled by the Department of Veteran Affairs stemming from a service-connected disability are entitled to seek federal student loan forgiveness.[334]

If the loan account is current at the time of discharge, the borrower should not experience a significant impact or change in the borrower's credit score. However, we have heard from veterans who are disabled that following a discharge due to a service-connected disability, they experienced damage to their credit score even though they had never missed a payment. For example, one service-disabled veteran described how his credit score fell by 150 points after

---

[333] 34 C.F.R. § 685.213(c).

[334] 34 C.F.R. § 685.213(c)(1).

TPD discharge. His score went from a nearly perfect "super prime" credit score to a much lower score simply because he received loan forgiveness.

> *I am a 100 percent disabled Veteran who has had his credit score ruined by a broken credit scoring system. I had my student loans...discharged...in August 2013...I went from 800 to 650 in less than 2 months. I am fighting to survive because a company from my own country is killing me.*[335]

Depending on how the servicer furnishes information to the credit bureaus, a borrower could experience a significant impact to their credit score and their ability to obtain future credit such as a mortgage or auto loan. This is because some servicers choose to furnish certain optional information, known as special comment codes, to the national credit bureaus. However, some of these special comment codes are interpreted by scoring models to reflect a high level of risk and therefore negatively impact a borrower's credit score. Therefore, some veterans who are disabled and who apply for loan discharge and to take advantage of a federal benefit may be unnecessarily harmed by information furnished from their servicer.

## 1.5.2   Older consumers

Although student loans are usually thought of as a younger American issue, in reality, an increasing number of older consumers are paying back student loan debt. Many older consumers struggle with student loan debt, sometimes forcing them to delay retirement or threatening financial security when in retirement.[336] Older consumers may hold student loan debt because they are still paying off loans that were: accrued when they were much younger,

---

[335] For further discussion, *see* Consumer Financial Protection Bureau, *Veterans: Take advantage of student loan forgiveness, but don't let it damage your credit* (Nov. 2014), *available at* http://www.consumerfinance.gov/blog/veterans-dont-let-student-loan-forgiveness-damage-your-credit/.

[336] *See, e.g.*, CFPB-2015-0021-0930; *see also* U.S. Gov't Accountability Office, GAO-14-866T, Older Americans: Inability to Repay Students Loans May Affect Financial Security of a Small Percentage of Retirees (Sep. 10, 2014), *available at* http://www.gao.gov/assets/670/665709.pdf.

acquired during the course of a mid- or late-career switch, or taken out for the education of their children, grandchildren, or other family members.[337]

**Older consumers often struggle to pay looming student loan debt; and in instances where their federal student loan goes into default, they risk garnishment of their social security check.**[338] Older borrowers in retirement discuss the need to access flexible repayment options that consider their reduced retirement income and current financial situation.

> *I will be 66 years old this year and I owe $55,104 in student loans. I am retired and living on social security and a pension. My income will not increase and yet I have not been able to change my chosen payment plan. I made that request again today for another year and pray that it will be approved. I might add that I made each monthly payment in the Income Sensitive program but if I'm required to pay the payment that I would have to pay on the graduate payment plan, I will not be able to do so and regrettably go into default.*[339]

Moreover, older borrowers who default on their own federal student loans face having their Social Security income garnished.[340] Since over one-third of adults 65 and older rely on Social

---

[337] For further discussion, *see* Consumer Financial Protection Bureau, *Sound off on student loan servicing* (June 2015), *available at* http://www.consumerfinance.gov/blog/sound-off-on-student-loan-servicing/.

[338] Forty-one percent of older consumers with a student debt are concerned about being able to pay their loans. *See,* Caroline Ratcliffe & Signe-Mary McKernan, *Forever in Your Debt: Who has Student Loan Debt, and Who's Worried?* (June 2013), *available at* http://www.urban.org/sites/default/files/alfresco/publication-pdfs/412849-Forever-in-Your-Debt-Who-Has-Student-Loan-Debt-and-Who-s-Worried-.PDF.

[339] CFPB-2015-0021-0311.

[340] *See* 31 U.S.C. § 3716(c)(3)(A)(i); *see also* Consumer Financial Protection Bureau, *Consumer advisory: Your benefits are protected from garnishment* (May 2015), *available at* http://www.consumerfinance.gov/blog/consumer-advisory-your-benefits-are-protected-from-garnishment/.

Security for 90 percent or more of their income, garnishment will likely result in extreme financial hardship for these consumers.[341]

**Many older consumers who co-sign on private student loans state that their payments are misapplied to all loans held by the primary borrower, instead of only to the loans they co-signed.**[342] Servicers generally process payments based upon a default payment allocation policy, which typically apportions payments across all loans. However, these practices may cause particular problems for co-signers. Co-signers have complained that their payments are applied across all of the primary borrower's loans, resulting in improper late fees and interest accrual, as well as the misreporting of information to credit reporting agencies.

In some instances co-signers submit their payments with specific instructions that the payment only be applied to the loans they co-signed. Despite these instructions, co-signers state that loan servicers continue to misapply their payments.

**Older consumers who co-sign for private student loans state they are often unable to access important loan documents and notices.** Some co-signers state that loan servicers do not provide them with periodic billing statements and notices of missed payments until the primary borrower is delinquent. It is only when the primary borrower falls behind that the co-signer is notified of the arrears and is required to repay. Often by then, the amount due is significant and the co-signer's credit has been damaged.

**Student loan borrowers and co-signers report that servicers provide them incorrect information regarding co-signer release and repayment options.**[343] Many market participants advertise and offer a co-signer release from the loan obligation upon the

---

[341] Social Security Administration, *Income of the Population 55 and Older, 2012: Relative Importance of Social Security for Beneficiary Aged Units 65 or Older*, Table 9.A1 (Sept. 2015), *available at* http://www.ssa.gov/policy/docs/statcomps/income_pop55/2012/sect09.html#table9.a2.

[342] For further discussion on complaints from co-signers, *see* Consumer Financial Protection Bureau, *Mid-year update on student loan complaints* (Apr. 2014), *available at* http://files.consumerfinance.gov/f/201404_cfpb_midyear-report_private-student-loans-2014.pdf; *see also* Consumer Financial Protection Bureau, *Mid-year update on student loan complaints* (June 2015), *available at* http://files.consumerfinance.gov/f/201506_cfpb_mid-year-update-on-student-loan-complaints.pdf.

[343] *See, e.g.*, CFPB-2015-0021-0325.

primary borrower making a certain number of on-time payments and undergoing a credit check. Despite being told about this option prior to originating the loan, borrowers state that they cannot obtain enough information from the servicer to utilize the release.[344] For example, borrowers note that their servicer's website does not provide information on how to qualify or apply for co-signer release and/or provide the necessary forms.

In addition, servicers often require the primary borrower to undergo a credit check before releasing the co-signer. However, borrowers state that servicers generally do not reveal the minimum qualification standards, such as a credit score threshold.[345] Borrowers also state that they were denied for co-signer release for reasons that were not previously explained. For instance, some primary borrowers complain that when electing to enter forbearance, they were never told that it would reset the clock for qualifying for the co-signer release.

**Private student loans borrowers tell us that servicers may automatically place loans in default upon the death or bankruptcy of a co-signer, even when a borrower is paying as agreed.** Many private student loan contracts contain provisions that provide the lender or servicer the option to place a borrower in default under certain circumstances. For instance, contracts have been interpreted to allow a lender or servicer to place a loan in default and accelerate the full balance of the loan upon the death or bankruptcy filing of a co-signer, regardless of whether the loan was in good standing.[346]

We have heard from borrowers discovering they are in default when their co-signer, often a parent or grandparent passes away.[347] Some borrowers assume that death of a co-signer will result in a release of the co-signer's obligation to repay. Borrowers report confusion when they receive notices to pay in full since they believed their loan to be in good standing and current.

---

[344] *See, e.g.*, CFPB-2015-0021-0295.

[345] *See, e.g.*, CFPB-2015-0021-0993.

[346] For further discussion, *see* Consumer Financial Protection Bureau, *Mid-year update on student loan* complaints (Apr. 2014), *available at* http://files.consumerfinance.gov/f/201404_cfpb_midyear-report_private-student-loans-2014.pdf.

[347] *See, e.g.*, CFPB-2015-0021-1774; CFPB-2015-0021-1402.

Borrowers also describe how debt collectors threaten to place liens on property or other assets if the decedent's family members or estate administrators do not immediately pay the loan in full. Borrowers note debt collectors' attempts to collect from a co-signer's estate, even after the estate has been closed and settled.[348]

Borrowers also report becoming startled when they receive phone calls from a debt collector claiming their loans are in default because their co-signer filed for bankruptcy protection.[349] In most of these cases, the borrower was unaware that the co-signer pursued bankruptcy. Furthermore, co-signers were surprised to find that the primary borrower's loans were negatively affected due to the co-signer's decision to pursue bankruptcy.

Borrowers state that after their co-signer filed for bankruptcy, they stopped receiving communications from their servicer and did not receive billing statements, notice of default, or were locked out of their online account.[350]

## 1.5.3   Student loan debt relief companies

As student loan delinquencies and defaults continue to rise, many borrowers struggling to make ends meet will seek assistance. These borrowers are often solicited by third-party "debt relief" companies advertising services that claim to provide borrowers with lower monthly student loan payments and loan forgiveness. These companies generally enroll borrowers in free federal consumer protections, such as income-driven repayment plans, in exchange for up-front or recurring fees. In some cases, this assistance may prove illusory, as these companies charge up-front fees to their customers but fail to secure reduced monthly payments.[351]

---

[348] *See, e.g.*, CFPB-2015-0021-5490.

[349] *See, e.g.*, CFPB-2015-0021-0883.

[350] *Id.*

[351] *See, e.g.*, Complaint for Permanent Injunction, Civil Money Penalties, and Other Relief, Consumer Financial Protection Bureau v. College Education Services LLC et al., No. 8:14-cv3078 (M.D. Fla. Dec. 11, 2014), *available at* http://files.consumerfinance.gov/f/201412_cfpb_complaint_the-college-education-services.pdf.

In the past 12 months, the Bureau and several state attorneys general and banking regulators have taken action against a number of these companies for defrauding student loan borrowers.[352] In addition, last year, the Bureau published a consumer advisory that warns student loan borrowers about common signs of student loan debt relief scams, including high-pressure tactics, up-front fees, and solicitations to sign third-party authorizations or powers of attorney.[353] Earlier this year, the Bureau also alerted search and social media companies and shared concerns related to how some of these companies use search and social media to target distressed student loan borrowers.

As discussed previously, federal student loans are unique relative to other consumer financial products in that borrowers have a legal right to a monthly payment driven by their income. As discussed in Section 1.1, commenters suggest that awareness of these protections among borrowers who could potentially benefit is limited, making borrowers in distress particularly susceptible to marketing by these debt relief companies.[354]  Limited awareness also raises questions about whether outreach and information provided by student loan servicers is sufficient to ensure borrowers are readily able to access these consumer protections.  For

---

[352] Last year, the Bureau took action to shut down two companies offering student loan debt relief services, alleging that these companies illegally charged borrowers up-front fees to enroll borrowers with federal student loans in income-driven repayment plans.  *See* Consumer Financial Protection Bureau, *Press Release: CFPB Takes Action to End Student "Debt Relief" Scams* (Dec. 11, 2014), *available at* http://www.consumerfinance.gov/newsroom/cfpb-takes-action-to-end-student-debt-relief-scams; *see also* Illinois Attorney General, *Press Release: Madigan Files Lawsuits Against Student Loan Debt Relief Scammers* (May 2015), *available at* http://www.illinoisattorneygeneral.gov/pressroom/2015_05/20150504.html; New York Department of Financial Services, *Press Release: Investigation by Student Protection Unit finds Direct Student Aid Engaged in Misleading and Deceptive Advertising, Other Improper Practices* (July 2015), *available at* http://www.governor.ny.gov/news/governor-cuomo-announces-student-loan-debt-relief-provider-will-cease-operations-after; Washington State Office of the Attorney General, *Press Release: AG Sues Firm Over Illegal Student Loan Practices* (Apr. 7, 2015), *available at* http://www.atg.wa.gov/news/news-releases/ag-sues-firm-over-illegal-student-loan-practices; Office of the Minnesota Attorney General, *Press Release: Attorney General Lori Swanson Files Lawsuit Against Company Promising Student Loan Debt "Forgiveness"* (July 1, 2015), *available at* http://www.ag.state.mn.us/Office/PressRelease/20150701StudentAidCenter.asp.

[353] *See* Consumer Financial Protection Bureau, Consumer Advisory: Student loan debt relief companies may cost you thousands of dollars and drive you further into debt (Dec. 2014), *available at* http://www.consumerfinance.gov/blog/consumer-advisory-student-loan-debt-relief-companies-may-cost-you-thousands-of-dollars-and-drive-you-further-into-debt.

[354] *See* CFPB-2015-0021-0373; CFPB-2015-0021-0356.

borrowers who do reach out to student loan servicers for advice on alternative repayment options, the servicing problems described in this report may also drive borrowers to seek assistance from these companies. As one commenter notes:

> Servicers' poor practices have also created an unfortunate side effect: the recent growth of "student debt relief" companies. These companies take unfair advantage of people overwhelmed by the system, promising to enroll them in income-driven repayment plans, consolidate their loans, or even get their debts discharged – all for a hefty fee.[355]

As one state attorney general noted last year:

> [T]he companies that engage in these scams are mere symptoms of a larger problem. Too many former students are having a hard time paying down their student debt. In many cases, they are not aware of the options available to them. Student loan debtors can have a hard time getting the right person on the phone. And they are not receiving information on the options available to them for repaying their loans. This massive confusion provides an easy opening for scammers.[356]

Commenters note that the relationship between loan servicing problems and the proliferation of "debt relief" scams played out similarly in the mortgage market. As the number of American families struggling to manage high mortgage payments and avoid foreclosure climbed in the wake of the financial crisis, homeowners in distress also sought assistance to find a way to stay in their homes. Companies purporting to offer "mortgage rescue" services solicited up-front fees from homeowners by promising to secure modified mortgage payments and halt foreclosures.

In many cases, mortgage rescue companies defrauded their customers by accepting fees and failing to provide advertised services. As these scams proliferated, federal and state law

---

[355] *See* CFPB-2015-0021-0975.

[356] *The Role of States in Higher Education: Hearing before the S. Comm. on Health, Education, Labor and Pensions*, 113th Cong. 4 (July 24, 2014) (testimony from Illinois Att'y Gen. Lisa Madigan) *available at* http://www.help.senate.gov/imo/media/doc/Madigan1.pdf.

enforcement agencies sued and shut-down individual foreclosure relief scams[357] and the Federal Trade Commission finalized a new federal regulation prohibiting companies from charging fees to homeowners until after the company delivers, and the consumer agrees to a written offer of mortgage relief from the customer's lender or servicer.[358]

Despite action by state and federal regulators and law enforcement agencies, the recent wave of mortgage rescue scams did not abate until the economic recovery took hold and the share of homeowners in distress began to subside.  As discussed above, elevated levels of distress among student loan borrowers do not appear to be linked to the business cycle—student loan delinquencies remain elevated, despite declining levels of delinquency in other markets. Policymakers and market participants contemplating additional action to address illegal practices by certain student loan debt relief companies may wish to also focus on the underlying market conditions that permit these scams to proliferate. In particular, they should consider the extent to which improved conduct by student loan servicers related to income-driven payment plans can better assist distressed borrowers searching for a way to stay afloat.

---

[357] *See, e.g.*, Illinois Attorney General, *Press Release: Attorney General Madigan Sues Chicago Area Mortgage Rescue Schemes* (July 27, 2011), *available at* http://www.illinoisattorneygeneral.gov/pressroom/2011_07/20110727.html.

[358] 12 C.F.R. § 1015.

# 2. Public input on analogies to servicing approaches in other markets

In recent years, policymakers have undertaken broad-based legislative and regulatory efforts to strengthen applicable federal consumer financial laws protecting consumers in the servicing of mortgages and credit cards. However, for student loan borrowers, there is no existing, comprehensive federal statutory or regulatory framework providing consistent standards for the servicing of all student loans.[359] Still, there are limited protections for certain federal student loan borrowers[360] related to specific aspects of the repayment process.[361]

Many commenters to the *Request for Information on Student Loan Servicing* note that the issues encountered by student loan borrowers today, as detailed in the preceding section, mirror

---

[359] In 2014, the Bureau expanded its examination program for student loan servicing to supervise both large depository institutions and larger nonbank student loan servicers for compliance with federal consumer law, including the prohibition against unfair, deceptive and abusive practices under the Dodd-Frank Act. This is the first examination program at the federal level focused on both bank and nonbank actors in the student loan servicing market. *See* Consumer Financial Protection Bureau, Education Loan Examination Procedures (Dec. 2013), *available at* http://files.consumerfinance.gov/f/201312_cfpb_exam-procedures_education-loans.pdf.

[360] *See, e.g.*, 34 C.F.R. Part 682 for certain disclosures and other requirements for companies servicing FFELP loans.

[361] CFPB-2015-0021-0354 ("Although federal loans are a much more consumer-friendly product than private loans, there is still room for improvement, especially with respect to the Federal Family Education Loan program (FFEL), the now defunct bank-based loan system and Federal Perkins Loans issued and serviced by institutions of higher education.").

many of the servicing problems faced by consumers in the mortgage market following the financial crisis.[362]

Comments from individual student loan borrowers, organizations representing borrowers and other consumers,[363] colleges and universities,[364] state law enforcement officials,[365] banking regulators,[366] a Member of Congress,[367] and some student loan market participants[368] suggest that recent changes to mortgage and credit card servicing practices may offer insight on possible approaches to remedy student loan servicing concerns. In contrast, some comments from trade associations representing industry participants and from individual student loan market participants reject this analogy, stating that the differences in underlying terms and features of mortgages and credit cards are sufficiently different from student loans so as to make the comparison unhelpful to policymakers.[369]

The following discussion attempts to synthesize this public input, while identifying specific mortgage, credit card, and other servicing reforms commenters note as potentially applicable to the student loan servicing industry. Reforms discussed in public comments fall into four broad categories:

- Practices and protections for struggling or delinquent borrowers;

- Practices and protections related to servicing transfers;

---

[362] *See, e.g.*, CFPB-2015-0021-0856; CFPB-2015-0021-0806; CFPB-2015-0021-0808; CFPB-2015-0021-0861; CFPB-2015-0021-0860; CFPB-2015-0021-0354.

[363] *See, e.g.*, CFPB-2015-0021-0861; CFPB-2015-0021-0360; CFPB-2015-0021-0373.

[364] *See, e.g.*, CFPB-2015-0021-0806.

[365] *See, e.g.*, CFPB-2015-0021-0376.

[366] *See, e.g.*, CFPB-2015-0021-0381.

[367] *See* CFPB-2015-0021-0379.

[368] *See, e.g.*, CFPB-2015-0021-0355; CFPB-2015-0021-0974; CFPB-2015-0021-0070.

[369] *See, e.g.*, CFPB-2015-0021-0357; CFPB-2015-0021-0370; CFPB-2015-0021-0859; CFPB-2015-0021-0361.

- Practices and protections related to requests for information and error resolution; and

- Practices and protections related to the processing of payments.

# 2.1   Practices and protections for struggling or delinquent borrowers

As discussed in Section 1.1, student loan borrowers may experience problems when seeking to access or maintain enrollment in alternative payment plans. Comments from organizations representing consumers state that loan modifications and other alternative repayment options may be beneficial to both borrowers and loan holders because a performing loan, even one that is modified, may offer a greater return than recovery of a defaulted loan through collections.[370] One commenter cites, for example, a study indicating that home loan modifications may return greater value to investors than foreclosures.[371] Commenters suggest that student loan borrowers, lenders, and investors—similar to the mortgage context—may be better served by modifications of certain loans.[372] Commenters also suggest that mortgage servicers did not offer modifications to borrowers in the past because servicers have had financial incentives to foreclose.[373] For mortgage servicers, the cost of offering individualized modifications could be more expensive than sending borrowers to foreclosure.[374] Commenters suggest that, similar to mortgage servicers, student loan servicers may have a financial disincentive to offer loan modifications or alternative repayment plans.[375] Specifically, student loan servicers may not have adequate

---

[370] *See, e.g.*, CFPB-2015-0021-0856.

[371] *See* CFPB-2015-0021-0364.

[372] *See, e.g.*, CFPB-2015-0021-0858; CFPB-2015-0021-0364.

[373] *See, e.g.*, CFPB-2015-0021-0364.

[374] *Id.*

[375] *See, e.g.*, CFPB-2015-0021-0861; CFPB-2015-0021-0364.

economic incentive to provide more expensive loss mitigation outreach and relief to borrowers, as opposed to placing them in deferment or forbearance.[376]

Commenters urge policymakers to consider recent history in the mortgage market—specifically the servicing problems surrounding loss mitigation programs that may have been caused, in part, by a disconnect between borrowers, servicers, and investors.[377]

Commenters, including individual borrowers and organizations representing student loan borrowers, recommend policymakers evaluate whether certain loss mitigation-related and other mortgage servicing requirements in Regulation X under the Real Estate Settlement Procedures Act (RESPA) offer a useful analogy when considering protections for student loan borrowers.[378]

One comment from nearly two-dozen law professors urges policymakers to consider the protections of the mortgage servicing rules when developing standards to assist distressed student loan borrowers, noting that:

> There is every reason to believe that student loan servicing, which represents a dramatically increasing share of overall consumer debt, would benefit from similar consumer protections. In crafting any regulations governing servicing of student loans, we urge [policymakers] to examine the effectiveness of federal agency guidelines and contract terms in inducing meaningful mortgage loan servicing. We also urge [policymakers] to adopt standards that apply equally to borrowers of both private and public student loans.[379]

In contrast, several comments from student loan market participants and industry trade associations state that the differences between mortgages and student loans are significant and therefore this analogy is inappropriate.[380] For example, one trade association representing the

---

[376] *See, e.g.*, CFPB-2015-0021-0861; CFPB-2015-0021-0364.

[377] *See, e.g.*, CFPB-2015-0021-0364.

[378] *See, e.g.*, CFPB-2015-0021-1137; CFPB-2015-0021-0861; *see also* CFPB-2015-0021-0354.

[379] CFPB-2015-0021-0858.

[380] *See, e.g.*, CFPB-2015-0021-0357; CFPB-2015-0021-0370; CFPB-2015-0021-0859; CFPB-2015-0021-0361.

student loan servicing industry rejects this analogy, noting that "the concept of loss mitigation is not appropriate to student loans. There is no asset to save."[381]

When drawing comparisons between mortgage servicing and student loan servicing, several commenters specifically highlight the following mortgage provisions:

- **Early intervention for struggling borrowers.** Mortgage servicers must make a good faith effort to establish live contact with a borrower no later than the 36th day of a borrower's delinquency.[382] No later than the 45th day of delinquency, a servicer must provide a written notice that includes, among other things, a statement encouraging the borrower to contact the servicer and, if applicable, a brief description of examples of loss mitigation options that may be available.[383]

- **Continuity of contact.** Mortgage servicers must maintain policies and procedures designed to assign designated personnel to respond to a delinquent consumer's inquiries and, as applicable, assist the consumer with available loss mitigation options.[384] This provides the consumer the ability to access information about his or her mortgage.[385]

- **Properly disclosing loss mitigation options and reviewing loss mitigation applications.** Mortgage servicers must adopt policies and procedures reasonably designed to ensure that the servicer can (1) identify all loss mitigation options for which a borrower may be eligible; (2) provide prompt access to all documents and information submitted by a borrower in connection with a loss mitigation option to servicer personnel assigned to assist borrowers; (3) identify documents and information that a borrower is required to submit to complete a loss mitigation application; and (4)

---

[381] CFPB-2015-0021-0357.

[382] 12 C.F.R. § 1024.39(a).

[383] 12 C.F.R. § 1024.39(b).

[384] 12 C.F.R. § 1024.40(a).

[385] 12 C.F.R. § 1024.40(a)(3).

107

properly evaluate a borrower who submits an application for all loss mitigation options for which the borrower may be eligible.[386]

## 2.1.1   Early intervention for struggling borrowers

Commenters suggest that early intervention and prompt contact from student loan servicers to discuss repayment options could allow a greater number of student loan borrowers to avoid default.[387]

As discussed above, federal student loan borrowers are entitled to enroll in alternative repayment plans that cap monthly payments as a percentage of the borrower's discretionary income, called income-driven repayment plans. However, according to commenters, some borrowers are unaware of these repayment options and ultimately fall into default.[388]

In contrast, there are no repayment programs widely available for struggling private student loan borrowers that are analogous to the options in place for borrowers with federal loans.[389] Some private student loan lenders and servicers offer deferment or forbearance, but commenters note that servicers "rarely change the terms of the loan permanently to make the monthly payment more affordable for the borrower."[390] Participants in the private student lending industry do note broader availability of expanded programs to provide relief for borrowers experiencing serious financial hardship, particularly over the past 24 months.[391] However, as one policy organization notes, "unlike federal student loan borrowers or many

---

[386] 12 C.F.R. § 1024.40(b)(2); *see also* 12 C.F.R. § 1024.41.

[387] *See, e.g.*, CFPB-2015-0021-0354.

[388] *See, e.g.*, CFPB-2015-0021-0378; CFPB-2015-0021-6009.

[389] *See* CFPB-2015-0021-0809; CFPB-2015-0021-0354.

[390] CFPB-2015-0021-0354.

[391] *See, e.g.*, CFPB-2015-0021-0361.

mortgage borrowers, distressed private student loan borrowers have few affordable, sustainable repayment options to help them stay current on their loan."[392]

Commenters suggest that student loan borrowers need enhanced assistance from servicers in order to prevent delinquency and default.[393] One industry commenter does note that pursuant to federal regulations, delinquent borrowers with FFELP loans must receive additional written disclosures related to alternative repayment plans and other options to cure delinquencies.[394] No comparable regulatory requirements exist for servicers handling private student loans or Direct Loans.

Consumer group commenters suggest a potential protection for borrowers based on similar standards to those that require mortgage servicers to attempt to contact a delinquent borrower and make efforts to contact the borrower again at certain intervals following missed payments.[395]

Commenters further note that mortgage servicing guidelines usually require servicers to contact the borrower by phone or other "live" contact instead of other means, such as pre-recorded messages.[396] Commenters indicate that requiring servicers to connect with borrowers may allow servicers to discover the reasons for missed payments and offer appropriate loss mitigation options to borrowers.[397] According to some commenters, establishing early contact after a missed payment would be particularly relevant to student loan borrowers because many student loan borrowers are unaware of specific repayment options that could help prevent a long-term default.[398]

---

[392] CFPB-2015-0021-0354.

[393] *See, e.g.*, CFPB-2015-0021-0354.

[394] *See* CFPB-2015-0021-0357.

[395] *See, e.g.*, CFPB-2015-0021-0861; *see also* CFPB-2015-0021-0354.

[396] *See, e.g.*, CFPB-2015-0021-0861.

[397] *Id.*

[398] *See, e.g.*, CFPB-2015-0021-0861; CFPB-2015-0021-0354.

## 2.1.2   Continuity of contact

Comments from organizations representing student loan borrowers suggest adopting standards that provide a continuity of contact for delinquent borrowers.[399] A trade association representing the student loan servicing industry notes that these standards would raise operating costs for student loan servicers.[400]

One consumer group commenter notes that a limited version of similar protections are already required for certain federal student loan borrowers, stating that the "Department of Education regulations applicable to [FFELP] loans set out minimal 'due diligence' requirements for servicers to provide information about payment options to borrowers during periods of delinquency prior to default."[401] However, this commenter further explains that no comparable federal regulatory requirements exist for private student loans or Direct Loans. This commenter states that it is unclear whether the Department of Education has incorporated these standards for Direct Loans through contracts and states that the "Department must make clear that these guidelines apply to Direct Loans as well."[402]

## 2.1.3   Properly disclosing loss mitigation options and evaluating loss mitigation applications

As discussed above, many federal and private student loan borrowers struggle to make their scheduled monthly payments, but may not have a complete understanding of available repayment arrangements. Commenters suggest that policymakers consider the parallel between mortgages and student loans and implement similar loss mitigation-related requirements as those in place to assist struggling mortgage loan borrowers.[403]

---

[399] *See, e.g.*, CFPB-2015-0021-0975; CFPB-2015-0021-0861.

[400] *See* CFPB-2015-0021-0357.

[401] CFPB-2015-0021-0861; *see also* CFPB-2015-0021-0354.

[402] CFPB-2015-0021-0861.

[403] *See, e.g.*, CFPB-2015-0021-0381; *see also* CFPB-2015-0021-0808; CFPB-2015-0021-0364; CFPB-2015-0021-0354.

## Servicers must disclose to borrowers all available loss mitigation options

Commenters highlight that mortgage servicers generally are required to inform borrowers of all loss mitigation options that may be available to them.[404] However, according to commenters, student loan servicers may not provide sufficient information to distressed borrowers because servicers may have a financial disincentive to assist borrowers in the process.[405]

Commenters note that disclosure aspects of rules related to mortgage loss mitigation applications could serve as a model for similar student loan servicing standards. For example, one private student lender notes that it currently publicly discloses available modification options on its website and provides borrowers who identify as experiencing financial hardship with this information in inbound and outbound telephone contacts.[406] Commenters also suggest additional requirements, such as requiring servicers to provide delinquent student loan borrowers at certain intervals with applications for all available repayment options, including income-driven repayment plans.[407]

## Servicers must review for all available loss mitigation options

One commenter notes that the mortgage servicing rules generally require servicers to evaluate a borrower's loss mitigation application for all available loss mitigation options.[408] Another commenter representing consumers states that in many instances the loan holder will benefit if the terms of the loan are modified to allow the borrower to continue successfully repaying the loan on an affordable repayment schedule.[409] An organization representing low-income student loan borrowers comments that the mortgage servicing rules recognize "that consumers often do not know what options they may be eligible for when they ask a servicer for assistance.

---

[404] *See* CFPB-2015-0021-0354.

[405] *See, e.g.*, CFPB-2015-0021-0364.

[406] *See* CFPB-2015-0021-0361.

[407] *See, e.g.*, CFPB-2015-0021-0861.

[408] *See* CFPB-2015-0021-0851.

[409] *See* CFPB-2015-0021-0364.

Therefore, it is reasonable to place the burden on the servicer to ensure that it reviews borrowers for all available options."[410]

One private student lender states that it has developed a standardized set of options available for private student loan borrowers seeking modifications, publishing eligibility criteria on its website and training customer service personnel on how to administer these programs when contacted by a private student loan borrower experiencing financial distress.[411]

An organization representing consumers comments that servicers "should be required to prioritize options that keep people in repayment, instead of offering forbearances as the first option."[412] Another commenter also suggests going beyond the mortgage servicing rules by stating that borrowers should be given the right to "submit a new application upon a change in circumstances," even if the borrower has previously submitted a loss mitigation application and been reviewed.[413]

## Prohibition on declaring default prior to determination on loss mitigation application

Commenters stress that although the default of a student loan is not directly analogous to the foreclosure process, the result of a defaulted loan could have significant long-term effects on the student loan borrower.[414] Commenters note that a defaulted student loan can be significantly detrimental to a borrower since a defaulted student loan often occurs early in a borrower's credit history and could ruin the borrower's ability to obtain subsequent credit.[415]

---

[410] CFPB-2015-0021-0861.

[411] *See* CFPB-2015-0021-0361.

[412] CFPB-2015-0021-0975.

[413] CFPB-2015-0021-0861.

[414] *See, e.g.*, CFPB-2015-0021-0364.

[415] *See, e.g.*, CFPB-2015-0021-0364.

To prevent the negative consequences of placing a loan into default, comments from organizations representing consumers urge policymakers to consider applying protections similar to those in place for mortgage borrowers that generally prohibit a mortgage servicer from completing a foreclosure process without first reviewing a borrower's loss mitigation application.[416]

Commenters suggest that policymakers consider the "declaration of default as an equivalent of a foreclosure sale."[417] Some commenters advocate for standards requiring student loan servicers to consider the borrower's eligibility for all available loan modifications and alternative repayment plans before transferring an account to collections.[418]

## Right to appeal loss mitigation review

Comments from organizations representing consumers suggest that after a servicer has reviewed the borrower's eligibility for all available loan modifications or alternative repayment programs, the borrower should receive written notice of the servicer's decisions for all options.[419] Commenters further suggest that if a student loan servicer denies a request for loss mitigation, the borrower should be entitled to a "clear explanation for its decision and provide a way for a borrower to appeal the decision,"[420] "at any time while a loan is outstanding" and "be able to appeal servicer decisions after default and throughout the post-default collection process."[421]

---

[416] *See, e.g.*, CFPB-2015-0021-0861.

[417] CFPB-2015-0021-0861. In contrast to the process in the mortgage market, upon default, federal student loans are generally transferred to a debt collector for recovery. Student loan servicers are generally not part of the post-default collections process for student loan borrowers. For loans held by the Department of Education and loans made under FFELP, default ends the business relationship between the borrower and a student loan servicer.

[418] *See, e.g.*, CFPB-2015-0021-0975.

[419] *See, e.g.*, CFPB-2015-0021-0861.

[420] CFPB-2015-0021-0354.

[421] CFPB-2015-0021-0861; *see also* CFPB-2015-0021-0354.

Commenters suggest that if a borrower is successful in an appeal of a servicer's decision that leads to an "improper declaration of a default," then the loan should be taken "out of default, even if the loan is subject to a collection action."[422]

## Additional loss mitigation-related comments

Some industry commenters highlight the unique aspects of student loans in comparison to mortgages, especially the fact that student loan servicing does not involve the recovery of property, such as a home.[423] One industry commenter notes that, as an unsecured loan, the analogy to mortgage loss mitigation rules does not apply and these rules should not inform any policy approach or practices designed to better facilitate utilization of alternative repayment plans for student loans.[424]

Some commenters note that by adapting loss mitigation-related protections for mortgage borrowers to the student loan servicing market, policymakers and market participants may establish practices that improve the administration of the consumer protections provided by law for borrowers with federal student loans and may better ensure that private student loan borrowers in distress are able to access options to the extent they are offered.[425]

# 2.2   Practices and protections related to servicing transfers

As discussed in Section 1.2, following a servicing transfer, some student loan borrowers may experience problems related to lack of notice, lost benefits and protections, misapplied payments, and unexpected or inappropriate late fees. Some commenters suggest that the

---

[422] CFPB-2015-0021-0861.

[423] *See, e.g.*, CFPB-2015-0021-0357; CFPB-2015-0021-0370; *but see* CFPB-2015-0021-0861; CFPB-2015-0021-0364.

[424] *See* CFPB-2015-0021-0357.

[425] *See, e.g.*, CFPB-2015-0021-0858.

current mortgage servicing rules under RESPA that are relevant to servicing transfer notices and transfer of documents and data can be "applied easily in the student loan servicing context."[426] Commenters identify provisions, including:

- **Notice of transfer of loan servicing.** If a lender or servicer transfers a loan's servicing to a new servicer, the prior servicer must provide a notice to the borrower no less than 15 days before the effective date of transfer, and the transferee servicer must provide a notice not more than 15 days after the effective date of transfer, with limited exceptions.[427]

- **Prohibition on treating the consumer as late.** During the 60-day period beginning on the effective date of transfer, the servicer cannot treat a consumer's payment as late for any purpose (and cannot charge a late fee) if the consumer has made a timely payment to the prior servicer.[428]

- **Timely transfer of documents and information to new servicer.** Mortgage servicers are required to maintain policies and procedures reasonably designed to facilitate the transfer of information during servicing transfers.[429] These policies should be tailored to ensure timely transfer of all documents and information in the possession or control of the prior servicer relating to the transferred loan to the new servicer.[430]

## 2.2.1   Notice of transfer of loan servicing

As described in Section 1.2, some student loan borrowers may be unaware that their loans have been transferred to a new servicer, which commenters note can lead to disruptions in payments, unexpected late fees, and other challenges for borrowers and servicers. According to

---

[426] CFPB-2015-0021-0861.

[427] 12 C.F.R. § 1024.33(b)(3).

[428] 12 C.F.R. § 1024.33(c)(1).

[429] 12 C.F.R. § 1024.38(b)(4).

[430] 12 C.F.R. § 1024.38(a).

commenters, there are no uniform notice requirements for student loan servicing transfers, which contribute to borrower confusion and frustration.[431]

Comments from organizations representing consumers and from market participants suggest that one approach to mitigate student loan transfer or servicing problems could be modeled on requirements similar to those in mortgage rules related to disclosure and notice of servicing transfers.[432] Some commenters suggest that one approach may be to require notice be provided to the borrower before a servicing transfer.[433]

While there are no market-wide requirements for conduct related to student loan servicing transfers, commenters do note that there are some protections offered to certain federal student loan borrowers with FFELP loans, including a joint notice from the transferee and transferor servicer not later than 45 days after a transfer has occurred.[434] However, no comparable regulatory notice requirements related to servicing transfers exist for borrowers with private or Direct Loans. In addition, no federal regulatory requirements for student loans require any specific notice or disclosure prior to a servicing transfer.[435]

One large student loan servicer endorses providing additional notices during servicing transfers, commenting that it voluntarily provides notices to its FFELP and private student loan customers before and after the transfer.[436] In addition, this commenter states that it already adopted the

---

[431] *See, e.g.*, CFPB-2015-0021-0354; CFPB-2015-0021-0378.

[432] *See, e.g.*, CFPB-2015-0021-0975; *see also* CFPB-2015-0021-0355.

[433] *See, e.g.*, CFPB-2015-0021-0975.

[434] *See, e.g.*, CFPB-2015-0021-0357; CFPB-2015-0021-0370.

[435] Readers should note that federal student loan borrowers with Direct Loans and FFELP loans have a contractual right to notice in the event of loan transfer, but this notice clause does not specify whether notice must occur prior to or following transfer.  For Direct Loan borrowers, this notice requirement is only triggered if there is a change in the address to which the borrower must send payments or direct communications. *See, e.g.*, U.S. Department of Education, *Federal Family Education Loan Program (FFELP) Stafford Loan Master Promissory Note*, *available at* http://www.ifap.ed.gov/dpcletters/attachments/FP0608StaffApp2008.pdf; U.S. Department of Education, *Master Promissory Note: William D. Ford Direct Loan Program*, *available at* http://www.direct.ed.gov/pubs/dlmpn.pdf.

[436] *See* CFPB-2015-0021-0355.

practice of following other relevant portions of the mortgage servicing transfer-related rules for its FFEL and private student loan customers.[437]

## 2.2.2   Prohibition on treating the consumer as late

Following a servicing transfer, some borrowers may submit payments to their old servicer or send payments to their new servicer that include the account information from their prior servicer, which may in turn delay payment processing or result in late fees. Commenters state that "without a reliable process, a borrower may not be clear on where to send their payment and, as a result the new servicer may not receive payment."[438]

To assist borrowers following a servicing transfer, a comment from more than 100 consumer, civil rights, labor, and student groups suggests that policymakers look to mortgage rules that govern payment processing following a servicing transfer.[439] The mortgage servicing rules prohibit treating a consumer's payment as late for any purpose or charging late fees for 60 days beginning on the effective date of the servicing transfer if the consumer has made a timely payment to the prior servicer.[440] Commenters emphasize that "this waiting period allows the borrower two billing cycles to make sure they have the correct payment information."[441]

Comments from organizations representing consumers also urge policymakers to consider implementing new rules and guidance concerning misdirected payments during servicing transfers, such as requiring servicers to "affirmatively notify borrowers if payments are made in error" to the wrong servicer and "allow[ing borrowers] to use their old account information to access their new, transferred accounts during the adjustment period with their new student loan servicer."[442]

---

[437] *Id.*

[438] CFPB-2015-0021-0354.

[439] *See* CFPB-2015-0021-0856.

[440] 12 C.F.R § 1024.33(c)); s*ee also* CFPB-2015-0021-0354.

[441] CFPB-2015-0021-0354.

[442] CFPB-2015-0021-0358.

One industry commenter states that ensuring smooth servicing transfers are in servicers' best interest.[443] In addition, this commenter states that in the event of a transfer, "the existing and future servicers work intensively together in the 3 to 6 month period prior to the transfer to ensure that it is as seamless and problem-free as possible," ensuring that servicing transfers do not adversely impact borrowers' due dates.[444]

## 2.2.3   Timely transfer of documents and information to new servicer

Commenters suggest that policymakers consider standards to address document retention issues, particularly during student loan servicing transfers.[445] Commenters point to the mortgage servicing rule requiring retention of documents for at least one year after the transfer of servicing.[446] Commenters also state that student loan servicers should be "required to maintain key documents, including but not limited to payment histories, payoff statements, communications with borrowers, and any supplemental materials the borrowers have submitted in relation to a complaint or request."[447]

Commenters also point to mortgage servicing rules requiring "a transferor servicer to have policies and procedures reasonably designed to provide for the timely transfer of all information and documents in its possession or control to a transferee servicer in a manner that ensures the accuracy of the information and documents transferred."[448] One consumer group commenter

---

[443] *See* CFPB-2015-0021-0357.

[444] CFPB-2015-0021-0357.

[445] *See, e.g.*, CFPB-2015-0021-0975.

[446] *See, e.g.*, CFPB-2015-0021-0354.

[447] CFPB-2015-0021-0975.

[448] CFPB-2015-0021-0861; *see also* CFPB-2015-0021-0354.

recommends that the Bureau require all records to be transferred to the new servicer before borrowers are required to submit their first payment to the new servicer.[449]

A comment from one large student loan servicer notes that "[a]n important step in adding transparency, clarity, and simplicity to student loans would be to align certain policies across the three loan types. For example, policies regarding . . . the definitions and standards for loan transfers should all be consistent across loan types."[450]

# 2.3  Practices and protections related to customer service and error resolution

As discussed in Section 1.3, student loan borrowers express frustration that they are unable to get accurate or timely information related to their student loans. Borrowers also explain that when they experience a servicing error, they do not know where to turn or how to fix the problem.[451]

## 2.3.1  Error resolution and requests for information

Commenters note that account errors can have a substantial impact on a borrower's financial ability to successfully repay a loan, such as increased costs or negative impacts on a borrower's credit report.[452] For these reasons, some commenters suggest that "student loan servicers should be required to resolve errors promptly" and within the same timelines as are currently required for mortgage servicing errors.[453]

---

[449] *See* CFPB-2015-0021-0975.

[450] CFPB-2015-0021-0974.

[451] *See, e.g.*, CFPB-2015-0021-0861.

[452] *See, e.g.*, CFPB-2015-0021-0354.

[453] CFPB-2015-0021-0354.

Commenters urge the Bureau to "require servicers to follow . . . error resolution procedures similar to the RESPA requirements" for mortgage loans.[454] These commenters note that the mortgage servicing rules include "detailed procedures for borrowers to seek correction of account errors and to request information related to their loans."[455] Commenters note that several aspects of the mortgage servicing rules related to error resolution and requests for information may be particularly helpful for student loan borrowers. One organization representing consumers comments that policymakers should consider the following mortgage borrower protections:

- the ability to request information about the identity of the loan owner, subject to an expedited response schedule;

- a clear declaration in the rules that the servicer cannot charge fees in connection with a response;

- the inclusion of a "reasonable efforts" requirement pertaining both to the duty to investigate to correct an error and the duty to find requested information;

- the right of the borrower to ask for the documents that the servicer relied upon in refusing to correct an error; and

- the requirement that the servicer respond to a notice of error before conducting a foreclosure sale as long as the servicer receives the request at least seven days before the sale and the error involves a "dual tracking" violation.[456]

Currently, there are no uniform requirements for student loan servicers to respond, investigate, or provide information related to a borrower's student loan.[457] Commenters suggest that some of

---

[454] CFPB-2015-0021-0975; *see also* CFPB-2015-0021-0861; CFPB-2015-0021-0354.

[455] CFPB-2015-0021-0861.

[456] *See* CFPB-2015-0021-0861.

[457] Commenters note that "regulations under the Higher Education Act require that borrower inquiries be responded to in 30 days." CFPB-2015-0021-0357. However these requirements are limited to FFELP loans and do not provide the consumer protections that are afforded to mortgage borrowers, such as an investigation, appeal, or information in connection with the dispute.

the mortgage requirements noted above could have direct applicability to the student loan industry.[458] For example, when a borrower inquires about an error on her student loan account, rules could require the servicer to investigate and correct the problem or respond to the borrower within a specified time frame.

In addition to the right to an investigation into servicing errors, commenters also suggest that the borrower should have the right to appeal "a wide range of servicer decisions."[459] One consumer group commenter suggests that the policymakers consider modeling the appeal process after other federally-run loan programs that allow for "informal review, mediation, and a formal administrative hearing" before a neutral decision-maker.[460]

One commenter that provides legal assistance to mortgage borrowers suggests that student loan borrowers should have access to high-quality customer service.[461] This commenter further states that, based on observations made assisting mortgage borrowers, "front line staff communicating with borrowers must be well trained, extremely knowledgeable and adequately supervised."[462]

One large student loan servicer states that it has made significant investments in its customer service operations, including as it relates to processing and tracking borrower complaints.[463] This company emphasizes that these changes require servicing personnel to provide customers with responses on pending information requests and error resolution processes within specific timeframes.[464]

---

[458] *See, e.g.*, CFPB-2015-0021-0861.

[459] CFPB-2015-0021-0861.

[460] *Id.*

[461] *See* CFPB-2015-0021-0808.

[462] *Id.*

[463] *See* CFPB-2015-0021-0355.

[464] *Id.*

### 2.3.2   Streamlined complaint system

Consumer group commenters note that there are some circumstances where student loan borrowers may need to access a complaint system administered by government agency or neutral third-party. One commenter suggests that a "robust complaint system is essential to allow borrowers the opportunity to get relief when servicers fail to perform and to track common issues and evaluate servicer performance."[465] Commenters further note that "there is also a need for one streamlined complaint system where student loan borrowers are encouraged to submit complaints . . . with a clear expectation of timely response from the loan servicer."[466]

# 2.4   Practices and protections related to the processing of payments

Commenters note that there is significant diversity in servicing practices related to student loan payment processing. As discussed in Section 1.4, student loan contracts and promissory notes are generally silent on many of the payment processing issues outlined in this section. Beyond the relatively limited payment application requirements, the handling of borrowers' student loan payments is governed by a patchwork of practices established by lenders, investors, and student loan servicers. Depending on the company selected to service a borrower's loans, these practices may vary significantly. One very large student loan servicer comments:

---

[465] CFPB-2015-0021-0861, *see also* CFPB-2015-0021-0975.

[466] *Id.*; *see also* CFPB-2015-0021-0356.

*Compounding this issue are inconsistencies in rules across loan types. In federal loans, there are differences in rules applicable to FFEL and Direct student loans. Rules governing private student loans are generally less defined by regulators. An important step in adding transparency, clarity, and simplicity to student loans would be to align certain policies across the three loan types.*[467]

Other commenters suggest that the absence of a consistent, market-wide set of standards for payment processing leaves borrowers vulnerable to practices that may be designed to maximize servicers' revenue rather than facilitate borrower success.[468]

In contrast, some industry commenters suggest that the current regulatory framework for student loan servicing provides substantial protections for student loan borrowers and that further regulation would increase costs without meaningfully improving quality.[469] These comments emphasize the importance of preserving borrower choice as a tenet of high-quality student loan servicing.[470]

Commenters note that the CARD Act established a number of specific conduct requirements for companies servicing credit cards that may offer policymakers and market participants an analogous framework for how to better align industry practices to protect consumers and facilitate successful repayment.[471] Provisions in the credit card market specifically highlighted by commenters include:

---

[467] CFPB-2015-0021-0974.

[468] *See, e.g.*, CFPB-2015-0021-0373.

[469] *See, e.g.*, CFPB-2015-0021-0357; CFPB-2015-0021-0361; CFPB-2015-0021-0362.

[470] For example, one trade association representing servicers' legacy FFELP servicing and private student loan servicing business units states it "support[s] the idea of transparency and believe[s] that each servicer should clearly disclose their payment application methodology so that a borrower may request a different payment application rule if that is not what he/she wants." CFPB-2015-0021-0357; *see also* CFPB-2015-0021-0861.

[471] *See, e.g.*, CFPB-2015-0021-0364; CFPB-2015-0021-0975.

123

- **Timely posting of payments.**[472] Credit card companies generally must credit all payments as of the day they are received if payments are received by 5 p.m. that day.[473] If they are received by 5 p.m. on the due date, payments are generally considered to be on-time.

- **Periodic billing statements.**[474] Credit card companies generally must have reasonable procedures designed to ensure that billing statements are mailed or delivered at least 21 days before a payment is due.[475] In addition, credit card companies generally must disclose on the billing statement how long it would take and the total cost to the consumer to pay the full balance on the card by making only the required minimum payments.[476] The statement generally must also disclose the monthly payment required to repay the full balance in three years, and the resulting total cost to the consumer, assuming no additional transactions.[477]

- **Application of payments.**[478] Credit card companies, upon receipt of a payment in excess of the minimum payment amount due, generally must first apply the excess to the card balance bearing the highest interest rate, and then to each successive balance bearing the next highest rate of interest, until the payment is exhausted.[479]

---

[472] *See* CFPB-2015-0021-0364; CFPB-2015-0021-0975; CFPB-2015-0021-0377.

[473] 15 U.S.C. § 1666c(a).

[474] *See* CFPB-2015-0021-0364; CFPB-2015-0021-0975; CFPB-2015-0021-0377.

[475] 15 U.S.C. § 1666b(a).

[476] 15 U.S.C. §§ 1637(b)(11)(B)(i)-(ii).

[477] 15 U.S.C. § 1637(b)(11)(B)(iii).

[478] *See* CFPB-2015-0021-0364; CFPB-2015-0021-0975; CFPB-2015-0021-0377.

[479] 15 U.S.C. § 1666c(b)(1).

124

- ▪ **Assessment of certain fees.**[480] Credit card companies are only permitted to assess penalty fees that are "reasonable and proportional" to a consumer's action, when a consumer violates terms or other requirements of a credit card account.[481]

- ▪ **"Lookbacks" for rate increases on credit cards.**[482] Credit card companies are required to conduct periodic "lookbacks" on accounts where the rate has been increased because of credit risk of the consumer, market reasons, or other factors to evaluate whether the reasons for the increase have changed and, if so, to reduce the rate.[483]

In addition, a number of commenters identify the following protections included in Regulation X under RESPA and the Truth in Lending Act (TILA) and its implementing regulation, Regulation Z, related to mortgage servicing as a potential guide:

- ▪ **Timely posting of payments.** Mortgage servicers generally must credit payments to a borrower's account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency.[484]

  - ▫ **Periodic statements.** Mortgage servicers generally must provide borrowers with periodic statements on a monthly basis.[485] These statements must include certain additional information for delinquent borrowers.[486]

---

[480] *See* CFPB-2015-0021-0364.

[481] 15 U.S.C. § 1665d(a).

[482] *See* CFPB-2015-0021-0975.

[483] 15 U.S.C. § 1665c; 12 C.F.R. § 1026.59.

[484] 12 C.F.R. § 1026.36(c)(1)

[485] 12 C.F.R. § 1026.41.

[486] 12 C.F.R. § 1026.41(d)(8).

> □ **Payoff statements.**[487] A servicer must provide a payoff statement, specifying the amount needed to pay the loan in full as of a particular date, within seven business days after receiving the consumer's written request.[488]

## 2.4.1   Timely posting of payments

Industry and consumer group commenters note that policymakers should consider applying to student loans the mortgage servicing or credit card servicing rules that require servicers to credit payments to the borrower's account as of the day of receipt.[489] As discussed in Section 1.4, commenters emphasize that student loan borrowers experience "unnecessary uncertainty" if there is a delay in crediting a payment to a borrower's account which could result in unwarranted late fees.[490]

One trade association representing depository institutions highlights that most large student loan servicers use advanced technology to track the "effective date" of the payment or the date in which the payment is received.[491] This commenter notes that large servicers are able to use this effective date to retroactively credit the payment to the account if the servicer is unable to post the payment on the day of receipt.[492] This commenter further states that "although no doubt occasional errors or delays arise, modern technology has made payment delays rare."[493]

One trade association representing student loan servicers notes that servicers are already subject to payment handling requirements for electronic payments under the Electronic Funds

---

[487] *See* CFPB-2015-0021-0364; CFPB-2015-0021-0861; CFPB-2015-0021-0857; CFPB-2015-0021-0985.

[488] 12 C.F.R. § 1026.36(c)(3).

[489] *See, e.g.*, CFPB-2015-0021-0974, (discussing requirements under the CARD Act); *and* CFPB-2015-0021-0861 (discussing requirements under 12 C.F.R. § 1026.36(c)(1)).

[490] CFPB-2015-0021-0354; *see also* CFPB-2015-0021-1026.

[491] CFPB-2015-0021-0370.

[492] *Id.*

[493] *Id.*

Transfer Act (EFTA), implemented by Regulation E, and rules related to electronic payments required by NACHA.[494] For these reasons, this organization does not recommend new payment posting requirements for student loan servicers.[495]

## 2.4.2   Periodic billing statements

As discussed in Section 1.4, commenters state that student loan borrowers may not always receive accurate or timely information on billing statements or receive information on the current status of their loans.[496] Borrowers also state that they may receive billing statements near the payment due date and they are unable to successfully remit timely payment, resulting in late fees or forbearance.[497] If borrowers do not receive a billing statement with sufficient time before the due date, borrowers may not have enough time to collect funds and make arrangements to satisfy their monthly payment obligations.

Commenters suggest policymakers look to the CARD Act for provisions to regulate periodic billing statements.[498] These commenters recommend that the Bureau require student loan servicers to implement reasonable procedures designed to ensure the mailing or delivery of statements 21 days before the payment due date, similar to requirements for credit card issuers.[499]

Consumer group commenters also urge policymakers to consider the mortgage periodic statement provisions under TILA and Regulation Z, which generally require mortgage servicers to provide a periodic statement to borrowers on a monthly basis.[500] These commenters also

---

[494] *See* CFPB-2015-0021-0357.

[495] *Id.*

[496] *See also* CFPB-2015-0021-0861; CFPB-2015-0021-0354.

[497] *See, e.g.,* CFPB-2015-0021-0953.

[498] *See, e.g.,* CFPB-2015-0021-0975; CFPB-2015-0021-0364.

[499] *See, e.g.,* CFPB-2015-0021-0975; CFPB-2015-0021-0364.

[500] *See, e.g.,* CFPB-2015-0021-0861 (referencing 12 C.F.R. § 1026.41).

suggest mandating special periodic statement requirements for delinquent borrowers, offering additional information on the consequences of default and the amount needed to bring the loan current, as well as information about available options for restructuring payments and correcting a delinquency.[501]

Some industry commenters note that federal regulations currently require certain disclosures for delinquent FFELP loan borrowers related to income-driven repayment plans and other options to lower or suspend payment, and further comment that additional requirements are unnecessary.[502] One comment made by an organization that represents low-income student loan borrowers notes that these regulatory requirements do not apply to borrowers with private student loans or Direct Loans.[503]

## 2.4.3   Payment allocation

The CARD Act included a provision governing payment allocation associated with credit cards that commenters suggest may be applicable to student loan borrowers. Commenters analogize the allocation of payments in excess of the minimum payment in the credit card market to payment processing for student loans because credit card customers and student loan borrowers "may have balances with several different interest rates."[504]

As discussed in Section 1.4, when a borrower has several loans with multiple interest rates and seeks to make a prepayment, a borrower can save more money over the life of her loans if a prepayment is allocated to the loan with the highest interest rate first. Commenters note that after the implementation of the CARD Act, credit card issuers generally are required to allocate payments in excess of the minimum payment to the balance with the highest interest rate, potentially saving credit card borrowers money in the long-run.[505] Commenters from

---

[501] *See, e.g.*, CFPB-2015-0021-0861.

[502] *See, e.g.*, CFPB-2015-0021-0357.

[503] *See* CFPB-2015-0021-0861.

[504] CFPB-2015-0021-0364.

[505] *See, e.g.*, CFPB-2015-0021-0364; CFPB-2015-0021-0975; CFPB-2015-0021-0860.

organizations representing consumers propose that policymakers require student loan servicers to follow similar provisions in order to save student loan borrowers interest over the life of the loan.[506]

Industry and consumer group commenters state that borrower instructions related to the allocation of prepayments should supersede a servicer's default methodology for payment allocation.[507] Furthermore, consumer group and industry commenters note that any new standards for the handling of prepayments should also account for borrower preference and require servicers to follow borrower instructions.[508]

Industry commenters note that servicers' payment allocation policies may vary.[509] As discussed in Section 1.4, one trade association representing student loan servicers further state that the "application of this credit card rule to the student loan market might have unintended consequences," explaining that servicers' policies with regard to "paid ahead status" (and federal regulatory requirements for FFELP loans) may conflict with any new requirements that mandate application of prepayments first to loans with the highest interest rates.[510] For these reasons, this organization opposes the application of standards to the student loan market for the allocation of prepayments based on the CARD Act's approach.[511]

Commenters also raise concerns regarding some student loan servicers' current practices related to the handling of partial payments.[512] Consumer group commenters suggest that borrowers would benefit from specific servicing standards related to this process.[513] One comment from an

---

[506] *See, e.g.*, CFPB-2015-0021-0975.

[507] *See, e.g.*, CFPB-2015-0021-0357; CFPB-2015-0021-0974; CFPB-2015-0021-0355; CFPB-2015-0021-0364.

[508] *See, e.g.*, CFPB-2015-0021-0357; CFPB-2015-0021-0974; CFPB-2015-0021-0364.

[509] *See, e.g.*, CFPB-2015-0021-0357; CFPB-2015-0021-0974; CFPB-2015-0021-0355.

[510] CFPB-2015-0021-0357.

[511] *See id.*

[512] *See, e.g.*, CFPB-2015-0021-0364.

[513] *See, e.g.*, CFPB-2015-0021-0975.

organization representing consumers suggests servicers' payment allocation rules require the allocation of partial payments in a manner that satisfies in-full as many loans on a borrower's account as possible.[514]

## 2.4.4   Late fees

Student loan borrowers raise concerns related to the size of late fees and policies regarding assessment of late fees, as further discussed in Section 1.4. Commenters suggest that "excessive late fees make it much harder for a borrower to get back on track with their payments."[515]

Some commenters discuss how late fees were problematic for credit card borrowers prior to the CARD Act.[516] One commenter explains that prior to the CARD Act, "credit card issuers began to charge increasingly more and larger late fees" and the "fees morphed from proportionate" to a substantial cost which the commenter characterized as essentially resulting in a penalty.[517]

Commenters suggest that student loan borrowers encounter problems related to certain servicers' late fee practices, in light of recent actions by regulators.[518] For example, the FDIC determined that the servicer violated federal law by inadequately disclosing its payment allocation methodologies to borrowers while allocating borrowers' payments across multiple loans in a manner that maximizes late fees.[519]

Commenters propose that policymakers consider similar provisions to those in the CARD Act as standards for student loan servicers, particularly the requirement that late fees and other

---

[514] *See* CFPB-2015-0021-0364.

[515] CFPB-2015-0021-0354.

[516] *See, e.g.*, CFPB-2015-0021-0860.

[517] CFPB-2015-0021-0364.

[518] *See, e.g.*, CFPB-2015-0021-0364.

[519] Federal Deposit Insurance Corporation, *Press Release: FDIC Announces Settlement with Sallie Mae for Unfair and Deceptive Practices and Violations of the Servicemembers Civil Relief Act* (May 13, 2014), *available at* https://www.fdic.gov/news/news/press/2014/pr14033.html.

penalty fees be "reasonable and proportional to the consumer's action."[520] Commenters further note that there is also a need for standard treatment of late fees across the student loan market, such as limiting fees to one late fee per account.[521] One industry commenter states that servicers with contracts to service loans made under the Direct Loan program are not permitted to assess late fees to these borrowers under current Department of Education policy.[522]

## 2.4.5   Payoff statements

As previously mentioned in Section 1.4, commenters report that some student loan borrowers have difficulty obtaining accurate payoff statements and also that they experience payment processing breakdowns as they attempt to refinance certain loans.[523]

Discussing the central role payoff statements play for borrowers seeking to refinance, one student loan refinancing company comments that servicers should be expected to make payoff information "readily available," noting that it "increases transparency, provides for a seamless experience and improves customer service."[524]

Commenters note that mortgage servicers generally are required to respond within seven business days after receiving a written request by a borrower for a loan payoff statement.[525] One comment from an organization representing student loan borrowers states that "given the flexible nature of student loan payments, borrowers need a prompt and reliable means to obtain information about the status of their accounts. Along with periodic statements . . . a requirement to provide a payoff statement upon request is appropriate in the student loan context."[526]

---

[520] CFPB-2015-0021-0364.

[521] *See, e.g.*, CFPB-2015-0021-0377.

[522] *See* CFPB-2015-0021-0355.

[523] *See, e.g.*, CFPB-2015-0021-0985.

[524] CFPB-2015-0021-0985.

[525] *See, e.g.*, CFPB-2015-0021-0861; *see also* 12 C.F.R. § 1026.36(c)(3).

[526] CFPB-2015-0021-0861.

A different student loan refinancing company also states that some servicers do not follow the payment instructions accompanying a payoff payment and "servicers sometimes miss or ignore our specific payoff instructions to apply a payment to the higher interest loans (which [are designated] by account number) and thus apply payments to the wrong loans."[527] This industry commenter states that these payment processing breakdowns cause "unwanted payments on specific groups of loans, confusing the borrower."[528]

---

[527] CFPB-2015-0021-0857.

[528] *Id.*

# 3.  Recommendations

In the preceding section, commenters identify a number of options for policymakers and market participants to consider when evaluating ways to improve student loan servicing practices, promote borrower success, and minimize defaults.

Comments from student loan servicers and organizations representing consumers suggest[529] taking additional steps to realign incentives for student loan servicers in order to encourage better outcomes for borrowers.[530] While federal student loans feature an array of flexible repayment options, these commenters state that it is not clear whether third-party student loan servicers have adequate economic incentives to enroll borrowers in these options to avoid default.[531]

For both private and federal student loans, the compensation model used in most third-party

---

[529] *See, e.g.*, CFPB-2015-0021-0355 ("The fundamental questions for policymakers are whether the level of investment in loan servicing is adequate to achieve program goals and whether there are better ways to align servicer incentives with borrower and taxpayer interests."); CFPB-2015-0021-0373; CFPB-2015-0021-0377; CFPB-2015-0021-0356.

[530] The March 2015 Presidential Memorandum on a Student Aid Bill of Rights provides that "The Director of the Office of Management and Budget and the Secretary of Education shall convene quarterly an interagency task force consisting of the Department of the Treasury, Department of Education, Office of Management and Budget, and Domestic Policy Council to monitor trends in the student loan portfolio, budget costs, and borrower assistance efforts. No later than August 1, 2015, the task force shall review recommendations for the Department of Education from its members and the Consumer Financial Protection Bureau on best practices in performance-based contracting to better ensure that servicers help borrowers responsibly make affordable monthly payments on their student loans.", *available at* https://www.whitehouse.gov/the-press-office/2015/03/10/presidential-memorandum-student-aid-bill-rights.

[531] *See, e.g.*, CFPB-2015-0021-0355; CFPB-2015-0021-0373; CFPB-2015-0021-0377; CFPB-2015-0021-0356.

servicing contracts provides student loan servicers with a flat monthly fee per account serviced.[532] Although this fee may adjust based on a loan's repayment status,[533] fees are generally fixed on a monthly basis and do not rise or fall depending on the level of service a particular borrower requires in a given month. In effect, this fee structure may create an economic disincentive to address borrower default, since compensation remains fixed irrespective of the services a borrower needs, and the servicer will likely incur unreimbursed costs when seeking to mitigate default.

When taking further action to improve borrower outcomes and mitigate defaults, including potential steps to develop minimum baseline standards for certain student loan servicing practices, policymakers, loan holders, and student loan servicers should also pursue steps to adjust economic incentives to encourage these outcomes.[534]

---

[532] This monthly servicing fee may be set as a flat dollar amount per month per account, or set based on a percentage of a borrower's aggregate principal balance. In both cases, the fee paid to student loan servicers may vary depending on repayment status (generally rising as borrowers transition from "in school" to "in grace" to "in repayment") but generally do not vary depending on the level of service provided in a given month. *See, e.g.*, First Marblehead Corporation, *Prospectus Supplement: The National Collegiate Student Loan Trust 2007-3* (Sept. 17, 2007), *available at* http://www.snl.com/interactive/lookandfeel/4094003/NCSLT_2007_3_FPS.PDF; U.S. Department of Education, *Title IV Redacted Contract Awards 12-13*, *available at* https://www.fbo.gov/spg/ED/FSA/CA/FSA-TitleIV-09/listing.html. Contracts fix monthly compensation on a per-borrower basis, and the compensation depends on the repayment status of each borrower being serviced. *See also* U.S. Department of Education, *Student Aid Administration Fiscal Year 2015 Request*, at AA-15, *available at* http://www2.ed.gov/about/overview/budget/budget15/justifications/aa-saadmin.pdf (estimating the average cost per-borrower to be $1.67 per month, based on the contractual prices and the proportion of borrowers with different repayment statuses).

[533] Generally, these adjustments coincide with the lifecycle of a student loan, increasing servicers' compensation as borrowers progress from "in school" to "in grace" to "repayment" status. In contrast, the Department of Education implemented a declining compensation structure, decreasing servicers' compensation as borrowers' delinquency increases in severity.

[534] On August 28, 2015, an intergovernmental Task Force, consisting of the Department of the Treasury, Department of Education, Office of Management and Budget, and Domestic Policy Council, released recommendations "to ensure that contractors providing student loan servicing help borrowers responsibly make monthly payments on their student loans," developed in consultation with the Bureau and other stakeholders. These recommendations suggest specific changes to the compensation structure and performance measurements included in federal Direct Loan servicing contracts. These recommendations also endorse minimum service-level and borrower communications requirements, recognizing that while necessary, realigned incentives alone may be insufficient to achieve these agencies' goals. U.S. Department of Education, *Recommendations on Best Practices in Performance-Based Contracting* (2015), *available at* http://www2.ed.gov/finaid/loans/repay/best-practices

## Framework for student loan servicing reform

The following recommendations synthesize common themes and offer a roadmap for policymakers and market participants when evaluating ways to manage costs and improve the customer experience. As one financial institution notes:

> *Accurate and timely application of payments, access to information, delivery of important notices and disclosures, and resolution of any account errors are essential service level expectations in the financial services industry. There is no reason those expectations should be any lower for student loan borrowers than they are for home loans, credit cards, or other consumer debts.*[535]

Based on the analysis and commentary offered in this report, the Bureau identified four general principles that should inform any future action in this market, which are discussed in greater detail below. These principles are also reflected in a joint policy statement published in tandem with this report by the Department of Education, the Department of the Treasury, and the Bureau.[536] At minimum, student loan servicing should be:

- Consistent;

- Accurate and actionable;

- Accountable; and

- Transparent.

---

recommendations.pdf. Policymakers, loan holders and student loan servicers may wish to consider whether certain aspects of these recommendations are appropriate for servicing contracts in other segments of the student loan market. *See* U.S. Department of Education, *Another Step Forward Under the Student Aid Bill of Rights* (Aug. 28, 2015), *available at* http://www.ed.gov/blog/2015/08/another-step-forward-under-the-student-aid-bill-of-rights/.

[535] CFPB-2015-0021-0070.

[536] *See* Appendix A. To the extent that the recommendations contained in this section augment the *Joint Statement of Principles on Student Loan Servicing,* these recommendations have not been endorsed by the Department of Education or the Department of the Treasury and readers should treat them as recommendations offered by the Bureau alone.

These general principles for reform reflect input shared by stakeholders, including student loan market participants, organizations representing student loan borrowers, law enforcement officials and state regulators, colleges and universities, and academics. Taken together, the Bureau believes these principles should guide any attempt to develop a set of baseline standards of conduct to strengthen student loan servicing.[537]

# 3.1   Consistent

Student loan borrowers would benefit from a clear and consistent set of baseline standards for student loan servicing functions common to the entire market. Student loan borrowers reasonably expect that policies and practices be consistent across all market participants and for all types of student loans, while accounting for and recognizing varations in loan features, terms and borrower protections. This is not currently the case.

**Differing approaches to common functions may create obstacles for borrowers.**
The student loan servicing market shares common elements, irrespective of the identity of the loan servicer or the type of student loan. Borrowers and loan holders expect student loan servicers to process payments, respond to customer inquiries, resolve errors, and provide basic information about benefits and alternative payment options. As noted above, servicing practices related to these functions may vary significantly between companies, and may also vary between business units of the same company. Many of the comments discussed in the preceding sections suggest that servicers' differing approaches to common functions may create significant problems for borrowers, particularly when loans are transferred between servicers or for borrowers with multiple loans serviced by different companies.

**Baseline standards for conduct related to common market features should be clear and consistent.** Comments suggest that both borrowers and loan holders may not be well

---

[537] Many commenters also emphasize that any baseline standards for conduct for the student loan servicing industry should not prevent loan holders, state legislatures, and others from requiring higher levels of service from student loan servicers. Notably, the Department of Education has taken steps to improve standards for Direct Loan borrowers and may continue to require its contractors to exceed any floor for conduct required market-wide. *See* CFPB-2015-0021-0861.

served by a market where practices related to many of these functions vary significantly between companies and where expectations for conduct may not be clear. Should baseline standards for adequate conduct be established market-wide, student loan servicers may be able to realize efficiencies, particularly as loan holders, including the Department of Education, expand requirements for conduct related to certain types of loans. One large specialty student loan servicer notes that:

> *Student loans are unique financial instruments . . . Despite this uniqueness, basic principles of loan servicing remain applicable to student loans. Borrowers must be fully informed of their debt, have access to informed, trained customer service personnel, receive timely notice of required actions, have access to user-friendly online tools, and understand all of their options for repaying their obligation. Servicers must post payments promptly and must maintain and be able to retrieve information about borrower accounts and ensure that billing and payment application are accurate. . . . Overall, [the company] supports applying similar standards [as those that apply to mortgage and credit cards] to student loans, as long as the unique characteristics of student loans are taken into consideration.*[538]

**Baseline standards may also better align borrower needs with the service delivered by market participants.** As noted above, variations in product features and terms may result in servicers adopting different processes to perform common functions. In some cases, borrower frustration may be the result of a borrower experiencing a different process with another company and expecting similar treatment across student loan servicers.

Benefits of consistent baseline standards may exist even when product features differ significantly. For example, a borrower in distress may contact his federal student loan servicer and his private student loan servicer seeking options to reduce his monthly payment. His federal student loan servicer provides information about an income-driven repayment plan to which the borrower has a legal right under federal law.

His private student loan servicer provides information about existing proprietary modification options offered by the owner of his loan. In this case, both student loan servicers identified that

---

[538] CFPB-2015-0021-0974.

this borrower was experiencing financial distress and presented him with available options to avoid default. This borrower would benefit from, for example, consistent disclosure requirements about alternative repayment options, even if product features vary significantly.

When considering ways to improve the quality of service delivered to student loan borrowers, policymakers should ensure that any standards consider variations in product features, terms, borrower protections, and borrower preferences, but, to the extent practicable, be consistent across all loan types.

# 3.2   Accurate and actionable

As discussed in Part One of this report, commenters note the complexity of student loan repayment relative to other consumer financial products. In particular, commenters note that FFELP loans and Direct Loans feature a range of statutory consumer protections, borrower benefits, and other features that have evolved over time. These loan features are designed to encourage successful repayment, ensure that student loan borrowers are able to afford monthly student loan payments, and provide relief when borrowers struggle to repay due to difficult financial circumstances. Borrowers' success may depend, in part, on servicers' effective disclosure and administration of these loan features.

**Student loan borrowers should be able to expect that information provided by their servicer is accurate.** As discussed in Part One, borrowers depend on information provided by student loan servicers when seeking to manage their loans, lower costs, or access borrower benefits and consumer protections. In many cases, borrowers seek to access loan features that involve evaluating trade-offs between competing benefits. For example, a borrower working in public service may need to decide whether to enroll in a negatively-amortizing income-driven repayment plan that may increase her total debt burden in the short-term, in pursuit of loan forgiveness after 10 years of qualifying payments. Alternatively, a borrower with a co-signed private student loan may need to decide whether to make low, interest-only payments early in his repayment period, even if those payments may later preclude him from releasing his co-signer from her obligation early in his term. As these examples illustrate, when servicers' practices do not allow the borrower to be informed when making a decision that may increase costs or otherwise inhibit borrower success.

138

**Student loan borrowers should be able to expect that information provided by their servicer is actionable.** Given the complexity of many of the programs and protections discussed in this report, policymakers and market participants may wish to consider the medium and means through which servicers provide information to student loan borrowers.[539] As noted above, simply providing accurate information about the full breadth of programs and benefits associated with a student loan may not be sufficient to empower a borrower to make decisions in his or her financial interest.

Consider loan servicing for borrowers experiencing financial distress. Servicers may be required to offer certain modification options for private student loan borrowers under certain circumstances.[540] Servicers also facilitate the enrollment in certain income-driven repayment plans that are provided for in Title IV of the Higher Education Act for borrowers with commercial FFELP loans or Direct Loans.[541] In all cases, the servicer may also offer certain forbearance options for borrowers experiencing financial hardship. However, simply offering the options may not be enough for some borrowers. From the perspective of a consumer with limited knowledge of the availability and terms of these programs, the differences between various modification options may be less important than the desired outcome: actionable information about how to obtain an affordable monthly payment and a path to long-term financial success.

Policymakers and other stakeholders looking to develop new disclosure approaches to assist student loan borrowers in repayment should seek to present information in a manner that emphasizes the best information for most consumers.  In contrast to an approach that pursues completeness alone, the relative emphasis on specific information presented in disclosures is critical to facilitate borrower understanding and empower effective decision-making.

---

[539] The Department of Education is currently conducting several pilot programs related to certain aspects of the student loan repayment process, taking steps to test alternative mechanisms to communicate information about income-driven repayment plans to student loan borrowers.

[540] *See, e.g.,* CFPB-2015-0021-0974.

[541] *See* 34 C.F.R. § 685.209 (PAYE, only available for Direct Loans or loans consolidated into Direct Loans); 34 C.F.R. § 685.221 (IBR under the Direct Loan program); 34 C.F.R. § 682.215 (IBR under FFELP).

Additionally, user testing of disclosures may help in crafting disclosures that ensure that the information provided meets borrowers' needs.

When contemplating standards of conduct related to the disclosure of information about loan terms, features, and consumer protections, policymakers and market participants should ensure that any disclosure approaches consider borrowers' need for both accurate and actionable information.

# 3.3   Accountable

Baseline standards for conduct in the student loan servicing market should make it more likely that, for the vast majority of student loan borrowers, servicers will "get it right the first time" and provide, at minimum, adequate service across all servicing functions. However, given the size of the market and the complexity of the product, policymakers and market participants must also recognize that, to some degree, some borrowers may still encounter servicing problems.

As discussed in detail in Sections 1.3 and 2.3, error resolution (the process through which borrowers self-identify and seek correction of servicing problems) is a critical feature of any well-functioning market for loan servicing. Additionally, servicers should implement robust quality assurance and compliance management functions, in order to ensure individual issues identified by consumers are evaluated and, to the extent related problems exist for other borrowers; servicers have the information necessary to proactively identify and address issues. Beyond error resolution for individual borrowers, a healthy student loan servicing market must also be subject to rigorous oversight by state and federal regulators. In addition, regulators and law enforcement agencies should have access to appropriate mechanisms to identify potential violations or other issues and obtain remediation for consumers.

**Student loan borrowers need servicers to resolve errors when they occur.**
Borrowers depend on servicers to offer an error resolution process that is accessible, effective, and transparent.  Adequate customer service and error resolution is especially important in the student loan market, where the consequences of borrowers' failure to satisfy an obligation can

be particularly injurious, given many borrowers' limited credit history.[542] When errors occur and are not quickly addressed, harm to borrowers may not be limited to problems with the individual loan or loans in question. Increasingly, consumer credit profiles serve as a precondition to employment, housing, and access to credit, and consequently, servicing errors can have spillover effects on many other aspects of borrowers' lives and livelihoods. Student loan borrowers would benefit from an orderly process through which borrowers can receive answers to questions and inquiries.

As one organization notes on behalf of its low-income student loan borrower clients:

> *Requests to correct errors and to provide information about an account have obvious application in the student loan context. Student loan borrowers should be able to use a clearly defined procedure to correct errors in areas such as setting payments under an income-sensitive plan, applying payments, and assessing fees. Similarly, borrowers need to have a reliable system for obtaining information such as the type of program guidelines applicable to their loan, the available payment options, and data about their account history. Servicers and the loan owner should benefit from such a system as well.*[543]

**State and federal regulators and law enforcement officials should be able to identify violations and obtain remediation for consumers when servicing practices violate consumer financial laws.** Historically, state and federal regulatory agencies have largely overseen student loan servicers as service providers to or as affiliates of financial institutions under their purview. This may have fragmented oversight responsibilities and inadvertently created barriers for regulators and law enforcement agencies seeking to understand and improve practices for all student loan borrowers.

As one state banking regulator notes, when discussing authorization of the first state-level licensing and examination program for student loan servicers earlier this year:

---

[542] As commenters note in the preceding sections, many student loan borrowers depend on the student loan repayment process to help establish their credit histories.

[543] CFPB-2015-0021-0861.

*Robust enforcement authority over all student loan servicers at the state level is necessary in order to allow states to protect their student borrowers and identify issues that may be unique to that state, to an individual servicer's instate practices, or to a particularly relevant borrower population. States have a unique ability to work on a granular level while simultaneously spotting trends and systemic issues at a state or regional level. States cannot see the national picture with sufficient detail; they must share their knowledge and experience with the Bureau, who can develop that picture and disseminate it to the public.*[544]

Recognizing that servicing errors may occur, even in a well-functioning student loan market, servicers should expect to be accountable for their conduct. Policymakers should consider steps to ensure borrowers have access to appropriate mechanisms to resolve errors. Furthermore, when violations of law occur, federal and state agencies should identify issues, correct conduct, and obtain remediation for borrowers.

# 3.4   Transparent

As policymakers, regulators, market participants, and other stakeholders acknowledge, both in response to the Bureau's *Request for Information* and in other forums, there is insufficient public data related to the performance of student loans, which may magnify risks for borrowers.[545] Increased transparency, including periodic public reporting of servicer-level data on student loan performance, is critical to ensure that stakeholders have a more complete understanding of borrower behavior in order to effectively address the underlying factors driving elevated levels of student loan delinquency.  Improved public access to data on student

---

[544] CFPB-2015-0021-0381.

[545] *See* Susan Dynarski, *We're Frighteningly in the Dark About Student Debt,* New York Times (Mar. 20, 2015), *available at* http://www.nytimes.com/2015/03/22/upshot/were-frighteningly-in-the-dark-about-student-debt.html; Federal Reserve Bank of New York, *Opening Remarks at the Convening on Student Loan Data Conference* (Mar. 4, 2015), *available at* http://www.ny.frb.org/newsevents/speeches/2015/dud150304.html; *see also* CFPB-2015-0021-0370.

loan performance will also allow stakeholders to anticipate future problems for borrowers repaying student loan debt.

**Current public data on student loan performance is inadequate.** Commenters note that current requirements for publication of student loan data are quite limited.[546] As one commenter notes:

> *Shortcomings in available student loan data have two main effects. First, the gaps hamper efforts to identify student loan trouble spots. Second, they hinder servicing improvement. The net result is a system that treats all borrowers the same while also not constructing the repayment system in a way that sufficiently assists those who need greater help.*[547]

The Department of Education compiles and maintains administrative loan level performance data for all student loan borrowers with federal student loans through the National Student Loan Data System, the primary information system used by the Department, colleges and universities, market participants and others to administer federal loan programs.[548] However, historically, public access to this data has been limited. The Department of Education has taken steps in recent months to expand the summary information available for the Direct Loan program, including the publication of the first servicer-level information on loan performance, but significant gaps remain.  There is no equivalent souce of information available to the public related to the performance of private student loans or FFELP loans.

**Policymakers and market participants should look to the availability of mortgage data as a potential guide.** Policymakers and the public have access to increasingly robust data about the performance and origination of mortgages through a number of sources. Data from housing GSEs and mortgage-backed securities filings shed significant light on loan-level performance. The Office of the Comptroller of the Currency regularly publishes a mortgage

---

[546] *See, e.g.*, CFPB-2015-0021-0860.

[547] CFPB-2015-0021-0354; *see also* CFPB-2015-0021-0356.

[548] 20 U.S.C. § 1092b; *see also* http://nslds.ed.gov/.

metrics report detailing loan modification performance and other key servicing data.[549] In addition, most loan-level mortgage origination data is currently subject to public disclosure, stripped of borrower-identifiable information, under the Home Mortgage Disclosure Act.[550]

In contrast, available public data about student loans is limited. The Federal Financial Institutions Examination Council collects reports from insured depository institutions on balance sheet holdings, but student loans are aggregated with many other types of non-mortgage credit products.[551] The U.S. Securities and Exchange Commission filings from large financial institutions rarely contain reporting of key data on student loans, which may be combined in public filings with information about the performance of other consumer loans. Student loan ABS filings and servicer performance reports are much less granular than similar mortgage reports.

As Federal Reserve Bank of New York President William Dudley noted earlier this year at a conference on student loan data:

> *[T]here are many important questions still left unanswered. . . . What attributes are associated with borrowers who are more successful at repaying their student loans? . . . What are the best interventions to help borrowers avoid the consequences of delinquency and default, and to limit any default costs to taxpayers? Do borrowers who use programs like income-based repayment eventually succeed in paying off their debts?. . . These are important questions for the nation, as the human capital of our*

---

[549] *See, e.g.*, Office of the Comptroller of the Currency, *Mortgage Metrics Report for 2013 Q4* (Mar. 2014), *available at* http://www.occ.gov/publications/publications-by-type/other-publications-reports/mortgage-metrics-2013/mortgage-metrics-q4-2013.pdf.

[550] The Bureau developed and maintains a web tool to allow the public to access and analyze mortgage origination data released pursuant to HMDA. *See* Consumer Financial Protection Bureau, *The Home Mortgage Disclosure Act, available at* http://www.consumerfinance.gov/hmda.

[551] *See* Federal Financial Institution Examination Council, *Central Data Repository: Reports of Condition and Income (Call Report)*, *available at* https://cdr.ffiec.gov/public/.

*citizens is far and away our most important asset, and student loans are an important mechanism for financing needed investments in that asset.*[552]

Significant improvements in market transparency may permit student loan borrowers, market participants, regulators, and law enforcement agencies to better understand the student loan market in order to identify emerging risks and effectively target resources to address problems, encourage borrower success, and mitigate defaults.

---

[552] Federal Reserve Bank of New York, *Opening Remarks at the Convening on Student Loan Data Conference* (Mar. 4, 2015), *available at* http://www.ny.frb.org/newsevents/speeches/2015/dud150304.html.

# Conclusion

Adequate student loan servicing can empower consumers to satisfy their financial obligations and participate fully in the economy. The servicing practices discussed in this report, when taken together, raise serious questions about whether more than 41 million American consumers with student loan debt have access to the services, information, and protections they need in order to lead healthy financial lives.

As policymakers consider proposals to address the key drivers of rising student loan debt, including potential changes to the structure of higher education financing for future generations of student loan borrowers, the thousands of comments that informed this report should serve as a public reminder that millions of current student loan borrowers may not be well-served by the status quo.

Policymakers and market participants should consider the framework for reform outlined in this report as they take necessary action to protect student loan borrowers from illegal practices, realign incentives to encourage better outcomes and seek to improve the level of service provided market-wide. The Bureau intends to continue to monitor the student loan marketplace closely using all appropriate tools to ensure that borrowers are treated fairly and to improve servicing outcomes for borrowers.

# Contact information

**CFPB'S STUDENT LOAN OMBUDSMAN:**

Email: students@cfpb.gov

Webpage:    http://www.consumerfinance.gov/students

Address:  Consumer Financial Protection Bureau

1700 G St NW

Washington, DC 20552


**TO SUBMIT A COMPLAINT:**

Webpage: http://www.consumerfinance.gov/complaint

Toll-Free:    (855) 411-CFPB (2372)

Español:  (855) 411-CFPB (2372)

TTY/TDD:    (855) 729-CFPB (2372)

Fax:    (855) 237-2392

Address:  Consumer Financial Protection Bureau

PO Box 4503

Iowa City, Iowa 52244

**FOR ADDITIONAL RESOURCES TO ASSIST STUDENT LOAN BORROWERS:**

Repay Student Debt web tool: http://www.consumerfinance.gov/paying-for-college/repay-student-debt

Paying for College suite of tools:   www.consumerfinance.gov/paying-for-college/

Ask CFPB: http://www.consumerfinance.gov/askcfpb/


**FOR PRESS & MEDIA REQUESTS:**

Email:    press@consumerfinance.gov


147

APPENDIX A:

# Joint statement of principles on student loan servicing

United States Department of the Treasury

United States Department of Education

Consumer Financial Protection Bureau

## Joint statement of principles on student loan servicing

The U.S. Department of Education, the U.S. Department of the Treasury, and the Consumer Financial Protection Bureau have developed this *Joint Statement of Principles on Student Loan Servicing* as a framework to improve student loan servicing practices, promote borrower success, and minimize defaults.[553]

---

[553] On March 10, 2015, the President signed a Presidential Memorandum on a Student Aid Bill of Rights to Help Ensure Affordable Loan Repayment. The President directed the Secretary of Education, in consultation with the Secretary of the Treasury and the Director of the Consumer Financial Protection Bureau, to issue a report by October 1, 2015 on, among other things, recommendations concerning private and federal student loan servicing standards, flexible repayment opportunities for all student loan borrowers, and changes to bankruptcy laws. This *Joint Statement of Principles on Student Loan Servicing* will inform this required report.

## General principles for student loan servicing[554]

Consistent with their respective authorities, responsibilities, and missions, the Departments and the Bureau are committed to working together so that all student loan borrowers have access to (1) the information they need to repay their loans responsibly and avoid default; (2) protections so that they will be treated fairly even if they are struggling to repay their loans; and (3) mechanisms so that errors are resolved expeditiously and assurances that student loan servicers, both in the marketplace and through federally-contracted companies, are held accountable for their conduct. The following principles have been developed to advance these goals.

There are four main types of postsecondary education loans under which borrowers have outstanding balances. Direct Loans are federal loans made directly to borrowers by the U.S. Department of Education through the William D. Ford Federal Direct Loan program. Federal Family Education Loan Program (FFELP) loans were originated by private lenders and guaranteed by the federal government. Federal Perkins Loans, which are co-funded by institutions of higher education and the federal government, are originated and administered by participating institutions. Direct Loans, Perkins Loans and FFELP loans are made pursuant to Title IV of the Higher Education Act of 1965, as amended (HEA). The SAFRA Act, enacted in 2010, ended new loan originations under the FFEL program in 2010, but a significant number of loans remain outstanding. Private student loans are made by depository and non-depository financial institutions, states, institutions of higher education, and other entities. Private loans are not governed by HEA, but are subject to other federal and state laws.  All Federal Direct Loans and some FFELP loans are held by the Department of Education and serviced pursuant to contracts with loan servicers and collection contractors.  Servicing for Perkins Loans, privately-held FFELP loans, and private student loans is provided at the direction of the current loan holder, and servicing activities for Perkins and FFELP loans are governed by rules and regulations laid out by law and through the U.S. Department of Education. The economic

---

[554] On September 29, 2015, the Consumer Financial Protection Bureau published *Student Loan Servicing: Analysis of Public Input and Recommendations for Reform*, analyzing comments the Bureau solicited from stakeholders including student loan borrowers, federal student loan servicers, private student loan market participants, policy experts, and state law enforcement officials and regulators as part of the Departments' and the Bureau's joint efforts to identify initiatives to strengthen student loan servicing.

incentives to provide servicing that best serves borrowers', loan holders', and taxpayers' needs vary across the different types of student loans.

In addition, the respective loan types come with varying levels of consumer protections and special benefits. Direct Loans, in general, offer borrowers more protections than private or FFELP loans. Borrowers with FFELP loans continue to consolidate into the Direct Loan program to access certain protections and benefits including the Public Service Loan Forgiveness Program, the nonaccrual of interest for servicemembers serving in areas of hostilities, and certain income-driven repayment plans. For federal loans, pursuant to provisions in the HEA, institutions of higher education are required to provide certain disclosures to borrowers that provide them with clear and helpful information about their loans and repayment options as part of schools' statutorily required entrance and exit counseling duties.

The Departments and the Bureau intend to work closely with one another, consistent with their respective authorities, to strengthen servicing protections for student loan borrowers, and will seek to ensure that student loan servicing is, where appropriate:

- **Consistent**. Student loan borrowers and servicers alike would benefit from a clear set of expectations for what constitutes minimum requirements for services provided by student loan servicers and servicer communications with borrowers, including adequate and timely customer service. Student loan borrowers should expect effective student loan servicing, including, but not limited to, conduct related to payment processing, servicing transfers, customer requests for information, error resolution, and disclosure of borrower repayment options and benefits. uch conduct should account for and recognize variations in loan features, terms, and borrower protections.

- **Accurate and actionable**. Student loan borrowers often depend on servicers to provide basic information about account features, borrower protections, and loan terms. It is critical that information provided to borrowers by student loan servicers be accurate and actionable. Information, including explanation and instructions regarding borrowers' loans and repayment options, should be presented in a manner that best informs borrowers, helps them achieve positive outcomes, and mitigates the risk and costs of default.

150

- **Accountable**. Student loan servicers, whether for-profit, not-for-profit, or government agencies, should be accountable for serving borrowers fairly, efficiently, and effectively. If servicers fall short and violate federal or state consumer financial laws, the HEA, contractual requirements, or federal regulations, then borrowers, federal and state agencies and regulators, and law enforcement officials should have access to appropriate channels for recourse, as authorized under law.

- **Transparent**. The public, including student loan borrowers, may benefit from information about the performance of private and federal student loans and the practices of individual student loan lenders and servicers, including information related to loan origination, loan terms and conditions, borrower characteristics, portfolio composition, delinquency and default, payment plan enrollment, utilization of forbearance and deferment, the administration of borrower benefits and protections, and the handling of borrower complaints. The federal government already makes much of this information available for federal student loans, and private-sector lenders and servicers should follow suit. Portfolio performance data, including data at the individual servicer level, should be available for all types of student loans.

EXHIBIT E

August 2016

# Midyear update on student loan complaints

Income-driven repayment plan application issues



# Table of contents

**Executive summary**................................................................................2

**1. About this report** .............................................................................5

**2. Student loan complaint data** .............................................................6

**3. Issues faced by borrowers** ...............................................................12

    3.1    Overview of student loan complaints ............................................12

    3.2    Issue highlight: Income-driven repayment plan application obstacles..........14

**4.    Ombudsman's discussion** ................................................................25

    4.1    Securing and keeping an income-driven student loan payment ...................25

    4.2    Recommendations ........................................................................29

**5.    Contact information**.........................................................................35

**Appendix** ..........................................................................................36

# Executive summary

▪ This midyear report analyzes complaints submitted by consumers from October 1, 2015 through May 31, 2016. During this period, the Bureau handled approximately 3,500 private student loan complaints, and also handled 1,500 debt collection complaints related to private and federal student loans. The Bureau also began handling complaints about problems managing or repaying federal student loans, and handled 2,400 federal student loan servicing complaints during the final three months of this reporting period.

▪ Since 2009, the vast majority of borrowers with federal student loans have a right under federal law to set their monthly student loan payments based on their income. For borrowers who are unemployed or earn low wages, these income-driven repayment (IDR) plans provide for a "payment" as low as $0 per month.

▪ Many borrowers depend on student loan servicers to inform them about the availability of IDR options and for processing borrowers' enrollment in these plans. This report observes that borrowers encounter obstacles when submitting applications for IDR plans, including poor customer service, unexpected delays, lost paperwork, and inconsistent or inaccurate application processing. Consumer complaints describe how these obstacles can increase costs, reduce benefits, and extend repayment terms for consumers.

▪ This report focuses on problems for borrowers who submit an application to enroll in or recertify income and family size under an IDR plan. These observations build on previous reports by the Bureau that noted consumers encountered problems with two other key segments of the IDR enrollment process. First, we described problems identified by consumers related to the information provided by student loan servicers regarding available repayment options. These include concerns raised by borrowers about practices by some servicing personnel that drive borrowers into short-term alternatives such as forbearance, over longer-term options that may be better suited to meet many borrowers' needs. Second, we noted that borrowers described problems related to communications and processes for recertifying income and family size for

2

borrowers who do successfully enroll—the process through which borrowers maintain an income-driven payment over the long-term.

- With this report, the Bureau has now reported on servicing problems at every step of the IDR lifecycle, as identified by consumers with federal student loans.

- The Bureau handled complaints from borrowers describing IDR application processing delays that last weeks or months, during which these borrowers lose out on protections that can lower their monthly payment, save them money on interest charges, and start them on the path to loan forgiveness. Many student loan borrowers are able to complete the application process for an IDR plan online at www.studentloans.gov, supplemented by tax information provided electronically by the Internal Revenue Service. For these borrowers, a student loan servicer need only validate the information provided, and approve or deny the application. However, consumers seeking to apply online in this manner report encountering costly and cumbersome delays.

- The Bureau has also handled complaints from otherwise eligible borrowers describing differing approaches to addressing incomplete applications, depending on the identity of their servicer. Borrowers report that servicers reject borrowers' applications without providing borrowers the opportunity to fix mistakes or update documentation. Instead of facilitating these borrowers' enrollment in their requested IDR plan, clumsy or flawed IDR enrollment practices mean borrowers are unlikely to obtain an affordable repayment option. Many borrowers are required to provide supplemental information directly to their student loan servicer outside of the electronic enrollment process, either to attest that they are unemployed or have no income, or to provide documentation indicating that their income has changed substantially since their prior year's tax returns. These borrowers rely on their student loan servicer to evaluate whether borrowers' supporting documentation is sufficient to approve or deny an enrollment application, and to work with them to address any deficiencies in their application. However, consumers report surprise rejections that can lead to payment shocks, delayed benefits, and increased interest charges.

- This report offers recommendations to address the challenges identified in consumer complaints. This report recommends immediate action from student loan servicers, highlighting recent policy guidance issued by the Department of Education as a roadmap to strengthen practices related to the handling of IDR applications. This report also

3

recommends that servicers consider providing clear, actionable instructions to consumers who submit incomplete IDR applications by clarifying any deficiencies, and providing adequate time for borrowers to provide corrections and stay on track to certify or recertify their income and family size.

- The Bureau developed a prototype *Income-Driven Repayment Application Fix it Form* (IDR Fix It Form). Servicers seeking to adopt the recommendations included in this report can look to the IDR Fix It Form as one approach to improve the level of service they provide to their customers seeking to apply for IDR. The IDR Fix It Form documents any deficiencies with borrowers' IDR applications and communicates to borrowers about how to address the deficiencies and get their applications back on track. The Bureau has also made available a sample IDR Fix It Form that consumers can provide their servicer when attempting to navigate the enrollment and recertification process.

- This report also notes the lack of publicly available data related to the processes highlighted in this report, calling for policymakers to take immediate action in order to publish servicer-specific metrics related to application handling, processing time, and borrower outcomes under a range of IDR plans.

4

# 1. About this report

The Dodd-Frank Wall Street Reform and Consumer Protection Act (Act) established a Student Loan Ombudsman within the Bureau. Pursuant to the Act, the Ombudsman shall compile and analyze data on private student loan complaints and make appropriate recommendations to the Secretary of the Treasury, the Director of the Consumer Financial Protection Bureau, the Secretary of Education, and Congress.

This report analyzes more than 3,500 private student loan complaints, 2,400 federal student loan servicing complaints, and approximately 1,500 debt collection complaints related to private and federal student loan debt handled between October 1, 2015 and May 31, 2016. The information included in this report represents the Ombudsman's independent judgment and does not necessarily represent the view of the Consumer Financial Protection Bureau.

Seth Frotman
*Student Loan Ombudsman*
**Consumer Financial Protection Bureau**

# 2. Student loan complaint data

Information about consumer complaints, including information about private student loan and debt collection complaints, is available to the public through the CFPB's Consumer Complaint Database.[1]

The database contains anonymized complaint data provided by consumers, including the type of complaint, the date of submission, the consumer's zip code, and the company that the complaint concerns. The database also includes information about the actions taken by a company in response to a complaint: whether the company's response was timely, how the company responded, and whether the consumer disputed the company's response. The database does not include consumers' personal information. The database includes web-based features such as the ability to filter data based on specific search criteria; to aggregate data in various ways, such as by complaint type, company, location, date, or any combination of available variables; and to download data.

The following tables are based on complaints handled from October 1, 2015, through May 31, 2016, as exported from the public Consumer Complaint Database as of August 1, 2016.[2] Due to

---

[1] Consumer Financial Protection Bureau, *Consumer Complaint Database, available at* http://www.consumerfinance.gov/complaintdatabase/. The database lists complaints where the companies have had the opportunity to provide a response or after the companies have had the complaint for 15 calendar days –whichever comes first. The publication criteria are available at http://files.consumerfinance.gov/f/201303_cfpb_Final-Policy-Statement-Disclosure-of-Consumer-Complaint-Data.pdf.

[2] Not all complaints handled by the Bureau are published in the public Consumer Complaint Database. Therefore the number of complaints published in the database may be fewer than the total number of complaints handled by the Bureau. For example, complaints that do not meet the publication criteria may be removed from the database.  In addition, when we first begin to accept complaints about a specific product (such as federal student loan servicing complaints, which we began handling in February 2016), the Bureau first evaluates the data of each new product or

the lack of publicly available data on private student loans, these tables are not indexed for market share.[3]

**FIGURE 1:**   PRIVATE STUDENT LOAN ISSUES REPORTED BY CONSUMERS FROM OCTOBER 1, 2015 THROUGH MAY 31, 2016



Note: Consumers submitting student loan complaints can select from the following three types of complaint categories: "Getting a loan," "Can't pay my loan," and "Dealing with my lender or servicer." This figure reflects the categories consumers selected when submitting a complaint.

---

service and considers whether any product- or service-specific policy changes are warranted before beginning to publish those complaints.

[3] Compared to other large markets of consumer financial products, such as residential mortgages and credit cards, availability of market data is quite limited for private student loans, which grew rapidly in the years leading up to the financial crisis. *See* Consumer Financial Protection Bureau and U.S. Department of Education, *Private Student Loans* (2012), *available at* http://www.consumerfinance.gov/reports/private-student-loans-report/.

**TABLE 1:**   COMPANIES WITH THE MOST PRIVATE STUDENT LOAN COMPLAINTS RANKED BY VOLUME

| Company | Oct. 2014 – May 2015 | Oct. 2015 – May 2016 |
|---|---|---|
| Navient | 1,210 | 1,123 |
| AES/PHEAA | 259 | 317 |
| Sallie Mae | 149 | 161 |
| Wells Fargo | 156 | 154 |
| Transworld Systems Inc. | 70 | 128 |

Note: This table reflects complaints where (1) the consumer identified the sub-product as a non-federal student loan and (2) the identified company responded to the complaint, confirming a relationship with the consumer.

**FIGURE 2:**   ISSUES IDENTIFIED IN PRIVATE STUDENT LOAN COMPLAINTS BY COMPANY FROM OCTOBER 1, 2015 THROUGH MAY 31, 2016



Note: This table reflects complaints where (1) the consumer identified the sub-product as a non-federal student loan, (2) the consumer identified the issue and (3) the identified company responded to the complaint, confirming a relationship with the consumer. This table only reflects the top companies by complaint volume.

**FIGURE 3:**   PRIVATE STUDENT LOAN COMPLAINTS BY MONTH



Note: This table reflects complaints where (1) the consumer identified the sub-product as a non-federal student loan and (2) the identified company responded to the complaint, confirming a relationship with the consumer.

**FIGURE 4:**   PRIVATE STUDENT LOAN COMPLAINTS RELATED TO REPAYMENT DISTRESS BY MONTH

Note: This table reflects complaints where (1) the consumer identified the sub-product as a non-federal student loan, (2) the consumer identified their issue as "can't repay my loan" and (3) the identified company responded to the complaint, confirming a relationship with the consumer. This table only reflects the top companies by complaint volume.

From October 1, 2015 through May 31, 2016, the CFPB handled approximately 1,500 debt collection complaints related to private and federal student loans.

**TABLE 2:**   TOP RECIPIENTS OF DEBT COLLECTION COMPLAINTS ABOUT STUDENT LOANS FROM OCTOBER 1, 2015 THROUGH MAY 31, 2016

| Federal Student Loans | Number of Complaints | Private Student Loans | Number of Complaints |
|---|---|---|---|
| Navient | 102 | Navient | 115 |
| Transworld Systems Inc. | 25 | AES/PHEAA | 50 |
| ECMC Group, Inc. | 21 | Transworld Systems Inc. | 26 |
| Allied Interstate LLC | 18 | URS Holding, LLC | 19 |
| AES/PHEAA | 17 | Financial Asset Management Systems Inc. | 15 |
| Performant Financial Corporation | 17 | Allied Interstate LLC | 13 |

Note: This table reflects debt collection complaints where (1) the consumer identified the sub-product as a non-federal or a federal student loan and (2) the identified company responded to the complaint, confirming a relationship with the consumer. This table also reflects aggregated complaints of subsidiary debt collection companies that operate under their respective parent companies.

**FIGURE 5:**   DISTRIBUTION OF LOAN TYPE FOR STUDENT LOAN DEBT COLLECTION COMPLAINTS BY COMPANY FROM OCTOBER 1, 2015 THROUGH MAY 31, 2016



Note: This table reflects debt collection complaints where (1) the consumer identified the sub-product as a non-federal or a federal student loan and (2) the identified company responded to the complaint, confirming a relationship with the consumer. This table was not adjusted to reflect each company's relative market share. This table reflects the top companies by complaint volume. This table also reflects aggregated complaints of subsidiary debt collection companies under the parent company.

# 3. Issues faced by borrowers

## Sources of information

To identify the range of issues faced by student loan borrowers, the report relies primarily on complaints handled by the Bureau. We reviewed other information, such as comments submitted by the public in response to requests for information, submissions to the "Tell Your Story" feature on the Bureau's website, and input from discussions with consumers, regulators and law enforcement agencies, and market participants.

## Limitations

Readers should note that this report does not suggest the prevalence of the issues described as they relate to the entire student loan market. The information provided by borrowers helps to illustrate where there is a mismatch between borrower expectations and actual service delivered. Representatives from industry and borrower assistance organizations will likely find the inventory of borrower issues helpful in further understanding the diversity of customer experience in the market.

## 3.1   Overview of student loan complaints

The Bureau continues to handle complaints from borrowers related to a range of servicing problems, including payment processing, payment handling, and servicer communications. Over this reporting period, student loan borrowers with private loans continue to submit complaints when unable to identify options that would lower their monthly payment or allow them to enroll in an affordable repayment program for their private loan. Complaints also suggest that alternative repayment plans may be available for certain private student loan borrowers, but that these borrowers may experience difficulty in accessing information about these plans. When borrowers seek to investigate potential repayment options and contact their lender or servicer to obtain information, complaints reveal that some of these borrowers may receive responses that servicers do not or were unable to offer an alternative repayment plan.

Borrowers also submitted complaints noting that they received conflicting information from multiple customer service representatives about eligibility criteria to enroll in alternative repayment programs. Borrowers with private student loans also continue to submit complaints related to the process of "auto-defaulting" on a student loan, in which a servicer places a borrower's loan in default upon the death or bankruptcy of a co-signer, even when the borrower has been making full, on-time payments each month.[4]

In February 2016, the Bureau began handling complaints from borrowers with federal student loans related to student loan servicing. The Bureau handled more than 2,400 complaints from consumers with federal student loans, related to servicer communications, payment processing, and the administration of benefits and protections created under Title IV of the Higher Education Act, including IDR plans.[5] The following section seeks to explore complaints citing problems related to the administration of IDR plan applications in further detail.

---

[4] Earlier this year, the Bureau noted in an edition of *Supervisory Highlights* that examiners determined that one or more student loan servicers engaged in an unfair practice in violation of the Dodd-Frank Act relating to auto-default. When a private student loan had a borrower and a co-signer, one or more servicers would auto-default both the borrower and co-signer if either filed for bankruptcy. These auto-defaults were determined to be unfair where the *Whole Loan Due* clause was ambiguous on this point because reasonable consumers would not likely interpret the promissory notes to allow their own default as the result of a co-debtor's bankruptcy. Further, one or more servicers did not notify either co-debtor that the loan was placed in default. Some consumers only learned that a servicer placed the loan in a default status when they identified adverse information on their consumer reports, the servicer stopped accepting loan payments, or they were contacted by a debt collector. Supervision directed one or more servicers to immediately cease this practice. *See* Consumer Financial Protection Bureau, *Supervisory Highlights: Winter 2016* (March 2016), *available at* http://files.consumerfinance.gov/f/201603_cfpb_supervisory-highlights.pdf.

[5] During the reporting period ending on May 31, 2016.

# 3.2   Issue highlight: Income-driven repayment plan application obstacles

The Bureau has repeatedly discussed widespread problems reported by consumers related to student loan servicing practices, and in particular, practices related to IDR plans. To date, we have focused on two key areas where there is a mismatch between borrower expectations and actual service delivered. First, we described problems identified by consumers related to the information provided by student loan servicers regarding available repayment options. These include concerns raised by borrowers related to practices by some servicing personnel that drive borrowers into short-term alternatives such as forbearance, instead of longer-term options that may be better suited to meet many borrowers' needs.[6] Second, we highlighted problems borrowers described when seeking to maintain an income-driven monthly payment amount, including issues related to servicer communications regarding borrowers' obligation to recertify income and family size under these plans.[7] This report focuses on a third key area in the lifecycle of a student loan borrower enrolled in an IDR plan—the processing of application paperwork and other obstacles related to IDR enrollment.

---

[6] *See* Consumer Financial Protection Bureau, *Student Loan Servicing*, 25 (Sept. 2015), *available at* http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf ("Borrowers may not be informed about the availability of certain alternative repayment plans or may be encouraged by servicing personnel to enroll in alternatives that may not be in their best interest.").

[7] *See* Consumer Financial Protection Bureau, *When you make student loan payments on an income-driven plan, you might be in for a payment shock* (Aug. 2015), *available at* http://www.consumerfinance.gov/about-us/blog/when-you-make-student-loan-payments-on-an-income-driven-plan-you-might-be-in-for-a-payment-shock/; s*ee also* Consumer Financial Protection Bureau, *Student Loan Servicing* (Sept. 2015), *available at* http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf ("Commenters note that servicing issues related to certifying income continue for borrowers even after they successfully enroll in income-driven repayment plans.").

**FIGURE 6:**   SERVICING LIFECYCLE OF AN INCOME-DRIVEN REPAYMENT PLAN



**Note:** To date, the Bureau has reported problems identified by borrowers related to the first and third category in this diagram— servicer communications about repayment options and servicer communications and processing when borrowers seek to recertify income and family size in order to retain a monthly payment based on their income.  This report focuses on the second category in this diagram—servicer processing of IDR enrollment applications.

Prior to 2009, most federal student loan borrowers experiencing financial hardship were forced to choose between delinquency, which leads to late fees and damaged credit, or forbearance, an option that permits suspension of monthly payments for a limited period of time, effectively extending the term of the loan and causing the borrower to incur interest expenses. Accordingly, both delinquent borrowers and borrowers in forbearance who encountered financial hardship could not progress toward payoff (or loan forgiveness) during periods of economic distress. However, since 2009, the vast majority of federal student loan borrowers experiencing financial distress have had access to IDR plans, when the Income-Based Repayment (IBR) plan was created.[8] IDR plans typically offer a better option for distressed borrowers—one intended to provide a long-term alternative that preserves these borrowers' credit profiles and provides a path to satisfy their financial obligation.

Most federal student loan borrowers have a right to a repayment plan that sets their monthly student loan payments based on their discretionary income.[9] These plans offer benefits and

---

[8] *See* 20 U.S.C. § 1098e(b). IBR is one of several types of IDR plans. While all IDR plans peg a borrower's payment amount to the borrower's discretionary income and family size, the individual plans each have slightly different terms, the most prominent of which is the percentage of discretionary income used to determine the payment (*e.g.*, IBR payments are set at 15 percent of a borrower's discretionary income, while payment under Pay As You Earn, another IDR plan, are set at 10 percent of a borrower's discretionary income).

[9] *See* U.S. Department of Education, *Repayment Plans* (accessed Aug. 1, 2016), *available at* https://studentaid.ed.gov/sa/repay-loans/understand/plans.

protections intended to facilitate successful repayment. Under an IDR plan, borrowers can make payments based on their income and family size, rather than based on their loan balance.[10] For borrowers who are unemployed or have very low wages, "payments" under these plans may be as low as $0 per month.[11] In addition to obtaining immediate payment relief, borrowers enrolled in these plans can take advantage of other immediate and long-term benefits, including interest subsidies, special treatment of unpaid interest, and potentially loan forgiveness.

Borrowers depend on student loan servicers to manage and process enrollment in IDR plans, including making determinations about eligibility, evaluating documentation, and communicating with borrowers about the enrollment process.

However, since the Bureau began accepting federal student loan servicing complaints, issues related to enrollment in IDR plans have emerged. In particular, consumer complaints continue to cite IDR enrollment issues that result in lost interest subsidy benefits, potentially delay eligibility for loan forgiveness benefits, and trigger unnecessary capitalization of interest.

## Application processing delays drive up borrower costs

To enroll in an IDR plan, borrowers are required to submit an application, along with proof of income and family size, to their servicer for review and processing. This application may be submitted online through www.studentloans.gov—an information system managed by the

---

[10] *See* U.S. Department of Education, *Income-Driven Repayment Plans for Federal Students Loans* (Feb. 2016), *available at* https://studentaid.ed.gov/sa/sites/default/files/income-driven-repayment.pdf.

[11] In April 2016, the Department of Education published a framework outlining its expectations for how student loan information should appear on borrowers' credit reports. *See* U.S. Department of Education, *Fact Sheet: Modernizing Credit Reporting for Student Loans* (Apr. 2016), *available at* http://www2.ed.gov/documents/press-releases/04282016-credit-reporting.doc.

Department of Education—or via paper application, submitted directly to a student loan servicer. In both cases, servicers target processing IDR applications within 15 days.[12]

---

[12] *See* U.S. Department of Education, Memorandum from U.S. Department of Education Under Secretary Ted Mitchell on *Policy Direction on Federal Student Loan Servicing* (July 20, 2016), *available at* http://www2.ed.gov/documents/press-releases/loan-servicing-policy-memo.pdf.

17

**FIGURE 7:**   IDR ENROLLMENT AND RECERTIFICATION PROCESS



Servicers' failure to timely process these applications can be detrimental to borrowers. Borrower complaints note that IDR applications may take weeks or months to process, delaying borrowers' access to the consumer protections described above. Furthermore, when borrowers' enrollment in IDR is delayed, they may be subject to otherwise avoidable harms, such as increased loan balances and loss of benefits.

**Borrowers complain that their loan balances grow due to the accrual and capitalization of interest during extended application processing periods.** Generally, servicers will place a borrower's loans into administrative forbearance for up to 60 days while processing an initial IDR application.[13] During periods of forbearance, interest continues to accrue. However, unlike other types of forbearance, interest accrued during a period of administrative forbearance will not capitalize (*i.e.*, will not be added on to a borrower's principal balance) if an application is processed and the borrower is successfully enrolled in IDR during this period.[14] However, borrowers report that servicers may take longer than 60 days to process their applications, even when these applications are complete and submitted timely. Borrowers complain that their administrative forbearance period expires before their application is processed, and only learn of the expiration of forbearance when they receive an unexpected bill indicating that they owe a payment set at their prior, standard 10-year amount. For some borrowers, this can also result in the capitalization of unpaid interest charges, potentially increasing loan balances by hundreds or even thousands of dollars.

**Prolonged application processing delays borrowers' access to interest subsidies.** When borrowers enroll in an IDR plan, their payments may not be sufficient to cover the interest charged each month, potentially resulting in a growing balance of unpaid interest. However, any unpaid interest charges on subsidized loans are waived during the first 36 months of repayment under any IDR plan.[15] Additionally, for borrowers enrolled in Revised Pay As You Earn (REPAYE), the Department of Education will further waive 50 percent of any unpaid interest for both subsidized and unsubsidized loans, with no associated time limit.[16] Borrowers

---

[13] *See* 34 C.F.R. § 685.205(b)(9). One servicer notes that 70 percent of its borrowers enrolling in an IDR plan enter forbearance prior to enrollment. *See* Comment from Navient, CFPB-2016-0018-0665, *available at* https://www.regulations.gov/document?D=CFPB-2016-0018-0665.

[14] *See* 34 C.F.R. § 685.205(b)(9).

[15] This interest subsidy is available for borrowers under IBR, PAYE, and REPAYE, but not for borrowers enrolled in Income-Contingent Repayment (ICR).

[16] *See* 34 C.F.R. § 685.209(c)(2)(iii).

report that when servicers process applications over an extended period of time, these delays can result in extra interest charges that would have otherwise been waived.

**Delayed IDR enrollment also delays and decreases borrowers' potential loan forgiveness.** Borrowers enrolled in an IDR plan are entitled to forgiveness of any remaining loan balance after 20 or 25 years of qualified payments.[17] If these borrowers are employed in public service, they can receive loan forgiveness after 10 years of qualified payments.[18] Borrowers complain that their servicer's delayed processing of their IDR applications is obstructing their road to repayment, and effectively reducing any loan forgiveness benefit they may ultimately receive.[19] One borrower notes:

> *[My servicer] still [has] not completed the processing of my application. . . . This delay . . . is creating a hardship on me, as it is lengthening the amount of time I remain in debt and delays my final repayment date back as many months as [my servicer is] unable to get me into the new repayment plan. I am also enrolled in the Public Service Loan Forgiveness program, so the "clock" on my maximum 10-year repayment time span has essentially stopped. . .*

**Borrowers complain that processing delays drive them to draw down on a limited allotment of forbearance.** Federal student loan borrowers are entitled to 36 months of financial hardship forbearance over the life of their loan—an important protection against very

---

[17] *See* 34 C.F.R. § 682.215(f); 34 C.F.R. §§ 685.209(a)(6), (c)(5).

[18] *See* 34 C.F.R. § 685.219.

[19] In effect, borrowers using forbearance forgo qualifying months at their present income and family size and assume an obligation to make future monthly payments—in some circumstances, borrowers may experience future wage growth that makes these monthly payments substantially higher than payments based on their current income and family size. For these borrowers, processing delays can result in higher future payments that may further increase the total lifetime cost of their loan.

short-term financial distress or temporary changes in borrowers' financial circumstances.[20] When IDR enrollment is not timely processed, borrowers may need to draw on this limited allowance for each month that processing extends beyond the 60 days of administrative forbearance. Borrowers complain that they had intended to preserve their finite allotment of forbearance in case of financial emergency, but were driven to draw on this protection in order to keep their loan current. Borrowers who encounter servicing delays each time they recertify their IDR plan may find their forbearance allowance depleted long before their loans are forgiven.

## Application rejections

Borrowers seeking to enroll in an IDR plan are required to submit an application to their student loan servicer, either electronically through www.studentloans.gov or via a paper application submitted directly to their servicer.  Borrowers submitting applications electronically have the option to include income information provided directly by the Internal Revenue Service using an electronic version of their most recent federal tax return. Borrowers who are unemployed or need to use alternative documentation due to a recent change in income must provide this information directly to their servicer, even when applying through www.studentloans.gov.[21] Upon receipt, servicers are required to evaluate these applications and make determinations about borrowers' eligibility and payment level.

---

[20] *See* U.S. Department of Education, *Deferment and Forbearance, available at* https://studentaid.ed.gov/sa/repay-loans/deferment-forbearance. Financial hardship forbearance, one type of "voluntary" forbearance, permits the borrower to temporarily cease payments on his or her loan while remaining current. Borrowers can verbally request this type forbearance from their servicer. Any interest accrued during periods of voluntary forbearance is capitalized upon reentering repayment under any repayment plan.

[21] One large servicer notes that at least 50 percent of its borrowers cannot complete their application solely through www.studentloans.gov, and require additional documentation certifying no income or income requiring alternative documentation. *See* Comment from Navient, CFPB-2016-0018-0665, *available at* https://www.regulations.gov/document?D=CFPB-2016-0018-0665.

As noted above, federal law makes IDR plans available to the vast majority of federal student loan borrowers experiencing financial distress, excluding borrowers under only two discrete circumstances: (1) having loans that are ineligible for the requested IDR plan;[22] or (2) not demonstrating partial financial hardship (a prerequisite for most, but not all, IDR plans).[23] In effect, borrowers with eligible loans who are able to demonstrate partial financial hardship have the right to enroll in an IDR plan, provided they supply their servicer with all the necessary information.[24] However, consumers report a range of problems that result in rejected applications, including barriers to enrollment related to some servicers' customer service and IDR application handling practices.

**Borrowers submit complaints describing how servicers reject incomplete applications submitted by otherwise eligible borrowers, without providing an opportunity to remedy any deficiency.** Borrowers may submit applications for IDR enrollment that do not include one or more components necessary for their servicer to timely

---

[22] Certain types of federal student loans are not eligible to enroll in an IDR plan. Other federal loans must first be consolidated with a Direct Consolidation Loan in order to be eligible. For example, loans made to parents of undergraduate students (Parent PLUS loans) are ineligible for any IDR plan; however, a parent borrower may be eligible to enroll in Income-Contingent Repayment (ICR) if he or she consolidates into a Direct Consolidation Loan. Borrowers with federal loans made by institutions of higher education under the Perkins Loan program face a similar additional step; once a Perkins loan is consolidated into a Direct Loan, it is potentially eligible for any IDR plan for which the borrower would otherwise qualify. *See* U.S. Department of Education, *Loan Consolidation* (accessed Aug. 1, 2016), *available at* https://studentaid.ed.gov/sa/repay-loans/consolidation.

[23] *See, e.g.*, 34 C.F.R. § 382.215(b)(1); 34 C.F.R. § 658.221(b)(1); 34 C.F.R. § 685.209(a)(2)(i). Additionally, borrowers with delinquent or defaulted loans are not eligible to enroll in an IDR plan. For delinquent borrowers seeking to enroll in an IDR plan, servicers may retroactively apply forbearance to resolve any past-due payment and bring the borrower's account current. *See, e.g.*, 34 C.F.R. § 682.211(f)(14). Borrowers in default seeking to enroll in IDR must either consolidate their defaulted loans into a Direct Consolidation Loan, or complete a rehabilitation program. *See* U.S. Department of Education, *Getting out of Default* (accessed Aug. 11, 2016), *available at* https://studentaid.ed.gov/sa/repay-loans/default/get-out.

[24] On December 17, 2015, the Department of Education announced a new IDR plan, Revised Pay As You Earn (REPAYE), available to virtually all borrowers with federal student loans, excluding loans made to parents to finance the education of an und

process their enrollment.[25] Deficiencies may include lack of income documentation, signatures on required forms, or other personal or demographic information. Borrowers with incomplete applications report that servicers reject their applications, despite borrowers' offering to remedy the application. Borrowers note that rejections may result from missing information or lost paperwork, and that in both circumstances borrowers are not asked to address these issues prior to the denial of their application. Other borrowers complain that their application is rejected simply for checking the "wrong box," and that they are not given the opportunity to submit a corrected application prior to rejection. These borrowers complain that they must then submit a new application, potentially encountering the same processing delays and lost benefits described above.

**Borrowers who enter forbearance due to application processing delays may find their applications rejected due to their use of forbearance.** When borrowers submit IDR applications, they must provide the current status of their income and their loans, including whether the loan is in forbearance.[26] As previously discussed, borrowers complain that when application processing exceeds their allotted 60 days of administrative forbearance, borrowers with loans that were in active repayment may need to use an additional "voluntary" forbearance, in some cases at the express direction of servicing personnel. As a result, by the time these borrowers' applications are finally reviewed, their loan status will have changed from repayment to voluntary forbearance. Borrowers complain that servicers subsequently reject their applications because of inaccurate information regarding loan status, yet the loan status only

---

[25] As noted above, the distinction between an "incomplete" application and an "ineligible" loan or borrower is critical. Potentially eligible consumers report that their enrollment in IDR is rejected by their servicer despite the fact that they have both (1) an "eligible loan," and (2) are able to demonstrate partial financial hardship. These rejections occur because an application is "incomplete"—once a servicer has identified deficiencies in a borrower's application that may be easily remedied (*e.g.*, missing information, incorrect documentation), borrowers report that their servicer may opt not to take proactive steps to work with them to address these deficiencies and, in some cases, may summarily reject the application.

[26] *See* U.S. Department of Education, *Income-Driven Repayment Request Application*, *available at* http://www.ifap.ed.gov/dpcletters/attachments/18450102IDRFINALExtended.pdf.

changed due to the servicer's processing delays. When these borrowers enter voluntary forbearance on the advice of their servicer, they are not informed that the voluntary forbearance will have the unintended effect of rendering their IDR application inaccurate.

Borrowers note that, had they been presented with an opportunity to correct these deficiencies prior to the rejection of their application, they would have been able to quickly get back on track to enroll in IDR.

**Borrowers complain that they are rejected when seeking to enroll in an IDR plan, because of changes in borrowers' circumstances during a prolonged application processing period.** Borrowers note that their applications were rejected when servicers' application processing delays coincided with changes in borrowers' circumstances, resulting in inaccuracies to information contained in their applications. For example, one borrower complained that she submitted a complete application and, after nearly four months of processing, she received a notice rejecting her enrollment in IDR because her income information provided in the application was more than 90 days old. Despite attempts to quickly correct her application, it took the borrower an extra two months and numerous calls to her servicer to finally enroll in IDR.

# 4. Ombudsman's discussion

Based on the analysis of complaints and other market trends, additional discussion is offered below. The discussion represents the Ombudsman's independent judgment and does not necessarily represent the view of the Consumer Financial Protection Bureau.

## 4.1   Securing and keeping an income-driven student loan payment

The preceding section of this report focuses on application processing problems that can increase costs and cause delays for borrowers seeking to enroll in an IDR plan. Similarly, these challenges can cause problems for borrowers seeking to recertify income and family size—a requirement for borrowers seeking to maintain an income-driven monthly payment under any IDR plan.

The recertification process essentially functions as re-enrollment; borrowers must submit the same application and proof of income as they did when initially enrolling in the IDR plan, using the same process described above. The Bureau handled substantively similar complaints describing comparable obstacles for borrowers seeking to recertify. As the following discussion highlights, servicing practices related to enrollment or recertification, particularly processing delays, can create substantial, unnecessary costs for borrowers.

**When borrowers apply to enroll in IDR, processing delays can increase the short-term and long-term cost of repayment.** Consider a borrower with $23,000 in Direct Subsidized Loans (the loan limit for dependent undergraduate students) with a weighted

average interest rate of 3.76 percent interest who is not currently enrolled in an IDR plan but who would qualify for a $0 monthly payment upon enrollment.[27] She completes an IDR enrollment application online at www.studentloans.gov and her servicer offers to suspend her prior monthly payment as her application is processed, using an administrative forbearance. Because this borrower is not enrolled in an IDR plan while waiting for her application to be processed, she is responsible for paying any interest charges on her loan that accrue during this period.[28]

Due to the daily accrual of interest on student loans, this borrower will have to pay $2.37 in extra interest charges for each day that it takes her servicer to process her application.[29] Because she has Direct Subsidized Loans, any interest charges that accrued while enrolled in an IDR plan would be waived for up to 36 consecutive months. This protection does not apply to periods of

---

[27] $23,000 is the maximum aggregate subsidized loan amount available to undergraduate Direct Loan borrowers. *See* https://studentaid.ed.gov/sa/types/loans/subsidized-unsubsidized. Direct Subsidized Loans for undergraduates disbursed between July 1, 2016 and July 1, 2017 carry an interest rate of 3.76 percent. *See* https://studentaid.ed.gov/sa/about/announcements/interest-rate. Some observers also suggest that IDR borrowers outperform borrowers in other repayment plans because these plans are largely utilized by higher-income borrowers with graduate degrees and above-average levels of student debt. Although public data on wages of borrowers in IDR plan is limited, one large student loan servicer provided data to the Bureau related to IDR utilization by its customers with Direct Loans. This data shows that, of the greater than 1 million Direct Loan borrowers on its platform enrolled in IBR or PAYE, 50 percent reported adjusted gross income between $0 and $20,000 and 84 percent reported AGI less than $50,000. 95 percent of these borrowers reported AGI less than $75,000. *See also* Government Accountability Office, *Federal Student Loans: Education Could Do More to Help Ensure Borrowers are Aware of Repayment and Forgiveness Options* (Aug. 25, 2015), *available at* http://www.gao.gov/products/GAO-15-663.

[28] Readers should note that when servicers apply a specific type of administrative forbearance to a borrower's account and complete an IDR application within 60 days, unpaid interest charges may not capitalize and will be treated similarly to any unpaid interest charges accrued while making IDR payments.

[29] For higher-balance borrowers or borrowers with higher-rate debt, the cost associated with processing delays increases. This is particularly true for higher-balance borrowers enrolled in Revised Pay As You Earn (REPAYE) who are entitled to a 50 percent subsidy of unpaid interest on all federal student loans. A graduate student who borrows up to the loan limit of $138,500 in Direct Unsubsidized Loans and enrolls in REPAYE with a $0 payment can expect a monthly interest subsidy of $302.23. Processing delays will cost this borrower more than $10 per day in unnecessary interest charges.

forbearance. In effect, for every month this borrower must wait for her enrollment to be approved, she is charged more than $70 in interest.[30]

In addition, if her servicer takes more than 60 days to process her application, all outstanding, unpaid interest charges may be capitalized, resulting in greater interest charges over the life of her loan. If, for example, it takes four months for her servicer to complete her enrollment, she will have missed out on nearly $300 interest subsidies, as noted above. She will also pay an additional $10 a year in extra interest because the interest charges incurred during this period are added to the outstanding balance of her student loan.[31]

**When borrowers who enroll in IDR seek to retain a payment based on their income, processing delays can also increase the short-term and long-term cost of repayment.** Now consider a similar borrower with the same starting balance at the same interest rate, but with Direct Unsubsidized Loans, as he approaches the expiration of his initial income and family size certification. He has been making $0 IDR payments under Pay As You Earn and each month, unpaid interest has remained outstanding, but has not been added to his principal balance.[32] Over the first 12 months of his enrollment in IDR, he has accrued more than $865 in unpaid interest. If this borrower submits his application 45 days before his current certification expires, but experiences the same four month servicer processing delay, he would find that his loan balance increased by more than $1,000, and as a result, he will also pay more than $30 in unnecessary interest charges every year for the lifetime of his loan. In effect,

---

[30] Student loans are simple daily interest loans. In this illustration, we calculated the monthly interest costs as 1/12[th] of the total annual interest charges on this loan. Borrowers' actual daily interest charges are equivalent to 1/365[th] of the annual interest that would accrue based on the outstanding daily principal balance. In this illustration, the daily interest charged on a $23,000 balance is $2.37.

[31] $280 at 3.76 percent interest results in $10 in accrued interest per year.

[32] Interest accrued during period of IDR repayment is not capitalized as long as the borrower timely recertifies at the end of the current repayment period, and the recertification application is timely processed.

processing delays by his student loan servicer cause him to forfeit the long-term protection against compounding unpaid interest, a key feature of IDR plans.

It is also important to note that in both cases described above, the borrowers would miss out on progress toward loan forgiveness during any month in which the borrowers needed to use forbearance to postpone an unaffordable monthly payment. In effect, because each borrower must still make 240 months of qualifying payments in total, not including any months spent in forbearance, each borrower forgoes qualifying months toward loan forgiveness in the near term, but remains obligated to make additional monthly payments in the future.[33] This may prove particularly costly if either borrower experiences wage growth, causing future qualifying payments to be calculated based on a higher income. As these examples demonstrate, there are multiple touchpoints during the IDR application process where processing delays can lead to substantial increases in costs for consumers.[34]

Borrowers on an IDR plan can expect to recertify income and family size as many as 24 times during the life of their loan.[35] If a single application processing delay can increase a borrower's loan balance by over $1000, delays during each annual recertification process could cause a borrower's loan balance to increase by tens of thousands of dollars.[36]

---

[33] Borrowers enrolled in PAYE are entitled to loan forgiveness after making 240, or 20 years, of qualified payments. *See* 34 C.F.R. § 685.209(a)(6).

[34] *See also* Education Secretary John King, Remarks on Student Loan Servicing (July 20, 2016) (stating, "When loan servicers make mistakes or don't provide the right information at the right time, borrowers pay the price. And I'm concerned that less-than-stellar student loan servicing is tripping up borrowers as they seek to climb the economic ladder.").

[35] *See* 34 C.F.R. § 682.215(f); 34 C.F.R. §§ 685.209(a)(6), (c)(5).

[36] The Department of Education has proposed multiyear recertification as a potential option to mitigate the harm caused by processing delays. Under this process, borrowers would be able to recertify eligibility for an IDR plan over multiple years in order "to simplify the repayment process for many borrowers in these plans." U.S. Department of Education, *U.S. Department of Education Releases Report on Strengthening the Student Loan System to Better*

# 4.2   Recommendations

We continue to see signs that the promise of high quality servicing may be elusive for too many student loan borrowers. The preceding discussion offers additional support for the Bureau's recommendation that policymakers pursue industrywide standards for student loan servicers.[37] Policymakers and market participants seeking to improve consumers' experience may wish to consider steps to provide more structure around the processing of IDR applications by providing borrowers who submit incomplete IDR enrollment and recertification applications with clear, actionable instructions, including precise information related to how to address application deficiencies. Finally, policymakers should consider additional steps to expand public access to data on student loan performance and the utilization of alternative repayment plans, including IDR plans.

## Industry standards for IDR enrollment and recertification

Market participants may wish to consider immediate action in order to address the specific problems identified in this report. Last month, the Department of Education issued policy direction to Federal Student Aid related to certain student loan servicing practices.[38] This policy direction will "guide development of contract provisions related to the servicing of federal

---

*Protect All Borrowers* (Oct. 1, 2015), *available at* http://www.ed.gov/news/press-releases/us-department-education-releases-report-strengthening-student-loan-system-better-protect-all-borrowers.

[37] *See, e.g.*, U.S. Department of the Treasury, U.S. Department of Education, Consumer Financial Protection Bureau, *Joint Statement of Principles on Student Loan Servicing* (Sept. 2015), *available at* http://files.consumerfinance.gov/f/201509_cfpb_treasury_education-joint-statement-of-principles-on-student-loan-servicing.pdf; Consumer Financial Protection Bureau, *CFPB Concerned About Widespread Servicing Failures Reported by Student Loan Borrowers* (Sept. 29, 2015), *available at* http://www.consumerfinance.gov/about-us/newsroom/cfpb-concerned-about-widespread-servicing-failures-reported-by-student-loan-borrowers/.

[38] *See supra* note 12.

student loans," as Federal Student Aid seeks to award a new servicing contract this year.[39] The Department of Education also noted that this framework is broadly applicable to the servicing of all federal student loans.[40] Specific elements of the Department of Education's policy direction offer an approach that market participants may wish to consider to better serve their most vulnerable customers and to strengthen IDR processing.

In particular, this policy direction provides that a borrower should only be denied enrollment in IDR plans under specific, limited circumstances:

1.  When the borrower's loan is ineligible for the IDR plan for which the borrower applied ([and] if the borrower asks the Department of Education to choose the plan on behalf of the borrower based on plan characteristics (*i.e.*, lowest available monthly payment), a denial could only occur when the borrower is ineligible for any IDR plan);

2.  The borrower does not provide the necessary information for a servicer to make a determination about eligibility, the borrower's income and family size do not indicate partial financial hardship, and such determination prohibits enrollment in the plan requested by the borrower; or

3.  The borrower fails to respond within 60 days to notices received about a deficiency in an application.

---

[39] *Id.* (stating "[the Department of] Education expects the following policy direction to guide the development of contract provisions related to the servicing of federal student loans and will continue to work with federal and state law enforcement agencies and regulators to apply this policy direction expeditiously to the servicing of all student loans, to the maximum extent practicable.").

[40] Id.

30

All other deficiencies that would otherwise cause an application to be denied should instead render the application incomplete, and the policy directive indicates the servicer should actively engage with the borrower to complete the application.[41]

The problems highlighted in this report and the Department of Education's continuing commitment to expand IDR enrollment to millions of new borrowers suggest that there is an immediate need for a strengthened set of standards related to this stage of the IDR enrollment and recertification process and an opportunity for market participants to better serve their customers by looking to this policy directive when considering process improvements. Consumers would benefit from a responsive, transparent process for handling applications, particularly for borrowers who submit incomplete applications or are not able to complete an application through www.studentloans.gov.[42]

## Strengthened borrower communications related to incomplete applications

Building on the preceding recommendation, servicers seeking to strengthen communications related to certain types of incomplete applications may wish to provide borrowers with clear and actionable instructions to complete IDR applications. To assist two specific populations of borrowers applying for IDR—those who provide alternative documentation of income (ADOI), and those who provide a written attestation stating that they have no income—the Bureau developed a prototype *Income-Driven Repayment Application Fix It Form* (Appendix). The IDR Fix It Form offers one approach for servicers seeking to take immediate action to improve the level of service they provide to their customers applying for IDR.

---

[41] This approach may be particularly beneficial for borrowers enrolling in REPAYE, since enrollment eligibility does not require a test for partial financial hardship. In effect, all eligible Direct Loan borrowers who submit a complete application are entitled to enroll in REPAYE, under federal regulations.

[42] *See supra* note 12.

As we have discussed in this report, some borrowers report that their applications for enrollment in or recertification of income and family size under an IDR plan are rejected due to incomplete or deficient applications, but may not be provided the opportunity to complete the application prior to denial. For these borrowers, rejection may result from minor typographical errors or missing information that a servicer could obtain through proactive communication with the borrower. In these cases, additional corrections or supplemental information may be provided by the borrower orally, over the phone. In effect, borrowers' ability to rectify an incomplete application prior to denial may depend on the practices at their specific servicer.

Borrowers complain of extended periods of uncertainty without any communications from their servicer regarding the status of their application. Upon receiving any application for enrollment or recertification, borrowers would benefit from a timely determination by their servicer about whether the application is incomplete or deficient, and prompt notification to the borrower of either successful enrollment or recertification, or of specific issues requiring further action that render an application incomplete. For incomplete applications, borrowers would benefit from a clear list of exactly what information and documents would make the application complete, as well as a date by which the information must be received to ensure timely enrollment or recertification.

Borrowers would also benefit from additional targeted communications describing any change in payment level if they fail to complete the application, as well as the date on which such payment will be due.

The Bureau has also made available a sample IDR Fix It Form that consumers can provide to their servicer when attempting to navigate the enrollment and recertification process.[43] The IDR

---

[43] *See* Consumer Financial Protection Bureau, *Trying to enroll in an income-driven repayment plan? Avoid #ApplicationAbyss with our tips and resources* (Aug. 18, 2016), *available at* http://www.consumerfinance.gov/about-us/blog/trying-enroll-income-driven-repayment-plan-avoid-applicationabyss-our-tips-and-resources/.

Fix It Form may enable borrowers to more clearly understand the documentation and information necessary to successfully complete an application for enrollment or recertification.

## Public enrollment and recertification data

We have discussed in this report and in past publications that public data on student loan performance is limited when compared to available data on origination and performance of other consumer financial products, particularly mortgages.[44] This is particularly concerning given that policies and performance across servicers regarding IDR plan enrollment and recertification vary.[45] Borrowers, market participants, and regulators would all benefit from the periodic publication of identifiable, servicer-level data related to:

- Servicer-level performance data, including metrics on IDR plan enrollment, recertification, utilization of forbearance, and the share of borrowers making partial financial hardship payments;

- Servicer-level data on certain practices related to IDR plans, including overall rates of recertification, on-time recertification, and late recertification; average time borrowers filed for recertification (average number of days prior to the end of a borrower's 12-month IDR payment cycle); number of days of forbearance prior to recertification; recertification of income; and utilization of alternative documentation of income;

- Servicer-level performance data on the number of days it takes to enroll borrowers in IDR plans, and the number of days borrowers are in administrative forbearance and the

---

[44] *See, e.g.*, Consumer Financial Protection Bureau, *2015 Annual Report of the CFPB Student Loan Ombudsman* (October 2015), *available at* http://files.consumerfinance.gov/f/201510_cfpb_annual-report-of-the-cfpb-student-loan-ombudsman.pdf.

[45] Id.

33

number of days borrowers spend in voluntary forbearance while awaiting IDR plan enrollment;

- Servicer-level approval rates (borrowers who receive at least one bill for an income-driven payment under any plan) and denial rates (applications that are not approved due to the criteria discussed in the preceding recommendation) for borrowers seeking enrollment in IDR plans; and

- Servicer-level performance data on borrower delinquencies and defaults following IDR plan enrollment and recertification denial, as defined above.

Policymakers may also wish to consider whether there is an opportunity to aggregate and publish servicer-specific data on a periodic basis in order to facilitate comparison in performance among student loan servicers. Last month, the Department of Education directed Federal Student Aid to implement a series of servicer-level public "dashboards."[46] The "Repayment Plan Dashboard" and "Consumer Protection Dashboard" included in this policy direction can serve as a potential framework for policymakers considering immediate action. In recent months, policymakers and market participants have placed renewed emphasis on expanding IDR utilization amid continued reports of challenges for borrowers seeking to enroll or recertify. Immediate publication of robust performance metrics can better position policymakers and market participants to target resources to assist consumers and can inform future initiatives to establish industrywide standards for the servicing of student loans.

---

[46] *See supra* note 12.

# 5. Contact information

*To reach the CFPB's Student Loan Ombudsman:*

**By email**      students@cfpb.gov

**By mail**      Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552

*To submit a complaint:*

**Online**      consumerfinance.gov/complaint

**By phone**      180+ languages, M-F 8am-8pm EST
Toll-Free: (855) 411-CFPB (2372)
TTY/TDD: (855) 729-CFPB (2372)

**By mail**      Consumer Financial Protection Bureau
PO Box 4503
Iowa City, Iowa 52244

**By fax**      (855) 237-2392

*Press and media requests*

**By email**      press@consumerfinance.gov

*Congressional inquiries*

**By phone**      (202) 435-7960

*Additional resources to assist student loan borrowers*

**Repay Student Debt web tool**
http://www.consumerfinance.gov/paying-for-college/repay-student-debt

**Paying for College suite of tools**
www.consumerfinance.gov/paying-for-college/

**Ask CFPB**
http://www.consumerfinance.gov/askcfpb/

35

APPENDIX

# Income-Driven Repayment Application Fix It Form

The *Income-Driven Repayment Application Fix It Form* (IDR Fix It Form) is designed to facilitate accurate and actionable communications between a servicer and borrower regarding the status of a borrower's application for enrollment in or recertification of income and family size under an IDR plan. This IDR Fix It Form may be particularly helpful for borrowers seeking to enroll in an IDR plan who must submit Alternative Documentation of Income (ADOI) or provide a written attestation that they have no income.

**INCOME-DRIVEN REPAYMENT APPLICATION FIX IT FORM**

## Borrower information (to be provided by student loan borrower)

| Please provide your full name and account information | FIRST NAME | LAST NAME | SUFFIX |
|---|---|---|---|
| | STUDENT LOAN ACCOUNT NUMBER | | |

**Borrower requests servicer fill out this form and return within 10 business days**

*If this timeline does not permit the timely processing of a completed application prior to the borrower's annual deadline (if applicable), servicer should contact the borrower at _____*

## Application status (to be completed by servicer)

| | |
|---|---|
| ○ Accepted | Your new monthly payment amount of _____ will be due on _____ No further action is required from you at this time. **This is not a bill.** Your bill or automatic debit will reflect your new monthly payment amount beginning _____ |
| ○ Denied | ☐ Loans are ineligible for requested plan ☐ Your payment under your requested plan would be higher than your payment under a standard plan *If either of the above options are checked, see attachment for other repayment plans and an estimate of your payments under these plans* ☐ Borrower did not respond within 60 days to request for more information |
| ○ Incomplete | ❶ **You need to provide the information and documents listed on the following page.** You can upload these documents at _____ or send by U.S. Mail: |

37

**INCOME-DRIVEN REPAYMENT APPLICATION FIX IT FORM**

❶ **Borrower application is incomplete**

Borrower should provide the following information to the servicer to complete the IDR application.

1   **Frequency of pay is not provided (weekly, bi-weekly monthly, etc.)**          ○ YES    ○ NO

   *Borrower can call _____ to provide this information by phone*

2   **Income documentation is out of date**          ○ YES    ○ NO

3   **Missing signature**          ○ YES    ○ NO

4   **Other missing information**          ○ YES    ○ NO

   ☐ *Borrower can call _____ to provide this information by phone*

Servicer should provide an explanation for questions 1-4:

SERVICER RECEIVED THIS FORM ON:          SERVICER RETURNED THIS COMPLETED FORM TO BORROWER ON:

☐☐ – ☐☐ – ☐☐☐☐          ☐☐ – ☐☐ – ☐☐☐☐